---------------------------------------------------x

In re                         :    Chapter 11

                             :

RathGibson, Inc., et al.,[1]    :    Case No. 09 - _____ (    )

                             :

            Debtors.       :    Joint Administration Pending

---------------------------------------------------x

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364: (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, AND (B) GRANT SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (II) APPROVING USE OF CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF

RathGibson, Inc. ("RathGibson"), Greenville Tube Company ("Greenville") and

RGCH Holdings LLC ("Holdings," and together with RathGibson and Greenville, the

"Debtors"), three of the debtors and debtors in possession in the above-captioned cases, hereby

move for entry of an interim order and a final order, pursuant to sections 105(a), 361, 362, 363

and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004

and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local

Rules 2002-1, 4001-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of

the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), authorizing

the Debtors to enter into a debtor in possession financing facility, grant senior liens and

superpriority administrative expense status, use cash collateral, provide "adequate protection" to

---

[1] The last four digits of the taxpayer identification numbers of the Debtors in these chapter 11 cases follow in parentheses: (i) Greenville Tube Company (2689); (ii) RathGibson, Inc. (3283); (iii) RG Tube Holdings LLC (4080); and (iv) RGCH Holdings Corp. (9683). The Debtors' executive headquarters' address is 475 Half Day Road, Suite 210, Lincolnshire, Illinois 60069.

the Prepetition Secured Lender[2] and schedule a final hearing with respect to the relief requested herein, all as more fully described herein (the "Motion").  In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Jon M. Smith in Support of Chapter 11 Petitions and First Day Pleadings (the "Smith Declaration"), which was filed with the Court concurrently herewith.  In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## PRELIMINARY STATEMENT

1.      The Debtors intend to finance ongoing operations of their businesses during these cases through the use of cash collateral and the proceeds of a secured superpriority debtor in possession multiple draw term loan agreement (the "DIP Facility") in the amount of up to $80 million, structured as a non-amortizing multiple draw secured term loan facility, which will be provided by certain members of the Ad Hoc Noteholders Committee and/or their affiliates (together with their successors and permitted assigns, the "DIP Lenders").  In combination with cash generated from operations, the DIP Facility will provide the Debtors with much needed liquidity to fund their operating, working capital and capital expenditure needs during the course of these chapter 11 cases.

2.      The reasons supporting the Debtors' request for authority to obtain postpetition financing under the DIP Facility and to use Cash Collateral are compelling.  As explained in greater detail below, the DIP Facility will be used to provide liquidity for working capital and other general corporate purposes of the Debtors in the ordinary course of business, as well as the payment of bankruptcy-related expenses, including professional fees, subject to a

---

[2]      Unless indicated otherwise, capitalized terms used but not immediately defined herein have the meanings ascribed to them later in this Motion.

budget. The proposed DIP Facility will provide the Debtors with funds necessary for the operation of their businesses, including meeting their payroll and supplier obligations. Without the DIP Facility, the Debtors will be unable to fund their operations and their reorganization effort will fail before it begins. Further, the Debtors have an immediate need for use of Cash Collateral, without which they will be unable to operate their businesses.

   3.  By this Motion and pursuant to sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, the Debtors hereby seek entry of two orders necessary to satisfy two of the conditions to borrowing under that certain Secured Super-Priority Debtor in Possession Multiple Draw Term Loan Agreement (the "DIP Credit Agreement"):[3]

- **Interim Order:** On the date hereof or as soon as reasonably practical hereafter, the Debtors request that the Court hold and conduct an expedited interim hearing (the "Interim Hearing") to consider entry of an order entitled: Interim Order: (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Senior Liens and Superpriority Administrative Expense Status; (II) Approving Use of Cash Collateral of Prepetition Lender, (III) Granting Adequate Protection to Prepetition Lender, (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (V) Granting Related Relief (the "Interim Order"), the proposed form of which is annexed hereto as Exhibit A: (i) granting the Debtors the authority to (a) use Cash Collateral, and (b) borrow up to an aggregate of $65 million under the DIP Credit Agreement, on an interim basis and pay related fees and expenses, and (ii) scheduling a final hearing (the "Final Hearing") to consider the entry of the Final Order (as defined below); and

- **Final Order:**[4] Thereafter, the Debtors shall seek entry of an order, following the Final Hearing, granting final approval of, *inter alia*, the borrowings under the DIP Credit Agreement and related fees, and the use of Cash Collateral (as defined below) (the "Final Order," and together with the Interim Order, the "Orders").

---

[3] A copy of the DIP Credit Agreement in substantially final form is annexed to the Interim Order as Exhibit A (excluding schedules and exhibits).

[4] A copy of the proposed Final Order shall be filed under separate cover prior to the Final Hearing.

## JURISDICTION

4.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for relief requested herein are sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Rules 2002-1, 4001-1 and 6004-1.

## BACKGROUND

5.      On July 13, 2009 (the "Petition Date"), the Debtors and RG Tube Holdings LLC, the ultimate parent company of the Debtors, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors have requested that these chapter 11 cases be consolidated for procedural purposes. As of the date hereof, no official committee of unsecured creditors has been appointed.

6.      The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the Smith Declaration.

7.      The Debtors' prepetition debt and capital structure is comprised of: (i) a senior secured revolving credit facility with a maximum borrowing capacity of $90.0 million subject to borrowing base availability; (ii) 11.25% senior unsecured notes due February 15, 2014 in an aggregate principal amount of $200 million; and (iii) 13.5% unsecured pay-in-kind notes due June 15, 2015 in an original principal amount of $115 million.

4

(i)  **The Revolving Credit Facility**

8.  The Debtors are a party to that certain senior secured revolving credit agreement, dated as of February 7, 2006 (as amended, the "Prepetition Credit Agreement"), by and among RathGibson as borrower, and Holdings and Greenville as guarantors, the financial institutions who are parties to the credit agreement as lenders (the "Prepetition Secured Lender"), and General Electric Capital Corporation ("GECC"), as administrative agent (the "Prepetition Agent").[5]  The maximum borrowing capacity under the Prepetition Credit Agreement is $90 million, subject to borrowing base availability.  As of the Petition Date, the outstanding balance under the Credit Agreement was approximately $55.35 million (the "Prepetition Secured Debt"), which debt is secured by substantially all of the Debtors' real and personal property (collectively, "Prepetition Collateral"), including proceeds from collateral, bank accounts and all deposits therein, and all money, cash or cash equivalents of the Debtors (collectively, the "Cash Collateral").

(ii)  **Senior Notes**

9.  Pursuant to an indenture (the "Indenture"), dated as of February 7, 2006, RathGibson issued 11.25% Senior Notes (the "Senior Notes") due February 15, 2014 in an aggregate principal amount of $200 million.  The Senior Notes are unsecured and guaranteed by Greenville.  As of the Petition Date, the outstanding balance of the Senior Notes, including principal and accrued but unpaid interest, was approximately $209.1 million.

---

[5]  On June 19, 2009, (i) GECC and Wayzata Opportunities Fund II, L.P. ("Wayzata") entered into that certain Assignment and Transition Agency Agreement, and (ii) Natixis and Wayzata entered into that certain Assignment Agreement, pursuant to which GECC and Natixis, respectively, assigned their interests in and commitments as lenders under the Prepetition Credit Agreement to Wayzata.  Consequently, as of the Petition Date, Wayzata is the sole remaining Prepetition Secured Lender under the Prepetition Credit Agreement.  GECC continues to act as Prepetition Agent under the Prepetition Credit Documents.

(iii)    **The PIK Notes**

10.    Pursuant to that certain Credit Agreement dated as of June 15, 2007, among Holdings, the lenders that are a party thereto, and Credit Suisse as administrative agent, Holdings incurred $115 million of 13.5% payment-in-kind loans ("PIK Notes") due on June 15, 2015. As of the Petition Date, the outstanding balance of the PIK Notes was approximately $152.2 million. The other Debtors are not a party to any agreement related to the PIK Notes and do not have any obligations (including guarantee obligations) with respect to the PIK Notes.

(iv)    **Negotiations with Prepetition Secured Parties and Others**

11.    Prior to the Petition Date, the Debtors approached their then secured lenders under the Prepetition Credit Agreement regarding: (i) consensual use of cash collateral; and (ii) potential debtor in possession financing. The Debtors also, through Jefferies & Company, Inc. ("Jefferies"), their investment banker and financial advisor, solicited offers from several parties for the provision of postpetition debtor in possession financing. RathGibson solicited interest from approximately 20 parties, of which eight (8) entered into non-disclosure agreements, and provided such parties with an opportunity to perform due diligence.

12.    During this time, the liquidity was especially needed because the Debtors were close to covenant breaches under their credit agreement and had insufficient availability to meet their liabilities to trade creditors. Furthermore, the then prepetition secured lenders had begun sweeping the Debtors' accounts on a daily basis and either were slow to honor borrowing requests or denied RathGibson its right to so draw, despite availability under its borrowing base. At that time, the then Prepetition Secured Lenders also were conducting an inventory valuation, which upon conclusion may have left RathGibson with no borrowing base availability under the Credit Agreement. In light of the liquidity crisis facing the company, RathGibson's advisors

6

reached out to parties who may have had an interest in providing additional financing to RathGibson and required the submission of debtor in possession financing commitment letters, in a very short period of time, to provide funding to the Company to enable it to continue its operations.

13.    Several factors contributed to the Debtors' difficulty in obtaining additional financing proposals from other outside investors, including: (i) the currently depressed state of the capital markets; (ii) the scarcity of additional borrowing base assets to provide liquidity for an asset-based facility; (iii) the time available for due diligence and ultimate funding; and (iv) the unwillingness of any outside party contacted to sign up for a non-consensual priming facility.

14.    As a result of this urgent need for additional liquidity, on June 19, 2009, Wayzata Opportunities Fund II, L.P. ("Wayzata"), one of the DIP Lenders, took assignment of the prepetition secured debt and entered into an amendment to the Prepetition Credit Agreement to provide, among other things, the Debtors with much needed liquidity necessary to operate their businesses. Also on June 19, 2009, the Debtors negotiated a term sheet and signed a commitment letter (as amended and restated on June 30, 2009, the "Commitment Letter") with certain of the DIP Lenders outlining the terms and conditions of the DIP Facility.

15.    The DIP Facility was the only financing available to the Debtors on comparable terms to allow the Debtors to access sufficient working capital at this critical, early stage of their reorganization efforts in order to stabilize their businesses, mitigate any adverse effects attendant to the commencement of their chapter 11 cases and ensure their ongoing operations. In combination with cash generated from operations, the DIP Facility will provide the Debtors with much needed liquidity to fund their operating and capital expenditure needs

during the course of these cases. Most importantly, the credit provided under the DIP Facility will help restore the confidence of the Debtors' vendors, customers and key constituencies which, in turn, should encourage them to resume ongoing credit relationships with the Debtors and enhance the value of the Debtors' estates.

16.    Subsequent to execution of the Commitment Letter, in its capacity as a Prepetition Secured Lender, Wayzata entered into certain amendments to the Prepetition Credit Agreement to enable the Debtors to receive up to $14 million of additional liquidity. This additional liquidity was vital in order to permit the Debtors to avoid serious operational disruptions and/or the necessity for a sale or liquidation. Wayzata also agreed to provide the Debtors with additional time in which to proceed on a more orderly path to a pre-arranged chapter 11 filing.

17.    With the additional time and financing, and as required by the terms of the Commitment Letter, and after good faith negotiations, the Debtors negotiated the terms of a plan support agreement (the "Plan Support Agreement") with an informal committee (the "Ad Hoc Noteholders Committee") of the holders of the Senior Notes, which includes certain of the DIP Lenders, and a proposed plan of reorganization for the Debtors (the "Plan"), a copy of which is being filed concurrently with this Motion. The Plan is described in greater detail in the Smith Declaration.

18.    The Plan Support Agreement was executed by certain holders of the Senior Notes representing more than 73% in principal amount of the Senior Notes, each of whom agreed to vote in favor of the Plan if certain conditions are met in accordance with the terms of the Plan Support Agreement.

8

# TERMS AND CONDITIONS OF THE
# POSTPETITION FINANCING ARRANGEMENTS

A. **Highlighted Provisions under Bankruptcy Rule 4001 and Local Rule 4001-2**

19.    The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi), to the extent applicable, are set out at the following sections of the DIP Credit Agreement and the Interim Order:

(i)     Grant of Priority or a Lien on Property of the Estates.  DIP Credit Agreement § 4.18; Interim Order ¶¶ 10-12, 22.

(ii)    Adequate Protection or Priority for a Claim that Arose before the Commencement of the Cases.  Interim Order ¶¶ 6, 12

(iii)   Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose before the Commencement of the Cases. Interim Order ¶¶ C, D.

(iv)    Waiver or Modification of the Automatic Stay.  DIP Credit Agreement §§ 3.1(a), 9.2; Interim Order ¶ 22, 23.

(v)     Waiver or Modification of Authority to File a Plan, Seek an Extension of Time in which the Debtors have the Exclusive Right to File a Plan, Request Use of Cash Collateral or Request Authority to Obtain Credit.  Not applicable.

(vi)    Establishment of Deadlines for Filing a Plan of Reorganization, for Approval of a Disclosure Statement, for a Hearing on Confirmation or Entry of a Confirmation Order.  DIP Credit Agreement § 9.1(q)-(s).

(vii)   Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien. Not applicable.

(viii)  Release, Waiver or Limitation on any Claim or Cause of Action Belonging to the Estate.  DIP Credit Agreement § 3.1(a); Interim Order ¶¶ C, D, 14, 15.

(ix)    Indemnification of Any Entity.  DIP Credit Agreement §§ 12.5, 13.4; Interim Order ¶ 9.

DB02:8425871.3

068401.1001

(x)     Release, Waiver or Limitation on Rights under Section 506(c).
        DIP Credit Agreement §§ 3.1(a), 11.5; Interim Order ¶ 18.

(xi)    Liens Granted on Claims Arising Under Chapters 5 or 7.
        DIP Credit Agreement §§ 3.1(a), 11.1; Interim Order ¶ 11.

20.     In accordance with Local Rule 4001-2(a)(i)(A)-(G), the Debtors also draw the Court's attention to certain material provisions of the DIP Credit Agreement and in the relief set forth in the attached Interim Order:

(i)     Binding the Estate to Validity, Perfection or Amount of Secured Debt or Limitations on Investigation (Local Rule 4001-2(a)(i)(B)). DIP Credit Agreement § 3.1(a), Interim Order ¶¶ C, D, 14, 15.

(iii)   Waiver of Section 506(c) Surcharge (Local Rule 4001-2(a)(i)(C)). DIP Credit Agreement §§ 3.1(a), 11.5; Interim Order ¶ 18.

(iv)    Liens on Proceeds of Avoidance Actions (Local Rule 4001-2(a)(i)(D)). DIP Credit Agreement §§ 3.1(a), 11.1; Interim Order ¶ 11.

(v)     Roll-Over Provisions (Local Rule 4001-2(a)(i)(E)). DIP Credit Agreement § 4.12; Interim Order ¶ 5.

(vi)    Disparate Treatment of Professionals (Local Rule 4001-2(a)(i)(F)). Not applicable.

(vii)   Priming Lien (Local Rule 4001-2(a)(i)(G)). DIP Credit Agreement § 4.18(b)(iii); Interim Order ¶ 11.

21.     Although not specifically required to be highlighted pursuant to Local Rule 4001-2, the Debtors also draw the Court's attention to paragraph 29 of the Interim Order, which provides, in part, that any order dismissing these chapter 11 cases shall not be effective until sixty (60) days after it is entered in order to give the DIP Lenders and the Prepetition Secured Lender the opportunity to perfect their respective security interests and liens in the collateral under non-bankruptcy law and the procurement of waivers or consents from any landlord, tenant, mortgagee, bailee, warehouseman, licensor or similar party-in-interest.

10

22.     The provisions above were negotiated and are necessary for the Debtors to procure the financing made available under the DIP Credit Agreement in a sufficient amount and on a timely basis.

**B.    <u>Summary of Principal Terms of the DIP Credit Agreement</u>**

23.     The significant elements of the DIP Credit Agreement and the related documents to be executed in connection therewith and to which the DIP Credit Agreement refers (collectively, the "<u>DIP Credit Documents</u>") are as follows:[6]

| | |
|---|---|
| **Borrower:** | RathGibson (in such capacity, the "<u>Borrower</u>"). |
| **Guarantors:** | Greenville and Holdings (collectively, in such capacity, the "<u>Guarantors</u>"). |
| **Administrative Agent:** | Wilmington Trust FSB (in such capacity, the "<u>Administrative Agent</u>"). |
| **DIP Lenders:** | Certain members of the Ad Hoc Noteholders Committee and/or their affiliates (collectively, in such capacities, the "<u>DIP Lenders</u>"). |
| **Type and Amount of the DIP Facility:** | A non-amortizing multiple draw super-priority secured term loan facility in an aggregate principal amount not to exceed $80,000,000 (the DIP Lenders' commitment under the DIP Facility, the "<u>Commitment</u>"; the loans under the DIP Facility, the "<u>Loans</u>"; and the transactions contemplated by the Commitment Letter, the "<u>Transactions</u>"). The Loans under the DIP Facility may be incurred during the Availability Period (as defined below) as follows: (i) an initial drawing on the Closing Date (as defined below) in an aggregate principal amount of $65,000,000; and (ii) an additional drawing on the date of entry of the Final Order in an aggregate principal amount not to exceed $15,000,000 (the date of any draw under the DIP Facility pursuant to clause (i) or (ii), a "<u>Draw Date</u>"); <u>provided</u> that the amount of any Loan made or made available on any Draw Date |

---

[6]     This summary is qualified in its entirety by reference to the provisions of the DIP Credit Documents. The DIP Credit Documents will control in the event of any inconsistency between this motion and the DIP Credit Documents. Unless otherwise defined herein, capitalized terms used in this section have the meanings ascribed to them in the DIP Credit Documents.

shall be not greater than the amount permitted by the operating budget for the Debtors approved by the DIP Lenders, (the "Approved Budget") to be drawn on such date. Once repaid, the Loans incurred under the DIP Facility cannot be reborrowed in whole or in part.

**Availability Period:** Loans under the DIP Facility may be drawn during the period from and including the Closing Date up to but excluding the DIP Termination Date (as defined below) (such period, the "Availability Period"). The Commitment will expire at the end of the Availability Period.

**Closing Date:** The first date on which the conditions precedent to the initial loans as section forth in Section 3.1 of the DIP Credit Agreement are satisfied or waived, provided, that such date shall not be later than July 20, 2009.

**Maturity:** All obligations under the DIP Facility will be due and payable on the earliest of: (i) February 10, 2010 (the "Scheduled Termination Date"); (ii) the effective date of the Noteholder Plan (as defined below); (iii) the consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code; (iv) if the Final Order has not been entered, the date that is forty-five (45) days after the Petition Date; and (v) in accordance with Section 9.2 of the DIP Credit Agreement, the acceleration of the Loans and the termination of the Commitments upon the occurrence and continuation of an Event of Default (any such date, the "DIP Termination Date").

**Purpose:** Proceeds of the Loans under the DIP Facility may be used solely as follows: (a) to the extent set forth in the Approved Budget and in accordance with the terms of the Orders, for working capital, capital expenditures and other general corporate purposes of the Debtors not in contravention of any requirement of law or the DIP Credit Documents, (b) to the extent set forth in the Approved Budget, to pay certain costs and expenses of administration of these cases, including professional fees in accordance with the terms to be specified in the Orders, (c) to the extent set forth in the Approved Budget, to pay Adequate Protection Obligations to the extent permitted by the Orders, (d) solely with respect to a Loan drawn on the Closing Date under clause *(i)* under "Type & Amount of DIP Facility" above, to the extent authorized by the Bankruptcy Court pursuant to the First Day Orders, (x) to the extent necessary, for cash collateralization of letters of credit issued

and then outstanding under the Prepetition Credit Agreement in an amount not to exceed $1,050,000, and (y) for repayment of the then outstanding loans under the Prepetition Credit Agreement in an amount not to exceed $[_____] (the "Prepetition Revolver Repayment"), and (e) to the extent set forth in the Approved Budget, as long as no Default or Event of Default has occurred and is continuing, to pay any other Permitted Prepetition Claim Payments.

**Interest:**

Loans will bear interest, at the option of the Borrower, at one of the following rates, provided, that, Borrowings on the Closing Date shall consist entirely of Base Rate Loans:

(i)     the Applicable Margin (as defined below) plus the higher of: (i) the rate of interest announced from time to time in the *Wall Street Journal* as the prime lending rate in the United States; and (ii) the sum of (x) 0.50% per annum plus (y) the Federal Funds Rate (the "Base Rate"); provided, however, that in no event shall the Base Rate at any time be less than 3.00% per annum; or

(ii)    the Applicable Margin plus the current Eurodollar Rate obtained by dividing (a) the Eurodollar Base Rate by (b) a percentage equal to 100% minus the reserve percentage applicable three (3) Business Days before the first day of such Interest Period under regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, supplemental or other margin reserve requirements) for a member bank of the Federal Reserve System in New York City with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the Eurodollar Rate is determined) having a term equal to such Interest Period; provided, that in no event shall the Eurodollar Rate at any time be less than 2.00% per annum (the "Eurodollar Rate").

"Applicable Margin" means a rate per annum equal to (x) 7.50%, in the case of Base Rate Loans, and (y) 8.50%, in the case of Eurodollar Rate Loans.

**Default Interest:**

During the continuance of an Event of Default (as defined in the Credit Agreement), Loans will bear interest at an additional 2.00% per annum.

DB02:8425871.3

068401.1001

| | |
|---|---|
| **Mandatory Prepayments:** | Upon receipt by any Loan Party or any of its Subsidiaries of net proceeds from (i) asset sales (other than certain net proceeds permitted under <u>Section 8.4</u> of the DIP Credit Agreement), (ii) insurance proceeds in excess of $1 million, (iii) equity issuances (other than by the Loan Parties in the ordinary course to directors, officers and employees), and (iv) debt incurrence (other than permitted under <u>Section 8.1</u> of the DIP Credit Agreement), the Borrower shall immediately prepay the Loans in an amount equal to 100% of such net proceeds. |
| **Priority and Security under DIP Facility:** | All obligations of the Borrower and the Guarantors to the DIP Lenders and the Administrative Agent, including, without limitation, all principal and accrued interest, costs, fees and expenses or any exposure of a DIP Lender or any of its affiliates in respect of cash management or hedging transactions incurred on behalf of the Borrower or any Guarantor, shall be: |

(a)    Secured pursuant to section 364(c)(2) of the Bankruptcy Code, subject to the Carve-Out (defined below), by a first priority perfected lien on, and security interest in, all present and after acquired property of the Debtors not subject to a lien or security interest on the Petition Date, <u>provided</u> that any pledge in stock (or equivalent equity interest) of a foreign subsidiary of a Debtor shall be limited to 65% of the equity interest in each such foreign subsidiary if, in the judgment of the DIP Lenders, the pledge of more than 65% of such stock would have materially adverse tax consequences to the Debtors;

(b)    Secured pursuant to section 364(c)(3) of the Bankruptcy Code, subject to the Carve-Out, by a junior perfected lien on, and security interest in, all property of the Debtors that is subject to a perfected lien or security interest on the Petition Date or subject to a lien or security interest in existence on the Petition Date that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, a pledge by Holdings of 100% of its equity interest in the Borrower; <u>provided</u> that any pledge in stock (or equivalent equity interest) of a foreign subsidiary of a Debtor shall be limited to 65% of the equity interest in each such foreign subsidiary if, in the judgment of the DIP Lenders, the pledge of more than 65% of such stock would have materially adverse tax consequences to the Debtors; and

(c)     Secured pursuant to section 364(d)(1) of the Bankruptcy Code, subject to the Carve-Out and subject to the customary Permitted Liens defined in the DIP Credit Agreement, by a first priority, perfected senior priming lien on, and security interest in, all property of the Debtors that is subject to a perfected lien or security interest on the Petition Date securing the Prepetition Credit Agreement; and

(d)     Claims entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having a super-priority over any and all administrative expenses of the kind that are specified in section 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code ("Superpriority Claims"), subject only to a carve-out (the "Carve-Out") for: (i) following the occurrence of a Carve-Out Event (as defined below), the payment of allowed professional fees and disbursements incurred by the professionals retained by the Debtors and no more than one statutory committee appointed in these chapter 11 cases, in an aggregate amount not to exceed $2,500,000; (ii) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6); and (iii) any fees payable to the Clerk of the Bankruptcy Court and any agent thereof; in each case described in the foregoing clauses (i), (ii) and (iii) of this paragraph, incurred prior to the occurrence of a Carve-Out Event but not paid on or before the date of such Carve-Out Event, to the extent subsequently allowed by the Bankruptcy Court, in each case subject to the rights of the Administrative Agent, the DIP Lenders and any other party in interest to object to the allowance of any such fees and expenses.

Prior to a Carve-Out Event, the Debtors shall be permitted to pay compensation and reimbursement of fees and expenses authorized to be paid under sections 330 and 331 of the Bankruptcy Code or otherwise pursuant to an order of the Bankruptcy Court, as the same may be due and payable, and such payments shall not reduce the Carve-Out. Upon the first date on which the Administrative Agent is entitled to exercise remedies under the DIP Credit Agreement and provides written notice thereof to the Debtors (the "Carve-Out Event Notice"), the right of the Debtors to pay professional fees outside the Carve-Out shall terminate (a "Carve-Out Event"), and, after receipt of the Carve-Out Event Notice, the Debtors shall

DB02:8425871.3

068401.1001

provide immediate notice by facsimile to all professionals informing them that a Carve-Out Event has occurred and further advising them that the Debtors' ability to pay such professionals is subject to and limited by the Carve-Out.

Notwithstanding anything to the contrary therein, no portion of the Carve-Out may be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of actions against the Prepetition Secured Lender, the Prepetition Agent, the holders of the Senior Notes, the Indenture Trustee, the Administrative Agent or the DIP Lenders and/or challenging or raising any defenses to the prepetition obligations under the Prepetition Credit Agreement, the Indenture, the obligations under the DIP Credit Documents or the liens of the Prepetition Agent, the Prepetition Secured Lender, the Indenture Trustee, the holders of the Senior Notes, the Administrative Agent or the DIP Lenders.

The property referred to in the preceding clauses (a), (b) and (c) is collectively referred to as the "DIP Collateral" and shall include, without limitation, all assets (whether tangible, intangible, real, personal or mixed) of the Borrower and the Guarantors, whether now owned or hereafter acquired, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof.

|  |  |
|---|---|
| **Conditions Precedent to the Closing of the DIP Facility:** | Conditions precedent to initial borrowings under the DIP Facility are set forth in Section 3.1 of the DIP Credit Agreement and include, without limitation: (i) entry by this Court of the Interim Order in form and substance satisfactory to the DIP Lenders within three (3) business days of the Petition Date; (ii) the delivery of a duly executed DIP Credit Agreement and related DIP Credit Documents; (iii) the delivery of a plan support agreement executed by the Debtors, the DIP Lenders and certain holders of Senior Notes; (iv) the delivery of UCC search results; (v) the delivery of a 13-week budget; and (vi) the payment of all fees, costs and expenses required to be paid on or before the Closing Date (including all fees described in the Fee Letter). |
| **Conditions Precedent to** | Conditions precedent to each subsequent borrowing are set forth in Section 3.2 of the DIP Credit Agreement and include, without |

| | |
|---|---|
| **Loans on Each Draw Date:** | limitation: (i) the absence of any continuing default or event of default; (ii) the accuracy of all representations and warranties (in certain cases, in all material respects); (iii) the receipt of the Borrower's notice of borrowing; (iv) there being no legal bar to the DIP Lenders making the applicable loan; and (v) the Bankruptcy Court having entered the Final Order in form and substance satisfactory to the Requisite Lenders, and the Final Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed with out prior written consent of the Administrative Agent and the DIP Lenders. |
| **Representations and Warranties:** | Representations and warranties are usual and customary for transaction of this type, are contained in <u>Article IV</u> of the DIP Credit Agreement and include the following: |
| | Corporate existence; compliance with law; corporate power; authorization; enforceable obligations; ownership of company; subsidiaries; financial statements; material adverse effect; litigation; taxes; full disclosure; margin regulations; no burdensome restrictions; no defaults; Investment Company Act; Public Utility Holding Company Act; use of proceeds; insurance; labor matters; ERISA; environmental matters; title; real property; secured, super-priority obligations; accounts; no other liens; pledged collateral; intellectual property; waiver of any priming rights; and such other representations and warranties as are set forth in <u>Article IV</u> of the DIP Credit Agreement. |
| **Affirmative Covenants:** | Affirmative covenants that are usual and customary for transactions of this type, are contained in <u>Article VII</u> of the DIP Credit Agreement, and include the following: |
| | Preservation of legal existence, compliance with laws, conduct of business, payment of taxes, maintenance of insurance; access; keeping of books; maintenance of properties; application of proceeds; environmental; adherence to approved budget (subject to a maximum 10% variance on certain items); further assurances; tax; additional subsidiaries; certain post-closing obligations; landlords' agreements, mortgagee agreements, bailee letters and real estate purchases; and such other affirmative covenants as are set forth in <u>Article VII</u> of the DIP Credit Agreement. |

DB02:8425871.3

068401.1001

| | |
|---|---|
| **Negative Covenants:** | Negative covenants that are usual and customary for transactions of this type, are contained in <u>Article VIII</u> of the DIP Credit Agreement, and include the following: |
| | Indebtedness; liens; investments; sale of assets; restricted payments; restriction on fundamental changes; change in nature of business; transactions with affiliates; restrictions on subsidiary distributions; no new negative pledge; modification of constituent documents; accounting changes; fiscal year; margin regulations; operating leases; sale/leasebacks; modification, prepayment and cancellation of indebtedness; no speculative transactions; compliance with ERISA; environmental; super-priority claims; the Orders; Public Utility Holding Company Act; employee compensation; passive holding company covenant of the parent and the ultimate parent; reclamation claims; that RathGibson, Inc. and its subsidiaries may not make any payments to or investments in, incur indebtedness to, sell assets to, buy assets from, merge with, or pay indebtedness of Holdings; and such other negative covenants as are set forth in <u>Article VIII</u> of the DIP Credit Agreement. |
| **Financial Covenants:** | Financial covenants contained in <u>Article V</u> of the DIP Credit Agreement will apply to the Borrower and the Guarantors and include the following: |
| | (a) Maximum Capital Expenditures will be limited to $2.0 million; |
| | (b) Consolidated Liquidity will not be less than $2.0 million; and |
| | (c) Monthly Gross Sales must not be less than the amounts set forth in <u>Article V</u> of the DIP Credit Agreement. |
| **Financial Reporting Requirements:** | <u>Sections 6.1</u> and <u>6.6</u> of the DIP Credit Agreement contain financial reporting covenants including, without limitation, that the Borrower shall provide: (i) monthly consolidated financial statements of the Debtors and their subsidiaries within thirty (30) days of month-end; (ii) quarterly consolidated financial statements of the Debtors and their subsidiaries within forty-five (45) days of fiscal quarter-end; (iii) annual audited consolidated financial statements of the Debtors and their subsidiaries within ninety (90) days of fiscal year-end, certified with respect to such consolidated statements by independent certified public accountants acceptable to the DIP Lenders; (iv) copies of all |

reports of the Borrower filed with the Securities and Exchange Commission; and (v) on a weekly basis, (a) an updated rolling 13-week cash flow statement in form and substance satisfactory to the DIP Lenders, setting forth all receipts and disbursements on a weekly basis for the next succeeding 13-week period, including a line item specifying the projected amount of cash and outstanding Loans as of the end of each week covered thereby, and the related variance report, (b) an update on the monthly projections required under the DIP Credit Agreement presented on a monthly basis for each month remaining in Fiscal Year 2010, which Projections shall be in form and substance acceptable to the Requisite Lenders, and (c) an update to the Approved Budget required under the DIP Credit Agreement, which update shall be in form and substance acceptable to the Requisite Lenders.

**Reporting Covenants:** Sections 6.2 through 6.14 of the DIP Credit Agreement contain other customary reporting requirements for similar financings including, without limitation, with respect to default notices, litigation, asset sales, notices under Prepetition Credit Agreement, labor relations, tax returns, insurance, ERISA and pension matters, and environmental matters (collectively with the financial reporting information described above, the "Information").

**Events of Default:** Article IX of the DIP Credit Agreement contains specified events of default (subject to cure periods and thresholds), including, without limitation, failure to make payments when due; noncompliance with covenants; breaches of representations and warranties; the DIP Credit Documents fail to create a perfected lien on any of the collateral; the existence of certain materially adverse employee benefit liabilities; impairment of DIP Credit Documents; the Debtors' cases shall be dismissed, suspended or (except with respect to Holdings) converted to cases under chapter 7 of the Bankruptcy Code; the Debtors seek or the Court approves payment of prepetition claims not authorized under the DIP Credit Agreement, relief from the automatic stay to permit foreclosure of assets; the consummation of a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; the Interim Order ceasing to be in effect and the Final Order not having been entered by such cessation; the Final Order not having been entered by 45 days after the Petition Date; the Final Order ceasing to be in full force and effect after its entry; the Debtors fail to comply with the terms of the Order; the Orders being vacated, supplemented, stayed, reversed, amended or

otherwise modified without the consent of the Requisite Lenders; the Court entering an order to appoint a trustee or an examiner with extended powers; a Material Adverse Effect; the Debtors shall fail to file the plan of reorganization negotiated with the Ad Hoc Noteholders Committee (the "Noteholders Plan") and related disclosure statement (the "Noteholders Plan Disclosure Statement"); failure to obtain approval of the Noteholders Plan Disclosure Statement within 60 days of the Petition Date; failure to confirm the Noteholders Plan within 105 days of the Petition Date; failure of the Effective Date to occur within 120 days of the Petition Date; termination or breach by the Debtors of the Plan Support Agreement that is not cured; and loss of exclusivity.

**Remedies:**

Section 9.2 of the DIP Credit Agreement provides that upon the occurrence and during the continuance of any Event of Default, without further order of, application to, or action by, the Bankruptcy Court, the Administrative Agent (a) may, and shall at the request of the Requisite Lenders, by notice to the Borrower, declare that all or any portion of the Commitments be terminated, whereupon the obligation of each DIP Lender to make any Loan shall immediately terminate, and/or (b) may, and shall at the request of the Requisite Lenders, by notice to the Borrower, declare the Loans, all interest thereon and all other amounts and Obligations payable under the DIP Credit Agreement to be forthwith due and payable, whereupon the Loans, all such interest and all such amounts and Obligations shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Loan Parties. In addition, subject solely to any requirement of the giving of notice required by the Orders (as described below), the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically vacated or lifted, as applicable, without further action or order of the Bankruptcy Court and the Administrative Agent and the DIP Lenders shall be entitled to exercise all of their respective rights and remedies under the Loan Documents and applicable law, including, without limitation, all rights and remedies with respect to the Collateral and the Guarantors; provided, however, that prior to exercising any setoff remedies, terminating the Borrower's right to use of cash collateral, or exercising any rights to freeze monies or balances in the Loan Parties' Accounts, the Administrative Agent shall be required to provide five (5) Business Days written notice to the Borrower (with a copy to the Borrower's bankruptcy counsel), counsel to the Committee, counsel to the

20

Prepetition Secured Lender and the U.S. Trustee.

**Indemnification:**  As set forth more fully in <u>Section 13.4</u> of the DIP Credit Agreement, the Debtors shall jointly and severally indemnify and hold harmless the Administrative Agent, each DIP Lender and each of their affiliates and each of the respective officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives of each (each, an "<u>Indemnified Party</u>") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to the DIP Credit Agreement, the DIP Credit Documents or the transactions contemplated thereby, or any use made or proposed to be made with the proceeds of the DIP Credit Agreement, whether or not such investigation, litigation or proceeding is brought by any Debtor or any of its subsidiaries, any shareholders or creditors of the foregoing, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the DIP Credit Documents are consummated, except to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's fraud, gross negligence or willful misconduct. No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's fraud, gross negligence or willful misconduct. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.

**Requisite Lenders:**  "<u>Requisite Lenders</u>" means, collectively, (a) on or before the last day of the Availability Period, Lenders (other than Non-Funding Lenders) having more than fifty percent (50%) of the aggregate amount of the Commitments of all Lenders (other than Non-Funding Lenders) or (b) after the last day of the Availability Period, Lenders (other than Non-Funding Lenders)

having more than fifty percent (50%) of aggregate outstanding principal amount of the Loans of all DIP Lenders (other than Non-Funding Lenders); <u>provided</u> that, for the avoidance of doubt, any Non-Funding Lender shall not be entitled to vote on any matters arising hereunder, and the portion of its Commitment and the Loans held by any such Non-Funding Lender shall be disregarded in determining whether the Requisite Lenders have approved or consented to any matters hereunder, including, without limitation, any matters requiring the approval or consent of the Requisite Lenders or unanimous consent of the DIP Lenders.

**Miscellaneous:**     <u>Article XIII</u> of the DIP Credit Agreement includes standard miscellaneous provisions, including, without limitation, provisions relating to amendments and waivers; assignments and participations; costs and expenses; indemnities; limitation of liability; right of set-off; sharing of payments; notices; no waiver; remedies; binding effect; governing law; submission to jurisdiction; service of process; wavier of jury trial; marshaling; payments set aside; and such other miscellaneous provisions as are set forth in <u>Article XIII</u>.

**Governing Law:**     Except as governed by the Bankruptcy Code, the State of New York.

## C.   <u>Use of Cash Collateral</u>

24.     During the ordinary course of operations, the Debtors generate Cash Collateral from the use of the Prepetition Collateral. The Debtors use Cash Collateral in the normal course of their business in order to continue to finance their operations, make essential payments, such as employee payroll, taxes and to purchase goods and services essential to their businesses. It is imperative that the Debtors obtain authority to use Cash Collateral subject to the terms of this Motion and the DIP Facility because the use of Cash Collateral is necessary in conjunction with the financing provided by the DIP Facility in order to fund the Debtors' working capital needs and for other general corporate purposes.

DB02:8425871.3

068401.1001

## ADEQUATE PROTECTION

25.     The Debtors and the DIP Lenders have agreed that the Prepetition Secured Lender should receive the following as adequate protection of their interests in the Prepetition Collateral, in an amount equal to the aggregate diminution in value of the Prepetition Secured Lender's Prepetition Collateral (collectively, the "<u>Adequate Protection Obligations</u>"):

| | |
|---|---|
| **Adequate Protection:** | As adequate protection for the use of the Prepetition Collateral securing the Prepetition Credit Agreement, the Prepetition Secured Lender will, until the occurrence of the Prepetition Revolver Repayment, receive (a) payments of cash interest on a current basis, calculated at the non-default interest rate under the Prepetition Credit Agreement as in effect on the Petition Date (without prejudice to the Prepetition Secured Lender's right to later assert claims for interest at the default rate), (b) payments in cash on a current basis, promptly, but in no event later than ten (10) days following receipt by the Borrower's Agent of an invoice therefor, of all reasonable fees, costs and expenses of the Prepetition Secured Lender's and the Prepetition Credit Agreement Agent's outside counsel (limited to one firm of outside counsel, plus any local counsel), financial advisors and other professional advisors and (c) replacement liens having a super-priority over any and all administrative expenses of the kind that are specified in Bankruptcy Code Section 503(b) or 507(b) or any other provisions of the Bankruptcy Code, in each case, of the same relative priority as their prepetition Liens to the extent of the post-petition diminution in value, if any, of the Prepetition Collateral; subject, in each case, to (i) the liens and super-priority claims granted to secure the Facility and (ii) the Carve-Out. |

26.     The Debtors believe the foregoing adequate protection package adequately protects the Prepetition Secured Lender.  In addition, the Prepetition Secured Lender consented to the foregoing Adequate Protection Obligations.  Therefore, the Debtors respectfully request that the Adequate Protection Obligations be approved.

DB02:8425871.3

068401.1001

## BASIS FOR RELIEF

### A.  Approval under Section 364(c) of the Bankruptcy Code

27.     The Debtors propose to obtain financing under the DIP Credit Agreement by providing security interests and liens as set forth above pursuant to sections 364(c) and (d) of the Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]...." 11 U.S.C. § 364(c).  Financing pursuant to section 364(c) of the Bankruptcy Code is appropriate when the trustee or debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

28.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

> (a)     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;
>
> (b)     the credit transaction is necessary to preserve the assets of the estate; and
>
> (c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

24

In re Ames Dep't Stores, 115 B.R. at 37-39; see also In re St. Mary Hospital, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); In re Crouse Group, Inc., 71 B.R. at 549.

29.     While the Debtors were in the process of negotiating the terms of the DIP Credit Agreement, the Debtors also attempted to identify other sources of postpetition financing to determine whether they could obtain debtor in possession financing on better terms. Based on current capital markets conditions and discussions with potential lenders, the Debtors determined that postpetition financing on an unsecured basis or on a junior priority basis to the Prepetition Secured Lender would be unobtainable in amounts necessary to fund the Debtors' operations during the course of these chapter 11 cases. Finally, given the Debtors' circumstances and the volatile conditions and lack of liquidity in the capital markets, the Debtors believe the terms of the DIP Facility are fair, reasonable and adequate, all as more fully set forth below.

B.     **Approval of Priming Liens and Adequate Protection under Section 364(d)**

30.     If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d). Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(a)     the trustee is unable to obtain credit otherwise; and

(b)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

31.     The Bankruptcy Code does not explicitly define "adequate protection." Section 361 of the Bankruptcy Code does, however, provide three nonexclusive examples of what may constitute "adequate protection" of an interest of an entity in property under sections 362, 363 or 364 of the Bankruptcy Code:

(a)     requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the…use…under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(b)     providing to such entity an additional or replacement lien to the extent that such. . . use . . . or grant results in a decrease in the value of such entity's interest in such property; or

(c)     granting such other relief…as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

32.     Similarly, the Bankruptcy Code does not expressly define the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under section 361, 363 and 364 of the Bankruptcy Code.  However, the Bankruptcy Code plainly contemplates that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property."  See 11 U.S.C. § 361.  Indeed, courts have repeatedly held that the purpose of adequate protection "is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."  In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); see also In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (same); Bank of New England v. BWL, Inc., 121 B.R. 413, 418 (D. Me. 1990) (same); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (focus of adequate protection "is

protection of the secured creditor from diminution in the value of its collateral during the reorganization process").

33.     The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis. See In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." Id. (quoting In re Beker Indus. Corp., 58 B.R. at 736).  The Debtors have concluded that financing comparable to that provided by the DIP Lenders under the DIP Credit Agreement is currently unobtainable.

34.     In accordance with section 364(d) of the Bankruptcy Code, and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the Prepetition Secured Lender with the Adequate Protection as described in paragraph 22 above, including: (a) adequate protection payments of interest under the Prepetition Credit Agreement; (b) adequate protection payments of reasonable attorneys fees costs and expenses; (c) superpriority administrative claims under section 507(b) of the Bankruptcy Code, to the extent of the postpetition diminution of the Prepetition Collateral; and (d) replacement liens, to the extent of the postpetition diminution of the Prepetition Collateral.  Adequate Protection payments of interest and fees are appropriate in instances such as the present one where the Prepetition Secured Lender is oversecured and entitled to such payments under the Prepetition Credit Agreement.  In addition, the superpriority claims and the replacement liens will only be granted if the use of cash collateral results in the diminution in value of the Prepetition Collateral, and only then to the extent of such diminution.  In addition, the Prepetition Secured

DB02:8425871.3

068401.1001

Lender has consented to such Adequate Protection. Therefore, the Adequate Protection is appropriate in these cases.

## C. Repayment of the Prepetition Secured Debt

35. The Debtors' agreement to the Prepetition Revolver Repayment should be approved pursuant to sections 363 and 105(a) of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In addition, section 105(a) of the Bankruptcy code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

36. The proposed use, sale or lease of property of the estate may be approved under section 363(b) of the Bankruptcy Code if it is supported by sound business justification. See In re Montgomery Ward, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions"). Although established in the context of a proposed sale, the "business judgment" standard has been applied in non-sale situations. See, e.g., Institutional Creditors of Continental Air Lines v. Continental Air Lines (In re Continental Air Lines), 780 F.2d 1223, 1226 (5th Cir. 1986) (court applied "business judgment" standard in context of proposed "use" of estate property). Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree which is in the interest of preserving or protecting the value of the Debtor's assets. See, e.g., In re Chinichian, 784 F.2d 1440, 1443 (9th Cir. 1986).

28

37.     The Prepetition Revolver Repayment is supported by sound business judgment as it will satisfy the Debtors' secured obligations under the Prepetition Credit Agreement.  As noted above, and as will be shown at the hearing on this Motion, the Debtors were unable to obtain any postpetition financing proposals superior to that of the DIP Lenders. In addition, one of the primary DIP Lenders is the same entity as the Prepetition Secured Lender, and the repayment of the Prepetition Secured Debt was a condition to such DIP Lender's willingness to enter into the DIP Credit Agreement.  If the Prepetition Revolver Repayment is not approved, the DIP Lenders will not be required to close on the DIP Credit Agreement, thereby leaving the Debtors without financing and an inability to reorganize.  Indeed, without postpetition financing, the Debtors would be unable to operate their business as a going concern, which would significantly impair the value of the Debtors' assets and limit their ability to repay their debts and liabilities.[7]

38.     This Court has recently granted relief consistent with this Motion (including refinancing of prepetition secured debt) under similar circumstances in several cases. See, e.g., In re Dayton Superior Corp., Case No. 09-11351 (BLS) (Bankr. D. Del. Apr. 21, 2009); In re Vertis Holdings, Inc., Case No. 08-111460 (CSS) (Bankr. D. Del. July 16, 2008); In re Hoop Holdings, Inc., Case No. 08-10544 (BLS) (Bankr. D. Del. Apr. 16, 2008); In re Buffets Holdings, Inc., Case No. 08-10141 (MFW) (Bankr. D. Del. Feb. 22, 2008); In re Dura

---

[7]     As set forth in section 3.1(a) of the DIP Credit Agreement, the Interim Order establishes a deadline of the earlier of: (i) seventy-five (75) days from the Petition Date; and (ii) sixty (60) days from the appointment of an official unsecured creditors' committee for any statutorily appointed unsecured creditors' committee (and in the event that no unsecured creditors' committee is appointed, any party in interest (other than the Borrower and the Guarantors)) to bring any cause of action against the Prepetition Secured Lender or the Prepetition Senior Noteholders based on the Prepetition Credit Agreement or the Prepetition Senior Indenture, as applicable, or any acts or omissions of the Prepetition Secured Lender that occurred prior to the Petition Date.

<u>Automotive Systems, Inc.</u>, Case No. 06-11202 (KJC) (Bankr. D. Del. Nov. 21, 2006).

Consequently, the Debtors submit that repayment in full of the Prepetition Secured Debt is

appropriate in these cases.

D.      **Use of Cash Collateral**

      39.      Section 363 of the Bankruptcy Code governs the Debtors' use of property

of the estates.[8]  Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated
> under Section . . . 1108 . . . of this title and unless the court
> orders otherwise, the trustee may enter into transactions,
> including the sale or lease of property of the estate, in the
> ordinary course of business, without notice or a hearing,
> and may use property of the estate in the ordinary course of
> business without notice or a hearing.

11 U.S.C. § 363(c)(1).

      40.      Section 363(c)(2) of the Bankruptcy Code, however, provides an

exception with respect to "cash collateral" to the general grant of authority to use property of the

estate in the ordinary course set forth in section 363 of the Bankruptcy Code.  Specifically, a

trustee or debtor in possession may not use, sell, or lease "cash collateral" under subsection

(c)(1) of the Bankruptcy Code unless:

> (A)      each entity that has an interest in such collateral
> consents; or
>
> (B)      the court, after notice and a hearing, authorizes such
> use, sale, or lease in accordance with the provisions
> of [section 363 of the Bankruptcy Code].

11 U.S.C. § 363(c)(2).

---

[8]      Pursuant to section 1107 of the Bankruptcy Code, a debtor in possession has all of the rights and powers of
a trustee with respect to property of the estate, including the right to use property of the estate in
compliance with section 363 of the Bankruptcy Code.  <u>See</u> 11 U.S.C. § 1107(a).

41.     The Debtors submit that, under the circumstances here, their request to use Cash Collateral should be approved.  As set forth above, the Prepetition Secured Debt is secured by the Prepetition Collateral on all of the Debtors' assets, including Cash Collateral.  Thus, the Debtors do not have any unencumbered cash.  Consequently, the Debtors have an immediate need for the use of Cash Collateral at this time, without which they will be unable to operate their businesses.  Moreover, the Prepetition Secured Lender and the DIP Lenders have consented to the use of Cash Collateral provided that the relief requested herein is granted.

E.      **No Comparable Alternative to the DIP Facility is Currently Available**

42.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.  See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  The Debtors, through their financial advisors, contacted approximately 20 potential third party lenders who have historically been active in the debtor in possession financing market.  In the light of, among other things, the current debt capital markets conditions, the current economic conditions and their adverse impact on the tubing industry, steel and other required commodities' prices, only the former prepetition lenders (prior to the assignment of the Prepetition Secured Debt) had extended a proposed debtor in possession financing term sheet, which was subject to obtaining debtor in possession financing on a junior basis and which junior financing was intended to be used to payoff the former prepetition lenders.  While one entity had delivered a term sheet to the Debtors with a proposal to provide debtor in possession financing on a junior basis to the then Prepetition Secured Lender, once the assignment of the Prepetition Secured Debt was effected, the initial offer, which was missing certain essential terms, would not have provided the Debtors with

31

sufficient liquidity to operate during the course of these cases. Because the Debtors were experiencing a severe liquidity crisis prior to the assignment of the Prepetition Secured Debt and they did not receive any superior offers to the DIP Lenders, the Debtors had no viable alternative than to enter into the commitment letter with the DIP Lenders.

43. Ultimately, the Debtors determined, based on the current state of the credit markets combined with their advisers' discussions with other potential lending sources, that the financing provided under the DIP Facility was the only financing available on comparable terms. This determination was informed by, among other considerations: (i) that one of the DIP Lenders was willing to become the Prepetition Secured Lender and extend additional needed credit (in the amount of $13.35 million) to the Debtors prior to the Petition Date to avoid serious operational disruptions and/or the necessity for a potential orderly chapter 11 or chapter 7 liquidation; (ii) the ability of the Debtors to procure a commitment up to $80 million; and (iii) the lack of superior debtor in possession financing proposals from third-parties. Thus, in addition to evidence to be introduced at the Interim Hearing if necessary, the Debtors submit that the requirement of sections 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors is satisfied.

F. **The DIP Credit Agreement Terms are Fair, Reasonable and Adequate**

44. The proposed terms of the DIP Credit Agreement are fair, reasonable and adequate given the severe credit crisis that exists in today's market as well as the severe liquidity crisis that the Debtors' otherwise would be faced with, and the fact that such terms neither: (i) tilt the conduct of these chapter 11 cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; nor (ii) prevent motions by parties-in-interest from being decided on their merits.

DB02:8425871.3 068401.1001

45.     The proposed DIP Credit Agreement provides that the security interests and administrative expense claims granted to the DIP Lenders are subject to the Carve-Out. In In re Ames Dep't Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. Id. at 40.

46.     Likewise, the various fees and charges required by the DIP Lenders, including those outlined in the Fee Letter, were necessary to secure their agreement to provide the financing notwithstanding the volatility that exists in today's capital markets.[9] The terms and conditions of the DIP Credit Agreement were negotiated by the parties in good faith and at arm's length, and are fair and reasonable under the circumstances. Accordingly, the DIP Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of such agreement.

G.     **The Section 506(c) Waiver in the Final Order Should Be Approved**

47.     The Court should approve the Debtors' waiver, in the Final Order, of any right to surcharge the DIP Collateral. Such waivers and provisions are standard and customary under financings between sophisticated parties. As one court noted in discussing the later enforceability of such waivers, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)." In re Molten Metal Technology, Inc., 244 B.R. 515, 527 (Bankr. D. Mass. 2000). See also In re Nutri/System of

---

[9]     Concurrently herewith, the Debtors are filing a motion to file the Fee Letter under seal.

Florida Assocs., 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor in possession financing); In re Telesphere Communications, Inc., 179 B.R. 544, 549 (Bank. N.D. Ill. 1994) (approving settlement between debtor and certain lenders wherein debtor waived certain rights — including 506(c) rights — against the lenders in exchange for valuable consideration).

48.     The waiver of surcharge rights is particularly appropriate where, as here, it is tied to the benefit to be received from the Carve-Out. Under the DIP Facility, the Debtors agree to waive any rights to charge costs and expenses against the DIP Collateral except for the Carve-Out. In other words, the Debtors have waived the uncertainty of surcharge rights in exchange for the valuable and predictable rights granted to the Debtors' other estate professionals under the Carve-Out. See In re Lunan Family Restaurants Ltd. P'ship, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that [(1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the secured creditor was the party primarily benefited by the expenditure].") (citing In re Flagstaff, 739 F.2d 73, 77 (2d Cir. 1984) and New Orleans Public Service Inc. v. Delta Towers, Ltd. (In re Delta Towers), 112 B.R. 811, 815 (E.D. La. 1990), rev'd on other grounds sub nom., In re Delta Towers, 924 F.2d 74 (5th Cir. 1991).

## H.     **Modification of Automatic Stay**

49.     The DIP Facility contemplates a modification of the automatic stay to the extent applicable and necessary, to permit the parties to implement the terms of the Orders and, upon the occurrence and during the continuance of an event of default under the DIP Credit Agreement, to exercise all rights and remedies in the DIP Credit Agreement as set forth in the Interim Order subject the requirement that the Administrative Agent provide five (5) business

DB02:8425871.3

068401.1001

days written notice to the Borrower, the Debtors' counsel, counsel to the Committee, counsel to the Prepetition Secured Lender and the U.S. Trustee. Provisions of this kind are standard in debtor in possession financing and are reasonable under the circumstances.

## I. **Interim Approval Should Be Granted**

50.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

51.     The Debtors request that the Court hold and conduct the Interim Hearing to consider entry of the Interim Order authorizing the Debtors from and after entry of the Interim Order until the Final Hearing to borrow an amount sufficient to fund operating expenses and to use Cash Collateral. This relief will enable the Debtors to operate their business in a manner that will permit them to preserve and maximize value and therefore avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

52.     Pending entry of the Final Order, the Debtors will require $65 million in available financing in order to payoff the outstanding and unpaid obligations under the Prepetition Credit Agreement and provide for the working capital needs of the Debtors (as set forth in the Approved Budget). Such interim availability will avoid a disruption in the Debtors' operations pending the Final Hearing and will provide the Debtors' customers, vendors and employees with the level of confidence necessary to continue operating.

J.     **Notice Procedures and the Final Hearing**

53.     Pursuant to Local Rule 4001-2(c), the Final Order may only be entered after notice and a hearing and the Debtors may not schedule a hearing to consider the Final Order until at least ten (10) days after the organizational meeting of the creditors' committee. The Debtors shall, within three (3) business days of the entry of the Interim Order by the Court, serve by overnight mail, a copy of the Interim Order and a notice of the Final Hearing (the "Final Hearing Notice") to consider entry of the Final Order on the date established by the Court.

54.     Any party in interest objecting to the relief sought at the Final Hearing shall serve and file objections, which objections shall: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; and (iii) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware no later than five (5) business days before the Final Hearing and served upon the following parties so as to be received not less than five (5) business days before the Final Hearing: (a) counsel to the Debtors, (i) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attn: Paul V. Shalhoub, Esq. and Robin Spigel, Esq. and (ii) Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, Attn: Robert S. Brady, Esq. and Matthew B. Lunn, Esq.; (b) RathGibson, Inc., 475 Half Day Road, Suite 210, Lincolnshire, Illinois 60069, Attn: Jon M. Smith; (c) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Jane M. Leamy, Esq.; (d) counsel to the Prepetition Secured Lender, DIP Lenders and Administrative Agent, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York, 10038, Attn: Kristopher M. Hansen, Esq. and Jayme T. Goldstein, Esq.; and (e) counsel to any statutory committee appointed in these chapter 11 cases.

DB02:8425871.3          068401.1001

55.     The Debtors respectfully request that the Court schedule the Final Hearing on this Motion prior to the date that is forty-five (45) days after the Petition Date, as the DIP Lenders' commitment will terminate unless the Final Order is entered by that date. Such relief is necessary in order to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to the Debtors' respective estates.

## NOTICE

56.     Notice of this Motion will be given to: (a) the United States Trustee for the District of Delaware; (b) counsel to the agent for the Prepetition Secured Lender; (c) counsel to the Administrative Agent and the Ad Hoc Noteholders Committee; (d) the indenture trustee for the Senior Notes; (e) the agent for the PIK Notes; and (f) each of the Debtors' twenty (20) largest unsecured creditors. The Debtors submit that, under the circumstances, no other or further notice is required except as set forth in the Interim Order.

57.     No previous motion for the relief sought herein has been made to this or any other Court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

DB02:8425871.3                                   068401.1001

## CONCLUSION

WHEREFORE, the Debtors respectfully request (i) entry of an order substantially in the form of the proposed Interim Order annexed hereto as Exhibit A; (ii) after the Final Hearing, entry of the Final Order substantially in the form that shall be filed with the Court; and (iii) such other and further relief as is just.

Dated: Wilmington, Delaware
July 13, 2009

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

- and -

WILLKIE FARR & GALLAGHER LLP
Marc Abrams
Paul V. Shalhoub
Robin Spigel
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

Proposed Co-Counsel for Debtors and
Debtors in Possession

38

# EXHIBIT A

## Proposed Interim Order

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------x

| | |
|---|---|
| In re | : Chapter 11 |
| | : |
| RathGibson, Inc., <u>et al.</u>,[1] | : Case No. 09-_____ (    ) |
| | : |
| Debtors. | : Joint Administration Pending |
| | **Ref. Docket No. _____** |

----------------------------------------------------x

**INTERIM ORDER: (I)  PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) GRANT SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (II) APPROVING USE OF CASH COLLATERAL OF PREPETITION LENDER; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDER; (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND (V) GRANTING RELATED RELIEF**

This matter is before the Court on the motion dated June 30, 2009 (the "<u>Motion</u>")[2] of RathGibson, Inc. ("<u>RathGibson</u>" or the "<u>Borrower</u>"), Greenville Tube Company ("<u>Greenville</u>") and RGCH Holdings Corp. ("<u>RGCH</u>", and together with RathGibson and Greenville, the "<u>Debtors</u>"), three of the debtors and debtors-in-possession in the above-referenced chapter 11 cases (collectively, the "<u>Chapter 11 Cases</u>"), for entry of an interim order (this "<u>Interim Order</u>") and a final order (the "<u>Final Order</u>"), under sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "<u>Bankruptcy Rules</u>") and Rules 2002-1(b), 4001-1, 4001-2 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the

---

[1]  The last four digits of the taxpayer identification numbers of the Debtors in the above-captioned cases follow in parentheses: (i) Greenville Tube Company (2689); (ii) RathGibson, Inc. (3283); (iii) RG Tube Holdings LLC (4080); and (iv) RGCH Holdings Corp. (9683).  Such Debtors' executive headquarters' address is 475 Half Day Road, Suite 210, Lincolnshire, Illinois 60069.

[2]  All defined terms shall have the meaning ascribed to them in the Motion or the applicable DIP Documents (as defined herein) unless otherwise defined herein.

United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, among other things:

(1) authorization for RathGibson, to obtain secured postpetition financing (the "DIP Facility") pursuant to the terms and conditions of that certain Secured Super-priority Debtor-in-Possession Multiple Draw Term Loan Agreement, dated as of July 13, 2009, by and among RathGibson, as Borrower, Greenville and RGCH, as guarantors, Wilmington Trust Company FSB as Administrative Agent (in such capacity, the "DIP Agent") and the lenders from time to time party thereto (the "DIP Lenders", and together with the DIP Agent, the "DIP Parties"), substantially in the form attached hereto as Exhibit A (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "DIP Agreement," and together with any related certificates, agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) delivered pursuant to or in connection therewith (including the "Loan Documents" under and as defined therein), collectively the "DIP Documents");

(2) authorization for the Debtors to execute and enter into the DIP Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Documents, including, without limitation, the payment of all principal, interest, fees, expenses and other amounts payable under the DIP Documents as such amounts become due and payable;

(3) authorization for the Debtors to grant security interests, liens and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of

2

the Bankruptcy Code and priming liens pursuant to section 364(d)(1) of the Bankruptcy Code) to the DIP Agent, for the benefit of the DIP Parties, in the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, to secure all obligations of the Debtors under and with respect to the DIP Facility (collectively, the "DIP Obligations"), as more fully set forth in this Interim Order;

(4) authorization for the Debtors' use of Cash Collateral of the Prepetition Secured Parties (as defined herein) under the Prepetition Credit Documents (as defined herein), as provided herein, and the provision of adequate protection to the Prepetition Secured Parties for any Diminution in Value (as defined herein) of their interests in the Prepetition Collateral (as defined herein), including Cash Collateral, as set forth in Paragraph 12 below;

(5) authorization for the indefeasible repayment in full in cash of all Prepetition Secured Obligations (the date upon which the Prepetition Secured Obligations are indefeasibly paid in full in cash and no longer subject to objection, challenge, recharacterization, disgorgement or recovery being known as the "Prepetition Secured Obligations Paydown Date"), subject to the reservation of rights provided in Paragraph 15 below;

(6) an emergency interim hearing (the "Interim Hearing") on the Motion for this Court to consider entry of this Interim Order;

(7) the scheduling of a final hearing (the "Final Hearing") on the Motion for a date that is before the forty-fifth (45th) day after the Petition Date to consider entry

DB02:8425874.1 068401.1001

of a Final Order authorizing the borrowings under the DIP Facility on a final basis and approval of notice procedures with respect thereto; and

(8) modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order.

This Court having found that, under the circumstances, due and sufficient notice of the Motion and Interim Hearing was provided by the Debtors as set forth in Paragraph K below, and having held the Interim Hearing on July __, 2009 after considering all the pleadings filed with this Court and as further stated on the record at the Interim Hearing; [and this Court having overruled all unresolved objections to the relief requested in the Motion;] and upon the record made by the Debtors at the Interim Hearing and the Affidavit of Jon M. Smith, Chief Financial Officer of the Debtors in Support of Chapter 11 Petitions and First Day Motions, and after due deliberation and consideration and good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS**:

A.  On July 13, 2009 (the "Petition Date"), each Debtor filed a petition with this Court commencing a case under chapter 11 of the Bankruptcy Code. The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.  This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought here are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, and Rules

2002, 4001, 6004 and 9014 of the Bankruptcy Rules, and Local Rules 2002-1(b), 4001-1, 4001-2 and 6004-1.

C. Without prejudice to the rights of any other non-Debtor party-in-interest with standing (but subject to the limitations thereon described in Paragraph 15 below), the Debtors hereby admit, acknowledge, agree and stipulate that:

(i)     Pursuant to that certain Credit Agreement, dated as of February 7, 2006 (as amended on August 15, 2006, June 15, 2007, December 13, 2007, February 27, 2008, April 8, 2008, May 4, 2009, May 15, 2009, June 19, 2009 and June 30, 2009 and as in effect on the Petition Date, the "Prepetition Credit Agreement" and together with all loan and security documents related thereto, the "Prepetition Credit Documents"), by and among RathGibson, as borrower, the other parties designated as "Credit Parties" (as defined therein) party thereto, the lender party thereto (the "Prepetition Lender"),[3] General Electric Capital Corporation ("GECC"), as Administrative Agent (in such capacity and in the capacity of Collateral Agent under the security documents for the Prepetition Credit Agreement, the "Prepetition Agent", and together with the Prepetition Lender, the "Prepetition Secured Parties"), the Prepetition Lender provided a revolving credit facility to or for the benefit of the Borrower and the Credit Parties (the "Prepetition Revolving Credit Facility"). As of the Petition Date, the aggregate outstanding principal amount owed by the Debtors under the Prepetition Revolving Credit Facility was not less

---

[3]  On June 19, 2009, (i) GECC and Wayzata Opportunities Fund II, L.P. ("Wayzata"), entered into that certain Assignment and Transition Agency Agreement (the "GECC Assignment Agreement"), and (ii) Natixis and Wayzata entered into that certain Assignment Agreement (the "Natixis Assignment Agreement", and together with the GECC Assignment Agreement, the "Assignment Agreements"), pursuant to which GECC and Natixis, respectively, assigned their interests in and commitments as lenders under the Prepetition Credit Agreement to Wayzata. Consequently, as of the Petition Date, Wayzata is the sole remaining Prepetition Lender under the Prepetition Credit Agreement. GECC continues to act as Prepetition Agent under the Prepetition Credit Documents.

than $55,350,000 with the aggregate undrawn face amount of all letters of credit issued and outstanding under the Prepetition Credit Agreement being not less than $1,000,000 (collectively, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition Credit Documents, including but not limited to, accrued and unpaid interest, any reimbursement obligations (contingent or otherwise) in respect of letters of credit, any fees, expenses and disbursements), treasury, cash management, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the Borrower's or any other Credit Parties' obligations pursuant to the Prepetition Credit Documents, including all "Obligations" under and as defined in the Prepetition Credit Agreement, collectively the "Prepetition Secured Obligations");

(ii)     To secure the Prepetition Secured Obligations, the Borrowers granted to the Prepetition Secured Parties a first priority security interest in and lien upon (the "Prepetition Liens") substantially all of the assets of the Debtors, including without limitation, all "Collateral" under and as defined in the Prepetition Credit Documents (collectively, the "Prepetition Collateral");

(iii)     (a) the Prepetition Secured Obligations constitute legal, valid, enforceable and binding obligations of each of the Debtors; (b) no offsets, defenses or counterclaims to the Prepetition Secured Obligations exist; (c) no portion of the Prepetition Secured Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition Credit Documents are valid and enforceable by the Prepetition Secured

6

Parties against each of the Debtors; (e) the Prepetition Liens were perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected liens in and to the Prepetition Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and such liens had priority over any and all other liens on the Prepetition Collateral, subject only to certain liens otherwise expressly permitted by the Prepetition Credit Documents (to the extent any such permitted liens were legal, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date or thereafter pursuant to section 546(b) of the Bankruptcy Code, the "Permitted Liens"); (f) as of the Petition Date, the value of the Prepetition Collateral securing the Prepetition Secured Obligations exceeded the amount of the Prepetition Secured Obligations, and the Prepetition Secured Obligations constitute allowed secured claims against the Debtors' estates; and (g) the Debtors and their estates have no claim, objection, challenge or cause of action against the Prepetition Secured Parties or any of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or arising under or in connection with any of the Prepetition Credit Documents (or the transactions contemplated thereunder), the Prepetition Secured Obligations or the Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery; and (h) the

Assignment Agreements were negotiated in good faith, and the Debtors' entry into the Assignment Agreements prior to the Petition Date was proper.

D. Without prejudice to the rights of any other non-Debtor party-in-interest (but subject to the limitations thereon described in Paragraph 15 below), the Debtors hereby agree and stipulate that:

(i)      Pursuant to that certain indenture, dated as of February 7, 2006 (as supplemented pursuant to that certain First Supplemental Indenture dated as of August 15, 2006 and as in effect on the date hereof, the "Senior Notes Indenture"), by and between RathGibson, as issuer, and The Bank of New York, as indenture trustee (in such capacity, the "Senior Notes Indenture Trustee"), and Greenville, as guarantor, RathGibson issued the 11.25% Senior Notes due 2014 (the "Senior Notes" and the holders of such Senior Notes, the "Senior Noteholders", and together with the Senior Notes Indenture Trustee, the "Senior Notes Parties"). As of the Petition Date, approximately $200 million in aggregate principal amount of Senior Notes, plus accrued and unpaid interest with respect thereto and all reasonable fees, costs and expenses as provided under the Senior Notes Indenture (collectively, the "Senior Notes Obligations") was outstanding; and

(ii)      (a) the Senior Notes Obligations constitute legal, valid, enforceable and binding obligations of RathGibson, as issuer, and Greenville, as guarantor; (b) no offsets, defenses or counterclaims to the Senior Notes Obligations exist; (c) no portion of the Senior Notes Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Senior Notes Indenture is valid and enforceable by the Senior Notes Indenture Trustee

and the Senior Noteholders against each of RathGibson and Greenville; (e) the Senior Notes Obligations constitute allowed unsecured claims against the RathGibson's and Greenville's estates; and (f) the Debtors and their estates have no claim, objection, challenge or cause of action against the Senior Notes Parties or any of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with the Senior Notes Indenture or the transactions contemplated thereunder or the Senior Notes Obligations, including without limitation, any right to assert any disgorgement or recovery.

E.  Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Facility and use of Cash Collateral.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, pay their employees,  purchase and supply new inventory and otherwise finance their operations is essential to the Debtors' continued viability.  In addition, based on the record presented at the Interim Hearing: (i) the Debtors' critical need for financing is immediate and the entry of this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates; (ii) in the absence of the DIP Facility and use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur; and (iii) the preservation, maintenance and enhancement of the going

9

concern value of the Debtors are of the utmost significance and importance to a successful reorganization of the Debtors.

F. Given the Debtors' current financial condition, financing arrangements and capital structure, and the present state of the economy and the credit markets generally, the Debtors are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facility and the DIP Documents, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. New credit is unavailable to the Debtors without providing the DIP Agent for the benefit of the DIP Lenders the (i) DIP Superpriority Claims (as defined herein), and (ii) DIP Liens (as defined herein) in the DIP Collateral (as defined herein), as provided herein and in the DIP Documents.

G. Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Parties, and (iii) any credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Parties have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

H. An immediate and critical need exists for the Debtors to use the Cash Collateral (in addition to the DIP Facility) to continue to operate their businesses in the ordinary course, pay wages, maintain business relationship with vendors, suppliers and customers, make capital expenditures, make adequate protection payments, generally conduct their business

affairs so as to avoid immediate and irreparable harm to their estates and the value of their assets, and afford the Debtors adequate time to finalize and execute documents under the DIP Facility (subject to and within the limits imposed by the terms of this Interim Order).

I. The Prepetition Secured Parties have consented to the (i) financing arrangements contemplated by this Interim Order and the DIP Documents and (ii) Debtors' proposed use of Cash Collateral, on the terms and conditions set forth in this Interim Order. As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Parties and the Prepetition Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facility shall be used, in each case only in a manner consistent with the terms and conditions of the DIP Documents and in accordance with an Approved Budget (as defined herein), solely for (v) working capital, capital expenditures and for other general corporate purposes, (w) adequate protection payments, as provided for hereunder, (x) the permitted payment of costs of administration of the Chapter 11 Cases, (y) payment of such prepetition expenses as are consented to by the DIP Parties and approved by the Court, and (z) in connection with the Initial Draw (as defined herein) under the DIP Facility, the repayment in full in cash of all Prepetition Secured Obligations (including, to the extent necessary, for cash collateralization of letters of credit issued and then outstanding under the Prepetition Credit Agreement). The repayment in full in cash of the Prepetition Secured Obligations is necessary, as the Prepetition Secured Parties will not otherwise consent to the DIP Lenders extending the DIP Facility and credit to the Debtors under the DIP Documents and as provided hereunder, and the Prepetition Secured Parties have not otherwise consented to the use of their Cash Collateral or the subordination of their liens to the DIP Liens. The consent of the Prepetition Secured Parties is expressly limited to the postpetition financing being provided by

DB02:8425874.1

068401.1001

the DIP Lenders and the use of Cash Collateral (as contemplated by this Interim Order and the DIP Documents) and the provision of adequate protection herein, and shall not extend to any other postpetition financing or to any modified version of the DIP Facility or to any modified version of the use of Cash Collateral.

J. The Prepetition Secured Parties are each entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363 and 364 of the Bankruptcy Code, as set forth in Paragraph 12 below, for any diminution in the value of each of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from, among other things, the Debtors' use, sale or lease of such collateral, market value decline of such collateral, the imposition of the automatic stay, the priming (to the extent provided for herein) of the Prepetition Liens and the subordination to the Carve-Out (defined below) and the DIP Liens (as herein defined) (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

K. Telephonic, facsimile notice or overnight mail notice of this Interim Hearing and the proposed entry of this Interim Order has been provided to: (i) the twenty (20) largest unsecured creditors of each Debtor; (ii) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (iii) the Securities and Exchange Commission; (iv) counsel to the DIP Agent; (v) counsel to the Prepetition Agent; (vi) the Senior Notes Indenture Trustee; (vii) Credit Suisse, as Administrative Agent for the 13.25% pay-in-kind notes due 2015; (viii) all known parties asserting a lien against the Collateral (as reflected on schedule 8.2 of the DIP Facility); (ix) each of the financial institutions listed in the Debtors' Motion For Order Authorizing: (A) Continued Use Of The Debtors' Cash Management System And Procedures; (B) Maintenance And Continued Use Of Existing Bank Accounts; (C) A Waiver Of Certain

Operating Guidelines Relating To Bank Accounts; (D) Waiver Of The Requirements Of Section 345 Of The Bankruptcy Code On An Interim Basis; And (E) Continuation Of Intercompany Transactions And According Administrative Expense Status To Claims For Such Transactions; and (x) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or are required to receive notice under the Bankruptcy Rules (collectively, the "Notice Parties"). Requisite notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rule 4001, and no other notice need be provided for entry of this Interim Order.

L. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed. This Court concludes that entry of this Interim Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefore,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. <u>Approval of Interim Order</u>. The Motion is approved on the terms and conditions set forth in this Interim Order. Any objections that have not previously been withdrawn are hereby overruled. This Interim Order shall become effective immediately upon its entry.

DB02:8425874.1 068401.1001

2.	Approval of DIP Documents; Authority Thereunder.  The Debtors are

hereby authorized to enter into, and execute and deliver, the DIP Documents, including the DIP

Agreement, and such additional documents, instruments and agreements as may be required or

requested by the DIP Parties to implement the terms or effectuate the purposes of this Interim

Order and the DIP Documents.  The terms and conditions of the DIP Documents are hereby

approved and the Debtors are authorized to comply with and perform all of the terms and

conditions contained therein.

3.	Validity of DIP Documents.  Upon execution and delivery of the DIP

Documents, each of the DIP Documents shall constitute, and are hereby deemed to be, the legal,

valid and binding obligations of the Debtors party thereto, enforceable against each such Debtor

in accordance with its terms.  Loans advanced under the DIP Agreement until the Final Hearing

will be made to fund the Debtors' working capital and general corporate needs, in each case, in

the ordinary course of business to the extent permitted under the DIP Agreement, and to pay

such other amounts as are required or permitted to be paid pursuant to the DIP Agreement, this

Interim Order and any other orders of this Court (including, without limitation, subject to

paragraph 15 below, the indefeasible payment in full in cash of the Prepetition Secured

Obligations).  No obligation, payment, transfer or grant of security under the DIP Documents or

this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the

Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense,

reduction, setoff, recoupment or counterclaim.

4.	Authorization to Borrow; Use of Cash Collateral.  Upon entry of this

Interim Order, the Debtors are immediately authorized to borrow from the DIP Lenders under

the DIP Facility in an aggregate principal amount equal to the Prepetition Secured Obligations

plus an additional drawing, of up to $65 million (the "Initial Draw"), subject to the terms and conditions set forth in the DIP Documents, and this Interim Order. Subject to the terms and conditions of this Interim Order, the DIP Documents and in accordance with the Approved Budget, the Debtors are authorized to use Cash Collateral until the Termination Date.

5. **Use of Proceeds; Repayment of Prepetition Secured Obligations.** From and after the entry of this Interim Order, the Debtors shall use advances of credit under the DIP Facility only for the express purposes specifically set forth in the this Interim Order, the DIP Documents and in compliance with the Approved Budget. Immediately upon entry of this Interim Order, the Debtors are authorized to make the Initial Draw to, among other things, indefeasibly pay in full in cash the Prepetition Secured Obligations (including, without limitation, accrued and unpaid interest, fees, expenses, legal fees, disbursement and other amounts owing under the Prepetition Credit Documents that are contingent and unliquidated and subsequently become liquidated), subject to the reservation of rights contained in Paragraph 15 of this Interim Order. Upon the Prepetition Secured Obligations Paydown Date, the Prepetition Secured Obligations shall be deemed to be indefeasibly paid in full in cash and no longer subject to objection, challenge, recharacterization, disgorgement or recovery.

6. **Payment of Adequate Protection.** The Debtors are authorized to use the proceeds of the Loans, in part, to make certain adequate protection payments to the Prepetition Secured Parties, as provided for in Paragraph 12 of this Interim Order and the DIP Agreement.

7. **Budget.** (a) Attached hereto as **Exhibit B** is a 13-week budget (the "Initial Approved Budget") which reflects the Debtors' anticipated cumulative cash receipts and expenditures on a weekly basis and all necessary and required cumulative expenses which the

Debtors expect to incur during each week during the term of the Initial Approved Budget. The Initial Approved Budget may be amended, supplemented or otherwise modified from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) prepared by the Debtors in accordance with the terms and conditions of the DIP Agreement and approved in writing pursuant to the terms of the DIP Agreement by the DIP Parties (each such additional budget, a "Supplemental Approved Budget"), in each case, without further notice, motion or application to, order of, or hearing before this Court; provided, however, that the Debtors shall file copies of each Supplemental Approved Budget with the Court within five (5) business days of its approval by the DIP Agent. The aggregate, without duplication, of all items in the Initial Approved Budget and any Supplemental Approved Budgets shall constitute the "Approved Budget".

(b)     Budget Covenants. The Debtors acknowledge and agree that pursuant to the terms of the DIP Documents they are required, among other things, (x) to provide to the DIP Agent, so as actually to be received by 5:00 p.m. (New York time) on the third Business Day of each week, weekly variance reports for the preceding weekly period and on a cumulative basis from the Petition Date to the report date, comparing actual cash receipts and disbursements to amounts projected in the Approved Budget, in substantially the same form and detail as delivered on the Closing Date; (y) by 5:00 p.m. (New York time) on the third Business Day of each week from the Closing Date until the DIP Termination Date, to deliver to the DIP Agent an updated, "rolling" 13-week budget which sets forth by line item updated projected receipts and disbursements for the Debtors during the period commencing from the end of the previous week through and including thirteen weeks thereafter; provided that the Debtors shall still be subject to and be governed by the terms of the Approved Budget then in effect and the DIP Parties shall

16

have no obligation to fund to such updated "rolling budget" or permit the use of Cash Collateral with respect thereto until the date on which such updated budget shall constitute an Approved Budget; and (z) by no later than five (5) business days prior to the end of the period covered by the then applicable Approved Budget, to deliver to the DIP Parties a Supplemental Approved Budget. The Debtors acknowledge and agree that (i) the incurrence or payment by the Debtors of expenses (x) other than amounts in connection with the itemized amounts set forth in the Approved Budget and (y) in excess of the variances permitted by Section 7.11 of the DIP Agreement, or (ii) other violation of the terms and condition of this sub-paragraph (b), shall constitute a "Default" or "Event of Default" (each as defined in the DIP Agreement), as the case may be, as provided under the DIP Agreement.

8. <u>Payment of DIP Fees and Expenses</u>. The Debtors are hereby authorized and directed to pay upon demand all fees, costs, expenses and other amounts payable under the terms of the DIP Documents and all other reasonable, out-of-pocket fees, costs and expenses of the DIP Parties in accordance with the terms of the DIP Documents (including, without limitation, the reasonable, out-of-pocket prepetition and postpetition fees, costs and expenses of legal counsel, financial advisors and third-party appraisers and consultants advising the DIP Parties, and any other fees set forth in the Fee Letter, including the DIP Equity (to the extent applicable)), whether or not the transactions contemplated hereby are consummated. None of such fees, costs, expenses or other amounts shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, that copies of any such invoices (which invoices may be redacted to the extent necessary, in the DIP Parties' sole and absolute discretion, to delete any information that is confidential or subject to the attorney-

client privilege or attorney work product) shall be provided contemporaneously to the U.S. Trustee and counsel to any official unsecured creditors' committee appointed in these Chapter 11 Cases (the "Committee"), provided further, that the Court shall have jurisdiction to determine any dispute concerning such invoices. All such unpaid fees, costs, expenses and other amounts owed or payable to the DIP Parties shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Documents.

9.	Indemnification. The Debtors are hereby authorized to indemnify and hold harmless the DIP Parties (and each of their respective directors, officers, employees, agents, representatives, attorneys, consultants, advisors and controlling persons, and each of their successors and assigns) from and against any and all damages, losses, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses (including, without limitation, reasonable attorney's fees) incurred or required to be paid by an indemnified party of every nature and character arising out of or related to or in connection with the DIP Facility or the DIP Documents or the transactions contemplated thereby and by this Interim Order (including, without limitation, the exercise by the DIP Parties of discretionary rights granted under the DIP Facility), to the extent set forth in the DIP Documents and this Interim Order, provided, that the Debtors shall not have any obligation to indemnify and hold harmless the DIP Parties under this paragraph 9 with respect to any matter solely resulting from the fraud, gross negligence or willful misconduct of the indemnified DIP Party, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. All indemnities of the DIP Parties shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Documents.

DB02:8425874.1

068401.1001

10.     DIP Superpriority Claims.   In accordance with Bankruptcy Code section 364(c)(1), the DIP Obligations shall constitute claims (the "DIP Superpriority Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114 or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code; provided, however, that the DIP Superpriority Claims: (i) shall be subject to the Carve-Out (as defined herein); and (ii) shall not be payable from or have recourse to the proceeds of Avoidance Actions (as defined herein) unless approved by the Final Order.

11.     DIP Liens.  As security for the DIP Obligations, the DIP Parties are hereby granted (effective upon the date of this Interim Order, without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, lockbox or control agreements, financing statements, or any other instrument or otherwise) valid and perfected, and unavoidable security interests in, and liens upon (such security instruments and liens collectively, the "DIP Liens"), any and all present and after-acquired tangible and intangible property and assets of the Debtors and their estates, whether real or personal, of any nature whatsoever, including, without limitation:  (i) a pledge of 100% of the capital stock of each Debtor's domestic subsidiaries, including, without limitation, a pledge by RGCH of 100% of its equity interests in RathGibson; (ii) a pledge of the capital stock (or equivalent equity interest) of each of the foreign subsidiaries of the Debtors; provided, however, any such pledge in stock (or equivalent equity interest) of a foreign subsidiary of a Debtor shall be limited to 65% of the equity interest in each such foreign subsidiary if, in the judgment of the DIP Lenders, the

pledge of more than 65% of such stock would have materially adverse tax consequences to the Debtors; (iii) all cash and cash equivalents; (iv) all causes of action and claims (including, subject to entry of the Final Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code (the "Avoidance Actions")), whether pursuant to federal law or applicable state law, of the Debtors or their estates; and (v) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing (collectively, the "DIP Collateral"), as follows:

(a)     pursuant to section 364(c)(2) of the Bankruptcy Code, subject to the Carve-Out, a first priority, perfected lien and security interest upon all of the Debtors' right, title and interest in, to and under all DIP Collateral that is not otherwise encumbered by a validly perfected unavoidable security interest or lien on the Petition Date;

(b)     pursuant to section 364(c)(3) of the Bankruptcy Code, subject to the Carve-out, a junior, perfected lien and security interest (other than as set forth in clause (c) below) upon all of the Debtors' right, title and interest in, to and under all DIP Collateral which is subject to (i) any validly perfected unavoidable security interest or lien in existence as of the Petition Date that is not subject to section 552(a) of the Bankruptcy Code, or (ii) any valid security interest or lien perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code) that is not subject to section 552(a) of the Bankruptcy Code; and

(c)     pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority, senior, priming, perfected lien and security interest upon all of the Debtors'

right, title and interest in, to and under the Prepetition Collateral, subject only to (i) the Carve-Out, and (ii) a valid perfected lien that is a "Customary Permitted Lien" (as defined in the DIP Agreement) and expressly permitted in the DIP Agreement to be senior to the DIP Liens granted to the DIP Parties in this Interim Order to secure the DIP Obligations.

12. <u>Prepetition Secured Credit Facility Adequate Protection</u>. As adequate protection of the Prepetition Liens of the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in Value of such Prepetition Liens in the Prepetition Collateral on account of, among other things: (i) the provisions of this Interim Order granting first priority priming liens on such Prepetition Collateral to the DIP Parties; (ii) the Debtors' use of Cash Collateral; (iii) the use, sale or lease of any other Prepetition Collateral, or the market value decline of collateral; (iv) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code; or (v) otherwise, pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code, the Prepetition Secured Parties are hereby granted, solely to the extent of the Diminution in Value of the Prepetition Liens in the Prepetition Collateral from and after the Petition Date and until the date upon which the Prepetition Secured Obligations are paid in full in cash:

(a) the payment of cash interest on a current basis, calculated at the non-default rate under the Prepetition Credit Agreement (without prejudice to the right of the Prepetition Secured Parties to later assert claims for interest at the default rate);

(b) payments in cash, promptly, but in no event later than ten (10) days following receipt by the Debtors of any invoice therefor, of (i) the reasonable fees, costs and expenses of Stroock & Stroock & Lavan LLP ("<u>Stroock</u>") and Richards, Layton &

Finger, P.C. ("RLF") as legal counsel to the Prepetition Lender, and (ii) the reasonable fees, costs, and expenses, including without limitation, legal and other professionals' fees and expenses, whether incurred before or after the Petition Date, of the Prepetition Agent, as required under the Prepetition Credit Documents; provided, however, that none of such fees, costs and expenses of Stroock, RLF or the Prepetition Agent as adequate protection payments hereunder shall be subject to approval by this Court or the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided further, however, that the Court shall have jurisdiction to determine any dispute concerning such invoices. Copies of any such invoices (redacted to remove confidential or attorney-client privileged information) shall contemporaneously be provided to the U.S. Trustee and any Committee;

(c) continuing valid, binding, enforceable, unavoidable and fully perfected post-petition replacement liens on and security interests in, subject to the Carve-Out and the DIP Liens in the DIP Collateral (collectively, the "Prepetition Lender Replacement Liens"); and

(d) superpriority administrative expense claims (the "Prepetition Lender Superpriority Claims") under sections 503 and 507 of the Bankruptcy Code against the Debtors' estates to the extent that the Prepetition Secured Lender Replacement Liens do not adequately protect against the Diminution In Value of the Prepetition Liens, which Prepetition Lender Superpriority Claims, if any, shall (subject only to the Carve-Out and the DIP Superpriority Claims, and which shall not be payable from or have recourse to the proceeds of Avoidance Actions unless approved by the Final Order) have priority in payment over any and all administrative expenses of the kinds

specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code;

provided, however, that in the event the Prepetition Secured Obligations are paid in full in cash, the adequate protection to be provided to the Prepetition Secured Parties pursuant to this Paragraph 12, with the exception of the adequate protection provided for in Paragraph 12(b), shall cease. With respect to the adequate protection to be provided to the Prepetition Secured Parties pursuant to this Paragraph 12(b) after the payment in full in cash of the Prepetition Secured Obligations, such amounts shall continue to be paid to the extent they arise from services provided in connection with any action or investigation regarding the Prepetition Secured Obligation until an action is adjudicated in a manner adverse to the Prepetition Secured Parties pursuant to a final order. In the event that any portion of the Prepetition Secured Obligations is ordered by the Bankruptcy Court to be reinstated or the proceeds of the repayment thereof are disgorged (in either instance solely to the extent that the Prepetition Secured Lenders hold secured claims), for so long as such portion of the Prepetition Secured Obligations remains outstanding, the adequate protection provided for in this Paragraph 12 shall be reinstated with respect to such outstanding Prepetition Secured Obligations until the Prepetition Secured Obligations Paydown Date as if such payment or repayment thereof had never occurred; provided further, however, that this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to seek additional forms of adequate protection at any time in the event that the adequate protection

DB02:8425874.1 068401.1001

provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective Prepetition Liens in the Prepetition Collateral during the Chapter 11 Cases.

13. <u>No Waiver of Prepetition Credit Agreement Provisions</u>. Except as otherwise specifically provided in this Interim Order, nothing contained in this Interim Order shall be deemed a waiver or constitute a consent to the modification of any provision contained in the Prepetition Credit Agreement by the Prepetition Secured Parties, including, but not limited to, the incurrence or issuance of any indebtedness by the Debtors, the incurrence of any lien in connection therewith or the making of any payment by the Debtors; <u>provided</u>, that the Debtors' compliance with the DIP Facility, including the incurrence of obligations thereunder and hereunder, shall not constitute a default under the Prepetition Credit Agreement.

14. <u>Carve-Out</u>. Upon the first date (the "<u>Carve-Out Event</u>") on which the DIP Agent is entitled to exercise remedies under the DIP Facility due to the occurrence of an Event of Default and provides written notice thereof to the Debtors (the "<u>Carve-Out Event Notice</u>"), to the extent unencumbered funds are not readily available on such date to pay administrative expenses in full, the DIP Liens, DIP Superpriority Claims, Prepetition Secured Lender Superpriority Claims, Prepetition Secured Lender Replacement Liens and Prepetition Liens shall be subject to the payment of (x) any unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Event by the professionals retained by the Debtors or the professionals retained by the Committee in these Chapter 11 Cases (collectively, the "<u>Professionals</u>") to the extent allowed by an order of this Court, <u>plus</u> (y) those fees, costs and expenses incurred by Professionals after the Carve-Out Event and subsequently allowed by order of this Court, provided that the amounts under (x) and (y) shall not in the aggregate exceed

$2,500,000, plus (z) fees pursuant to 28 U.S.C. § 1930 and to the Clerk of the Court (collectively, the "Carve-Out"); provided, however, that no portion of the Carve-Out, DIP Facility, DIP Collateral, Prepetition Collateral or Cash Collateral shall include, apply to, or be available for any fees, costs or expenses incurred by any party, including the Debtors or the Committee, in connection with: (i) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any of the DIP Parties, Prepetition Secured Parties or Senior Notes Parties, including, without limitation, (a) challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the DIP Obligations, DIP Superpriority Claims or security interests and liens of the DIP Parties in respect thereof, (b) challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Secured Obligations, Prepetition Lender Superpriority Claims or security interests and liens of the Prepetition Secured Parties in respect thereof or (c) challenging the amount, validity, extent, or enforceability of, or asserting any defense, counterclaim, or offset to the Senior Notes Obligations or claims of the Senior Notes Parties in respect thereof; or (ii) asserting any claims or causes of action, including, without limitation, claims or actions to hinder or delay the DIP Parties' assertions, enforcement or realization on the DIP Collateral in accordance with the DIP Documents or this Interim Order; provided, further, however, that no more than $50,000 of the proceeds of the DIP Facility or any proceeds of the DIP Collateral or the Cash Collateral may be used to (x) fund an investigation by the Committee into the existence of any causes of action or other type of litigation against the Prepetition Secured Parties with respect to the Prepetition Secured Obligations or the Senior Notes Parties with respect to the Senior Notes Obligations, or (y) prevent, hinder, or delay any of the DIP Parties' or Prepetition Secured Parties' respective

enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred; or using or seeking to use Cash Collateral or, except to the extent permitted by the terms of the DIP Documents, selling or otherwise disposing of DIP Collateral, in each case without the consent of the DIP Parties. After receipt of the Carve-Out Event Notice, the Debtors shall provide notice by facsimile within three (3) Business Days to all Professionals informing them that a Carve-Out Event has occurred and further advising them that the Debtors' ability to pay such Professionals is subject to and limited by the Carve-Out. Notwithstanding the foregoing, so long as a Carve-Out Event has not occurred: (i) the Debtors shall be permitted to pay administrative expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may become due and payable; and (ii) such payments shall not be applied to reduce the Carve-Out. Nothing contained herein is intended to constitute, nor should be construed as consent to, the allowance of any Professional's fees, costs or expenses by any party and shall not affect the right of the Debtors, DIP Parties, Committee, U.S. Trustee, or any other party-in-interest to object to the allowance and payment or any amounts incurred or requested.

15. <u>Reservation of Certain Third Party Rights</u>. The Committee (or any non-Debtor party-in-interest with standing) shall have a maximum of sixty (60) calendar days from the date of the Committee's appointment, but in no event later than seventy-five (75) calendar days from the Petition Date, and in the event that no Committee is appointed, all non-Debtor parties-in-interest (including a trustee, if appointed or elected prior to the Investigation Termination Date, as defined herein) shall have seventy-five (75) calendar days from the Petition Date (the "<u>Investigation Termination Date</u>") to investigate the validity, perfection and/or enforceability of the Prepetition Liens, the Prepetition Secured Obligations and the Senior Notes Obligations, or to assert any other claims or causes of action against the Prepetition Secured

Parties or the Senior Notes Parties. The Investigation Termination Date may be extended: (a)(i) solely with respect to investigations of the validity, perfection and enforceability of the Prepetition Liens and Prepetition Secured Obligations, with the consent of the Prepetition Secured Parties, and (ii) solely with respect to investigations of the validity and enforceability of the Senior Notes Obligations, with the consent of the Senior Notes Indenture Trustee and the Ad Hoc Committee of Senior Noteholders, in each case, as memorialized in an order of this Court or (b) pursuant to an order of this Court finding cause for such extension. If any Committee, or any non-Debtor party-in-interest hereafter vested with authority by this Court (including any chapter 7 trustee that may be appointed or elected prior to the Investigation Termination Date, or thereafter for the duration of any litigation commenced by the filing of a complaint on or prior to the Investigation Termination Date) determines that there may be a challenge to the validity, perfection and/or enforceability of the Prepetition Liens or the Prepetition Secured Obligations or the Senior Notes Obligations, respectively, by the Investigation Termination Date, then upon five (5) Business Days prior written notice to the Debtors and the Prepetition Secured Parties or the Senior Notes Parties, as applicable, such Committee or other non-Debtor party-in-interest hereafter (to the extent such other non-Debtor party is vested with authority by this Court) shall file and prosecute a complaint or objection related thereto (each, a "Challenge"), and shall have only until the Investigation Termination Date to file such objection or otherwise initiate an appropriate action on behalf of the Debtors' estates setting forth the basis of any such challenge, claim or cause of action. If a Challenge is not filed on or before the Investigation Termination Date (or such other later date as may be extended as set forth above), then: (a) the agreements, acknowledgements and stipulations contained in Paragraphs C and D of this Interim Order shall be irrevocably binding on the Debtors, the Committee and all parties-in-interest and any and all

successors-in-interest as to any of the foregoing, without further action by any party or this Court, and any Committee and any other party-in-interest and any and all successors-in-interest as to any of the foregoing, shall thereafter be forever barred from bringing any Challenge with respect thereto; (b) the Prepetition Liens of the Prepetition Secured Parties shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Prepetition Secured Obligations shall be deemed to be a finally allowed claim for all purposes against each of the Debtors and any subsequent chapter 7 cases, in the amount set forth in Paragraph C, and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise; (d) the Senior Notes Obligations shall be deemed to be a finally allowed claim for all purposes against RathGibson and Greenville and any subsequent chapter 7 cases, in the amount set forth in Paragraph D, and shall not be subject to challenge by any party-in-interest as to validity or otherwise; and (e) the Debtors shall be deemed to have released, waived and discharged the Prepetition Secured Parties and Senior Notes Parties (whether in their prepetition or postpetition capacity), together with their respective officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or successors, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Secured Obligations or the Senior Notes Obligations. The Prepetition Agent and the Senior Notes Indenture Trustee shall cooperate in all reasonable requests for information in order to assist the Committee in its investigation under this Paragraph 15. Notwithstanding anything to the contrary herein: (x) if any such Challenge is timely commenced, the stipulations contained in Paragraphs C and D of this Interim Order shall nonetheless remain binding on all parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully

DB02:8425874.1                                                              068401.1001

challenged in such Challenge; (y) the Prepetition Secured Parties and the Senior Notes Parties reserve all of their rights to contest on any grounds any Challenge; and (z) the Prepetition Secured Parties and the Senior Notes Parties shall comply with any and all orders of the Bankruptcy Court in connection with a successful Challenge; provided, however, that the Prepetition Secured Parties and the Senior Notes Parties preserve any and all of their rights to appeal and stay any orders of the Bankruptcy Court issued in connection with such successful Challenge.

16.     Protection of DIP Lenders' Rights. So long as there are any Loans or other amounts outstanding, the DIP Lenders have any Commitment (as defined in the DIP Agreement) under the DIP Agreement or any other DIP Obligations are outstanding, the Prepetition Secured Parties shall (i) not take any action to foreclose upon or recover in connection with their respective Prepetition Liens or Prepetition Lender Replacement Liens, other agreements, or operation of law of this Interim Order, or otherwise exercise remedies against any DIP Collateral, except to the extent authorized by an order of this Court, (ii) be deemed to have consented to any release of DIP Collateral authorized under the DIP Documents, (iii) not file any further financing statements, trademark filings, copyright filings, patent filings, mortgages, notices of lien or similar instruments, enter into any control agreement, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Agent files financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date and (iv) not seek to terminate or modify the use of Cash Collateral.

17.     Landlord Agreements.  Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtors to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed unenforceable and shall have no force and effect with respect to the transactions granting post-petition liens in such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lenders or Prepetition Lender in accordance with the terms of the DIP Documents or this Interim Order.

18.     Bankruptcy Code Section 506(c) Waiver.  Upon the entry of the Final Order, the Debtors shall irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Parties or Prepetition Secured Parties upon the DIP Collateral or the Prepetition Collateral (as applicable).  In no event shall the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable).

19.     Discharge Waiver.  The DIP Obligations and the Prepetition Secured Obligations, evidenced by the DIP Documents and the Prepetition Credit Documents, respectively, shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of Section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization.  The Debtors shall not propose or support any plan of

DB02:8425874.1                                        068401.1001

reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash, on or prior to the effective date of such plan of reorganization or sale and the Termination Date, of all DIP Obligations and Prepetition Secured Obligations unless the DIP Parties and the Prepetition Secured Parties (prior to the Prepetition Secured Obligation Paydown Date) have otherwise consented in writing to such plan or sale.

20. <u>Restrictions on Granting Postpetition Liens</u>. Other than the Carve-Out, or as otherwise provided in this Interim Order, no claim having a priority superior or *pari passu* with those granted by this Interim Order or the DIP Documents to the DIP Parties and Prepetition Secured Parties shall be granted or permitted by any order of this Court heretofore or hereafter entered in the Chapter 11 Cases, while (i) any portion of the DIP Facility (or refinancing thereof), any Loans or any other DIP Obligations are outstanding or (ii) the DIP Lenders have any Commitment under the DIP Agreement. Except as expressly permitted by the DIP Documents, the Debtors will not, at any time during the Chapter 11 Cases, grant mortgages, security interests or liens in the DIP Collateral (or any portion thereof) to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

21. <u>Return of Inventory</u>. The Debtors shall not, (i) prior to the Prepetition Secured Obligation Paydown Date, without the consent of the Administrative Agent (at the direction of the Requisite Lenders) and Prepetition Secured Parties, and (ii) on and after the Prepetition Secured Obligation Paydown Date, without the consent of the Administrative Agent (at the direction of the Requisite Lenders): (a) enter into any agreement to return any inventory to any of their creditors for application against any prepetition indebtedness under section 546(h) of the Bankruptcy Code; or (b) consent to any creditor taking any setoff against any of its

prepetition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise; <u>provided</u>, with respect to (ii) (a) and (b), such consent shall not be required if, such agreement, setoff or recoupment, the aggregate amount of prepetition Indebtedness (as defined in the DIP Credit Agreement), prepetition trade payables and other prepetition claims subject to all such agreements, setoffs and recoupments, since the Petition Date do not exceed $500,000.

22.     Automatic Effectiveness of Liens.   The DIP Liens and Prepetition Lender Replacement Liens shall not be subject to Challenge and shall attach and become valid, perfected, binding, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtors, the DIP Parties or the Prepetition Secured Parties, respectively, and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with a governmental unit (including, without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions.  All DIP Collateral shall be free and clear of other liens, claims and encumbrances, except as provided in the DIP Documents and this Interim Order.  If the DIP Agent hereafter requests that the Debtors execute and deliver to the DIP Agent financing statements, security agreements, pledge agreements, collateral assignments, mortgages, or other instruments and documents considered by the DIP Agent to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens, the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, pledge agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Agent is hereby authorized to file or record such documents in its discretion without seeking modification of the

DB02:8425874.1

068401.1001

automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the Petition Date. The Prepetition Secured Parties and the Senior Notes Parties are authorized and directed to execute and deliver all documents and instruments reasonably requested by the DIP Agent to effectuate and implement the terms, transactions and lien priorities contemplated by this Interim Order and the DIP Documents.

23. <u>Automatic Stay; Rights and Remedies Upon Event of Default</u>. Subject to the second sentence of this Paragraph, the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms, rights, benefit, privileges, remedies and provisions of this Interim Order and the DIP Documents in each case without further notice, motion, application to, order of, or hearing before, this Court. Subject to the provisions of the DIP Agreement and without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Parties (or any of their respective agents) to exercise, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the DIP Documents, and to take any or all of the following actions without further notice, motion or application to, order of or hearing before, this Court: (a) immediately terminate the Debtors' right, if any, under this Interim Order or the DIP Documents to use Cash Collateral; (b) cease making any Loans to the Debtors; (c) terminate, reduce or restrict any commitment to extend credit to the Debtors, (d) declare all DIP Obligations to be immediately due and payable; (e) freeze monies or balances in the Debtors' accounts; (f) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or any of the DIP Lenders (or any of their respective agents) against the DIP Obligations, or otherwise enforce all rights and

DB02:8425874.1 068401.1001

remedies against the DIP Collateral in the possession of any of the DIP Lenders for application towards the DIP Obligations; and (g) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Documents or applicable law against the DIP Collateral to effect the repayment of the DIP Obligations; provided, however, that prior to the exercise of any right in clause (e), clause (f) and clause (g) of this Paragraph, the DIP Agent shall be required to provide five (5) Business Days written notice to the Debtors (with a copy to their bankruptcy counsel), counsel to the Committee, DIP Parties and Prepetition Secured Parties, and the U.S. Trustee, as provided for in Section 9.2 of the DIP Agreement. Upon entry of this Interim Order, no party-in-interest shall have the right to contest the enforcement of the rights and remedies set forth in this Interim Order or the DIP Documents on any basis other than an assertion that no Event of Default has occurred, and, except with respect to such an assertion, no party-in-interest shall have the right to enjoin any such enforcement under section 105 of the Bankruptcy Code or otherwise, or to seek any injunctive relief inconsistent with the provisions of this Interim Order or the DIP Documents. Unless the Court determines during such five (5) Business Days notice period that such Event of Default has not occurred and/or is not continuing, the automatic stay, as to all of the DIP Lenders and the Prepetition Lender shall automatically be terminated at the end of such notice period, without further notice or order, and upon expiration of such notice period, the DIP Agent and Prepetition Agent shall be permitted to exercise all rights and remedies set forth in this Interim Order, the DIP Agreement, the other DIP Documents, the Prepetition Credit Agreement and the Prepetition Credit Documents, and as otherwise available at law without further notice, motion or application to, order of or hearing before, this Court. The rights and remedies of the DIP Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Parties may have under the DIP

DB02:8425874.1                    068401.1001

Documents or otherwise. The Debtors shall use their commercially reasonable efforts to cooperate with the DIP Parties in their exercise of their rights and remedies, whether against the DIP Collateral or otherwise. This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

24.     Binding Effect. The provisions of this Interim Order shall be binding upon and inure to the benefit of the Debtors, the DIP Parties, the Prepetition Secured Parties, the Senior Notes Parties and their respective successors and assigns. To the extent permitted by applicable law, this Interim Order shall bind any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Interim Order.

25.     Survival. The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Chapter 11 Cases; (ii) converting any of the Chapter 11 Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Interim Order as well as the DIP Superpriority Claims and the DIP Liens in the DIP Collateral granted pursuant to this Interim Order and the DIP Documents (and with respect to the entry of any order as set forth in clause (ii) or (iii) of this Paragraph 25, the Prepetition Lender Replacement Liens and Prepetition Lender Superpriority Claims) shall continue in full force and effect notwithstanding the entry of any such order. Such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Documents, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full in cash and discharged. In no event shall

any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Documents.

26.        Modifications of DIP Documents. The Debtors and DIP Parties are hereby authorized to implement, in accordance with the terms of the DIP Documents, any non-material modifications (including without limitation, any change in the number or composition of the DIP Lenders or the DIP Agent) of the DIP Documents without further notice, motion or application to, order of or hearing before, this Court, or any other modifications to the DIP Documents; provided, however, that notice of any material modification or amendment to the DIP Documents shall be provided to counsel to any Committee, the U.S. Trustee and the Prepetition Secured Agent (prior to the Prepetition Secured Obligations Paydown Date), each of whom shall have five (5) calendar days from the date of such notice within which to object in writing to such modification or amendment. If any Committee or the U.S. Trustee timely objects to any material modification or amendment to the DIP Documents, such modification or amendment shall only be permitted pursuant to an order of this Court, and if the Committee or the U.S. Trustee does not timely object to any such material modification or amendment then such material modification or amendment may be implemented by the Debtors and DIP Parties without Court approval.

27.        Insurance Policies. Upon entry of this Interim Order, on each insurance policy maintained by the Debtors or which in any way relates to the DIP Collateral: (i) the DIP Parties shall be, and shall be deemed to be, without any further action or notice, named as additional insureds; and (ii) the DIP Agent, on behalf of the DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as loss payee. The Debtors are authorized and directed to take any actions necessary to have the DIP Agent, on behalf of the

DIP Lenders, be added as an additional insured or loss payee, as applicable, on each insurance policy maintained by the Debtors or which in any way relates to the DIP Collateral.

28. <u>Protection Under Section 364(e) of the Bankruptcy Code</u>. The DIP Parties and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith. Based on the record of these Chapter 11 Cases, and in accordance with section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect the (i) validity of any DIP Obligations owing to the DIP Parties, or adequate protection obligations owing to the Prepetition Secured Parties incurred prior to the actual receipt by the DIP Agent or Prepetition Agent, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, or (ii) validity or enforceability of any Loans or other advances previously made or any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations, or adequate protection obligations owing to the Prepetition Secured Parties. Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations, or adequate protection obligations owing to the Prepetition Secured Parties by the Debtors prior to the actual receipt by the DIP Agent or Prepetition Agent, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Interim Order, and the DIP Parties and the Prepetition Secured Parties shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Interim Order, and the DIP Documents with respect to all uses of Cash Collateral and the

incurrence of DIP Obligations, and adequate protection obligations owing to the Prepetition Secured Parties.

29. Effect of Dismissal of Chapter 11 Cases. If the Chapter 11 Cases are dismissed, converted or substantively consolidated, then neither the entry of this Interim Order nor the dismissal, conversion or substantive consolidation of such Chapter 11 Cases shall affect the rights of the DIP Parties and the Prepetition Secured Parties under their respective DIP Document and Prepetition Credit Documents or this Interim Order, and all of the respective rights and remedies thereunder of the DIP Parties and the Prepetition Secured Parties shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, or substantively consolidated. If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that: (i) the DIP Liens and DIP Superpriority Claims granted to and conferred upon the DIP Parties and the protections afforded to the DIP Parties pursuant to this Interim Order and the DIP Documents shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been paid and satisfied in full in cash (and that such DIP Liens, DIP Superpriority Claims and other protections shall, notwithstanding such dismissal, remain binding on all interested parties); (ii) those Prepetition Liens, Prepetition Lender Replacement Liens and Prepetition Lender Superpriority Claims granted to and conferred upon the Prepetition Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Prepetition Secured Obligations shall have been paid and satisfied in full in cash (and that such Prepetition Lender Superpriority Claims shall, notwithstanding such dismissal, remain binding on all interested parties); (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the

DB02:8425874.1

068401.1001

purpose of enforcing the DIP Liens, Prepetition Lender Replacement Liens, DIP Superpriority Claims and Prepetition Lender Superpriority Claims referred to herein; and (iv) the effectiveness of any order dismissing the Chapter 11 Cases shall not occur until sixty (60) days after it is entered in order to give the DIP Parties and the Prepetition Secured Parties the opportunity to perfect their respective security interests and liens in the collateral under non-bankruptcy law, including, without limitation, the filing or recording of financing statements, mortgages, deeds of trust, security deeds, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, tradename or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar United States entity) and the procurement of waivers from any landlord, tenant, mortgagee, bailee or warehouseman and consents from any licensor or similar party-in-interest.

30.     Proofs of Claim.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in the Chapter 11 Cases to the contrary, or otherwise, (i) the DIP Parties and the Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein; and (ii) the Senior Notes Indenture Trustee shall be authorized (but not required) to file a master proof of claim against the Debtors (the "Senior Notes Indenture Trustee Master Proof of Claim") on behalf of itself and the Senior Noteholders on account of their prepetition claims arising under the Senior Notes Indenture.  If the Senior Notes Indenture Trustee so files a Senior Notes Indenture Trustee Master Proof of Claim against the Debtors, the Senior Notes Indenture Trustee and each Senior Noteholder, and each of their respective successors and assigns, shall be deemed to have filed proofs of claim in respect of their claims against the Debtors arising under the Senior Notes Indenture, and the claims of the Senior Notes Indenture Trustee and each Senior Noteholder (and their respective

successors and assigns) shall be allowed or disallowed as if such entities had filed separate proofs of claim in the Chapter 11 Cases or any successor cases. The Senior Notes Indenture Trustee shall further be authorized to amend, supplement or otherwise modify its respective Senior Notes Indenture Trustee Master Proof of Claim from time to time, to the extent permitted by applicable law. The provisions set forth in this Paragraph 30 and any Senior Notes Indenture Trustee Master Proof of Claim filed pursuant to the terms hereof are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest, including, without limitation, the rights of the Senior Notes Indenture Trustee and each Senior Noteholder as the holder of a claim against the Debtors under applicable law, and the numerosity requirements set forth in section 1126 of the Bankruptcy Code.

31. <u>Findings of Fact and Conclusions of Law</u>. This Interim Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon the execution thereof.

32. <u>Choice of Law; Jurisdiction</u>. The DIP Facility and DIP Documents (and the rights and obligations of the parties thereto) shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code. Except as otherwise provided in the DIP Agreement, the Bankruptcy Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facility or DIP Documents.

DB02:8425874.1                                                   068401.1001

33. <u>Controlling Effect of Interim Order</u>. To the extent any provision of this Interim Order conflicts with any provision of the Motion or any DIP Document, the provisions of this Interim Order shall control.

34. <u>Objections</u>. Objections to the entry of the Final Order shall be in writing and shall be filed with the Clerk of this Court, on or before 4:00 p.m. (prevailing Eastern time) on the date that is five (5) business days prior to and excluding the date of the Final Hearing set forth in paragraph 35 below, with a copy served upon: (i) counsel for the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019 (Attn: Paul V. Shalhoub, Esq. and Robin Spigel, Esq.) and Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801 (Attn: Robert S. Brady, Esq. and Mathew B. Lunn, Esq.), (ii) counsel to the DIP Lenders, Prepetition Lender and Ad Hoc Committee of Senior Noteholders, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 (Attn: Kristopher M. Hansen, Esq. and Jayme T. Goldstein, Esq.) and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Daniel J. DeFranceschi, Esq.), (iii) counsel to be selected by the Creditors' Committee upon its formation if selected by such date, and (iv) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Jane Leamy, Esq.).

35. <u>Final Hearing</u>. A final hearing on the Motion shall be heard before this Court on August ___, 2009 at _____ a.m. in Courtroom ____ at the United States Bankruptcy Court, 824 Market Street, Wilmington, DE 19801.

Dated: July ___, 2009.

_____
United States Bankruptcy Judge

41