THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN FOR RATHGIBSON, INC., ET AL., DATED AS OF MARCH 8, 2010. ACCEPTANCES OR REJECTIONS WITH RESPECT TO THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.

A HEARING TO CONSIDER THE ADEQUACY OF THIS DISCLOSURE STATEMENT UNDER SECTION 1125 OF THE BANKRUPTCY CODE HAS BEEN SET BY THE BANKRUPTCY COURT FOR APRIL 9, 2010 AT 2:00 P.M. (PREVAILING EASTERN TIME). THE DEBTORS RESERVE THE RIGHT TO AMEND, SUPPLEMENT OR OTHERWISE MODIFY FROM TIME TO TIME THIS DISCLOSURE STATEMENT PRIOR TO AND UP TO THE DATE OF SUCH HEARING.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| RathGibson, Inc., et al., | ) | Case No. 09-12452 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## DISCLOSURE STATEMENT FOR SECOND AMENDED
## JOINT CHAPTER 11 PLAN FOR RATHGIBSON, INC., ET AL.

Dated: Wilmington, Delaware
      March 8, 2010

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Co-Counsel for Debtors
and Debtors In Possession
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

**WILLKIE FARR & GALLAGHER LLP**
Co-Counsel for Debtors
and Debtors In Possession
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

<u>IMPORTANT NOTICE</u>

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE SECOND AMENDED JOINT CHAPTER 11 PLAN FOR RATHGIBSON, INC., ET AL. (THE "**<u>SECOND AMENDED PLAN</u>**"). NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS, THEIR BUSINESS OPERATIONS OR THE VALUE OF THEIR ASSETS, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THE DEBTORS URGE YOU TO READ THIS DISCLOSURE STATEMENT CAREFULLY FOR A DISCUSSION OF VOTING INSTRUCTIONS, RECOVERY INFORMATION, CLASSIFICATION OF CLAIMS, THE HISTORY OF THE DEBTORS AND THE CHAPTER 11 CASES, THE DEBTORS' BUSINESSES, PROPERTIES AND RESULTS OF OPERATIONS, HISTORICAL AND PROJECTED FINANCIAL RESULTS AND A SUMMARY AND ANALYSIS OF THE SECOND AMENDED PLAN.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE SECOND AMENDED PLAN, A COPY OF WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS <u>EXHIBIT 1</u>.

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE A FURTHER AMENDED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE SECOND AMENDED PLAN. THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL, OR THE SOLICITATION OF AN OFFER TO BUY, NOR WILL THERE BE ANY DISTRIBUTION OF ANY OF THE SECURITIES DESCRIBED HEREIN UNTIL THE EFFECTIVE DATE OF THE SECOND AMENDED PLAN.

THE SECOND AMENDED PLAN AND THIS DISCLOSURE STATEMENT HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW. DISSEMINATION OF THIS DISCLOSURE STATEMENT IS CONTROLLED BY BANKRUPTCY RULE 3017. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. PERSONS TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF THE DEBTORS SHOULD EVALUATE THE SECOND AMENDED PLAN IN LIGHT OF THE PURPOSES FOR WHICH IT WAS PREPARED.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE SECOND AMENDED PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE THE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE SECOND AMENDED PLAN, ONLY TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE SECOND AMENDED PLAN, THE PLAN SUPPLEMENT AND THE EXHIBITS ATTACHED THERETO AND THE AGREEMENTS AND DOCUMENTS DESCRIBED THEREIN. IF THERE IS A CONFLICT BETWEEN THE SECOND AMENDED PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE SECOND AMENDED PLAN WILL GOVERN. YOU ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE SECOND AMENDED PLAN AND PLAN SUPPLEMENT AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE SECOND AMENDED PLAN.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE SECOND AMENDED PLAN IS **4:00 P.M. (PREVAILING EASTERN TIME) ON MAY 11, 2010,** UNLESS EXTENDED BY THE DEBTORS (THE "**VOTING DEADLINE**"). TO BE COUNTED, BALLOTS MUST BE RECEIVED BY THE VOTING AGENT (AS DEFINED HEREIN) ON OR BEFORE THE VOTING DEADLINE.

THE CONFIRMATION AND EFFECTIVENESS OF THE SECOND AMENDED PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

THE SECOND AMENDED PLAN IS PREMISED ON A SALE TO EITHER THE STALKING HORSE BIDDER OR SUCH OTHER SUCCESSFUL BIDDER AS MAY BE CHOSEN AT THE CONCLUSION OF THE AUCTION AND APPROVED BY THE BANKRUPTCY COURT AT THE CONFIRMATION HEARING. THE PLAN AS FILED PROVIDES THAT THE PROCEEDS OF THE SALE TO THE STALKING HORSE BIDDER WILL BE USED TO PAY THOSE CLAIMS AND INTERESTS AS SET FORTH HEREIN; ANY CLAIM THAT IS AN ASSUMED LIABILITY SHALL BE ASSUMED BY THE PURCHASER AND THE PURCHASER SHALL BE RESPONSIBLE THEREFOR IN ACCORDANCE WITH THE TERMS OF THE APA AND THE HOLDER THEREOF SHALL HAVE NO RECOURSE AGAINST THE DEBTORS OR THE PLAN ADMINISTRATOR OR ANY OF THEIR PROPERTY ON ACCOUNT OF SUCH CLAIM. THE STALKING HORSE BID WILL BE SUBJECT TO HIGHER OR OTHERWISE BETTER BIDS AT THE AUCTION. HOWEVER, FOR ANY BID TO BE CHOSEN AS THE HIGHEST OR OTHERWISE BEST BID, THAT BIDDER MUST PROVIDE A BID THAT OFFERS CONSIDERATION SUFFICIENT TO SATISFY ALL CLAIMS REQUIRED TO BE SATISFIED TO CONFIRM A CHAPTER 11 PLAN. IF ANY POTENTIAL BIDDER PROVIDES A BID THAT WILL NOT FUND A CONFIRMABLE CHAPTER 11 PLAN, SUCH BID WILL NOT BE CHOSEN AS THE HIGHEST OR OTHERWISE BEST BID. THE DEBTORS PRESENTLY CANNOT INFORM CREDITORS EITHER IF ANOTHER BIDDER WILL BE CHOSEN AS THE SUCCESSFUL BIDDER OR THE TERMS THAT SUCH BIDDER MAY PROPOSE. HOWEVER, THE STALKING HORSE BIDDER PROVIDES A FLOOR THAT ANY SUCCESSFUL BIDDER MUST "TOP". TO "TOP" THE STALKING HORSE BID, A BIDDER MUST SUBMIT A HIGHER OR OTHERWISE BETTER OFFER IN ACCORDANCE WITH THE BID PROCEDURES. IN ORDER FOR CREDITORS TO RECEIVE ANY DISTRIBUTIONS FROM EITHER THE STALKING HORSE BID OR ANY OTHER SUCCESSFUL BID, THE SECOND AMENDED PLAN MUST BE APPROVED, CONFIRMED AND CONSUMMATED.

IF THE SECOND AMENDED PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE SECOND AMENDED PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE SECOND AMENDED PLAN) WILL BE BOUND BY THE TERMS OF THE SECOND AMENDED PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH, OR REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR WITH ANY OTHER SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE SECOND AMENDED PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY OTHER SECURITIES REGULATORY AUTHORITY, OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION

CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF OR CREATE ANY DUTY TO UPDATE SUCH INFORMATION.

NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE SECOND AMENDED PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE SECOND AMENDED PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED TO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THIS DISCLOSURE STATEMENT AND/OR THE SECOND AMENDED PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE SECOND AMENDED PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE SECOND AMENDED PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE SECOND AMENDED PLAN, THE SECOND AMENDED PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

**THE DEBTORS SUPPORT CONFIRMATION OF THE SECOND AMENDED PLAN AND URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE SECOND AMENDED PLAN. AS SET FORTH IN THE LETTER FROM THE CREDITORS' COMMITTEE ACCOMPANYING THE DISCLOSURE STATEMENT, THE CREDITORS' COMMITTEE SUPPORTS THE PLAN AND URGES UNSECURED CREDITORS TO VOTE IN FAVOR OF THE PLAN.**

# TABLE OF CONTENTS

ARTICLE I.    INTRODUCTION .................................................................................1
    1.1    General. ..............................................................................................1
    1.2    The Confirmation Hearing. ................................................................2
    1.3    Classification of Claims and Interests. ..............................................3
    1.4    Voting; Holders of Claims Entitled to Vote. .....................................4

ARTICLE II.    SUMMARY OF PLAN AND CLASSIFICATION AND
             TREATMENT OF CLAIMS AND INTERESTS THEREUNDER ..................8
    2.1    General. ..............................................................................................8
    2.2    Summary of the Stalking Horse Agreement. ......................................9
    2.3    Bid Procedures. ..................................................................................9
    2.4    Summary of Treatment of Claims and Interests Under the Second
             Amended Plan. ..................................................................................10

ARTICLE III.    BUSINESS DESCRIPTION AND CIRCUMSTANCES THAT LED
             TO THESE CHAPTER 11 CASES ...............................................18
    3.1    The Debtors' Businesses. ..................................................................18
    3.2    Summary of Corporate Structure. .....................................................23
    3.3    Debtors' Prepetition Capital and Debt Structure. .............................23

ARTICLE IV.    EVENTS LEADING TO CHAPTER 11 FILING ............................24
    4.1    The Debtors' Financial Position. .......................................................24
    4.2    Events Leading to the Formulation of the First Amended Plan. ........24

ARTICLE V.    REASONS FOR THE SOLICITATION; RECOMMENDATION .................26

ARTICLE VI.    THE SECOND AMENDED PLAN ..............................................26
    6.1    Overview of Chapter 11. ...................................................................26
    6.2    Intercompany Claims. .......................................................................27
    6.3    Overview of the Second Amended Plan. ...........................................27
    6.4    Acceptance or Rejection of the Second Amended Plan; Effect of
             Rejection by One or More Classes of Claims or Interests ..................37
    6.5    Means for Implementation. ...............................................................38
    6.6    RG Tube Cash. ..................................................................................46
    6.7    Termination of Subordination Rights and Settlement of Related Claims. .........46
    6.8    Comprehensive Settlement of Claims and Controversies. ..................47
    6.9    Treatment of Executory Contracts and Unexpired Leases. ...............47
    6.10    Compensation and Benefit Programs. ...............................................51
    6.11    Post-Petition Contracts and Leases. .................................................51
    6.12    Exculpation and Limitation of Liability. ..........................................51
    6.13    Releases. ...........................................................................................51
    6.14    Injunction. ........................................................................................53
    6.15    Injunction Related to Releases and Exculpation. ..............................54

ARTICLE VII.   CONFIRMATION OF THE SECOND AMENDED PLAN............................54
    7.1   Confirmation Hearing. ...................................................................54
    7.2   Confirmation. ...............................................................................55
    7.3   Classification of Claims and Interests............................................59
    7.4   Consummation. ............................................................................59
    7.5   The Role of the Creditors' Committee............................................60
    7.6   Post-Confirmation Jurisdiction of the Bankruptcy Court ...................60

ARTICLE VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
              OF THE SECOND AMENDED PLAN ......................................62
    8.1   Liquidation Under Chapter 7 of the Bankruptcy Code. ......................62
    8.2   Alternative Plan(s) of Reorganization. .............................................62
    8.3   Dismissal of the Debtors' Chapter 11 Cases.....................................63

ARTICLE IX.   SUMMARY OF VOTING PROCEDURES .......................................63

ARTICLE X.   DESCRIPTION AND HISTORY OF CHAPTER 11 CASES..........................64
    10.1   General Case Background............................................................64
    10.2   Retention of Professionals. ........................................................64
    10.3   Employment Obligations. ...........................................................65
    10.4   Continuing Supplier and Customer Relations...................................66
    10.5   Stabilization of Debtors' Business Operations. ...............................66
    10.6   Utilities...................................................................................67
    10.7   Appointment of a Creditors' Committee. ........................................67
    10.8   Section 341 Meeting ..................................................................68
    10.9   Schedules, Statements and Bar Date..............................................68
    10.10   Claims Objections ...................................................................69
    10.11   Preferences and Fraudulent Conveyances .....................................70
    10.12   Deadline Extensions.................................................................70
    10.13   Events Leading to Formulation of Second Amended Plan. .................71

ARTICLE XI.   CERTAIN RISK FACTORS TO BE CONSIDERED .....................................73
    11.1   Certain Bankruptcy and Sale Considerations. .................................73
    11.2   Certain Tax Consequences of the Second Amended Plan Raise
           Unsettled and Complex Legal Issues and Involve Factual
           Determinations. ......................................................................77

ARTICLE XII.   CERTAIN FEDERAL INCOME TAX  CONSEQUENCES OF THE
            SECOND AMENDED PLAN .....................................................77
    12.1   Introduction.............................................................................77
    12.2   Federal Income Tax Consequences to the Debtors............................78
    12.3   Federal Income Tax Consequences to Holders of Certain Claims. ..................80

ARTICLE XIII.   PROCEDURES FOR DISTRIBUTIONS UNDER THE SECOND
            AMENDED PLAN ..................................................................81
    13.1   Distribution Record Date. ...........................................................81
    13.2   Disbursing Agent. .....................................................................82
    13.3   Rights and Powers of Disbursing Agent. .........................................82
    13.4   Delivery of Distribution. .............................................................83

| | | |
|---|---|---|
| 13.5 | Unclaimed Property. | 83 |
| 13.6 | Reserve Accounts. | 84 |
| 13.7 | Distribution of RG Tube Cash. | 84 |
| 13.8 | Fractional Cents. | 85 |
| 13.9 | No Distribution in Excess of Amount of Allowed Claim. | 85 |
| 13.10 | Withholding and Reporting Requirements. | 85 |
| ARTICLE XIV. | PROCEDURES FOR RESOLVING CLAIMS | 85 |
| 14.1 | Objections to Claims. | 85 |
| 14.2 | Amendment to Claims. | 86 |
| 14.3 | Disputed Claims and Disputed Interests. | 86 |
| 14.4 | Estimation of Claims; Certain Reserves. | 87 |
| 14.5 | Directors' and Officers Claims. | 87 |
| 14.6 | No Recourse. | 88 |
| 14.7 | No Successor Liability. | 88 |
| ARTICLE XV. | CONCLUSION | 89 |

DB02:9340498.2

068401.1001

Annexed as Exhibits to this Disclosure Statement are copies of the following documents:

- Plan (Exhibit 1);

- Liquidation Analysis (Exhibit 2);

- Disclosure Statement Order (without exhibits) (Exhibit 3);

- Stalking Horse Agreement (Exhibit 4);

- Bid Procedures Order (without exhibits) (Exhibit 5); and

- Summary of Asset Purchase Agreement (Exhibit 6).

DB02:9340498.2

068401.1001

# ARTICLE I.

# INTRODUCTION

**1.1**  *General.*

Debtors RathGibson, Inc., Greenville Tube Company, RG Tube Holdings LLC, and RGCH Holdings Corp., transmit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, in connection with the Debtors' solicitation of votes (the "**Solicitation**") to confirm the Second Amended Joint Chapter 11 Plan for RathGibson, Inc., et al., dated as of March 8, 2010.

As described further below, the Second Amended Plan modifies and amends certain portions of the First Amended Plan (as defined below), which was sent to holders of Claims against RathGibson and Greenville for voting in September 2009. The purpose of this Disclosure Statement is to provide information concerning such modifications and amendments to the First Amended Plan.

*All Plan Documents are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Second Amended Plan), which may result in material changes to the terms of the Plan Documents.* On the Effective Date, all Plan Documents and all other agreements entered into or instruments issued in connection with any Plan Document, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto and shall be deemed to become effective simultaneously.

On [_____], 2010, after notice and a hearing, the Bankruptcy Court entered an order (the "**Disclosure Statement Order**"), which, among other things: (i) approved this Disclosure Statement as containing "adequate information" to enable a hypothetical, reasonable investor typical of holders of Claims against or Interests in the Debtors to make an informed judgment as to whether to accept or reject the Second Amended Plan; and (ii) authorized the Debtors to use this Disclosure Statement in connection with the solicitation of votes to accept or reject the Second Amended Plan. **The Disclosure Statement Order establishes May 11, 2010 at 4:00 p.m. (prevailing Eastern Time) as the Voting Deadline for the return of Ballots accepting or rejecting the Second Amended Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE SECOND AMENDED PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Second Amended Plan, and for filing objections to confirmation of the Second Amended Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim and an Interest entitled to vote on the Second Amended Plan should read this Disclosure Statement and the Exhibits hereto, including the Second Amended Plan and the Disclosure Statement Order, as well as the instructions accompanying the Ballot in their entirety before voting on the Second Amended Plan. These documents contain important information concerning the classification of Claims and Interests for voting purposes

and the tabulation of votes. No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Second Amended Plan, holders of Claims and Interests entitled to vote should not rely on any information relating to the Debtors and their businesses other than the information contained in this Disclosure Statement, the Second Amended Plan and all Exhibits hereto and thereto.

**THE DEBTORS AND THE CREDITORS' COMMITTEE RECOMMEND THAT HOLDERS OF CLAIMS AND INTERESTS IN CLASSES 3(b), 4(a), 5(a), 5(b), 6(a) AND 6(b) VOTE TO ACCEPT THE SECOND AMENDED PLAN, AS THE SECOND AMENDED PLAN PROVIDES FOR THE BEST AVAILABLE RECOVERY TO CREDITORS AND INTEREST HOLDERS IN SUCH CLASSES.**

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE SECOND AMENDED PLAN. THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE SECOND AMENDED PLAN HEREIN IS ONLY A SUMMARY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES-IN-INTEREST ARE CAUTIONED TO REVIEW THE SECOND AMENDED PLAN AND ANY RELATED EXHIBITS AND ATTACHMENTS FOR A FULL UNDERSTANDING OF THE SECOND AMENDED PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE SECOND AMENDED PLAN.

Additional copies of this Disclosure Statement (including the Exhibits hereto) are available upon request made to the Debtors' Claims Agent, The Garden City Group, Inc. ("**Garden City**"), P.O. Box 9396, Dublin, Ohio 43017-4296, Attn: RGI Bankruptcy Administration (888)-282-1244. Additional copies of this Disclosure Statement (including the Exhibits hereto) can also be accessed free of charge from the following website: http://www.rathrestructuring.com.

In addition, a Ballot for voting to accept or reject the Second Amended Plan is enclosed with this Disclosure Statement for the holders of Claims and Interests that are entitled to vote to accept or reject the Second Amended Plan. If you are a holder of a Claim entitled to vote on the Second Amended Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Second Amended Plan, please contact Garden City at the address above.

Each holder of a Claim or an Interest entitled to vote on the Second Amended Plan should read this Disclosure Statement, the Second Amended Plan, the other Exhibits attached hereto and the instructions accompanying the Ballots in their entirety before voting on the Second Amended Plan. These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.

**1.2**     *The Confirmation Hearing.*

In accordance with the Disclosure Statement Order and section 1128 of the Bankruptcy Code, a hearing will be held before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge for the District of Delaware, United States Bankruptcy Court,

Courtroom 6, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801 on **May 21, 2010 at 1:00 p.m. (prevailing Eastern Time)**, to consider confirmation of the Second Amended Plan, which includes approval of the sale of all or substantially all of the Debtors' assets. The Debtors will request confirmation of the Second Amended Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and they have reserved the right to modify the Second Amended Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, subject to the terms of the Second Amended Plan. Objections, if any, to confirmation of the Second Amended Plan must be served and filed so that they are received on or before **May 11, 2010, at 4:00 p.m. (prevailing Eastern Time)**, in the manner set forth in the Disclosure Statement Order. The hearing on confirmation of the Second Amended Plan, may be adjourned from time to time without further notice except for the announcement of the adjourned date and time at the hearing on confirmation or any adjournment thereof.

At the Confirmation Hearing, the Bankruptcy Court will, among other things:

- determine whether sufficient majorities in number and amount from each Class entitled to vote have delivered properly executed votes accepting the Second Amended Plan to approve the Second Amended Plan;

- hear and determine objections, if any, to the Second Amended Plan and to confirmation of the Second Amended Plan that have not been previously disposed of;

- determine whether the Second Amended Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Second Amended Plan.

**1.3     *Classification of Claims and Interests.***

The following table designates the Classes of Claims against and Interests in the Debtors, and specifies which Classes are: (a) impaired or unimpaired by the Second Amended Plan, (b) entitled to vote to accept or reject the Second Amended Plan in accordance with section 1126 of the Bankruptcy Code, or (c) deemed to accept or reject the Second Amended Plan.

DB02:9340498.2                                    068401.1001

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| *All Debtors* | | | |
| Class 1 | Priority Non-Tax Claims | No | No (Deemed to accept) |
| Class 2 | Other Secured Claims | No | No (Deemed to accept) |
| *RathGibson* | | | |
| Class 3(a) | Prepetition Secured Credit Agreement Claims | No | No (Deemed to accept) |
| Class 3(b) | Rath General Unsecured Claims | Yes | Yes |
| Class 3(c) | Existing Rath Interests | Yes | No (Deemed to accept)* |
| *Greenville* | | | |
| Class 4(a) | Greenville General Unsecured Claims | Yes | Yes |
| Class 4(b) | Existing Greenville Interests | Yes | No (Deemed to accept)* |
| *RGCH* | | | |
| Class 5(a) | RGCH PIK Notes Claims | Yes | Yes |
| Class 5(b) | RGCH General Unsecured Claims | Yes | Yes |
| Class 5(c) | Existing RGCH Interests | Yes | No (Deemed to accept)* |
| *RG Tube* | | | |
| Class 6(a) | RG Tube General Unsecured Claims | Yes[1] | Yes |
| Class 6(b) | Existing RG Tube Interests | Yes | Yes |

**1.4**    *Voting; Holders of Claims Entitled to Vote.*

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a chapter 11 plan are entitled to vote to accept or reject such proposed plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are altered under such plan. Classes of claims or equity interests under a chapter 11 plan in which the holders of claims or equity interests are unimpaired are deemed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan. In addition, classes of claims or equity interests (excluding those interest holders that are plan proponents herein) in which the holders of claims or equity interests will not receive or retain any property on account of their claims or equity interests are deemed to have rejected the chapter 11 plan and are not entitled to vote to accept or reject such plan.

---

\*    See section 4.3(b) infra.

[1]    The Debtors do not believe there will be any Allowed RG Tube General Unsecured Claims. Thus, while the Debtors believe that the Class 6(a) Distribution of $310,000 will be sufficient to satisfy all Allowed RG Tube General Unsecured Claims in full, because the Class 6(a) Distribution is limited in amount, out of an abundance of caution, Class 6(a) is deemed to be impaired under the Plan.

In connection with the Second Amended Plan:

- Claims and Interests in Classes 3(b), 4(a), 5(a), 5(b), 6(a) and 6(b) are impaired, will receive a distribution on account of such Claims to the extent provided in the Second Amended Plan and are entitled to vote to accept or reject the Second Amended Plan;

- Claims in Classes 1, 2 and 3(a) are unimpaired and, as a result, holders of such Claims are deemed to have accepted the Second Amended Plan and are not entitled to vote to accept or reject the Second Amended Plan; and

- Interests in Classes 3(c), 4(b) and 5(c) are impaired, but because the holders of such Interests are proponents of the Second Amended Plan and, thus, have consented to the filing of the Second Amended Plan and approval of the treatment afforded to such holders thereunder, such Classes are deemed to have accepted the Second Amended Plan and are not entitled to vote to accept or reject the Second Amended Plan.

The Bankruptcy Code defines "acceptance" of a plan: (a) by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the chapter 11 plan; and (b) by a class of interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the interests that cast ballots for acceptance or rejection of the chapter 11 plan. **Your vote on the Second Amended Plan is important.** The Bankruptcy Code requires as a condition to confirmation of the chapter 11 plan that each class that is impaired and entitled to vote under a plan vote to accept such plan, unless the provisions of section 1129(b) of the Bankruptcy Code are met.

If a Class of Claims or Interests entitled to vote on the Second Amended Plan rejects the Second Amended Plan, the Debtors reserve the right to amend the Second Amended Plan and/or to request confirmation of the Second Amended Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the non-acceptance of such plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept such plan. Under that section, a chapter 11 plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Second Amended Plan, a Ballot is enclosed for the purpose of voting on the Second Amended Plan. This Disclosure Statement, the Exhibits attached hereto, the Second Amended Plan and the related documents are the only materials the Debtors are providing to creditors and interest holders for their use in determining whether to vote to accept or reject the Second Amended Plan, and such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Second Amended Plan.

Please complete and sign your Ballot(s), and unless you are sending your Ballot to an Intermediary for inclusion in a master Ballot, return to the Debtors' claims and voting agent (the "**Voting Agent**") at the address below:

RGI Bankruptcy Administration
c/o The Garden City Group, Inc.
PO Box 9396
Dublin, Ohio 43017-4296

TO BE COUNTED, YOUR ORIGINAL BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE SECOND AMENDED PLAN MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN **4:00 P.M., PREVAILING EASTERN TIME, ON MAY 11, 2010**, UNLESS EXTENDED BY THE DEBTORS. YOUR BALLOT MAY BE SENT VIA MAIL, OVERNIGHT COURIER OR MESSENGER. FAXED COPIES AND VOTES SENT ON OTHER FORMS WILL NOT BE ACCEPTED EXCEPT IN THE DEBTORS' SOLE DISCRETION. ALL BALLOTS MUST BE SIGNED. IF YOU ARE SENDING YOUR BALLOT TO AN INTERMEDIARY FOR INCLUSION IN A MASTER BALLOT, THE *INTERMEDIARY* MUST RECEIVE YOUR PROPERLY COMPLETED BALLOT BY 12:00 P.M. NOON (PREVAILING EASTERN TIME) ON **MAY 6, 2010**, OR SUCH OTHER TIME AND DATE AS THE INTERMEDIARY MAY AGREE THAT ALLOWS THE INTERMEDIARY SUFFICIENT TIME TO PROCESS THE BALLOTS.

The Ballots have been specifically designed for the purpose of soliciting votes on the Second Amended Plan from the Class entitled to vote with respect thereto. Accordingly, in voting on the Second Amended Plan, please use only the Ballots sent to you with this Disclosure Statement or provided by the Debtors' Voting Agent.

The Debtors have fixed **5:00 p.m. (prevailing Eastern time) on [April 9], 2010** (the "**Voting Record Date**"), as the time and date for the determination of Persons who are entitled to receive a copy of this Disclosure Statement and all of the related materials and to vote whether to accept or reject the Second Amended Plan. Accordingly, only holders of record of Claims and Interests as of the Voting Record Date that are entitled to vote on the Second Amended Plan, will receive a Ballot and may vote on the Second Amended Plan.

All properly completed Ballots received prior to the Voting Deadline will be counted for purposes of determining whether a voting Class of impaired Claims and impaired Interests has accepted the Second Amended Plan. **Under the Bankruptcy Code, for the Second Amended Plan to be "accepted," a specified majority vote is required for each Class of impaired Claims and each Class of impaired Interests entitled to vote on the Second Amended Plan. If no votes are received with respect to any Class of impaired Claims and impaired Interests entitled to vote on the Second Amended Plan, then such Class shall be deemed to have accepted the Second Amended Plan. Any impaired Class that fails to have any Allowed Claims or any Allowed Interests as of the Confirmation Hearing will be deemed to have rejected the Second Amended Plan.** The Voting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Class entitled to vote.

- 6 -

In accordance with Bankruptcy Rule 3017(d), the Debtors will send Ballots to transfer agents, registrars, servicing agents or other intermediaries holding Claims for, or acting on behalf of, beneficial holders of Claims (collectively, the "**Intermediaries**"). Each Intermediary will be entitled to receive, upon request to the Debtors, a reasonably sufficient number of Ballots to distribute to the beneficial owners of the Claims or Interests for which it is an Intermediary, and the Debtors will be responsible for and pay each such Intermediary's reasonable costs and expenses associated with the distribution of Ballots to the beneficial owners of such Claims and Interests and the tabulation of the ballots. Additionally, each Intermediary must receive returned ballots by 12:00 p.m. Noon (prevailing Eastern time) on [May 6], 2010 or such other time and date as the Intermediary may agree so that it can tabulate and return the results to the Voting Agent in a summary "master" ballot in a form approved by the Bankruptcy Court (the "**Master Ballot**") indicating the number and dollar amount of cast ballots in the group of Claim holders for which it is an Intermediary or indicating the amount of cast ballots in the group of Interest holders for which it is an Intermediary. The Intermediaries must certify that each beneficial holder has not cast more than one vote with respect to any given Claim or Interest for any purpose, including for determining both the number of votes and the amount of the Claim and the Interest, even if such holder holds securities of the same type in more than one account. However, persons who hold Claims and/or Interests in more than one voting Class will be entitled to one vote in each such Class, subject to the applicable voting rules.

**IMPORTANT - Voting by Intermediary**

**Timing:** If your vote is being processed by an Intermediary, please allow time for transmission of your ballot to your Intermediary for preparation and delivery to the Voting Agent of a Master Ballot reflecting your vote and the votes of other Claims or Interests tabulated by the Intermediary.

To be counted, your vote must be received ***either*** (a) directly by the **Voting Agent** on or before the Voting Deadline, or (b) if your vote is processed by an Intermediary, by **your Intermediary** by 12:00 p.m. Noon (prevailing Eastern time) on [May 6], 2010 or such other date and time as the Intermediary may agree to allow the Intermediary to process the Ballots.

Receipt by the **Intermediary** on or close to the Voting Deadline may not allow sufficient time for the Intermediary to include your vote in the Master Ballot that it prepares and delivers to the Voting Agent by the Voting Deadline.

**Questions on Voting Procedures:** If you have a question concerning the voting procedures, please contact your Intermediary or the Voting Agent.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE SECOND AMENDED PLAN IS IN THE BEST INTERESTS OF ALL HOLDERS OF CLAIMS AND

INTERESTS AND RECOMMEND THAT ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE SECOND AMENDED PLAN VOTE TO ACCEPT THE SECOND AMENDED PLAN.

## ARTICLE II.

## SUMMARY OF PLAN AND CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS THEREUNDER

**2.1** *General.*

Pursuant to the Second Amended Plan and the terms and conditions of the APA, the Debtors will consummate the Sale, whereby they will sell, assume, assign and/or transfer the Purchased Assets to the Purchaser in exchange for the Purchase Price (which will consist of Cash and the Assumed Liabilities). The Purchaser either will be the Stalking Horse Bidder[2] or such other Person that submits the highest or otherwise best bid for the Purchased Assets in accordance with the Bid Procedures and with whom the Debtors consummate the APA. Thus, the Debtors do not presently know the identity of the Purchaser, or other information such as the ownership of the Purchaser, the capital structure of the Purchaser or the Purchaser's planned use of the Purchased Assets.

The Debtors expect to fund their obligations under the Second Amended Plan from the proceeds from the Sale. The Cash component of the Purchase Price will be used, first, to pay in full (to the extent not assumed by the Purchaser or paid by the Debtors in the ordinary course of business) the Allowed DIP Claims, Allowed Administrative Expense Claims, Allowed Fee Claims, U.S. Trustee Fees, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Other Secured Claims, except to the extent that the Debtors elect to treat holders of such Claims differently in accordance with the terms of the Second Amended Plan, and second, to fund the Wind Down Account. The remaining Cash proceeds of the Sale will be allocated to holders of Allowed Rath General Unsecured Claims and Allowed Greenville General Unsecured Claims (based on the revenue of each Debtor for fiscal year 2010), in each case solely to the extent such Claims and Interests are not assumed by the Purchaser in connection with the Sale. *See* section 11.1(c) below. Allowed RG Tube General Unsecured Claims, Allowed Existing RG Tube Interests, RGCH General Unsecured Claims and Allowed RGCH PIK Notes Claims plus the Ad Hoc RGCH PIK Noteholders Committee and the RGCH PIK Notes Agent shall be paid solely from the RG Tube Cash in accordance with the terms of the Second Amended Plan, in each case solely to the extent such Claims and Interests are not assumed by the Purchaser in connection with the Sale.

In addition to the foregoing, the Second Amended Plan reflects a global settlement (the "**Global Settlement**") of: (i) various potential Intercompany Claims; (ii) the Debtors' dispute with the Ad Hoc RGCH PIK Noteholders Committee; and (iii) potential

---

[2]     The Stalking Horse Bidder is RathGibson Acquisition Co, LLC, a Delaware limited liability company, and is comprised of several of the current DIP Lenders and certain holders of the Senior Notes.

disputes with the Creditors' Committee regarding various matters. The Second Amended Plan is the product of extensive negotiations and discussions with the Stalking Horse Bidder, the Creditors' Committee, the Ad Hoc Senior Noteholders Committee and, with respect to the recoveries to holders of Allowed RGCH PIK Notes Claims, the Ad Hoc RGCH PIK Noteholders Committee. If confirmed, the Second Amended Plan will address the treatment of Claims against and Interests in each of the four Debtors and will fully and finally resolve numerous intercompany and intercreditor issues.

As part of the Global Settlement, if holders of RGCH PIK Notes Claims vote, as a class, to accept the Second Amended Plan, in full and final settlement of such holders Claims, each holder of an RGCH PIK Notes Claim will receive its Pro Rata Share of $300,000 in Cash. Existing RGCH Interests, Existing Rath Interests, and Existing Greenville Interests will be cancelled. In full and final settlement of Existing RG Tube Interests, subject to the terms of the Plan, each holder of an Allowed RG Tube Interest will receive its Pro Rata Share of $25,000 in Cash.

The Debtors believe that the Second Amended Plan provides for appropriate treatment of all Classes of Claims and Interests, taking into account the differing natures and priorities of the Claims and Interests.

**2.2     *Summary of the Stalking Horse Agreement.***

Following extensive discussions and negotiations, the Debtors and the Stalking Horse Bidder agreed to the terms of the Stalking Horse Agreement for the purchase of the Purchased Assets. The Debtors believe that the value they will realize from the Stalking Horse Agreement or a higher or otherwise better bid from a Successful Bidder will support a confirmable chapter 11 plan that will maximize value to their various creditor constituencies and bring a successful conclusion to these Chapter 11 Cases. On that basis, the Debtors are prepared to proceed with the sale of their business and assets under the terms of the Stalking Horse Agreement and the Second Amended Plan, subject to higher or otherwise better bids in accordance with the Bid Procedures.

Pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder has agreed to acquire the Debtors' right, title and interest in, to and under, free and clear of all encumbrances (other than Permitted Encumbrances (as defined in the Stalking Horse Agreement)), all or substantially all of the Debtors' assets for a purchase price consisting of $93 million in cash, subject to downward adjustment, plus certain assumed liabilities. Annexed hereto as <u>Exhibit 6</u> is a summary of the material terms of the Stalking Horse Agreement (the "<u>Stalking Horse Agreement Summary</u>"). The Stalking Horse Agreement Summary is intended as a summary only. To the extent the description provided therein differs in any respects from the terms of the Stalking Horse Agreement, the terms of the Stalking Horse Agreement govern. A copy of the Stalking Horse Agreement is annexed hereto as <u>Exhibit 4</u>.

**2.3     *Bid Procedures.***

The Sale pursuant to the APA is subject to higher or better offers, as more fully set forth in the *Order (I) (A) Approving Bid Procedures With Respect To The Sale;*

*(B) Approving Bid Protections With Respect To Stalking Horse Bidder; (C) Approving Assumption, Assignment And/Or Transfer Procedures; And (D) Scheduling An Auction And Approving The Form And Manner Of Notice Thereof; And (II) Granting Related Relief* annexed hereto as <u>Exhibit 5</u> (the "**Bid Procedures Order**"). Pursuant to the Bid Procedures Order, the Bid Deadline (as defined in the Bid Procedures Order) is scheduled for [May 12], 2010 at 5:00 p.m., prevailing Eastern time. If an Auction is held, it is scheduled to be held on [May 19], 2010. The Debtors will seek approval of the Successful Bid (as defined in the Bid Procedures Order) at the Confirmation Hearing.

**2.4**     *Summary of Treatment of Claims and Interests Under the Second Amended Plan.*

        The following table classifies the Claims against, and Interests in, the Debtors into separate Classes and summarizes the treatment of each Class under the Second Amended Plan. The table also identifies which Classes are entitled to vote on the Second Amended Plan based on provisions of the Bankruptcy Code. Finally, the table indicates the estimated recovery for each Class. The recoveries and estimates described in the following tables represent the Debtors' best estimates given the information available on the date of this Disclosure Statement. All statements in this section relating to the amount of Claims and Interests are only estimates based on information known to the Debtors as of the date hereof, and the final amounts of Allowed Claims may vary significantly from these estimates. **The Sale is subject to higher or otherwise better offers. Persons entitled to vote on the Second Amended Plan will be casting their ballots to accept or reject the Second Amended Plan prior to the Auction, if any. Accordingly, if higher or otherwise better offers are received and accepted by the Debtors and approved by the Bankruptcy Court, the estimated distributions set forth below may be higher or otherwise better then as set forth below.**

        In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, U.S. Trustee Fees, Fee Claims, and Priority Tax Claims have not been classified. Except as specifically noted therein, the Second Amended Plan does not provide for payment of postpetition interest with respect to Allowed Claims (excluding Allowed DIP Claims).

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| Unclassified | DIP Claims | Holders of Allowed DIP Claims will be paid in full in Cash. | No. | $83.58 million[3] | 100% |

---

[3]     This amount includes a Court-approved "exit fee" of $3.2 million.

DB02:9340498.2         068401.1001

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------------------------------------|--------------------|
| Unclassified | Administrative Expense Claims | Each holder of an Allowed Administrative Expense Claim shall receive, unless such holder agrees to different treatment, Cash in an amount equal to such Allowed Claim; provided, however, that any Administrative Expense Claim that is an Assumed Liability shall be assumed by the Purchaser and the Purchaser shall be responsible therefor in accordance with the terms of the APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such Administrative Expense Claim. | No. | $175,000 | 100% |
| Unclassified | Fee Claims | Each holder of an Allowed Fee Claim for which a Fee Application has been approved by the Bankruptcy Court shall receive Cash in an amount so approved. | No. | $5.30 million | 100% |
| Unclassified | U.S. Trustee Fees | Each of the Debtors shall pay all outstanding U.S. Trustee Fees of such Debtor on an ongoing basis on the later of: (i) the Effective Date; and (ii) the date such U.S. Trustee Fees become due. | No | $33,000 | 100% |
| Unclassified | Priority Tax Claims | Unless such holder agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the applicable Debtor's option, either: (a) Cash in an amount equal to the amount of such Claim, or (b) deferred Cash | No. | $157,190 | 100% |

DB02:9340498.2

068401.1001

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------------------------------------|--------------------|
| | | payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (plus any interest due, calculated in accordance with section 511 of the Bankruptcy Code); provided, however, that any Priority Tax Claim that is an Assumed Liability shall be assumed by the Purchaser and the Purchaser shall be responsible therefor in accordance with the terms of the APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such Priority Tax Claim. | | | |
| Class 1 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment and after the date a Priority Non-Tax Claim becomes an Allowed Claim, on, or as soon thereafter as is reasonably practicable, the Initial Distribution Date, the holder of such Allowed Priority Non-Tax Claim shall receive Cash from the applicable Debtor in an amount equal to such Claim; provided, however, that any Priority Non-Tax Claim that is an Assumed Liability shall be assumed by the Purchaser and the Purchaser shall be responsible therefor in accordance with the terms of the | No. | $48,718 | 100% |

DB02:9340498.2

068401.1001

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------------------------------------|--------------------|
| | | APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such Priority Non-Tax Claim. | | | |
| Class 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment and after the date an Other Secured Claim becomes an Allowed Claim, on, or as soon thereafter as is reasonably practicable, the Initial Distribution Date, each holder of such Allowed Other Secured Claim shall receive, at the election of the Debtors: (i) Cash in an amount equal to such Allowed Claim; (ii) such other treatment that will render the Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; or (iii) the return of property securing such Allowed Other Secured Claim; provided, however, that any Other Secured Claim that is an Assumed Liability shall be assumed by the Purchaser and the Purchaser shall be responsible therefor in accordance with the terms of the APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such Other Secured Claim. | No. | $0 | 100% |

- 13 -

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| Class 3(a) | Prepetition Secured Credit Agreement Claims | To the extent not already paid in full prior to the Effective Date pursuant to the terms of DIP Orders or otherwise, on the Effective Date, or as soon as practicable thereafter, the Allowed Prepetition Secured Credit Agreement Claims shall be paid in an aggregate amount equal to (i) $52,747,405.02 plus (ii) any accrued and unpaid interest at the non-default contract rate under the Prepetition Secured Credit Agreement as of the Effective Date, except to the extent such interest is otherwise provided in the Second Amended Plan to be paid or satisfied, plus (iii) unpaid professional fees and expenses, as provided for in the Prepetition Secured Credit Agreement and the DIP Orders plus (iv) all other Obligations as defined in the Prepetition Secured Credit Agreement, in complete and final satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Claims. | No. | $53.29 million | 100%[4] |
| Class 3(b) | Rath General Unsecured Claims | Except to the extent that a holder of an Allowed Rath General Unsecured Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of the later of five (5) Business Days after the Prepetition | Yes. | $209.525 million | 1.2% |

---

[4] The Debtors' obligations under the Prepetition Secured Credit Agreement were paid in full pursuant to the Final DIP Order.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|-------|-------------|-----------|------------------|-------------------------------------------------|--------------------|
| | | Ordinary Course of Business Trade Claims Bar Date and the next Interim Distribution Date immediately following the date that a Rath General Unsecured Claim becomes an Allowed Claim, the holder of such Allowed Rath General Unsecured Claim shall receive its Pro Rata Share of the Class 3(b) Distribution; provided, however, that any Rath General Unsecured Claim that is an Assumed Liability shall be assumed by the Purchaser and the Purchaser shall be responsible therefor in accordance with the terms of the APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such Rath General Unsecured Claim. | | | |
| Class 3(c) | Existing Rath Interests | Existing Rath Interests shall be cancelled and holders of Existing Rath Interests shall not be entitled to any distribution under the Second Amended Plan. | No. | N/A | 0% |
| Class 4(a) | Greenville General Unsecured Claims | Except to the extent that a holder of an Allowed Greenville General Unsecured Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the next Interim Distribution Date immediately following the date that a Greenville General Unsecured Claim becomes an Allowed Claim, each holder of | Yes. | $209.250 million | 0.2% |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | | an Allowed Greenville General Unsecured Claim shall receive its Pro Rata Share of the Class 4(a) Distribution; provided, however, that any Greenville General Unsecured Claim that is an Assumed Liability shall be assumed by the Purchaser and the Purchaser shall be responsible therefor in accordance with the terms of the APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such Greenville General Unsecured Claim. | | | |
| Class 4(b) | Existing Greenville Interests | Existing Greenville Interests shall be cancelled and holders of Existing Greenville Interests shall not be entitled to any distribution under the Second Amended Plan. | No. | N/A | 0% |
| Class 5(a) | RGCH PIK Notes Claims | Each holder of an Allowed RGCH PIK Notes Claim shall receive in exchange for, such Claim its Pro Rata Share of the Class 5(a) Distribution; provided, however, holders of Allowed RGCH PIK Notes Claims shall not receive or retain any distribution under the Second Amended Plan on account of their RGCH PIK Notes Claims if Class 5(a) votes to reject the Second Amended Plan. | Yes. | $152.24 million | 0.2% |
| Class 5(b) | RGCH General Unsecured | Except to the extent that a holder of an Allowed RGCH General Unsecured Claim | Yes. | $0 | N/A |

DB02:9340498.2

068401.1001

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------------------------------------|--------------------|
| | Claims | agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the next Interim Distribution Date immediately following the date that a RGCH General Unsecured Claim becomes an Allowed Claim, the holder of such Allowed RGCH General Unsecured Claim shall receive its Pro Rata Share of the Class 5(b) Distribution; provided, however, that any RGCH General Unsecured Claim that is an Assumed Liability shall be assumed by the Purchaser and the Purchaser shall be responsible therefor in accordance with the terms of the APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such RGCH General Unsecured Claim. | | | |
| Class 5(c) | Existing RGCH Interests | Existing RGCH Interests shall be cancelled and holders of Existing RGCH Interests shall not be entitled to any distribution under the Second Amended Plan. | No. | N/A | 0% |
| Class 6(a) | RG Tube General Unsecured Claims | Except to the extent that a holder of an Allowed RG Tube General Unsecured Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the | Yes. | $0 | N/A |

DB02:9340498.2

068401.1001

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------------------------------------|--------------------|
| | | next Interim Distribution Date immediately following the date that a RG Tube General Unsecured Claim becomes an Allowed Claim, the holder of such Allowed RG Tube General Unsecured Claim shall receive its Pro Rata Share of the Class 6(a) Distribution in Cash; provided, however, that any RG Tube General Unsecured Claim that is an Assumed Liability shall be assumed by the Purchaser and the Purchaser shall be responsible therefor in accordance with the terms of the APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such RG Tube General Unsecured Claim. | | | |
| Class 6(b) | Existing RG Tube Interests | Each holder of an Allowed Existing RG Tube Interest shall receive its Pro Rata Share of $25,000 in Cash. | Yes. | N/A | N/A |

The recoveries set forth above are estimates and are contingent upon approval of the Second Amended Plan as proposed.

## ARTICLE III.

## BUSINESS DESCRIPTION AND CIRCUMSTANCES THAT LED TO THESE CHAPTER 11 CASES

**3.1** *The Debtors' Businesses.*

(a) **The Debtors.**

The Debtors (together with their non-debtor subsidiaries, the "**Company**"), headquartered in Illinois, comprise one of the world's leading specialty manufacturers of highly engineered premium stainless steel and alloy tubular products. The Company's products are

- 18 -

designed to meet customer specifications and are used in environments that require high-performance characteristics, such as exceptional strength and the ability to withstand corrosive materials, extreme temperatures, or high pressure. The Company sells over 1,000 products globally in diverse end-markets, including, among others: (a) chemical/petrochemical processing and power generation; (b) energy; (c) food, beverage and pharmaceuticals; and (d) general commercial markets. The Company's primary trade brands, Rath™, Gibson Tube® and GTC® are recognized as industry leaders, and the Company's products have won numerous awards for quality and reliability from its customers. In addition, the Company's short customer lead times and custom product lengths further distinguish the Company from lower quality, standardized steel tubing and pipe products.

The Company primarily operates within certain niche sub-segments of the global welded and seamless tube industry, and mainly focuses on stainless steel tubing products, which are premium products that offer higher margins than those products manufactured from carbon steel. The Company sells its products to value-added tubing distributors, original equipment manufacturers and engineering firms.

 (b) **Company History.**

In 1999, Rath Manufacturing Company Holdings, Inc., with operations in Janesville, Wisconsin, was combined with Gibson Tube Company, with operations in North Branch, New Jersey, to form RathGibson. In 2003, the Company hired a new executive team that implemented a comprehensive set of operational initiatives at its Janesville, Wisconsin facility, which enhanced the Company's efficiency and profitability. These included improved purchasing activities, the reduction of scrap generation and the upgrading of equipment to increase throughput and reduce labor costs. In October 2004, the Company integrated the management, business strategy, marketing and operations of its Janesville, Wisconsin and North Branch, New Jersey facilities and implemented the sharing of best practices between the two facilities.

On February 7, 2006, all of the equity interests of RathGibson were purchased by RGCH, a wholly-owned subsidiary of RGCH Holdings LLC ("**RGCH LLC**"), an affiliate of Castle Harlan Partners IV, L.P., a private equity investment fund, and certain members of RathGibson's senior management who exchanged a portion of their equity in RathGibson for equity in RGCH LLC.

On August 15, 2006, RathGibson acquired all of the outstanding equity interests of Greenville. Greenville manufactures specialty stainless steel and nickel alloy tubular products for use in various end-markets. Greenville is strategically focused on serving non-commodity niche tubing markets by providing tubing in custom sizes, small lots and non-traditional grades, while delivering orders with short lead times as compared to the industry.

On June 15, 2007, 100% of the equity of RGCH was purchased from RGCH LLC by RG Tube, which was then an affiliate of DLJ Merchant Banking Partners IV, L.P. and certain of its affiliated investment funds ("**DLJ**"), and certain members of RathGibson's senior management who exchanged a portion of their equity in RGCH LLC for equity in RG Tube (such transaction, the "**DLJ Acquisition**").

On February 27, 2008, the Company entered into an asset purchase agreement with Mid-South Control Line, Inc. ("**Mid-South**"), whereby the Company acquired substantially all of the assets and assumed certain of the liabilities of Mid-South. Mid-South is a distributor of stainless steel and nickel alloy tubing and accessories in the domestic and international oil and gas industry.

**(c)     Products.**

The Company primarily produces stainless steel tubing, which is typically either welded or seamless. Welded stainless steel and specialty alloy tubular products are desirable in applications that require exceptional strength, resistance to corrosion and the ability to withstand intense heat and pressure, such as energy applications. Furthermore, the easy cleaning, tolerance of sterilizing cycles and non-contaminating characteristics of stainless steel tubing make it the first choice for hygienic environments, such as pharmaceutical and food processing facilities, hospitals and kitchens.

Welded tubing, which is the Company's primary product, has become increasingly popular globally for most applications due to its dimensional and wall thickness, consistency and concentricity, corrosion resistance, mechanical strength and lower cost relative to seamless tubing, primarily attributable to steadily improving production technology. Welded tubes are manufactured by using consecutively smaller precision dies to roll strips of material into tubular shapes, while various welding technologies connect the edges to form a longitudinal seam. The tubes are then heat treated and tested for product integrity during the manufacturing process. This operation is more cost effective than seamless tubing because it is continuous, with the rolling, welding and testing taking place on the same mill.

The Company manufactures its tubing to comply with major industry standards, such as those of the American Society of Mechanical Engineers and the American Society for Testing Materials. The Company also seeks to ensure high quality products by employing multiple non-destructive testing techniques, such as film based x-ray, digital radiography, ultrasonic testing, dual frequency eddy current testing, hydrostatic testing, air underwater testing and metallographic examination. Approximately 70% of the Company's products are designed to meet customer specifications.

**(1)     Chemical/Petrochemical Processing and Power Generation Products.**

The Company's chemical/petrochemical processing and power generation products include stainless steel tubing used in heat exchangers and condensers as well as nickel alloy and titanium tubing. Heat exchangers transfer heat from one fluid or gas to another using various media such as air, gas, water, steam, oil, refrigerant, heat transfer fluids, glycol or polymers and are used for many manufacturing processes. The Company's tubing is primarily utilized in shell and tube heat exchangers, which consist of a bundle of tubes, 30,000 feet on average, enclosed in a cylindrical shell. Shell and tube heat exchangers comprise approximately 30% of the market for heat exchangers. Demand in this market primarily is driven by both new and refurbishment capital spending by the Company's chemical and petrochemical customers such as ExxonMobil, Shell Oil, DuPont and Monsanto.

- 20 -

(2)     **Energy Products.**

The Company's energy products include pressure coils, encapsulated wires and subsea umbilical tubing. Demand for these products primarily is driven by oil and gas production.

(3)     **Food, Beverage and Pharmaceutical Products.**

The Company's food, beverage and pharmaceutical products include high purity/electropolished and beverage coil tubing. High purity tubing is common in the food and beverage equipment market, as it meets stringent standards due to its surface finish and ease of cleaning. The internal and external surfaces of high purity tubes have enhanced smoothness which reduces the risk of contaminants adhering to the inside of the tubes. Demand for these products is driven by new pharmaceutical development and increased international demand for high purity products.

(4)     **General Commercial Products.**

The Company's commercial quality tubing products are used by a variety of customers in various markets either for their pressure retention, mechanical properties or corrosion resistance. The Company produces tubing to perform in a wide variety of applications, including such divergent uses as sprinkler systems and misting systems, conveyor belt rollers, car wash equipment, and for use in chemical plants, pulp and paper plants and for power generation applications. As a result of their broad range of end-users, demand for these products is driven by overall economic conditions.

(d)     **Facilities and Offices.**

The Company is headquartered in Lincolnshire, Illinois, and has four facilities located in Wisconsin, New Jersey, Louisiana and Arkansas. The Wisconsin facility produces welded straight tubing products; the Arkansas facility produces seamless straight tubing products; and the New Jersey facility primarily produces coiled tubing products. The Louisiana facility is primarily a distribution facility with a significant portion of its products purchased from the New Jersey plant. The Company's state-of-the-art production facilities use internally developed proprietary manufacturing and welding techniques and sophisticated finishing processes. The Company has the capability to manufacture products from over 35 different high-performance alloys. As customers' delivery requirements are often shorter than suppliers lead times, the Company carries significant inventories of raw materials.

In addition to their domestic facilities, the Debtors have three non-debtor foreign subsidiaries (the "**Foreign Subs**"), which operate sales offices, located in Australia, Singapore and India. In addition, RathGibson maintains sales offices in China, Korea, Austria, Bahrain and Argentina (the "**International Sales Offices**"). The Foreign Subs and the International Sales Offices together employ a total of 12 employees. The International Sales Offices provide the Debtors with access to a wide variety of markets in which they would otherwise be unable to readily sell their goods.

DB02:9340498.2     068401.1001

(e)    **Operations.**

(1)    **Suppliers.**

The principal raw material inputs for the Company's products include stainless steel, specialty alloys, titanium and industrial gases, such as hydrogen and argon. The Company's large volume of stainless steel purchases historically enabled it to negotiate favorable purchasing terms from suppliers of stainless steel.

(2)    **Competition.**

Global production of welded stainless steel tube and pipe products in the Company's industry niche sub-segments is largely concentrated in the United States. However, the Company also competes with a limited number of European and Asian manufacturers, primarily with respect to the Company's foreign sales. Domestically, the Company faces limited competition from foreign manufacturers due to shipping costs, longer lead times and the limited experience of most foreign manufacturers working with specialty alloys and producing the fully finished tubular products that customers for the Company's industry sub-segments demand.

The Company competes primarily on the basis of price, quality, service and ability to fill orders on a timely basis. The Company faces competition in the markets for each of the products it manufactures and its primary competitors are specialty manufacturers of tubular products that are believed to have annual net sales in the Company's product lines that are significantly less than the Company's. These specialty manufacturers typically manufacture one or two products with which the Company's products compete, and the Company therefore often has different competitors in the markets for each of its products.

(3)    **Government Regulation.**

The Company's manufacturing facilities are subject to many federal, state and local environmental laws, ordinances and regulations that limit discharges into the environment, establish standards for the handling, generation, emission, release, discharge, treatment, storage and disposal of hazardous materials, substances and waste, and require cleanup of contaminated soil and groundwater. These laws, ordinances and regulations are complex, change frequently and have tended to become more stringent over time. Many of them provide for substantial fines and penalties, orders (including orders to cease operations) and criminal sanctions for violations. They may also impose liability for property damage and personal injury stemming from the presence of, or exposure to, hazardous substances. The Company is unaware of any existing, pending, or threatened contingent liability that may have a material adverse effect on its ongoing business operations.

The Company's operations also are governed by laws and regulations relating to workplace safety and worker health and regulations which, among other requirements, establish lifting, noise and dust standards. The Company believes it is in material compliance with these laws and regulations and does not believe that future compliance with such laws and regulations will have a material adverse effect on its results of operations or financial condition.

DB02:9340498.2                                                                                       068401.1001

**3.2    Summary of Corporate Structure.**

        RG Tube is the ultimate parent of the other Debtors.  The majority of the equity of RG Tube is held by DLJ.  RG Tube owns 100% of the equity interests of RGCH, which is the direct parent of RathGibson.  RathGibson is the direct parent of Greenville as well as the three non-Debtor Foreign Subs, whose primary purpose is to assist the Debtors in their foreign sales.

**3.3    Debtors' Prepetition Capital and Debt Structure.**

        Certain of the Debtors are party to the senior secured revolving Prepetition Credit Agreement, dated as of February 7, 2006, by and among RathGibson, as borrower, RGCH and Greenville, as guarantors, the Prepetition Secured Lender (as explained in more detail in Section 4.2 below), and General Electric Capital Corporation, as agent ("**GECC**").  The maximum borrowing capacity under the Prepetition Credit Agreement was $90 million, subject to borrowing base availability.  As of the Petition Date, the outstanding balance under the Prepetition Credit Agreement, including principal and interest, was approximately $52.3 million, which debt is secured by substantially all of the Debtors' assets.  See Section 10.5(b), "Postpetition Financing and Use of Cash Collateral," below.

        In addition, pursuant to an indenture, dated as of February 7, 2006, RathGibson issued the Senior Notes in the aggregate principal amount of $200 million.  The Senior Notes bear interest at the annual rate of 11.25% and are due on February 15, 2014.  The Senior Notes are unsecured obligations of RathGibson, and are guaranteed by Greenville.  As of the Petition Date, the outstanding balance of the Senior Notes, including principal and interest, was approximately $209.25 million.

        In connection with the DLJ Acquisition, RGCH issued the RGCH PIK Notes in the aggregate principal amount of $115.0 million, pursuant to the RGCH PIK Credit Agreement. The RGCH PIK Notes bear interest at the annual rate of 13.5% and are due on June 15, 2015. The RGCH PIK Notes are unsecured and structurally subordinate to the Senior Notes.  As of the Petition Date, the outstanding balance of the RGCH PIK Notes, including principal and interest, was approximately $152.2 million.  The other Debtors are not a party to any agreement related to the RGCH PIK Notes and do not have any obligations (including any guarantee obligations) in respect of the RGCH PIK Notes.

        In addition, Greenville is party, with RathGibson as guarantor, to an approximately $1.6 million secured industrial development revenue bond with the City of Clarksville, Arkansas (which was subsequently assigned to GE Capital Franchise Finance Corporation), due December 30, 2014, the proceeds of which were used to fund a project at the Company's Clarksville, Arkansas facility.

        The Debtors estimate that as of the Petition Date, they had approximately $6.4 million in unpaid ordinary course trade obligations.  In addition, there were approximately $14.8 million in intercompany obligations, including ordinary course trade obligations, due from RathGibson to Greenville.

- 23 -

# ARTICLE IV.

## EVENTS LEADING TO CHAPTER 11 FILING

**4.1    _The Debtors' Financial Position._**

The Company had net losses of approximately $216 million in total for the fiscal year ended January 31, 2009 and net losses of approximately $40.8 million in total for the fiscal year to date period ended December 31, 2009. As of December 31, 2009, the Debtors' unaudited consolidated balance sheet reflected total current assets of approximately $106.5 million and total current liabilities of approximately $115.4 million.

**4.2    _Events Leading to the Formulation of the First Amended Plan._**

Leading up to the commencement of these chapter 11 cases, the Debtors faced significant operational challenges, including, inter alia: (i) a decline in the demand for the Debtors' products as a result of various macroeconomic factors; (ii) a decline in value of raw materials and other inventory held by the Debtors; and (iii) revenue shortfalls in the Debtors' businesses that have impacted profitability.

In February 2009, Moody's Investors Service downgraded the Company's credit ratings from B3 to Caa2 with a revision to the Company's outlook from stable to negative. The operational challenges and resulting impact on the Debtors' financial condition led to issues on the Debtors' ability to satisfy certain covenants under the RGCH PIK Credit Agreement, compromising their ability to borrow thereunder without certain waivers or amendments under the Prepetition Secured Credit Agreement.

The Debtors' increasing liquidity issues and the looming interest payment of $11.25 million under the Senior Notes, due on August 15, 2009, raised questions by the Debtors' auditors about the Debtors' ability to continue as a going-concern enterprise. These questions led the Debtors to file a Form 12b-25 with the SEC delaying the filing of its Form 10-K.

The 12b-25 and the Form 10-K filed in May 2009 and the Form 10-Q filed in June 2009 disclosed the negative trend in the Company's financial condition, its covenant compliance issues and its strained liquidity position. In May 2009, Standard & Poor's also downgraded the Company's credit ratings from B to CCC+ with a revision to the Company's outlook from negative to watch negative. In June 2009, Moody's further downgraded the Company's credit ratings.

Prior to the Petition Date, the Debtors had been continuously exploring their options for addressing their liquidity and capital structure issues with their lenders, noteholders and other constituents.

As a result of the severe liquidity issues facing the Company, in June 2009, the Company began exploring opportunities to obtain additional funding. The liquidity was especially needed because the Debtors were close to covenant breaches under their credit agreement and insufficient availability to meet its liabilities to trade creditors. At that time, the

then prepetition secured lenders also were conducting an inventory valuation, which upon conclusion may have left the Company with no borrowing base availability under the Prepetition Secured Credit Agreement. In light of the liquidity crisis facing the Company, the Company's advisors reached out to parties who may have had an interest in providing additional financing to the Company and required the submission of a commitment letter, in a very short period of time, to provide funding to the Company to enable it to continue its operations.

As a result of this urgent need for additional liquidity, on June 19, 2009, one of the DIP Lenders, took assignment[5] of the prepetition secured debt and entered into an amendment to the Prepetition Credit Agreement to provide, among other things, the Company with much needed liquidity necessary to operate their businesses. Also on June 19, 2009, the Debtors negotiated a term sheet and signed a commitment letter (the "**Commitment Letter**") with certain of the DIP Lenders outlining the terms and conditions of the DIP Facility.

As required by the terms of the Commitment Letter, and after good faith negotiations, the Debtors negotiated the terms of a plan support agreement and the First Amended Plan with an informal committee of the holders of the Senior Notes, which committee includes certain of the DIP Lenders. The plan support agreement, dated July 13, 2009, was executed by certain holders of the Senior Notes representing approximately 73% in principal amount of the Senior Notes, each of whom agreed to vote in favor of the First Amended Plan, if certain conditions were met in accordance with the terms of the plan support agreement.

On the Petition Date, RathGibson and Greenville, two of the Debtors, filed the First Amended Plan and related disclosure statement [Docket No. 33]. At a hearing held on August 31, 2009, the Bankruptcy Court approved the disclosure statement related to the First Amended Plan as containing adequate information under section 1125 of the Bankruptcy Code and authorized such Debtors to solicit votes to accept or reject the First Amended Plan. While the First Amended Plan was unanimously accepted by those Persons entitled to vote thereon, following the solicitation of votes in respect of the First Amended Plan, the Debtors determined it was appropriate to amend the First Amended Plan to, among other things, provide for the inclusion of RG Tube and RGCH in the chapter 11 plan and to implement a more tax efficient restructuring. After several months of discussions with key constituencies in these cases, the Debtors determined that it was in their, their estates and their creditors best interests to pursue the Sale, whereby the Debtors intend, subject to Bankruptcy Court approval and acceptance of the Second Amended Plan by the applicable Persons entitled to vote thereon, to sell substantially all of their assets to the Stalking Horse Bidder or such other bidder that submits a higher or otherwise better bid at the Auction pursuant to the Bid Procedures. The APA contemplates the

---

[5]     On June 19, 2009: (i) GECC and Wayzata Opportunities Fund II, L.P. ("**WF II**") entered into that certain Assignment and Transition Agency Agreement, and (ii) Natixis and WF II entered into that certain Assignment Agreement, pursuant to which GECC and Natixis, respectively, assigned their interests in and commitments as lenders under the Prepetition Credit Agreement to WF II. As a result of these assignments, WF II is the sole remaining Secured Lender under the Prepetition Credit Agreement as of the Petition Date. GECC continues to act as agent under the Prepetition Credit Agreement.

assumption of certain liabilities, including the assumption of all ordinary course of business trade payables listed on the Schedules and as set forth in the APA.

## ARTICLE V.

## REASONS FOR THE SOLICITATION; RECOMMENDATION

Chapter 11 of the Bankruptcy Code provides that unless the terms of section 1129(b) of the Bankruptcy Code are satisfied, for the Bankruptcy Court to confirm the Second Amended Plan as a consensual plan, the holders of impaired Claims against the Debtors in each Class of impaired Claims and each impaired Class of Interests entitled to vote on the Second Amended Plan must accept the Second Amended Plan by the requisite majorities set forth in the Bankruptcy Code. An impaired Class of Claims shall have accepted the Second Amended Plan if (a) the holders of at least two-thirds (2/3) in amount of the Claims in such Class actually voting on the Second Amended Plan have voted to accept it, and (b) more than one-half (1/2) in number of the holders in such Class actually voting on the Second Amended Plan have voted to accept it. An impaired Class of Interests shall have accepted the Second Amended Plan if the holders of at least two-thirds (2/3) in amount of the Interests in such Class actually voting on the Second Amended Plan have voted to accept it (in the case of such votes in (a) and (b), the "**Requisite Acceptances**").

In light of the significant benefits to be attained by the Debtors and their creditors if the transactions contemplated by the Second Amended Plan are consummated, the Debtors recommend that all holders of Claims and Interests entitled to do so, vote to accept the Second Amended Plan. The Debtors reached this decision after considering available alternatives to the Second Amended Plan and their likely effect on the Debtors' business operations, creditors, and shareholders. These alternatives included liquidation of the Debtors under chapter 7 of the Bankruptcy Code or a reorganization under chapter 11 of the Bankruptcy Code. The Debtors determined, after consulting with their legal and financial advisors, that the Second Amended Plan, if consummated, will maximize the value of these estates for stakeholders under the circumstances of these Chapter 11 Cases, as a result of, among other things, the Sale and the compromises and settlements embodied therein, as compared to any other out-of-court refinancing scenario reasonably available, or any other chapter 11 reorganization strategy or a liquidation under chapter 7. For all of these reasons, the Debtors support the Second Amended Plan and urge the holders of Claims and Interests entitled to vote on the Second Amended Plan to accept and support it. As set forth in the letter from the Creditors' Committee accompanying the Disclosure Statement, the Creditors' Committee supports the Plan and urges unsecured creditors to vote in favor thereof.

## ARTICLE VI.

## THE SECOND AMENDED PLAN

### 6.1 *Overview of Chapter 11.*

Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to restructure its business for the benefit of itself, its

- 26 -

creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the bankruptcy filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 restructuring case. A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a chapter 11 plan by the bankruptcy court makes that plan binding upon the debtor, any issuer of securities under the plan, any Person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan provides releases to a debtor and any debt that arose prior to the date of confirmation of the plan is satisfied in accordance with the terms of that particular plan.

In general, a chapter 11 plan (a) divides claims and equity interests into separate classes, (b) specifies the property, if any, that each class is to receive under the plan, and (c) contains other provisions necessary to the restructuring of the debtor and that are required or permitted by the Bankruptcy Code.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a plan may not be solicited after the commencement of a chapter 11 case until such time as the court has approved the disclosure statement as containing adequate information. Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the chapter 11 plan. To satisfy applicable disclosure requirements, the Debtors submit this Disclosure Statement to holders of Claims that are impaired and not deemed to have rejected the Second Amended Plan and Interests that are impaired and not deemed to have accepted or rejected the Second Amended Plan.

## 6.2    *Intercompany Claims.*

On the Effective Date, all Intercompany Claims (other than Intercompany Claims that constitute Purchased Assets or Assumed Liabilities and that are sold, transferred, assigned, conveyed or delivered by the applicable Debtor, pursuant to the terms of the APA) shall be eliminated by offset, the contribution or distribution of such Claims, or otherwise, including being settled pursuant to the terms of this Plan (as determined by the Debtors).

## 6.3    *Overview of the Second Amended Plan.*

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE SECOND AMENDED PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED**

**INFORMATION SET FORTH IN THE SECOND AMENDED PLAN AND THE EXHIBITS AND SCHEDULES THERETO.**

The Second Amended Plan classifies Claims and Interests separately in accordance with the Bankruptcy Code and provides different treatment for different Classes of Claims and Interests. Claims and Interests shall be included in a particular Class only to the extent such Claims or Interests qualify for inclusion within such Class. The Second Amended Plan separates the various Claims and Interests (other than those that do not need to be classified) into twelve (12) separate Classes. These Classes take into account the differing nature and priority of Claims against, and Interests in, the Debtors. Unless otherwise indicated, the characteristics and amounts of the Claims or Interests in the following Classes are based on the books and records of the Debtors.

This section summarizes the treatment of each of the Classes of Claims and Interests under the Second Amended Plan and describes other provisions of the Second Amended Plan. A description of the Sale and the APA are set forth above in Article II. Only holders of Allowed Claims — Claims that are not in dispute, contingent, or unliquidated in amount and are not subject to an objection or an estimation request — and holders of Allowed RG Tube Interests are entitled to receive distributions under the Second Amended Plan. For a more detailed description of the definition of "Allowed," see Article I of the Second Amended Plan. Until a Disputed Claim or Disputed Interest becomes Allowed, no distributions of Cash or otherwise will be made.

The Debtors believe that they will be able to perform their obligations under the Second Amended Plan. The Debtors also believe that the Second Amended Plan permits fair and equitable recoveries.

The Confirmation Date will be the date that the Confirmation Order is entered by the Clerk of the Bankruptcy Court. The Effective Date will be the first Business Day on or after the Confirmation Date on which all of the conditions to the Effective Date specified in Section 11.2 of the Second Amended Plan have been satisfied or waived, including the consummation of the transactions contemplated by the Second Amended Plan.

The Debtors anticipate that the Effective Date will occur on or prior to June 16, 2010. Resolution of any challenges to the Second Amended Plan may take time and, therefore, the actual Effective Date cannot be predicted with certainty.

Other than as specifically provided in the Second Amended Plan, the treatment under the Second Amended Plan of each Claim and Interest will be in full satisfaction, settlement, release and discharge of all Claims or Interests. The Debtors will make all payments and other distributions to be made under the Second Amended Plan unless otherwise specified.

All Claims and Interests, except DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article IV of the Second Amended Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified, and the holders thereof are not entitled to vote on the

Second Amended Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

A Claim or Interest also is placed in a particular Class for all purposes, including voting, confirmation and distribution under the Second Amended Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. However, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Second Amended Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

(a) **Unclassified Claims.**

(1) **DIP Claims.**

In full satisfaction, settlement, release and discharge of the Allowed DIP Claims, on the Effective Date the holders of Allowed DIP Claims shall be paid in full in Cash. The liens and security interests securing the DIP Claims shall continue in full force and effect until the DIP Claims have been paid in full in Cash.

(2) **Administrative Expense Claims.**

Time for Filing Administrative Expense Claims: The holder of an Administrative Expense Claim, other than the holder of:

a. a Fee Claim;

b. an Administrative Expense Claim subject to the Administrative Expense Claim Bar Date Order;

c. an Administrative Expense Claim that has been Allowed on or before the Effective Date;

d. an Administrative Expense Claim for an expense or liability incurred and payable in the ordinary course of business by a Debtor;

e. an Administrative Expense Claim on account of fees and expenses incurred on or after the Petition Date by ordinary course professionals retained by the Debtors pursuant to an order of the Bankruptcy Court;

f. an Assumed Liability under the APA;

g. an Ad Hoc Senior Noteholders Committee Fee Claim;

h. a Senior Notes Indenture Trustee Claim;

- 29 -

i.        a RGCH PIK Notes Agent Claim; and

j.        an Ad Hoc RGCH PIK Noteholders Committee Fee Claim,

must file with the Bankruptcy Court and serve on the Debtors, the Claims Agent, the Creditors' Committee and the Office of the United States Trustee, proof of such Administrative Expense Claim **within thirty (30) days after the Effective Date.** Such proof of Administrative Expense Claim must include at a minimum: (i) the name of the applicable Debtor that is purported to be liable for the Administrative Expense Claim and if the Administrative Expense Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (ii) the name of the holder of the Administrative Expense Claim; (iii) the amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

Treatment of Administrative Expense Claims: Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date an Administrative Expense Claim becomes an Allowed Claim, the holder of such Allowed Administrative Expense Claim shall receive from the applicable Debtor Cash in an amount equal to such Allowed Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, shall be paid by the applicable Debtor, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such liabilities; provided, further, however, that any Administrative Expense Claim that is an Assumed Liability shall be assumed by the Purchaser and the Purchaser shall be responsible therefor in accordance with the terms of the APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such Administrative Expense Claim.

In the case of the Senior Notes Indenture Trustee Claims, such Claims will be paid in the ordinary course of business (subject to the Debtors' prior receipt of invoices and reasonable documentation in connection therewith and without the requirement to file a fee application with the Bankruptcy Court) but no later than the Effective Date; provided, that such fees, costs and expenses are reimbursable under the terms of the Senior Notes Indenture; and provided further, however, that the Senior Notes Indenture Trustee will receive payment in the ordinary course of business (subject to the Debtors' prior receipt of invoices and reasonable documentation in connection therewith) for all reasonable fees, costs, and expenses incurred after the Effective Date in connection with the distributions required pursuant to the Second Amended Plan or the implementation of any provisions of the Second Amended Plan.

In the case of the Ad Hoc Senior Noteholders Committee Fee Claims, such Claims will be paid in full in Cash on the Effective Date for all reasonable, documented fees and

- 30 -

expenses incurred up to the Effective Date (without the requirement to file a fee application with the Bankruptcy Court). In the event that the Debtors dispute all or a portion of the Ad Hoc Senior Noteholders Committee Fee Claims, the Debtors shall pay the undisputed amount of such Claims, and reserve the Cash allocable to the remaining portion of such Claims until such dispute is resolved by the parties or by the Bankruptcy Court.

In the case of the Ad Hoc RGCH PIK Noteholders Committee Fee Claims, such Claims will be paid in full in Cash on the later of the Effective Date and 14 days after receipt by the Debtors of invoices demonstrating reasonable documented fees and expenses, without the requirement to file a fee application with the Bankruptcy Court. In the event that the Debtors dispute all or a portion of the Ad Hoc RGCH PIK Noteholders Committee Fee Claims, the Debtors shall pay the undisputed amount of such Claims, and reserve the Cash allocable to the remaining portion of such Claims until such dispute is resolved by the parties or by the Bankruptcy Court.

In the case of the RGCH PIK Notes Agent Claims, such Claims will be paid in the ordinary course of business (subject to the Debtors' prior receipt of invoices demonstrating reasonable documented fees and expenses, and without the requirement to file a fee application with the Bankruptcy Court) on or as soon as reasonably practicable after the Effective Date; provided, that such fees, costs and expenses are reimbursable under the terms of the RGCH PIK Notes Credit Agreement.

### (3) Fee Claims.

Time for Filing Fee Claims: Any Professional Person seeking allowance by the Bankruptcy Court of a Fee Claim shall file its respective final application for allowance of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date no later than forty-five (45) days after the Effective Date. **FAILURE TO FILE AND SERVE SUCH FEE APPLICATION TIMELY AND PROPERLY SHALL RESULT IN THE FEE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

Objections to such Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty-five (65) days after the Effective Date or such other date as established by the Bankruptcy Court; provided, however, that on the Effective Date, without the requirement to file a fee application with the Bankruptcy Court, the Debtors shall pay the Ad Hoc Senior Noteholders Committee Fee Claims, in accordance with Section 3.2(b) of the Second Amended Plan, in full in Cash.

Treatment of Fee Claims: All Professional Persons seeking allowance by the Bankruptcy Court of a Fee Claim shall be paid in full in such amounts as are approved by the Bankruptcy Court: (i) upon the later of (x) the Effective Date, and (y) ten (10) calendar days after the date upon which the order relating to the allowance of any such Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such Fee Claim and the Debtors. On the Effective Date, to the extent known, the Debtors shall reserve and hold in a segregated account or shall place in escrow Cash in an amount equal to the accrued but unpaid Fee Claims as of the Effective Date, which Cash shall be disbursed solely to the holders of Allowed Fee Claims with the remainder to be reserved until all Allowed Fee Claims have

- 31 -

been paid in full or all remaining Fee Claims have been Disallowed by Final Order, at which time any remaining Cash in the segregated account shall become the sole and exclusive property of the Debtors, to be distributed in accordance with the terms of the Plan.

### (4) U.S. Trustee Fees.

Each of the Debtors shall pay all outstanding U.S. Trustee Fees of such Debtor on an ongoing basis on the later of: (i) the Effective Date; and (ii) the date such U.S. Trustee Fees become due, until such time as a final decree is entered closing the applicable Chapter 11 Case or the applicable Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.

### (5) Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive, in the applicable Debtors' discretion, either: (i) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Claim, or (ii) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due; provided, further, however, that any Priority Tax Claim that is an Assumed Liability shall be assumed by the Purchaser and the Purchaser shall be responsible therefor in accordance with the terms of the APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such Priority Tax Claim.

---

**Interest Will Not Accrue After Petition Date**

Unless otherwise specified in the Second Amended Plan or by order of the Bankruptcy Court, no interest will accrue or be paid on an Allowed Claim, for any purpose, on or after the Petition Date

---

### (b) Classification of Claims and Interests.

### (1) Priority Non-Tax Claims (Class 1).

Voting: Class 1 is unimpaired and deemed to accept the Second Amended Plan. For this reason, holders of Priority Non-Tax Claims are not entitled to vote.

Treatment Under the Second Amended Plan: Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment and after the date a Priority Non-Tax Claim becomes an Allowed Claim, on, or as soon thereafter as is reasonably

- 32 -

practicable, the Initial Distribution Date, the holder of such Allowed Priority Non-Tax Claim shall receive Cash from the applicable Debtor in an amount equal to such Claim; provided, however, that any Priority Non-Tax Claim that is an Assumed Liability shall be assumed by the Purchaser, and the Purchaser shall be responsible therefor, in accordance with the terms of the APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such Priority Non-Tax Claim.

### (2)    Other Secured Claims (Class 2).

Voting:  Class 2 is unimpaired and deemed to accept the Second Amended Plan. For this reason, holders of Other Secured Claims are not entitled to vote.

Treatment Under the Second Amended Plan:  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment and after the date an Other Secured Claim becomes an Allowed Claim, on, or as soon thereafter as is reasonably practicable, the Initial Distribution Date, each holder of such Allowed Other Secured Claim shall receive, at the election of the Debtors: (i) Cash in an amount equal to such Allowed Claim; (ii) such other treatment that will render the Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code; or (iii) the return of property securing such Allowed Other Secured Claim; provided, however, that Class 2 Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the applicable Debtor, without further notice to or order of the Bankruptcy Court; provided, further, however, that any Other Secured Claim that is an Assumed Liability shall be assumed by the Purchaser, and the Purchaser shall be responsible therefor, in accordance with the terms of the APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such Other Secured Claim.  Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment or other satisfaction of such Allowed Other Secured Claim is made as provided in the Second Amended Plan.  On the full payment or other satisfaction of such Claims in accordance with the Second Amended Plan, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

Deficiency Claims:  To the extent that the value of the Collateral securing each Allowed Other Secured Claim is less than the amount of such Allowed Other Secured Claim, the undersecured portion of such Allowed Other Secured Claim shall be treated for all purposes under the Second Amended Plan as an Allowed General Unsecured Claim and shall be classified as a General Unsecured Claim against the applicable Debtor.

### (3)    Prepetition Secured Credit Agreement Claims (Class 3(a)).

Voting:  Class 3(a) is unimpaired and deemed to accept the Second Amended Plan.  For this reason, holders of Prepetition Secured Credit Agreement Claims are not entitled to vote.

DB02:9340498.2                                                       068401.1001

Allowance: Except to the extent that the Prepetition Secured Credit Agreement Claims of the Prepetition Secured Lender and the Prepetition Secured Agent are otherwise paid prior to the Effective Date, such Prepetition Secured Credit Agreement Claims shall be deemed Allowed Claims and shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defense, disallowance, impairment, objection or any challenges under any applicable law or regulation by any Person, in an aggregate amount equal to (i) $52,747,405.02, plus (ii) any accrued and unpaid interest at the non-default contract rate under the Prepetition Secured Credit Agreement as of the Effective Date, except to the extent such interest is otherwise provided in the Second Amended Plan to be paid or satisfied, plus (iii) unpaid professional fees and expenses, as provided for in the Prepetition Secured Credit Agreement and the DIP Orders, plus (iv) all other Obligations (as defined in the Prepetition Secured Credit Agreement); provided that, with respect to section 5.3(a)(iii) and (iv) of the Second Amended Plan, the Prepetition Secured Agent must provide a written notice to the Debtors (with a copy to counsel for the Debtors) of any such unpaid professional fees and expenses and unpaid Obligations no later than two days prior to the Effective Date. In the event the Debtors dispute any such professional fees, expenses or Obligations, the Debtors shall pay the undisputed amount of such professional fees, expenses or Obligations, and segregate the remaining portion of such professional fees, expenses or Obligations until such dispute is resolved by the parties or by the Bankruptcy Court.

Treatment Under the Second Amended Plan: To the extent not already paid in full prior to the Effective Date pursuant to the terms of DIP Orders or otherwise, on the Effective Date, or as soon as practicable thereafter, the Allowed Prepetition Secured Credit Agreement Claims shall be paid in full, in Cash, in complete and final satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Claims.

### (4) Rath General Unsecured Claims (Class 3(b)).

Voting: Class 3(b) is impaired and the holders of Rath General Unsecured Claims are entitled to vote to accept or reject the Second Amended Plan.

Treatment Under the Second Amended Plan: Except to the extent that a holder of an Allowed Rath General Unsecured Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of five (5) Business Days after the Prepetition Ordinary Course of Business Trade Claims Bar Date and the next Interim Distribution Date immediately following the date that a Rath General Unsecured Claim becomes an Allowed Claim, the holder of such Allowed Rath General Unsecured Claim shall receive its Pro Rata Share of the Class 3(b) Distribution; provided, however, that any Rath General Unsecured Claim that is an Assumed Liability shall be assumed by the Purchaser, and the Purchaser shall be responsible therefore, in accordance with the terms of the APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such Allowed Rath General Unsecured Claim.

### (5) Existing Rath Interests (Class 3(c)).

Voting: Class 3(c) is impaired, but because the holders of Existing Rath Interests are proponents of the Second Amended Plan and, thus, have consented to the filing of the Second

Amended Plan and approval of the treatment afforded to such holders, Class 3(c) is deemed to have accepted the Second Amended Plan. For this reason, holders of Existing Rath Interests are not entitled to vote.

Treatment Under the Second Amended Plan: Existing Rath Interests shall be cancelled and holders of Existing Rath Interests shall not be entitled to any distribution under the Plan.

### (6) Greenville General Unsecured Claims (Class 4(a)).

Voting: Class 4(a) is impaired and the holders of Greenville General Unsecured Claims are entitled to vote to accept or reject the Second Amended Plan.

Treatment Under the Second Amended Plan: Except to the extent that a holder of an Allowed Greenville General Unsecured Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of five (5) Business Days after the Prepetition Ordinary Course of Business Trade Claims Bar Date and the next Interim Distribution Date immediately following the date that a Greenville General Unsecured Claim becomes an Allowed Claim, the holder of such Allowed Greenville General Unsecured Claim shall receive its Pro Rata Share of the Class 4(a) Distribution; provided, however, that any Greenville General Unsecured Claim that is an Assumed Liability shall be assumed by the Purchaser, and the Purchaser shall be responsible therefor, in accordance with the terms of the APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such Allowed Greenville General Unsecured Claim.

### (7) Existing Greenville Interests (Class 4(b)).

Voting: Class 4(b) is impaired, but because the holders of Existing Greenville Interests are proponents of the Second Amended Plan and, thus, have consented to the filing of the Second Amended Plan and approval of the treatment afforded to such holders, Class 4(b) is deemed to have accepted the Second Amended Plan. For this reason, holders of Existing Greenville Interests are not entitled to vote.

Treatment Under the Second Amended Plan: Existing Rath Interests shall be cancelled and holders of Existing Rath Interests shall not be entitled to any distribution under the Second Amended Plan.

### (8) RGCH PIK Notes Claims (Class 5(a)).

Voting: Class 5(a) is impaired and the holders of RGCH PIK Notes Claims are entitled to vote to accept or reject the Second Amended Plan.

Treatment Under the Second Amended Plan: As part of the settlements and compromises contained in the Second Amended Plan, the RGCH PIK Notes Claims shall be deemed Allowed Claims against RGCH as of the Effective Date and, on the first Business Day after the Effective Date, or as soon thereafter as reasonably practicable, each holder of an Allowed RGCH PIK Notes Claim shall receive, subject to the terms of the Second Amended

- 35 -

Plan and in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim its Pro Rata Share of the Class 5(a) Distribution; provided, however, that Allowed RGCH PIK Notes Claims shall not receive or retain any distribution under the Second Amended Plan on account of their RGCH PIK Notes Claims if Class 5(a) does not vote to accept the Second Amended Plan.

### (9) RGCH General Unsecured Claims (Class 5(b)).

Voting: Class 5(b) is impaired and the holders of RGCH General Unsecured Claims are entitled to vote to accept or reject the Second Amended Plan.

Treatment Under the Second Amended Plan: Except to the extent that a holder of an Allowed RGCH General Unsecured Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the next Interim Distribution Date immediately following the date that a RGCH General Unsecured Claim becomes an Allowed Claim, the holder of such Allowed RGCH General Unsecured Claim shall receive its Pro Rata Share of the Class 5(b) Distribution; provided, however, that any RGCH General Unsecured Claim that is an Assumed Liability shall be assumed by the Purchaser, and the Purchaser shall be responsible therefor, in accordance with the terms of the APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such RGCH General Unsecured Claim.

### (10) Existing RGCH Interests (Class 5(c)).

Voting: Class 5(c) is impaired, but because the holders of Existing RGCH Interests are proponents of the Second Amended Plan and, thus, have consented to the filing of the Second Amended Plan and approval of the treatment afforded to such holders, Class 5(c) is deemed to have accepted the Second Amended Plan. For this reason, holders of Existing RGCH Interests are not entitled to vote.

Treatment Under the Second Amended Plan: Existing RGCH Interests shall be cancelled and holders of Existing RGCH Interests shall not be entitled to any distribution under the Second Amended Plan.

### (11) RG Tube General Unsecured Claims (Class 6(a)).

Voting: Class 6(a) is impaired and the holders of RG Tube General Unsecured Claims are entitled to vote to accept or reject the Second Amended Plan.

DB02:9340498.2

068401.1001

Treatment Under the Second Amended Plan: Except to the extent that a holder of an Allowed RG Tube General Unsecured Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the next Interim Distribution Date immediately following the date that a RG Tube General Unsecured Claim becomes an Allowed Claim, the holder of such Allowed RG Tube General Unsecured Claim shall receive its Pro Rata Share of the Class 6(a) Distribution; provided, however, that any RG Tube General Unsecured Claim that is an Assumed Liability shall be assumed by the Purchaser, and the Purchaser shall be responsible therefor, in accordance with the terms of the APA and the holder thereof shall have no recourse against the Debtors or the Plan Administrator or any of their property on account of such RG Tube General Unsecured Claim.

### (12)   Existing RG Tube Interests (Class 6(b)).

Voting: Class 6(a) is impaired and the holders of RG Tube Interests are entitled to vote to accept or reject the Second Amended Plan.

Treatment Under the Second Amended Plan: As part of the settlements and compromises contained in the Second Amended Plan, each holder of an Allowed Existing RG Tube Interest shall receive, subject to the terms of the Second Amended Plan and in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Existing RG Tube Interest, its Pro Rata Share of the Class 6(b) Distribution.

**6.4**   *Acceptance or Rejection of the Second Amended Plan; Effect of Rejection by One or More Classes of Claims or Interests*

(a)   **Class Acceptance Requirement.**

1.   A Class of Claims shall have accepted the Second Amended Plan if it is accepted by at least two-thirds (2/3) in amount of the Allowed Claims in such Class, and more than one-half (1/2) in number of holders of such Claims that have voted on the Second Amended Plan.

2.   A Class of Interests shall have accepted the Second Amended Plan if it is accepted by at least two-thirds (2/3) in amount of the Allowed Interests in such Class that have voted on the Second Amended Plan.

(b)   **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."**

If any Classes vote to reject the Second Amended Plan, the Debtors intend to request confirmation of the Second Amended Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Second Amended Plan or any Plan Document, as to any and all Debtors, in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

DB02:9340498.2                                          068401.1001

(c)     **Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Second Amended Plan for purposes of voting to accept or reject the Second Amended Plan and for purposes of determining acceptance or rejection of the Second Amended Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

(d)     **Voting Classes; Deemed Acceptance by Non-Voting Classes.**

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Second Amended Plan, the Second Amended Plan shall be deemed accepted by the holders of such Claims or Interests in such Class.

> **Important Note on Estimates**
>
> The estimates in the tables and summaries in this Disclosure Statement may differ from actual distributions because of variations in the asserted or estimated amounts of Allowed Claims and Allowed Interests, the existence of Disputed Claims, Disputed Interests and other factors, including the potential downward adjustment of the Purchase Price. Statements regarding projected amounts of Claims, Interests or distributions (or the value of such distributions) are estimates by the Debtors based on current information and are not representations as to the accuracy of these amounts. Except as otherwise indicated, these statements are made as of March 8, 2010, and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained in this Disclosure Statement is correct at any other time. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts of Claims or Interests allowed by the Bankruptcy Court.

**6.5    *Means for Implementation.***

(a)     **Non-Substantive Consolidation.**

The Second Amended Plan is a joint chapter 11 plan that does not provide for substantive consolidation of the Debtors' estates, and on the Effective Date, the Debtors' estates shall not be deemed to be substantively consolidated for purposes of the Second Amended Plan. Except as specifically set forth in the Second Amended Plan, nothing in the Second Amended Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor. Additionally, claimants holding Claims against multiple Debtors, to the extent Allowed in each Debtor's Chapter 11 Case, will be treated as holding a separate Claim against each Debtor's

- 38 -

estate, <u>provided</u>, <u>however</u>, that no holder of an Allowed Claim shall be entitled to receive more than payment in full of such Allowed Claim (plus postpetition interest, if and to the extent provided in the Second Amended Plan), and such Claims or Interests will be administered and treated in the manner provided in the Second Amended Plan.

DB02:9340498.2

068401.1001

(b)     **Sale of the Purchased Assets.**

Upon entry of the Confirmation Order, the Debtors shall be authorized to, among other things, sell, assume, assign and/or transfer the Purchased Assets pursuant to sections 105(a), 363, 365, 1123(b)(4), 1129 and 1146(a) of the Bankruptcy Code under the terms and conditions of the APA, and shall be authorized to take any and all actions necessary to consummate the Sale. Any such Sale shall be entered into in accordance all applicable orders of the Bankruptcy Court. The actions necessary to effect the sale of the Purchased Assets may include: (i) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the APA and the Second Amended Plan and having such other terms to which the Debtors and the Purchaser may agree, and (ii) all other actions that the Debtors and the Purchaser determine to be necessary or appropriate in connection with such transactions, including making such filings or recordings that may be required by or appropriate under applicable state law.

The solicitation of votes on the Second Amended Plan in accordance with the order approving the Disclosure Statement shall be deemed to be a solicitation of the holders of Claims and Interests for the approval of the APA and the Sale. Entry of the Confirmation Order shall constitute approval of any agreements and transactions related to the Sale.

(c)     **Plan Funding.**

The Debtors' obligations under the Second Amended Plan and the fees and expenses of the Debtors will be funded out of the proceeds from the Sale. Proceeds from the Sale shall be used as follows: (i) first, to satisfy Allowed DIP Claims, Allowed Administrative Expense Claims, Allowed Fee Claims, U.S. Trustee Fees, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Other Secured Claims; (ii) second, to fund the Wind Down Account; and (iii) third, to satisfy the Debtors' other obligations under the Second Amended Plan, in accordance with the terms thereof. To the extent that amounts deposited in the Wind Down Account are insufficient, the Debtors may withdraw Cash from the Claims reserves for unsecured claims established by the Plan Administrator as set forth in the Second Amended Plan.

Except as provided in Section 7.2(a)(i) and (a)(ii) of the Second Amended Plan, RGCH's and RG Tube's obligations under the Second Amended Plan and the fees and expenses of such Debtors will be funded solely from the RG Tube Cash in accordance with the terms of the Second Amended Plan.

(d)     **Continued Corporate Existence and Vesting of Assets.**

Except as otherwise provided in the Second Amended Plan, the Debtors will continue to exist after the Effective Date as separate corporate entities, in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized, for the purposes of satisfying their obligations under the Second Amended Plan, including making distributions as required under the Second Amended Plan and effectuating the Wind Down. On or after the Effective Date, each Debtor, in its sole and exclusive discretion, may take such action

- 40 -

as permitted by applicable law as such Debtor may determine is reasonable and appropriate, including, but not limited to, causing: (i) a Debtor to be merged into another Debtor, or its Subsidiary or affiliate; (ii) a Debtor to be dissolved; (iii) the legal name of a Debtor to be changed; or (iv) the closing of a Debtor's case on the Effective Date or any time thereafter.

On and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, and except as otherwise provided in the Plan or in the Confirmation Order, all property of the Debtors' Estates, including all claims, rights and Causes of Action (but excluding, for the avoidance of doubt, any Purchased Asset other than a Nonassignable Asset (as defined in the APA)), shall vest in each respective Debtor free and clear of all Claims, Liens, charges, other encumbrances and Interests (other than, with respect to any of the Nonassignable Assets, any Liens, charges or other encumbrances created under the APA). Subject to Section 7.3(a) of the Second Amended Plan, on and after the Effective Date, the Debtors may effectuate the Wind Down of the Estates, including payment of all Wind Down Costs, and may use, acquire and dispose of property and prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and Causes of Action (in each case that are not Purchased Assets or Assumed Liabilities) without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses or related support services without application to the Bankruptcy Court. Notwithstanding anything contained in the Second Amended Plan or in the APA to the contrary, the Debtors shall not be required to delay or otherwise alter the completion of the Wind Down.

(e)     **Cancellation of Credit Agreements, Existing Securities and Agreements.**

Except for the purpose of evidencing a right to distribution under the Second Amended Plan, and except as otherwise set forth in the Second Amended Plan, on the Effective Date all agreements, instruments, and other documents evidencing any Claim against or Interest in a Debtor and any rights of any holder in respect thereof, shall be deemed cancelled, discharged and of no force or effect. Notwithstanding the foregoing, pursuant to the settlements and compromises set forth in the Second Amended Plan: (i) the Senior Notes Indenture shall continue in effect to the extent necessary to allow the Debtors and the Senior Notes Indenture Trustee and/or the Disbursing Agent to make distributions pursuant to this Second Amended Plan on account of Allowed Rath General Unsecured Claims that are Allowed Senior Notes Claims, and the Senior Notes Indenture Trustee shall maintain any charging lien such Senior Notes Indenture Trustee may have for any fees, costs and expenses under the Senior Notes Indenture or other agreements until all such fees, costs, and expenses are paid pursuant to the Second Amended Plan or otherwise; provided, however, that such rights and liens are limited to the distributions, if any, to the holders of Senior Notes; and (ii) the applicable provisions of the RGCH PIK Notes Credit Agreement shall continue in effect solely for the purposes of permitting the RGCH PIK Notes Agent and/or the Disbursing Agent to make distributions pursuant to the Second Amended Plan on account of Allowed RGCH PIK Notes Claims, and the RGCH PIK Notes Agent shall maintain any charging lien such RGCH PIK Notes Agent may have for any

- 41 -

fees, costs and expenses under the RGCH PIK Notes Credit Agreement or other agreements until all such fees, costs, and expenses are paid pursuant to the Second Amended Plan or otherwise. The holders of or parties to such cancelled instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided for pursuant to the Second Amended Plan. Except as provided pursuant to the Second Amended Plan, the Senior Notes Indenture Trustee and the RGCH PIK Notes Agent and each of their respective agents, successors and assigns shall be discharged of all of their obligations associated with the Senior Notes and the RGCH PIK Notes, as applicable.

      (f)    **Corporate Governance.**

From and after the Effective Date, each of the Debtors shall be managed and administered through the Plan Administrator, who shall be appointed the sole officer of each of the Debtors and shall have full authority to administer the provisions of the Second Amended Plan. The Plan Administrator may employ one or more Persons to assist it with performing its duties under the Second Amended Plan.

      (g)    **Plan Administrator.**

      1.    <u>Appointment; Duties</u>. Not less than ten (10) days prior to the commencement of the Confirmation Hearing and subject to Bankruptcy Court approval in connection with confirmation of the Second Amended Plan, the Debtors, in consultation with the Committee, shall designate the person who initially will serve as the Plan Administrator; <u>provided, however</u>, that: (i) the Debtors shall have the right at any time prior to the Effective Date to remove the Plan Administrator without cause; and (ii) the Plan Administrator shall be subject to removal by the Bankruptcy Court for cause shown at any time. On or after the Confirmation Date but prior to the Effective Date, the Plan Administrator shall assume all of its obligations, powers and authority under the Second Amended Plan to: (i) establish bank accounts as may be required to fulfill the Debtors' obligations under the Second Amended Plan; and (ii) exercise such other power and authority as may be set forth in the Confirmation Order (collectively, the "**Pre-Effective Date PA Duties**"). On the Effective Date, the Plan Administrator shall assume all of its other obligations, powers and authority under the Second Amended Plan.

      2.    <u>Qualifications; Plan Administrator Agreement</u>. The Plan Administrator shall be a fiduciary of each of the Debtors and the Estates shall have such qualifications and experience as are sufficient to enable the Plan Administrator to perform its obligations under the Second Amended Plan and under the Plan Administrator Agreement, and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Plan Administrator Agreement. To the extent necessary, following the Effective Date, the Plan Administrator shall be deemed to be a judicial substitute for the Debtors as the party-in-interest in the Chapter 11 Cases, under the Second Amended Plan or in any judicial proceeding or appeal to which the Debtors are a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

The Plan Administrator shall not be liable for any action it takes or omits to take that it believes in good faith to be authorized or within its rights or powers unless it is ultimately

<div align="center">- 42 -</div>

and finally determined by a court of competent jurisdiction that such action or inaction was the result of fraud, gross negligence or willful misconduct.

The Plan Administrator Agreement and the Confirmation Order shall provide that: (i) the Plan Administrator shall be a fiduciary of each of the Debtors and the Estates; (ii) neither the Debtors (except as expressly set forth in the Plan Administrator Agreement) nor their respective boards of directors, managements, employees and professionals shall have any liability for any action taken or omitted to be taken by the Plan Administrator in performing the Pre-Effective Date PA Duties and all Persons are enjoined from pursuing any Claims against the foregoing pursuant to the Second Amended Plan on account of any such action taken or omitted to be taken); (iii) any determinations made by the Plan Administrator with respect to the establishment of reserves under the Second Amended Plan shall not be binding on any party if the Effective Date fails to occur; and (iv) if the Second Amended Plan is withdrawn or otherwise abandoned prior to the occurrence of the Effective Date, the Plan Administrator position shall thereafter be dissolved.

3.    Debtors' Stock.  On the Effective Date, a single share of stock shall be issued by each Debtor to the Plan Administrator.

4.    Disputed Reserves.  On the Effective Date, the Debtors shall transfer to the Plan Administrator all assets held in each of the reserves being held by Debtors, including reserves for Disputed Claims, if any, and the Plan Administrator shall establish such reserves, holdbacks and funds as may be required by the Second Amended Plan.

5.    Resignation, Death, or Removal.  The Plan Administrator may be removed by the Bankruptcy Court upon application for good cause shown.  In the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Plan Administrator, the Bankruptcy Court shall designate another Person to become Plan Administrator and thereupon the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of its predecessor.

6.    Wind Down Funds.  The Plan Administrator shall establish the Wind Down Account and any excess funds remaining after effecting the Wind Down shall be distributed in accordance with the terms of the Second Amended Plan.

(h)    **Wind Down of the Debtors' Estates.**

The Plan Administrator shall oversee the Wind Down and shall make distributions to, and otherwise hold all property of the Estates for the benefit of, holders of Allowed Claims and Allowed Interests consistent and in accordance with the Second Amended Plan and the Confirmation Order.  The Debtors (including the Plan Administrator as the sole shareholder of the Debtors) shall not be required to post a bond in favor of the United States.

As set forth in the Plan Administrator Agreement, the Plan Administrator shall have the power and authority to perform the following acts, in addition to any powers granted by law or conferred by any other provision of the Second Amended Plan and orders of the Bankruptcy Court: (i) take all steps and execute all instruments and documents necessary to

make distributions to holders of Allowed Claims and Allowed Interests; (ii) object to Claims as provided in the Second Amended Plan and prosecute such objections; (iii) resolve, compromise and/or settle any objections to the amount, validity, priority, treatment, allowance or priority of Claims, Administrative Expenses, or Interests; (iv) comply with the Second Amended Plan and the obligations thereunder; (v) if necessary, employ, retain, or replace professionals to represent it with respect to its responsibilities; (vi) establish, replenish or release reserves as provided in the Second Amended Plan, as applicable; (vii) take all actions necessary or appropriate to enforce the Debtors' rights under the APA and any related document and to fulfill, comply with or otherwise satisfy the Debtors' covenants, agreements and obligations under the APA and any related document; (viii) make all determinations on behalf of the Debtors under the APA; (ix) prepare and file applicable tax returns for any of the Debtors; (x) liquidate any of the Excluded Assets; (xi) deposit Estate funds, draw checks and make disbursements consistent with the terms of the Plan; (xii) purchase or continue insurance protecting the Debtors, the Plan Administrator and property of the Estates; (xiii) seek entry of a final decree in any of the Chapter 11 Cases at the appropriate time; (xiv) prosecute, resolve, compromise and/or settle any litigation; (xv) abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization (as such term is described in Internal Revenue Code section 501(c)(3) (whose contributions are deductible under Internal Revenue Code section 170)) of the Plan Administrator's choice, any Estate assets that are of no material benefit, including distributable Cash under the Second Amended Plan; and (xvi) take such other action as the Plan Administrator may determine to be necessary or desirable to carry out the purpose of the Second Amended Plan.

Following the Effective Date, the Debtors shall not engage in any business activities or take any actions, except those necessary to effectuate the Second Amended Plan, the Wind Down and the compliance with its obligations under the APA. On and after the Effective Date, the Plan Administrator may, in the name of the Debtors, take such action and settle and compromise Claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Second Amended Plan or the Confirmation Order.

(i)     **Bar Date for Prepetition Ordinary Course Trade Claims.**

Any trade vendor, supplier, or other Person who asserts a Claim related to or arising from goods or services provided to the Debtors in the ordinary course of business (but excluding any claims related to or arising from litigation against the Debtors, litigation-related claims, severance claims, or rejection or termination of an agreement with the Debtors, each of which was required to file Claims as set forth in the Bar Date Order) ("**Prepetition Ordinary Course of Business Trade Claims**") arising prior to the Petition Date must file with the Bankruptcy Court and serve on the Debtors, the Claims Agent, the Creditors' Committee and the Office of the United States Trustee, proof of such Prepetition Ordinary Course of Business Trade Claim **within thirty (30) days after the Effective Date (the "Prepetition Ordinary Course of Business Trade Claims Bar Date")**. Such proof of Prepetition Ordinary Course of Business Trade Claim must include at a minimum: (i) the name of the applicable Debtor that is purported to be liable for the Claim and if the Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (ii) the name of the holder of the Claim;

(iii) the amount of the Claim; (iv) the basis of the Claim; and (v) supporting documentation for the Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF SUCH CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE CLAIM BEING FOREVER BARRED AND DISCHARGED AND THE HOLDER OF SUCH CLAIM SHALL NOT BE ENTITLED TO RECEIVE ANY DISTRIBUTION FROM THE DEBTORS OR UNDER THE SECOND AMENDED PLAN ON ACCOUNT OF SUCH CLAIM.** The following Persons are **not** required to file a proof of such Prepetition Ordinary Course of Business Trade Claim on or before the thirty (30) days after the Effective Date:

1. Any Person whose Prepetition Ordinary Course of Business Trade Claim has been paid as of such date;

2. Any Person whose Prepetition Ordinary Course of Business Trade Claim is an Assumed Liability;

3. Any Person that already has properly filed a proof of Claim against one or more of the Debtors on account of such Prepetition Ordinary Course of Business Trade Claim with either The Garden City Group, the Bankruptcy Court-appointed claims agent in the Chapter 11 Cases, or the Clerk of the Bankruptcy Court; or

4. Any Person: (i) whose Prepetition Ordinary Course of Business Trade Claim is listed in the applicable Debtors' Schedules of Assets and Liabilities (the "**Schedules**") filed with the Bankruptcy Court or any amendments thereto, and (ii) whose Prepetition Ordinary Course of Business Trade Claim is not described therein as "disputed," "contingent," or "unliquidated," and (iii) who does not dispute the amount or classification of its Prepetition Ordinary Course of Business Trade Claim as set forth in the Schedules.

(j)     **Assumed Liabilities.**

In accordance with the terms of the APA, on the Effective Date, the Purchaser shall be responsible for payment and satisfaction of all Assumed Liabilities. All Persons holding Claims and Interests arising out of or concerning an Assumed Liability, shall be forever barred, estopped and permanently enjoined from asserting against the Debtors or the Plan Administrator and any of their property, such Persons' Claims or Interests (as applicable) arising out of or concerning such Assumed Liabilities. The Purchaser is not assuming, and shall not become liable for the payment of or performance of, any liabilities or other obligations of any of the Debtors of any nature whatsoever, whether accrued or unaccrued, other than the Assumed Liabilities.

(k)     **Cancellation of Certain Existing Security Interests.**

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors any collateral or other property of the Debtors held by such holder, and any termination

statements, instruments of satisfactions, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*; provided, however, any such collateral that is a Purchased Asset received by the Debtors from the holder of such Allowed Claim shall be delivered promptly to the Purchaser.

(l)     **Officers and Boards of Directors.**

1.     Officers.  The officers of the Debtors immediately prior to the Effective Date, in their capacities as such, shall be deemed removed from such positions as of the Effective Date and each such officer that is an employee of the Debtors shall be offered employment with the Purchaser as and to the extent set forth in the APA.

2.     Boards of Directors.  The members of the board of directors or board of managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Debtors on or after the Effective Date and each such member will be deemed to have resigned on the Effective Date.

3.     Plan Administrator as Sole Officer/Director.  The Plan Administrator shall be the sole director and officer of each of the Debtors from and following the Effective Date.

(m)     **Corporate Action.**

The Debtors shall serve on the United States Trustee quarterly reports of the disbursements made until such time as a final decree is entered closing the applicable Chapter 11 Case or the applicable Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise.  Any deadline for filing Administrative Expense Claims shall not apply to fees payable pursuant to section 1930 of title 28 of the United States Code.

**6.6     *RG Tube Cash***

In connection with the settlements and compromises embodied in the Second Amended Plan, (i) the RG Tube Cash shall be used as follows: (i) first, to fund the Allowed Claims of the RGCH PIK Notes Agent and the Ad Hoc RGCH PIK Noteholders Committee Advisors; and (ii) second, the remainder shall be distributed in accordance with Section 8.9 of the Second Amended Plan.

**6.7     *Termination of Subordination Rights and Settlement of Related Claims.***

Except as provided in the Second Amended Plan, the classification and manner of satisfying all Claims and Interests and the respective distributions and treatments under the Second Amended Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Second Amended Plan.  The Confirmation

- 46 -

Order shall permanently enjoin, effective as of the Effective Date, all Persons and entities from enforcing or attempting to enforce any such contractual, legal and equitable rights satisfied, compromised and settled pursuant to Article XII of the Second Amended Plan.

Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Second Amended Plan, the provisions of the Second Amended Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim or Interest may have or any distribution to be made pursuant to the Second Amended Plan on account of such Claim or Interest. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their respective properties, and holders of Claims and Interests, and is fair, equitable and reasonable.

**6.8** *Comprehensive Settlement of Claims and Controversies*

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Second Amended Plan, the provisions of the Second Amended Plan will constitute a good faith compromise and settlement of all Claims and Interests or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Second Amended Plan on account of any Allowed Claim or Allowed Interest, including the Claims asserted against the Debtors by members of the Ad Hoc RGCH PIK Noteholders Committee and all Intercompany Claims between and among the Debtors (including with respect to any related to tax refunds received or to be received from one or more taxing authorities or otherwise). Without limiting the generality of the immediately preceding sentence, the Class 5(a) Distribution, if any, under the Second Amended Plan shall be in full and complete satisfaction of, among other things, potential or actual Intercompany Claims RGCH may have against RathGibson or RG Tube. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (a) in the best interests (x) of the Debtors and their respective Estates and property, and (y) of the Claim and Interest Holders; and (b) fair, equitable and reasonable.

**6.9** *Treatment of Executory Contracts and Unexpired Leases.*

(a) **General Treatment.**

As of and subject to the occurrence of the Effective Date and payment (or provision of the adequate assurance of payment) of the applicable Cure Costs, to the fullest extent permitted under applicable law, all executory contracts and unexpired leases of the Debtors shall be deemed to be assumed by the applicable Debtor as of the Effective Date, except for any executory contract or unexpired lease that: (i) previously has been assumed and assigned or rejected pursuant to a Final Order of the Bankruptcy Court; (ii) is designated specifically or by

category as a contract or lease to be rejected on the Schedule of Rejected Contracts and Leases;[6] (iii) is the subject of a separate motion to assume and assign to a Person other than the Purchaser or to reject under section 365 of the Bankruptcy Code pending on the Effective Date; provided, however, that, to the fullest extent permitted by applicable law, the Purchaser shall have the right to instruct the Debtors to, and at the instruction of the Purchaser, the Debtors shall, at any time and from time to time prior to ten (10) days prior to the Confirmation Hearing (or such later date as is specified in the APA), amend the Schedule of Rejected Contracts and Leases in the manner set forth in the APA, the Bid Procedures Order, or by any other means approved by the Bankruptcy Court, to add any executory contract or unexpired lease listed therein, thereby providing for the rejection of such executory contract or lease pursuant to the terms hereof or to delete any executory contract or unexpired lease therein, thereby providing for its assumption and assignment pursuant to the terms of the Second Amended Plan. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assumptions and assignments and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Listing a contract or lease in the Schedule of Rejected Contracts and Leases shall not constitute an admission by the applicable Debtor that the applicable Debtor has any liability thereunder.

Except with respect to those insurance policies and any agreements, documents or instruments relating thereto that are listed on the Schedule of Rejected Contracts and Leases, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, shall be treated as executory contracts of the applicable Debtor under the Second Amended Plan and the Bankruptcy Code and shall be assumed and assigned to the Purchaser in accordance with the terms of the APA and the Second Amended Plan.

The final Schedule of Rejected Contracts and Leases shall be subject to the prior approval of the Purchaser.

Subject to Section 10.2 of the Second Amended Plan, entry of the Confirmation Order shall, subject to the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b) of the Bankruptcy Code, of the assumption and assignment of the executory contracts and unexpired leases assumed and assigned pursuant to Section 10.1(a) and

---

[6]  Under the Stalking Horse Agreement, the following categories of contracts and leases will not be assumed by the Stalking Horse Bidder, will be listed on the Schedule of Rejected Contracts and Leases and rejected unless the counterparty to a specific contract receives an Assumption Notice (defined below), in which case the applicable contract or lease shall be assumed and assigned to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement and in accordance with sections 365 and 1123 of the Bankruptcy Code: (i) see section 6.10 infra; (ii) any contract pursuant to which any Debtor has a commitment, undertaking, arrangement or commitment to make loans or otherwise extend credit to any Person (other than any of any such contract consisting of extensions of credit in the nature of accounts receivable arising from the grant of trade credit in the ordinary course of business); and (iii) any contract relating to the offer, subscription, issuance, sale or distribution of, or rights (including voting rights), restrictions or obligations relating to, shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership, equity or profits interests or units in) a Debtor, and all warrants, options, rights or other securities for the purchase, acquisition or exchange from a seller of any shares of capital stock of (or other ownership, equity or profits interests or units in) a Debtor (including through any convertible securities).

Section 10.1(b) of the Second Amended Plan; and (ii) the approval, pursuant to sections 365(a) and 1123(b) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases listed on the Schedule of Rejected Contracts and Leases pursuant to Section 10.1(a) or Section 10.1(b) of the Second Amended Plan.

      (b)    **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

All Claims arising from the rejection of executory contracts or unexpired leases, if any, will be treated as General Unsecured Claims. Upon receipt of their applicable Plan Distribution pursuant to Article V of the Second Amended Plan, all such Claims shall be discharged on the Effective Date, and shall not be enforceable against the Debtors, the Purchaser or their respective properties or interests in property (and shall not, for the avoidance of doubt, constitute Assumed Liabilities).

*Each Person who is a party to a contract or lease rejected under the Second Amended Plan must file with the Bankruptcy Court and serve on the Debtors, not later than thirty (30) days after the Effective Date, a proof of claim for damages alleged to arise from the rejection of the applicable contract or lease or be forever barred from filing a Claim, or sharing in distributions under the Second Amended Plan, related to such alleged rejection damages.*

      (c)    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

Within five (5) Business Days after entry of the Bid Procedures Order, the Debtors shall serve a notice (the "**Assumption Notice**") on the applicable counterparty of potential assumption and assignment of the executory contracts and unexpired leases that are anticipated to be assumed and assigned to the Purchaser (the "**Assigned Contracts**") and the amount, if any, that the Debtors contend is the amount needed to cure any defaults and pecuniary losses with respect to such Assigned Contracts (the "**Cure Costs**"); provided, however, except as designated specifically or by category as a contract or lease to be rejected on the Schedule of Rejected Contracts and Leases, all executory contracts and unexpired leases shall be assumed by the Debtors and assigned to the Purchaser and, to the extent a counterparty to an Assigned Contract does not receive an Assumption Notice, the Cure Cost for such executory contract or unexpired lease shall be $0.00. If the Debtors identify additional executory contracts and unexpired leases that might be assumed by the Debtors and assigned to the Purchaser, the Debtors will promptly send a supplemental Assumption Notice to the applicable counterparties to such contract or lease.

Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such executory contract or lease, the Purchaser (or the Debtors if so specified in the APA) shall cure any monetary defaults arising under each executory contract and lease to be assumed pursuant to the Second Amended Plan and assigned to the Purchaser pursuant to Section 10.1(a) or Section 10.1(b) of the Second Amended Plan, in accordance with section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Cost on the later of: (i) the Effective Date or as soon thereafter as is reasonably practicable; and (ii) the date on which the

- 49 -

Cure Cost has been resolved (either consensually or through judicial decision, subject, in any such case, to the terms and conditions of the APA) or as soon thereafter as is reasonably practicable.

Any party that fails to object to the applicable Cure Cost listed on the Assumption Notice by 5:00 p.m. (prevailing Eastern time) on the later of: (i) April 15, 2010, or (ii) eight (8) days after service of the supplemental Assumption Notice on such party, (a) shall be forever barred, estopped and enjoined from (x) disputing the Cure Cost relating to any executory contract or unexpired lease set forth on the Assumption Notice or, if no Assumption Notice is received and such executory contract or unexpired lease is not listed on the Schedule of Rejected Contracts and Leases, a Cure Cost of $0.00, and (y) asserting any Claim against the applicable Debtor arising under section 365(b)(1) of the Bankruptcy Code other than as set forth on the Assumption Notice or, if no Assumption Notice is received and such executory contract or unexpired lease is not listed on the Schedule of Rejected Contracts and Leases, a Claim in the amount of $0.00; and (b) shall be deemed to have consented to the assumption and assignment of such executory contract and unexpired lease and shall be forever barred and estopped from asserting or claiming against the Debtors, the Purchaser or any other assignee of the relevant executory contract or unexpired lease that any additional amounts are due or defaults exist, or conditions to assumption and assignment of such executory contract or unexpired lease must be satisfied (pursuant to section 365(b)(1) of the Bankruptcy Code or otherwise). Any objection relating to the Cure Cost shall specify the Cure Cost proposed by the counterparty to the applicable contract or lease.

In the event of a dispute (each, a "**Cure Dispute**") regarding: (i) any Cure Cost; (ii) the ability of the Debtors or the Purchaser to demonstrate "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under any contract or lease to be assumed; or (iii) any other matter pertaining to the proposed assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made at the times set forth in Section 10.3(b) of the Second Amended Plan following the entry of a Final Order resolving such Cure Dispute and approving the assumption. To the extent a Cure Dispute relates solely to a Cure Cost, the applicable Debtor may assume and assign the applicable contract or lease prior to the resolution of the Cure Dispute provided that the Purchaser establishes a reserve containing Cash in an amount sufficient to pay the full amount asserted as cure payment by the non-Debtor party to such contract or lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court). To the extent the Cure Dispute is resolved or determined unfavorably to the applicable Debtor, such Debtor may (with the consent of the Purchaser), reject the applicable executory contract or unexpired lease after such determination. Any Cure Disputes not consensually resolved prior to the Confirmation Hearing shall be heard at the Confirmation Hearing (or such other hearing as requested by the Debtors and determined appropriate by the Bankruptcy Court), including any disputed Cure Costs or objections to assumption and assignment, and/or objections to the adequacy of assurance of future performance being provided.

DB02:9340498.2

068401.1001

**6.10** *Compensation and Benefit Programs.*

All employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their respective employees, retirees and non-employee directors including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans are treated as executory contracts under the Second Amended Plan and on the Effective Date will be listed on the Schedule of Rejected Contracts and will be rejected unless any of the foregoing is a Purchased Asset and the counterparty thereto receives an Assumption Notice, in which case the same shall be assumed and assigned to the Purchaser pursuant to the APA and in accordance with sections 365 and 1123 of the Bankruptcy Code.

**6.11** *Post-Petition Contracts and Leases.*

Except to the extent set forth on the Schedule of Rejected Contracts and Leases, all contracts, agreements and leases that were entered into or assumed by the Debtors after the Petition Date (other than the APA and the Ancillary Agreements (as defined in the APA)) shall be deemed assigned by the Debtors to the Purchaser on the Effective Date, without a need for any consent or approval of, or notice to, the counterparty to any such contract, agreement or lease.

**6.12** *Exculpation and Limitation of Liability.*

Under Section 12.7 of the Second Amended Plan, none of the Released Parties shall have or incur any liability to any holder of any Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, or arising out of the Debtors' restructuring, including without limitation, the negotiation, implementation and execution of the Second Amended Plan, the Chapter 11 Cases, the APA, the Disclosure Statement, the solicitation of votes for and the pursuit of confirmation of the Second Amended Plan, the consummation of the Second Amended Plan, or the administration of the Second Amended Plan or the property to be distributed under the Second Amended Plan, including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition activities leading to the promulgation and confirmation of the Second Amended Plan except, gross negligence, or willful misconduct, each as determined by a Final Order of the Bankruptcy Court.

**6.13** *Releases.*

(a)    **Releases by the Debtors.**

*Section 12.6(a) of the Second Amended Plan provides that, for good and valuable consideration, the adequacy of which is confirmed by the Second Amended Plan, and except as otherwise provided in the Second Amended Plan or the Confirmation Order, as of the Effective Date, the Debtors, in their individual capacities and as debtors in possession, shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages,*

demands, debts, rights, Causes of Action and liabilities (other than the rights of the Debtors to enforce the Second Amended Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder, including the APA and all ancillary documents thereto) against the Released Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the parties released pursuant to Section 12.6 of the Second Amended Plan, the Chapter 11 Cases, the Second Amended Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors or their Estates, whether directly, indirectly, derivatively or in any representative or any other capacity; *provided*, *however*, that the foregoing is not intended to release any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities of or owed to the Debtors with respect to money borrowed from or owed to the Debtors by the current and former directors, officers and employees of the Debtors, as set forth in the Debtors' books and records.

(b)     **Releases by Holders of Claims and Interests.**

Section 12.6(b) of the Second Amended Plan provides that, except as otherwise provided in the Second Amended Plan or the Confirmation Order, on the Effective Date: (i) each holder of a Claim or Interest that voted to accept the Second Amended Plan; and (ii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims and Interests, in consideration for the obligations of the Debtors under the Second Amended Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Second Amended Plan, and each Person (other than the Debtors) that has held, holds or may hold a Claim or Interest, as applicable, will be deemed to have consented to the Second Amended Plan for all purposes and the restructuring embodied therein and deemed to forever release, waive and discharge all claims, demands, debts, rights, Causes of Action or liabilities (other than the right to enforce the obligations of any party under the Second Amended Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Second Amended Plan, including, without limitation, the APA) against the Released Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Sale, the transactions contemplated by the Stalking Horse Agreement, the Second Amended Plan or the Disclosure Statement; *provided*, *however*, that the foregoing releases shall not apply to any holder of a Claim or Interest if such holder "opts out" of the releases provided in Section 12.6(b) of the Second Amended Plan in a timely submitted Ballot.

(c)     **Inapplicability of Releases.**

Notwithstanding anything to the contrary contained in the Second Amended Plan: (i) except to the extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, the releases provided for in Section 12.6 of the

DB02:9340498.2                                                                          068401.1001

Second Amended Plan shall not release any non-Debtor entity from any liability arising under (x) the Internal Revenue Code or any state, city or municipal tax code, or (y) any criminal laws of the United States or any state, city or municipality; and (ii) the releases set forth in Section 12.6 of the Second Amended Plan shall not release any (x) Debtor's claims, right, or Causes of Action for money borrowed from or owed to a Debtor or its Subsidiary by any of its directors, officers or former employees as set forth in such Debtors' or Subsidiary's books and records, (y) claims against any Person to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against a Debtor or any of its officers, directors, or representatives, and (z) Person's fraud, gross negligence or willful misconduct, each as determined by a Final Order of the Bankruptcy Court, for matters with respect to the Debtors and their Subsidiaries and/or affiliates.

Notwithstanding anything to the contrary contained in the Second Amended Plan, nothing in the Second Amended Plan: (i) discharges, releases, or precludes any (a) environmental liability that is not a Claim; (b) environmental claim of the United States that first arises on or after the Confirmation Date, or (c) other environmental claim or liability that is not otherwise dischargeable under the Bankruptcy Code; (ii) releases the Debtors from any environmental liability that a Debtor may have as an owner or operator of real property owned or operated by a Debtor on or after the Confirmation Date; (iii) releases or precludes any environmental liability to the United States on the part of any Persons other than the Debtors; or (iv) enjoins the United States from asserting or enforcing any liability described in this paragraph; provided, that the holder of a Claim in respect of any such environmental liability that is an Assumed Liability shall have no recourse against the Debtors or the Plan Administrator or any of their property with respect to such Assumed Liability.

## 6.14    Injunction.

Section 12.5 of the Second Amended Plan provides that except as otherwise provided in the Second Amended Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors or the Estates are, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Estates or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor, (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors or the Estates or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor, (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors or the Estates or any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of

*the Second Amended Plan to the full extent permitted by applicable law, and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Second Amended Plan; provided, however, that nothing contained therein shall preclude such Persons from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Second Amended Plan.*

By accepting distributions pursuant to the Second Amended Plan, each holder of an Allowed Claim or Allowed Interest will be deemed to have specifically consented to the Injunctions set forth in section 12.5 of the Second Amended Plan.

**6.15** *Injunction Related to Releases and Exculpation.*

Section 12.8 of the Second Amended Plan provides that the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to the Second Amended Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released in Sections 12.6 and 12.7 of the Second Amended Plan. Such injunction shall extend to successors of the Debtors and their respective properties and interests in property.

<div align="center">

**ARTICLE VII.**

**<u>CONFIRMATION OF THE SECOND AMENDED PLAN</u>**

</div>

**7.1** *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan. The Debtors shall request that the Bankruptcy Court establish the date and time of the Confirmation Hearing with respect to the Second Amended Plan. The hearing may be adjourned or continued from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned or continued date made at the Confirmation Hearing or any subsequent adjourned or continued Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a chapter 11 plan. Any objection to confirmation of the Second Amended Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon: (i) (a) Willkie Farr & Gallagher LLP, counsel for the Debtors, 787 Seventh Avenue, New York, NY 10019, Attn: Paul V. Shalhoub, Esq. and Robin Spigel, Esq. and (b) Young Conaway Stargatt & Taylor, LLP, counsel for the Debtors, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, Attn: Robert S. Brady, Esq. and Matthew B. Lunn, Esq.; (ii) Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware

19801, Attn: Jane Leamy, Esq.; (iii) (a) Otterbourg, Steindler, Houston & Rosen P.C., 230 Park Avenue, New York, New York 10169, Attn: Jenette A. Barrow-Bosshart, Esq. and Jessica M. Ward, Esq. and (b) Pepper Hamilton LLP; Hercules Plaza, Suite 5100; 1313 Market Street; Wilmington, Delaware 19899 (Attn: David M. Fournier, Esq. and Henry J. Jaffe, Esq.), co-counsel for the Official Committee; and (iv) Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 (Attn.: Kristopher M. Hansen, Esq. and Jayme T. Goldstein, Esq.), counsel for the Ad Hoc Senior Noteholders Committee, the Stalking Horse Bidders and the DIP Lenders.

Bankruptcy Rule 9014 governs objections to confirmation of the Second Amended Plan. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## 7.2   *Confirmation.*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Second Amended Plan.

### (a)   **Confirmation Requirements.**

Confirmation of a chapter 11 plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the debtor will employ or retain, and the nature of any compensation for such insider;

- 55 -

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that if a class of priority claims has voted to accept the plan, holders of such claims may receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such claims);

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Subject to satisfying the standard for any potential "cramdown" of Classes that vote to reject the Second Amended Plan, the Debtors believe that:

- the Second Amended Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Second Amended Plan has been proposed in good faith.

Set forth below is a summary of the relevant statutory confirmation requirements.

### (1)    Acceptance.

Classes 3(b), 4(a), 5(a), 5(b), 6(a) and 6(b) are impaired under the Second Amended Plan and are entitled to vote to accept or reject the Second Amended Plan. Classes 1,

2, and 3(a) are unimpaired and, therefore, are conclusively presumed to have voted to accept the Second Amended Plan pursuant to section 1126(f) of the Bankruptcy Code. Classes 3(c), 4(b), and 5(c) are impaired, but because the holders of Interests in such Classes are proponents of the Second Amended Plan and, thus, have consented to the filing of the Second Amended Plan and approval of the treatment afforded to such holders thereunder, such Classes are deemed to have accepted the Second Amended Plan and are not entitled to vote to accept or reject the Second Amended Plan.

To the extent any Classes vote to reject the Second Amended Plan, the Debtors will request confirmation of the Second Amended Plan under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Second Amended Plan, any exhibit, or schedules thereto or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary, subject to the terms of the Second Amended Plan. The Debtors believe that the Second Amended Plan will satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to any rejecting Classes of Claims or Interests.

The Debtors also will seek confirmation of the Second Amended Plan over the objection of any individual holders of Claims who are members of an accepting Class. However, there can be no assurance that the Bankruptcy Court will determine that the Second Amended Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

### (2)    Unfair Discrimination and Fair and Equitable Test.

To obtain nonconsensual confirmation of the Second Amended Plan, it must be demonstrated to the Bankruptcy Court that the Second Amended Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class.

### (3)    Feasibility.

The Bankruptcy Code permits a chapter 11 plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the debtors or any successor to the debtors, unless such liquidation or reorganization is proposed in such plan. For purposes of determining whether the Second Amended Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Second Amended Plan. Under the terms of the Second Amended Plan, all Allowed Claims and Allowed Interests are being paid in whole or in part in Cash. The Purchase Price shall be the only form of consideration available for distribution (see table at Article II, "Summary of Plan Classification and Treatment of Claims and Interests" above) and the Debtors

- 57 -

expect that proceeds of the Sale will be sufficient to fund all distributions as and to the extent set forth in the Second Amended Plan.

(b)    **Best Interests Test.**

The "best interests" test requires that the Bankruptcy Court find either:

- that all members of each impaired class have accepted the chapter 11 plan; or

- that each holder of an allowed claim or interest of each impaired class of claims or interests will under the plan receive or retain on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To determine what holders of Claims and Interests in each impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of liquidation under chapter 7 of the Bankruptcy Code. The Cash amount that would be available for satisfaction of Claims and Interests would consist of the proceeds resulting from the disposition of the assets and properties of the Debtors, augmented by the Cash held by the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be: (i) first, reduced by the amount of the Allowed Prepetition Secured Lender Claims and Other Secured Claims, (ii) second, reduced by the costs and expenses of liquidation and such additional administrative claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation, and (iii) third, reduced by the Debtors' costs of liquidation under chapter 7, including the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. Any remaining net cash would be allocated to creditors and stakeholders in strict order of priority of claims contained in section 726 of the Bankruptcy Code. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts (including vendor and customer contracts) assumed or entered into by the Debtors prior to the filing of the chapter 7 cases. Certain claims that would otherwise be paid over the course of many years would be accelerated, such as termination liability with respect to the Debtors' obligations relating to other post-employment benefits.

To determine if the Second Amended Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the Debtors' assets and properties, after subtracting the amounts attributable to the foregoing claims, must be compared with the value of the property offered to such Classes of Claims under the Second Amended Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, the Debtors have determined that confirmation of the Second Amended Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to the liquidation of the Debtors under chapter 7.

- 58 -

Moreover, the Debtors believe that the value of any distributions to each Class of Allowed Claims and Allowed Interests in a chapter 7 case would be less than the value of distributions under the Second Amended Plan and any distribution in a chapter 7 case would not occur for a substantial period of time. It is likely that distribution of the proceeds of the liquidation could be delayed for up to eighteen months after the completion of such liquidation in order to resolve claims and prepare for distributions. In the likely event litigation was necessary to resolve claims asserted in the chapter 7 case, the delay could be prolonged.

Jefferies, with the assistance of the Debtors, prepared a liquidation analysis which is annexed hereto as Exhibit 2 (the "**Liquidation Analysis**"). The information set forth in Exhibit 2 provides: (a) a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates, and (b) the expected recoveries of the Debtors' creditors and equity interest holders under the Second Amended Plan. As reflected in Exhibit 2, the following Classes of Claims and Interests would have a zero percent (0%) recovery on their Claims in a liquidation scenario: Classes 1, 2, 3(a), (b) and (c), 4(a), and (b), 5(a), 5(b) and 5(c) and 6(a) and (b). Holders of Interests in RGCH, RathGibson, and Greenville will not receive anything on account of their interests pursuant to the Second Amended Plan.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a liquidation of the Debtors. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to be liquidated. The chapter 7 liquidation period is assumed to last nine months following the appointment of a chapter 7 trustee, allowing for, among other things, the discontinuation and wind-down of operations, the sale of the operations, the sale of assets and the collection of receivables. All holders of Claims that are entitled to vote to accept or reject the Second Amended Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Second Amended Plan.

## 7.3    *Classification of Claims and Interests.*

The Debtors believe that the Second Amended Plan meets the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim and interest into a class with other claims or interests that are "substantially similar."

## 7.4    *Consummation.*

The Second Amended Plan will be consummated on the Effective Date. The Effective Date will occur on the first Business Day on which the conditions precedent to the effectiveness of the Second Amended Plan, as set forth in the Second Amended Plan, have been satisfied or waived pursuant to the Second Amended Plan.

DB02:9340498.2

068401.1001

The Second Amended Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

**7.5** **_The Role of the Creditors' Committee_**

The Creditors' Committee shall be automatically dissolved on the later of: (i) the Effective Date; and (ii) the conclusion of any appeals with respect to the Confirmation Order (but such functions shall relate solely to services performed related to such appeal), and the Creditors' Committee shall be deemed dissolved as of such date except with respect to the review and prosecution of Fee Claims and any objections thereto. Following the Effective Date, the attorneys and financial advisors to the Creditors' Committee shall be entitled to assert any reasonable claims for compensation for services rendered or reimbursement for expenses incurred after the Effective Date in connection with the pursuit of their own Fee Claims or the representation of the Creditors' Committee in connection with the review of and the right to be heard in connection with all Fee Claims.

**7.6** **_Post-Confirmation Jurisdiction of the Bankruptcy Court_**

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(a) To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the Cure Disputes resulting therefrom;

(b) To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c) To ensure that distributions to holders of Allowed Claims or Allowed Interests are accomplished as provided in the Second Amended Plan;

(d) To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(e) To consider Interests or the allowance, compromise or distributions on account of any Interest;

(f) To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g) To issue and enforce injunctions, enter and implement other orders, and

DB02:9340498.2                                                                         068401.1001

take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Second Amended Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)     To hear and determine any application to modify the Second Amended Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Second Amended Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     To hear and determine all Fee Claims;

(j)     To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Second Amended Plan, the Confirmation Order, the APA, any transactions or payments contemplated thereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(l)     To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Second Amended Plan, as may be necessary to construe, enforce, implement, execute, and consummate the Second Amended Plan, including any release or injunction provisions set forth therein, or to maintain the integrity of the Second Amended Plan following consummation;

(m)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)     To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement Hearing, the Confirmation Hearing, any applicable Bar Date, or the deadline for responding or objecting to a Cure Cost, for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose;

DB02:9340498.2

068401.1001

(q)     To recover any property of the Estates that are not Purchased Assets, wherever located;

(r)     To determine any other matter not inconsistent with the Bankruptcy Code; and

(s)     To enter a final decree closing each of the Chapter 11 Cases.

# ARTICLE VIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE SECOND AMENDED PLAN

If the Second Amended Plan is not consummated, the Debtors' capital structure will remain over-leveraged and the Debtors will remain unable to service their debt obligations. Accordingly, if the Second Amended Plan is not confirmed and consummated, the alternatives include:

**8.1    *Liquidation Under Chapter 7 of the Bankruptcy Code.***

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code. A discussion of the effect a chapter 7 liquidation would have on the recoveries of the holders of Claims is set forth in Article VII of this Disclosure Statement. The Debtors believe that liquidation would result in lower aggregate distributions being made to creditors and interest holders than those provided for in the Second Amended Plan, which is demonstrated by the Liquidation Analysis set forth in Article VII and attached as Exhibit 2 of this Disclosure Statement.

**8.2    *Alternative Plan(s) of Reorganization.***

Assuming the Debtors had sufficient liquidity to operate, the Debtors believe that failure to confirm the Second Amended Plan would lead to expensive and protracted Chapter 11 Cases. However, the Debtors do not believe that, in such event, they will be able to procure additional financing and believe liquidation would likely result.

In formulating and developing the Second Amended Plan, the Debtors have explored numerous other alternatives and engaged in an extensive negotiating process with the Stalking Horse Bidder, the Ad Hoc Senior Noteholders Committee, the Ad Hoc RGCH PIK Noteholders Committee and the Creditors' Committee. The Debtors believe that the Second Amended Plan fairly adjusts the rights of various Classes of Claims and Interests, and also provides superior recoveries to Classes 3(b), 4(a), 5(a), 5(b), 6(a) and 6(b) over any alternative capable of rational consideration (such as a chapter 7 liquidation), thus enabling stakeholders to maximize their returns.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE SECOND AMENDED PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE SECOND AMENDED PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS

- 62 -

OF CLAIMS AND INTERESTS AND ANY ALTERNATIVE TO CONFIRMATION OF THE SECOND AMENDED PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES. THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS AND IMPAIRED INTERESTS ENTITLED TO VOTE ON THE SECOND AMENDED PLAN VOTE TO ACCEPT THE SECOND AMENDED PLAN.

**8.3** *Dismissal of the Debtors' Chapter 11 Cases.*

Dismissal of the Debtors' Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante.* Upon dismissal of the Debtors' Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time consuming process of negotiations with the creditors of the Debtors, and possibly resulting in costly and protracted litigation in various jurisdictions. Moreover, holders of Secured Claims may be permitted to foreclose upon the assets that are subject to their Liens, which is likely all of the Debtors' assets, including all of their Cash. Dismissal may also permit certain unpaid unsecured creditors to obtain and enforce judgments against the Debtors. The Debtors believe that these actions would seriously undermine their ability to obtain financing and could lead ultimately to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that dismissal of the Debtors' Chapter 11 Cases is not a viable alternative to the Second Amended Plan.

<div align="center">

**ARTICLE IX.**

**SUMMARY OF VOTING PROCEDURES**

</div>

This Disclosure Statement, including all Exhibits hereto and the related materials included herewith, is being furnished to the holders of Claims in Classes 3(b), 4(a), 5(a), 5(b) and 6(a), and Interests in Class 6(b), which are the only Classes entitled to vote on the Second Amended Plan.

All votes to accept or reject the Second Amended Plan must be cast by using the Ballot enclosed with this Disclosure Statement. No other votes will be counted. Consistent with the provisions of Bankruptcy Rule 3018, the Debtors have fixed [April 9], 2010 at 5:00 p.m. (prevailing Eastern Time) as the Voting Record Date. Ballots must be RECEIVED by the Voting Agent no later than 4:00 p.m. (prevailing Eastern Time) on [May 11], 2010, unless the Debtors, at any time, in their sole discretion, extend such date by oral or written notice to the Voting Agent, in which event the period during which Ballots will be accepted will terminate at 4:00 p.m. (prevailing Eastern Time) on such extended date. See Section 1.4 "Voting; Holders of Claims Entitled to Vote" above for additional disclosures regarding voting, including voting by Intermediary.

Ballots previously delivered may be withdrawn or revoked at any time prior to the Voting Deadline by the beneficial owner on the Voting Record Date who completed the original Ballot. Only the person or nominee who submits a Ballot can withdraw or revoke that Ballot. A Ballot may be revoked or withdrawn either by submitting a superseding Ballot or by providing written notice to the Voting Agent.

<div align="center">- 63 -</div>

Acceptances or rejections may be withdrawn or revoked prior to the Voting Deadline by delivering a written notice of withdrawal or revocation to the Voting Agent. To be effective, notice of revocation or withdrawal must: (a) be received on or before the Voting Deadline by the Voting Agent at its address specified in Section 1.4 above; (b) specify the name of the holder of the Claim or Interest whose vote on the Second Amended Plan is being withdrawn or revoked; (c) contain the description of the Claim or Interest as to which a vote on the Second Amended Plan is withdrawn or revoked; and (d) be signed by the holder of the Claim or Interest who executed the Ballot reflecting the vote being withdrawn or revoked, in the same manner as the original signature on the Ballot. The foregoing procedures should also be followed with respect to a person entitled to vote on the Second Amended Plan who wishes to change (rather than revoke or withdraw) its vote.

## ARTICLE X.

## DESCRIPTION AND HISTORY OF CHAPTER 11 CASES

**10.1** *General Case Background.*

On July 13, 2009, each of the Debtors and their direct and indirect parents, as applicable, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On July 14, 2009, the Bankruptcy Court entered an order (Docket No. 44) authorizing the joint administration of the Chapter 11 Cases, for procedural purposes only, under Case No. 09-12452. The Honorable Christopher S. Sontchi is presiding over the Chapter 11 Cases. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. As of the date hereof, no request has been made for the appointment of a trustee or examiner in these cases.

The following is a brief description of certain significant events that have occurred during the pendency of the Chapter 11 Cases.

**10.2** *Retention of Professionals.*

To assist them in carrying out their duties as debtors in possession, and to otherwise represent their interests in the Chapter 11 Cases, the Debtors filed with the Bankruptcy Court applications seeking entry of orders authorizing the Debtors to retain: (a) Willkie Farr & Gallagher LLP (Docket No. 28) and Young Conaway Stargatt & Taylor, LLP (Docket No. 80) as their co-counsel; (b) Kelley Drye & Warren LLP as their special corporate counsel (Docket No. 67); and (c) Mesirow Financial Consulting, LLC as their financial advisors (Docket No. 68). On August 11, 2009, the Bankruptcy Court entered orders (Docket Nos. 150, 154, 152, and 151, respectively) approving the applications.

On the Petition Date, the Debtors filed with the Bankruptcy Court an application seeking entry of an order authorizing the Debtors to retain Jefferies & Company, Inc. ("**Jefferies**") as their financial advisor and investment banker (Docket No. 29). On August 10, 2009, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order approving an addendum to the Debtors' engagement letter with Jefferies (Docket No. 145). On August 31,

- 64 -

2009, the Bankruptcy Court entered orders (Docket Nos. 244 and 243, respectively) approving the retention application and motion to approve the addendum.

Also on the Petition Date, the Debtors filed with the Bankruptcy Court an application seeking entry of an order, pursuant to 28 U.S.C. § 156(c), authorizing the Debtors to retain Garden City as the Debtors' claims, noticing and balloting agent (Docket No. 5). On July 14, 2009, the Bankruptcy Court entered an order (Docket No. 56) approving the application.

Additionally, the Debtors filed with the Bankruptcy Court a motion seeking authority, pursuant to section 327(e) of the Bankruptcy Code, to employ certain additional professionals, utilized in the ordinary course, to assist the Debtors in their day-to-day business operations (Docket No. 30). On August 11, 2009, the Bankruptcy Court entered an order (Docket No. 147) approving the motion.

**10.3**  *Employment Obligations.*

    (a)    **Prepetition Employee Compensation.**

The Debtors believe they have a valuable asset in their workforce, and that the efforts of the Debtors' employees are critical to a successful reorganization. On the Petition Date, the Debtors filed with the Bankruptcy Court a motion (the "**Employee Wage Motion**") for an order authorizing the Debtors to pay claims relating to, among other items, wages, salaries, compensation, withholding taxes, payroll taxes, vacation, reimbursable expenses, and other employee compensation (Docket No. 8). On July 14, 2009, the Bankruptcy Court entered an order (Docket No. 54) approving the motion, except with respect to the incentive bonus plan obligations discussed in section 10.3(b) hereof.

    (b)    **Incentive Bonus Plans.**

The Debtors maintain incentive bonus plans for their corporate executives, operational managers, local business unit managers, and international employees. Pursuant to the incentive bonus plans, participating employees receive bonuses based on various metrics, including EBITDA and working capital/net debt targets. By the Employee Wage Motion, the Debtors sought authorization to pay certain outstanding obligations in respect of the incentive bonus plans for middle managers and certain international employees for fiscal year 2008-2009. The Debtors did not seek to pay bonuses to any executives or insiders. On August 31, 2009, the Bankruptcy Court entered an order (Docket No. 241) authorizing the Debtors to satisfy their outstanding obligations to middle managers and international employees under the incentive bonus plans.

    (c)    **Retiree Benefits.**

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, payments in respect of retiree benefits (within the meaning of, and subject to the limitations of, section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code, at any time prior to the Confirmation Date, shall be continued for the duration of the period for which the Debtors had obligated

DB02:9340498.2                                                                 068401.1001

themselves to provide such benefits. Nothing herein or in the Second Amended Plan shall: (i) restrict the Debtors' right to modify the terms and conditions of the retiree benefits, if any, as otherwise permitted pursuant to the terms of the applicable plans, non-bankruptcy law, or section 1114(m) of the Bankruptcy Code; or (ii) be construed as an admission that any such retiree benefits are owed by the Debtors. The Debtors currently are unaware of any obligations owing in respect of retiree benefits.

### 10.4   *Continuing Supplier and Customer Relations.*

The Debtors believe that maintaining good relationships with their vendors, suppliers and customers is necessary to the continuity of the Debtors' business operations during the Chapter 11 Cases. On the Petition Date, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order authorizing the Debtors to pay, in the ordinary course of business, prepetition claims of certain priority vendors and certain critical vendors of goods and services, including foreign critical vendors (Docket No. 13). On July 14, 2009, the Bankruptcy Court entered an order (Docket No. 52) approving the motion.

In addition, on the Petition Date, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order authorizing the Debtors to continue certain prepetition customer programs, and satisfy, in the ordinary course of business, certain prepetition claims arising from such programs (Docket No. 12). On July 14, 2009, the Bankruptcy Court entered an order (Docket No. 50) approving the motion.

### 10.5   *Stabilization of Debtors' Business Operations.*

#### (a)   **Cash Management.**

The Debtors sought an order authorizing it to continue the management of their cash receipts and disbursements substantially in the manner in which they were handled immediately before the Petition Date, to continue to use of all of their existing bank accounts and certain business forms that are maintained by the Debtors in the operation of their businesses and to continue their investment practices in the ordinary course of its business. The Debtors believe it would be disruptive to their operations if they were forced to change significantly their cash management system upon the commencement of the Chapter 11 Cases. Accordingly, on the Petition Date, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order authorizing the Debtors to maintain their current cash management system (Docket No. 6). On July 14, 2009, the Bankruptcy Court entered an order (Docket No. 45) approving the motion.

#### (b)   **Postpetition Financing and Use of Cash Collateral.**

The Debtors could not meet their ongoing postpetition obligations unless they were authorized to use Cash claimed as part of their collateral by the Lenders and draw on the DIP Facility. On the Petition Date, certain of the Debtors filed with the Bankruptcy Court a motion seeking interim and final orders authorizing such Debtors to obtain secured postpetition financing consisting of a multiple draw secured term loan facility in an aggregate principal

- 66 -

amount not to exceed $80 million,[7] grant senior liens and superpriority administrative expense status, use cash collateral of the Prepetition Secured Lender and provide "adequate protection" to the Prepetition Secured Lender (the "**DIP Motion**") (Docket No. 15). On July 14, 2009, the Bankruptcy Court entered an order (Docket No. 48) approving the DIP Motion on an interim basis and, on August 11, 2009, entered an order (Docket No. 159), approving the DIP Motion on a final basis. Among other things, the Debtors used proceeds from the DIP Facility to repay loans outstanding under the Prepetition Secured Credit Agreement as of the Petition Date. As part of the Order approving the DIP Motion on a final basis, the Debtors were authorized, subject to the challenge period specified therein for the Creditors' Committee, to pay, and subsequently paid, the prepetition secured lenders in full in cash all Prepetition Secured Obligations (as defined in the final DIP Order).

<div align="center">(c)      <b>Certain Insurance Matters.</b></div>

       In the ordinary course in connection with the operation of their businesses, the Debtors maintain various workers' compensation and insurance policies which cover workers' compensation and employer liability, general liability, automobile liability, liability arising out of international operations, property damage, cargo losses, directors' and officers' liability, and kidnap and ransom damage. On the Petition Date, the Debtors filed a motion (Docket No. 10) seeking authority to continue honoring all of their obligations under their insurance policies, regardless of when such obligations arose. On July 14, 2009, the Bankruptcy Court entered an order (Docket No. 47) approving the motion.

**10.6**    *Utilities.*

       On the Petition Date, the Debtors filed with the Bankruptcy Court a motion for interim and final orders: (a) prohibiting utilities from altering, refusing or discontinuing services; (b) deeming utility companies adequately assured of future performance; and (c) establishing procedures for determining adequate assurance of payment (Docket No. 7). On July 14, 2009 and August 11, 2009, the Bankruptcy Court entered orders approving the motion on an interim and final bases, respectively (Docket Nos. 51 and 153).

**10.7**    *Appointment of a Creditors' Committee.*

       Pursuant to section 1102(a)(1) of the Bankruptcy Code, on July 22, 2009, the U.S. Trustee appointed the Creditors' Committee. The current members of the Creditors' Committee are set forth below:

---

[7]      On July 16, 2009, the Debtors entered into that certain Secured Super-priority Debtor-in-Possession Multiple Draw Term Loan Agreement, by and among RathGibson, as Borrower, Greenville and RGCH, as guarantors, Wilmington Trust Company FSB as Administrative Agent and the DIP Lenders (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "**DIP Facility**"), which provided the Debtors with a facility in an aggregate amount of $80,000,000.

<div align="center">- 67 -</div>

                                             

The Bank of New York Mellon
101 Barclay St., 8 West
New York, NY 10286
Attn: John Giuliano

David Pudelsky
469 South Horizon Way
Neshanic Station, NJ 08853

ECO Master Fund Ltd.
c/o ECO Management LP
320 Park Ave., 9th Floor
New York, NY 10022
Attn: Steven Friedman

On August 5, 2009 and August 20, 2009, the Creditors' Committee filed with the Bankruptcy Court applications seeking entry of an order authorizing the Creditors' Committee to retain Otterbourg, Steindler, Houston & Rosen, P.C. as its counsel (Docket No. 129) and Huron Consulting Financial Services LLC as its financial advisors (Docket No. 200), respectively. On September 11, 2009, the Bankruptcy Court approved such retentions (Docket Nos. 278 & 280).

**10.8**  *Section 341 Meeting*

On August 20, 2009, the U.S. Trustee convened a meeting of creditors (the "**341 Meeting**") pursuant to section 341(a) of the Bankruptcy Code. Mr. Jon Smith, Chief Financial Officer of the Debtors, attended the 341 Meeting on behalf of the Debtors. The 341 Meeting was closed on August 20, 2009.

**10.9**  *Schedules, Statements and Bar Date.*

(a)  **Schedules and Statements.**

On July 29, 2009, each Debtor filed with the Bankruptcy Court its Schedules of Assets and Liabilities ("**Schedules**") and Statement of Financial Affairs ("**SoFA**"). On August 26, 2009, RathGibson and Greenville filed certain amended Schedules. On October 2, 2009, RathGibson filed certain further amended Schedules. The Schedules and SoFAs are available electronically free of charge at http://www.rathrestructuring.com.

(b)  **Bar Date.**

On the Petition Date, the Debtors filed with the Bankruptcy Court a motion seeking an order establishing the Bar Dates for filing proof of certain claims against the Debtors that arose on or prior to the Petition Date, and approving the form and manner of notice of each Bar Date (Docket No. 14). On July 14, 2009, the Bankruptcy Court entered an order (Docket No. 47) (the "**Bar Date Order**") approving the motion and fixing the date that was 35 days from the date that each of the Debtors filed their Schedules and SoFAs with the Bankruptcy Court as the Bar Date for all creditors other than governmental units (the "**General Bar Date**"), and

- 68 -

January 11, 2010 as the Bar Date for governmental units. As the Debtors filed their Schedules and SoFAs on July 29, 2009, the General Bar Date was set as September 2, 2009. Pursuant to the Bar Date Order, any creditor affected by an amendment to the Schedules and SoFAs has 20 days from the date of such amendment to file a proof of claim. Additionally, any counterparty to an executory contract or unexpired lease with the Debtors that is rejected by the Debtors has until 30 days after entry of an order approving such rejection to file a proof of claim for damages arising from such rejection.

In accordance with the Bar Date Order, on August 10, 2009, a notice regarding the Bar Dates (the "**Bar Date Notice**") was published in The New York Times. In addition, on August 3, 2009, a proof of claim form and notice of the Bar Dates were mailed to all known entities holding potential prepetition claims against the Debtors.

## 10.10  *Claims Objections*

The Debtors have commenced the process of reconciling the proofs of claim filed with their books and records in order to identify claims to which they should object.

In connection therewith, on October 7, 2009, the Debtors filed an omnibus objection (Docket No. 324) (the "**First Omnibus Objection**") to the allowance of certain claims that: (i) duplicated other proofs of claim filed in the Debtors' cases; (ii) were filed against the incorrect Debtor; or (iii) were satisfied by the Debtors after the Petition Date. On November 4, 2009, the Bankruptcy Court entered an order (Docket No. 380) sustaining the First Omnibus Objection. Also on October 7, 2009, the Debtors filed an omnibus objection (Docket No. 325) (the "**Second Omnibus Objection**") to certain claims: (i) with respect to which the Debtors believed they were not liable; (ii) which, according to the Debtors' books and records, were asserted an incorrect amount; or (iii) which the Debtors determined should be reclassified to a different priority. On November 4, 2009, the Bankruptcy Court entered an order (Docket No. 378) sustaining the Second Omnibus Objection with respect to all claims subject thereto except for one claim, with respect to which the Second Omnibus Objection was adjourned.

On December 29, 2009, the Debtors filed an omnibus objection (Docket No. 470) (the "**Third Omnibus Objection**") to the allowance of certain claims that duplicated or were amended by other claims filed in the Chapter 11 Cases. On January 26, 2010, the Bankruptcy Court entered an order (Docket No. 503) sustaining the Third Omnibus Objection in its entirety. Also on December 29, 2009, the Debtors filed an omnibus objection (Docket No. 471) (the "**Fourth Omnibus Objection**") to certain claims: (i) with respect to which the Debtors believed they were not liable; or (ii) which, according to the Debtors' books and records, were asserted an incorrect amount. One claimant partially withdrew one of the claims subject to the Fourth Omnibus Objection and the Debtors withdrew its objection to one claim included in the Fourth Omnibus Objection. On January 28, 2010, the Bankruptcy Court entered an order (Docket No. 509]) sustaining the Fourth Omnibus Objection in its entirety, subject to the withdrawals described in the immediately preceding sentence.

As of the date hereof, the Debtors believe that they filed the majority of their objections to filed Claims. In their efforts to maximize the value of the Estates, consistent with their fiduciary duties, the Debtors will continue to diligently pursue the claims reconciliation

DB02:9340498.2

068401.1001

process and object to the remaining Claims, as appropriate, including after the Effective Date, in accordance with Section 9.1 of the Second Amended Plan.

**10.11** *Preferences and Fraudulent Conveyances*

Under the Bankruptcy Code, a debtor may seek to recover, through adversary proceedings in the bankruptcy court, certain transfers of the debtor's property, including payments of cash, made while the debtor was insolvent during the 90 days immediately before the commencement of the bankruptcy case (or, in the case of a transfer to or on behalf of an "insider," one year before the commencement of the bankruptcy case) in respect of antecedent debts to the extent the transferee received more than it would have received on account of such preexisting debt had the debtor been liquidated under chapter 7 of the Bankruptcy Code. Such transfers include cash payments, pledges of security interests or other transfers of an interest in property. In order to be preferential, such payments must have been made while the debtor was insolvent; debtors are rebuttably presumed to have been insolvent during the 90-day preference period. The Bankruptcy Code's preference statute can be very broad in its application because it allows the debtor to recover payments regardless of whether there was any impropriety in such payments.

However, there are certain defenses to such claims. For example, transfers made in the ordinary course of a debtor's and the transferee's business or transfers made in accordance with ordinary business terms are not recoverable. Furthermore, if the transferee extended credit contemporaneously with or subsequent to the transfer, and before the commencement of the bankruptcy case, for which the transferee was not repaid, such extension constitutes an offset against an otherwise recoverable transfer of property. If a transfer is recovered by a debtor, the transferee has a general unsecured claim against the debtor to the extent of the recovery.

Pursuant to Section 14.13 of the Second Amended Plan, except for any pending action as of the Effective Date, the Debtors intend to release and waive the right to prosecute any avoidance or recovery actions under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code. As of the date hereof, the Debtors do not anticipate prosecuting any avoidance or recovery actions against any ordinary course of business trade vendors or service providers because, among other things, holders of Allowed General Unsecured Claims are being paid in full under the Second Amended Plan.

**10.12** *Deadline Extensions*

      (a)    **Extension of Deadline for Removal of Prepetition Non-Bankruptcy Actions**

Pursuant to Bankruptcy Rule 9006(b)(1), the Debtors' original deadline to remove prepetition non-bankruptcy actions to federal court (the "**Removal Deadline**") was October 13, 2009. On November 4, 2009, the Bankruptcy Court entered an order (Docket No. 376) extending the Removal Deadline. On January 20, 2010, the Bankruptcy Court entered an order (Docket No. 494) further extending the Removal Deadline until the later of: (i) April 12, 2010; or (ii) 30 days after termination of the automatic stay with respect to the particular prepetition non-bankruptcy action to be removed.

- 70 -

(b) **Extension of Deadline to Assume or Reject
Unexpired Leases of Nonresidential Real Property.**

As of the Petition Date, certain of the Debtors were party to unexpired leases of nonresidential real property. Section 365(d)(4) of the Bankruptcy Code provides that any unexpired lease of nonresidential real property under which the debtor is a tenant shall be deemed rejected on the date that is 120 days after the petition date. Such deadline (the "**365(d)(4) Deadline**") may be extended by the Bankruptcy Court for 90 days, once, for cause. On November 4, 2009, the Bankruptcy Court entered an order (Docket No. 375) extending the Debtors' time to assume or reject all of their nonresidential real property leases by 90 days, through and including February 8, 2010.

In accordance with the Bankruptcy Code, subsequent extensions of the 365(d)(4) Deadline with respect to any unexpired lease may only be obtained with the consent of the applicable landlord. In January 2010, the Debtors obtained consensual extensions of the 365(d)(4) Deadline with respect to each of their leases, which extensions were memorialized in stipulations approved by orders of the Bankruptcy Court (Docket Nos. 485, 486, 491, 498, 518, 524 and 527). Such extensions were for periods ranging from 2.5 months to 6 months.

(c) **Extension of Debtors' Exclusive Periods**

Pursuant to section 1121 of the Bankruptcy Code, a chapter 11 debtor has the exclusive right to file and solicit acceptance of a chapter 11 plan for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If the chapter 11 debtor files a chapter 11 plan within this exclusive period, then it has the exclusive right for 180 days from the filing date to solicit acceptances to such plan. During these exclusive periods, no other party in interest may file a competing chapter 11 plan. The Bankruptcy Court may extend these periods upon request of a party in interest and "for cause."

The Debtors' initial exclusive filing period would have expired on November 10, 2009, and the Debtors' initial exclusive solicitation period would have expired on January 11, 2010. On November 9, 2009, the Debtors filed a motion (Docket No. 393) seeking to extend their exclusivity periods for 120 days and, on December 9, 2009, the Bankruptcy Court entered an order (Docket No. 442) granting the Debtors an extension of their exclusive filing period through February 23, 2010 and their exclusive solicitation period through April 28, 2010.

**10.13** *Events Leading to Formulation of Second Amended Plan.*

On the Petition Date, RathGibson and Greenville filed the Joint Chapter 11 Plan for RathGibson, Inc. and Greenville Tube Company [Docket No. 32] (as amended on August 31, 2009 [Docket No. 260], the "**First Amended Plan**") and related disclosure statement (as amended on August 31, 2009 [Docket No. 261], the "**Original Disclosure Statement**").

On August 27, 2009, the Ad Hoc RGCH PIK Noteholders Committee served: (i) a Notice of Deposition upon Oral Examination, First Set of Interrogatories, and First Request for the Production of Documents on the Debtors; and (ii) a Notice of Deposition upon Oral Examination and First Request for the Production of Documents on Wayzata, one of the

members of the Ad Hoc Senior Noteholders Committee (such notices, the "**Discovery Requests**"). Because the Discovery Requests did not pertain to a contested matter, the Debtors and Wayzata disputed the rights of the Ad Hoc RGCH PIK Noteholders Committee to obtain discovery. After negotiations in connection therewith, the Debtors and Wayzata agreed to respond to the Discovery Requests.

On September 2, 2009, the Bankruptcy Court entered an order [Docket No. 254] approving the Original Disclosure Statement and authorizing RathGibson and Greenville to commence solicitation of votes in respect of the First Amended Plan. On September 8, 2009, the Ad Hoc RGCH PIK Noteholders Committee filed a preliminary objection to the First Amended Plan [Docket No. 266], stating their intention to assert objections to confirmation of the First Amended Plan based on: (i) the alleged bad faith basis of the First Amended Plan; (ii) the alleged failure of the First Amended Plan to satisfy certain requirements for confirmation under section 1129; and (iii) the allegedly improper releases granted in the First Amended Plan.

In September, 2009, the Debtors and Wayzata began reviewing and producing documents in response to the Discovery Requests and scheduling depositions. While such discovery was being conducted, the Debtors, Wayzata and the Ad Hoc RGCH PIK Noteholders Committee engaged in discussions regarding a consensual resolution of the Ad Hoc RGCH PIK Noteholders Committee's objection to the First Amended Plan. During this time, the Debtors also began reviewing and analyzing the various Claims that each Debtor had against the other Debtors relating to several issues, including tax refunds, claims for reimbursement related to professional fees, preparation and filing of taxes and audit related fees. Contemporaneously, the Creditors' Committee also inquired of the Debtors regarding certain Intercompany Claims.

During this period of time, the Debtors determined, in their business judgment, that it was in their and their estates' best interests to further revise the First Amended Plan in order to implement a more efficient tax structure. Thereafter, the Debtors extensively discussed with the Ad Hoc Senior Noteholders Committee and the Creditors Committee various alternative restructuring scenarios. Ultimately, the Debtors determined that it was in their and their creditors' best interests to pursue the proposed Sale, which included extensive, spirited negotiations with the Stalking Horse Bidder, to sell substantially all of their assets to the Stalking Horse Bidder or such other bidder that submits a higher or otherwise better offer at the Auction and in accordance with the Bid Procedures pursuant to the Second Amended Plan, is accepted by the Debtors and approved by the Bankruptcy Court. The Second Amended Plan not only reflects the revised restructuring plan but also reflects the Global Settlement with the Ad Hoc RGCH PIK Noteholders Committee and the Creditors' Committee. On March 8, 2010, the Debtors filed the Second Amended Plan and this Disclosure Statement.

DB02:9340498.2

068401.1001

# ARTICLE XI.

## CERTAIN RISK FACTORS TO BE CONSIDERED

> **Important Risks to Be Considered**
>
> Holders of Claims against, or Interests in, the Debtors should read and consider carefully the following risk factors and the other information in this Disclosure Statement, the Second Amended Plan, the APA, the Plan Supplement and the other documents delivered or incorporated by reference in this Disclosure Statement and the Second Amended Plan, before voting to accept or reject the Second Amended Plan.
>
> These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Second Amended Plan and its implementation.

**11.1** *Certain Bankruptcy and Sale Considerations.*

    (a)    **General.**

        Although the Second Amended Plan is designed to implement the Sale and provide distributions to creditors and certain interest holders funded by the Purchase Price in an expedient and efficient manner, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties-in-interest that the Second Amended Plan will be confirmed.

        If the Debtors are unable to obtain confirmation of the Second Amended Plan on a timely basis because of a challenge to confirmation of the Second Amended Plan or a failure to satisfy the conditions to consummation of the Second Amended Plan, they may be forced to operate in bankruptcy for an extended period while they try to develop a different chapter 11 plan that can be confirmed. Such a scenario could jeopardize the Debtors' relationships with their key vendors and suppliers, customers and employees, which, in turn, would have an adverse effect on the Debtors' operations. A material deterioration in the Debtors operations likely would diminish recoveries under any subsequent chapter 11 plan. Further, in such event, the Debtors' may not have sufficient liquidity to operate in bankruptcy for such an extended period.

    (b)    **Actual Plan Distributions may be less than estimated by the Debtors for the purposes of this Disclosure Statement.**

        The projected Plan Distributions and recoveries set forth in this Disclosure Statement are based on the Purchase Price in the Stalking Horse Agreement of $93 million in cash plus consideration of the liabilities anticipated to be assumed by the Stalking Horse Bidder plus the Debtors' estimates of Allowed Claims and Allowed Interests. The Debtors' project that the Claims and Interests asserted against them will be resolved in and reduced to an amount that

- 73 -

approximates their estimates. The Debtors have estimated at $0 the two litigation-related claims filed against them. However, there can be no assurance that the Debtors' estimates, including relating to the litigation claims, will prove accurate. In the event such Claims and Interests are materially higher than the projected estimates, the Plan Distributions could be materially less than estimated.

(c)    **The Purchase Price allocation set forth herein may differ materially from the allocation to be performed by the Purchaser for federal income tax purposes.**

RG Tube and RGCH each are holding companies with no operations. As a result, the Debtors have not allocated any portion of the Purchase Price to either Debtor. Obligations of RG Tube and RGCH shall be satisfied from the RG Tube Cash, which is to be distributed in accordance with Section 8.9 of the Second Amended Plan. After: (i) payment of Allowed DIP Claims, Allowed Administrative Expense Claims, Allowed Fee Claims, U.S. Trustee Fees, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Other Secured Claims; and (ii) funding of the Wind Down Account, the Debtors will allocate the remainder of the Purchase Price between RathGibson and Greenville, the two Debtors with operations, based on fiscal year 2010 revenue, such that RathGibson is allocated approximately 86% of the Purchase Price and Greenville is allocated approximately 14% of the Purchase Price.

The sole purpose of allocating the Purchase Price as of the date hereof is to provide holders of Allowed Claims and Allowed Interests an understanding of the projected Plan Distributions, however, the Purchase Price allocation set forth herein may differ materially from the allocation to be performed by the Purchaser for federal income tax purposes. The Purchase Price allocation set forth herein is not meant, and should not be construed as, binding on the Purchaser, but is merely a mechanism for the Debtors to make distributions under the Second Amended Plan and effect the Wind Down.

(d)    **If the Debtors do not deliver net working capital to the Stalking Horse Bidder in excess of $71.8 million on the Effective Date, there will be a dollar-for-dollar downward adjustment in the Purchase Price.**

The Debtors have agreed with the Stalking Horse Bidder to a working capital adjustment mechanism and a target net working capital amount of $71.8 million. If the closing date net working capital, which is defined as the current assets that are Purchased Assets less the current liabilities that are Assumed Liabilities, is less than $71.8 million, then the Cash portion of the Purchase Price will be reduced on a dollar-for-dollar basis by the amount of the shortfall. Such reductions in the Cash portion of the Purchase Price will result in the Debtors having less post-closing Cash to deliver to its creditors and satisfy holders of Allowed Claims and Allowed Interests under the Plan (that are not being assumed by the Stalking Horse Bidder under the Stalking Horse Agreement). If there is a downward adjustment in the Purchase Price, the estimated recoveries to holders of Allowed Claims and Allowed Interests may be impacted materially.

- 74 -

(e) **The successful bidder in the Auction, if any, may not be the Stalking Horse Bidder.**

If an Auction is held and a party other than the Stalking Horse Bidder is the successful bidder, the Debtors will have determined, after consultation with the Creditors' Committee that such bid was higher or otherwise better than the Stalking Horse Bid. As a result of such successful bid, all executory contracts and unexpired leases of the Debtors not set forth on the Schedule of Rejected Contracts, as may be amended after the Auction, will be assumed by the applicable Debtor and assigned to the successful bidder. To the extent that the counterparties to those executory contracts and unexpired leases being assumed, assigned and/or transferred to the successful bidder do not timely object to such assumption, assignment and/or transferred, such counterparties will be: (i) barred, estopped and enjoined from disputing the Cure Cost relating to such executory contracts and unexpired leases set forth on the Assumption Notice, and if no such notice is received and such executory contracts and unexpired leases are not listed on the Schedule of Rejected Contracts and Leases (as may be amended), a Cure Cost of $0.00; and (ii) be deemed to have consented to the assumption and assignment of such executory contracts and unexpired leases and shall be forever barred and estopped from asserting or claiming against the Debtors or the successful bidder that any additional amounts are due or defaults exist, or conditions to assumption and assignment of such executory contracts and unexpired leases must be satisfied (pursuant to Section 365(b)(1) of the Bankruptcy Code or otherwise).

(f) **The Debtors may adjourn certain deadlines.**

In certain circumstances, the Debtors may deem it appropriate to adjourn any or all of: the Voting Deadline, the Bid Deadline, the Auction and/or the Confirmation Hearing. While the Debtors estimate that the Effective Date will occur on or around June 16, 2010, they cannot assure you that applicable dates related to the foregoing will not be extended and the Effective Date will not be delayed.

(g) **The Debtors may not be able to secure confirmation of the Second Amended Plan.**

The Debtors cannot assure you that the requisite acceptances to confirm the Second Amended Plan will be received. Even if the requisite acceptances are received, the Debtors cannot assure you that the Bankruptcy Court will confirm the Second Amended Plan. A non-accepting creditor or equity security holder of the Debtors might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Second Amended Plan if it found that any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the value of distributions to non-accepting holders of claims and interests within a particular Class under the Second Amended Plan will not be less than the value of distributions such holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. While the Debtors cannot

- 75 -

assure you that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that non-accepting holders within each Class under the Second Amended Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

If the Second Amended Plan is not confirmed, it is unclear whether a restructuring of the Debtors could be implemented and what distribution holders of Claims ultimately would receive with respect to their Claims. If an alternative restructuring could not be agreed to, it is possible that the Debtors would have to liquidate their assets, in which case it is likely that holders of Claims and Interests would receive substantially less favorable treatment than they would receive under the Second Amended Plan. There can be no assurance that the terms of any such alternative restructuring arrangement or chapter 11 plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Second Amended Plan.

(h)     **Failure to Consummate the Second Amended Plan.**

One condition to consummation of the Second Amended Plan is the entry of the Confirmation Order that will approve, among other things, the Sale. In addition, in order to consummate the Second Amended Plan, the Debtors must satisfy (or obtain waivers of) all conditions to closing under the APA. As of the date of this Disclosure Statement, there can be no assurance that these or the other conditions to consummation will be satisfied or waived. Accordingly, even if the Second Amended Plan is confirmed by the Bankruptcy Court and the Sale is approved, there can be no assurance that the Second Amended Plan or the APA will be consummated and the restructuring completed. If the APA is not consummated and the restructuring completed, these Chapter 11 Cases will be prolonged and the Debtors may lack sufficient liquidity to effect a successful restructuring under chapter 11 of the Bankruptcy Code.

(i)     **Objections to Classification of Claims.**

Section 1122 of the Bankruptcy Code provides that a chapter 11 plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Second Amended Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(j)     **The Debtors may object to the amount or classification of your claim.**

The Debtors reserve the right to object to the amount or classification of any Claim or Interest. The estimates set forth in this Disclosure Statement cannot be relied on by any creditor whose Claim or Interest is subject to an objection. Any such Claim or Interest holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

DB02:9340498.2                                                  068401.1001

**11.2   *Certain Tax Consequences of the Second Amended Plan Raise Unsettled and Complex Legal Issues and Involve Factual Determinations.***

The federal income tax consequences of the Second Amended Plan are complex and are subject to significant uncertainties. The Debtors currently do not intend to seek any ruling from the Internal Revenue Service ("**IRS**") on the tax consequences of the Second Amended Plan. Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date. In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request. *Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment in the Second Amended Plan, or that a court would not sustain such a challenge.*

## ARTICLE XII.

## CERTAIN FEDERAL INCOME TAX
## CONSEQUENCES OF THE SECOND AMENDED PLAN

**12.1   *Introduction.***

The following discussion summarizes certain federal income tax consequences expected to result from the consummation of the Second Amended Plan. This discussion is only for general information purposes and only describes the expected tax consequences to holders entitled to vote on the Second Amended Plan. It is not a complete analysis of all potential federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws. This discussion is based on the IRC, Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the IRS, all as in effect on the date of this Disclosure Statement. These authorities may change, possibly retroactively, resulting in federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences resulting from the consummation of the Second Amended Plan or that any contrary position would not be sustained by a court.

This discussion assumes that holders of Claims have held such property as "capital assets" within the meaning of IRC Section 1221 (generally, property held for investment). In addition, this discussion assumes that the Debtors' obligations under the Senior Notes and RGCH PIK Notes will be treated as debt for federal income tax purposes.

This discussion does not address all federal income tax considerations that may be relevant to a particular holder in light of that holder's particular circumstances or to holders subject to special rules under the federal income tax laws, such as financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans, partnerships and other pass-through entities, foreign corporations, foreign trusts, foreign estates, holders who are not citizens or residents of the U.S., holders subject to the alternative minimum tax, holders holding Claims as

- 77 -

part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, holders who have a functional currency other than the U.S. dollar and holders that acquired the Claims in connection with the performance of services.

In addition, this discussion does not address the treatment of any fees to be paid pursuant to the Second Amended Plan.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE SECOND AMENDED PLAN AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER FEDERAL TAX LAWS.

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**12.2** *Federal Income Tax Consequences to the Debtors.*

(a)      **Sale of the Purchased Assets.**

The Debtors intend that the Sale to the Purchaser will be treated as a taxable transaction and that the Debtors will recognize any gain or loss realized on such Sale. To determine the amount of gain or loss realized by a Debtor on the Sale, the total consideration received in such Sale must be allocated among the assets sold in accordance with their relative fair market values. The gain or loss realized with respect to each asset is then determined separately by subtracting the selling Debtor's tax basis in such asset from the amount of consideration received (including the amount of any Assumed Liabilities) for such asset. Any gain recognized by the Debtors with respect to the Sale may be offset either by operating losses that have accrued during the current tax year or by the Debtors' net operating loss and/or capital loss carryforwards. However, the Debtors may recognize some alternative minimum tax as a result of the Sale to the extent any gain from the Sale is offset by net operating losses and/or capital loss carryforwards, and not by operating losses from the current tax year. Any resulting tax will be paid by the Debtors. It is expected that the Debtors will recognize a loss as a result of the Sale of the Purchased Assets and, therefore, should not have any U.S. federal income tax liability as result of the Sale.

- 78 -

(b)     **Cancellation of Indebtedness and Reduction of Tax Attributes.**

The Debtors generally should realize COD Income to the extent the sum of: (i) cash and the fair market value of any property received by holders is less than the sum of (x) the adjusted issue price of any debt exchanged for Cash or other property pursuant to the Second Amended Plan, and (z) the amount of any unpaid accrued interest on such debt to the extent previously deducted by the Debtors.

The Debtors expect that the amount of COD Income realized upon consummation of the Second Amended Plan will be significant; however, the ultimate amount of COD Income realized by the Debtors is uncertain because, among other things, it will depend on the Purchase Price paid for the Purchased Assets pursuant to the Sale on the Effective Date. Estimated recoveries for the Debtors' various Claims are set forth in Article II above.

COD Income realized by a Debtor will be excluded from income if the discharge of debt occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a chapter 11 plan approved by the court (the "**Bankruptcy Exception**"). Because the Bankruptcy Exception will apply to the transactions consummated pursuant to the Second Amended Plan, the Debtors will not be required to recognize any COD Income realized as a result of the implementation of the Second Amended Plan.

A debtor that does not recognize COD Income under the Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD Income. Attributes subject to reduction include NOLs, NOL carryforwards and certain other losses, credits and carryforwards, and the debtor's tax basis in its assets (including stock of subsidiaries). Usually a debtor must reduce the tax basis in its own assets first before then reducing stock of subsidiaries, following which the assets of subsidiaries may be reduced. A debtor's tax basis in its assets generally may not be reduced below the amount of liabilities remaining immediately after the discharge of indebtedness. If the debtor is a member of a consolidated group and reduces its basis in the stock of another group member, a "look-through rule" requires a corresponding reduction in the tax attributes of the lower-tier member. NOLs for the taxable year of the discharge and NOL carryovers to such year generally are the first attributes subject to reduction.

The Debtors believe that, for federal income tax purposes, the Debtors' consolidated group generated approximately $60.7 million of consolidated NOLs in the tax year ending January 31, 2010, of which approximately $51.7 million are expected to be carried forward, and likely will generate additional NOLs during the current tax year. However, the amount of the Debtors' NOLs will not be determined until the Debtors prepare their consolidated federal income tax returns for such periods. Moreover, the Debtors' NOLs are subject to audit and possible challenge by the IRS. Accordingly, the amount of the Debtors' NOLs ultimately may vary from the amounts set forth above.

The Debtors currently anticipate that the application of IRC Section 108(b) will likely eliminate its NOLs and NOL carryforwards and will cause a reduction of the tax bases of any assets of the Debtors that are not Purchased Assets in connection with the Sale. However,

the ultimate effect of the attribute reduction rules is uncertain because, among other things, it will depend on the amount of COD Income realized by the Debtors and the extent to which the Debtors are required to reduce other tax attributes.

### (c) Alternative Minimum Tax.

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the taxable year. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated, with further adjustments required if AMTI, determined without regard to adjusted current earnings ("**ACE**"), differs from ACE. A corporation that pays AMT generally is later allowed a nonrefundable credit (equal to a portion of its prior year AMT liability) against its regular federal income tax liability in future taxable years when it is no longer subject to the AMT.

## 12.3 *Federal Income Tax Consequences to Holders of Certain Claims.*

### (a) Receipt of Distributions Under the Second Amended Plan

#### 1. In General.

A holder of a Claim will generally recognize gain or loss on the exchange of the Claim for Cash or other property under the Second Amended Plan. Subject to the rules discussed below under "*Other Considerations—Accrued Interest,*" such gain or loss will generally be equal to the difference between (i) the sum of Cash received and (ii) the holder's tax basis in its Claims. Subject to the rules discussed below under "*Other Considerations—Market Discount,*" any gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has held a Claim for more than one year as of the date of disposition. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

### (b) Other Considerations.

*Accrued Interest.* There is general uncertainty regarding the extent to which the receipt of Cash or other property should be treated as attributable to unpaid accrued interest. In accordance with the Second Amended Plan, the Debtors take the position that Cash or property distributed pursuant to the Second Amended Plan will first be allocable to the principal amount of a holder's Claim and then, to the extent necessary, to any unpaid accrued interest thereon. The IRS, however, could take a contrary position.

To the extent any property received pursuant to the Second Amended Plan is considered attributable to unpaid accrued interest, a holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the holder. A holder's tax basis in such property should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date. A holder generally will

- 80 -

be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE SECOND AMENDED PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.

*Market Discount*. A holder that acquires a debt instrument at a market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of accrued market discount not previously included in gross income by the holder. However, special rules apply to the disposition of a market discount obligation in certain types of non-recognition transactions, such as a recapitalization.

(c)     **Information Reporting and Backup Withholding.**

The Debtors (or their paying agent) may be obligated to furnish information to the IRS regarding the consideration received by holders (other than corporations and other exempt holders) pursuant to the Second Amended Plan.

Holders may be subject to backup withholding (currently, at a rate of 28%) on the consideration received pursuant to the Second Amended Plan. Certain holders (including corporations) generally are not subject to backup withholding. A holder that is not otherwise exempt generally may avoid backup withholding by furnishing to the Debtors (or their paying agent) its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the holder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax. Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE SECOND AMENDED PLAN DESCRIBED HEREIN. NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE SECOND AMENDED PLAN OR THE FOREGOING DISCUSSION.

## ARTICLE XIII.

## PROCEDURES FOR DISTRIBUTIONS UNDER THE SECOND AMENDED PLAN

**13.1    *Distribution Record Date.***

As of the close of business on the Distribution Record Date, the various lists of

- 81 -

holders of Claims and Interests in each of the Classes, as maintained by the Debtors, or their agents, shall be deemed closed and there shall be no further changes in the record holders of any of the Claims and Interests. Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of Claims or Interests occurring after the close of business on the Distribution Record Date. Additionally, with respect to payment of any Cure Costs or any Cure Disputes in connection with the assumption and/or assignment of the Debtors' executory contracts and leases, the Debtors shall have no obligation to recognize or deal with any party other than the non-Debtor party to the underlying executory contract or lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Cost.

Notwithstanding the foregoing or anything in the Second Amended Plan to the contrary, in connection with any distribution under the Second Amended Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors will be entitled to recognize and deal for all purposes under the Second Amended Plan with such holders to the extent consistent with the customary practices of DTC used in connection with such distribution. Distributions to be made on account of Allowed Senior Notes Claims shall be made by the Disbursing Agent to the Senior Notes Indenture Trustee or such other party designated by the Debtors, who shall also act as the transfer agent with respect to the Plan Consideration to be distributed to holders of Allowed Senior Notes Claims for further distribution in accordance with the terms of the Senior Notes Indenture or in accordance with the Second Amended Plan where such Senior Notes Indenture is silent. The Senior Notes Indenture Trustee shall cooperate and assist the Disbursing Agent and applicable transfer agent in connection with such distributions to the holders of Allowed Senior Notes Claims. Distributions to be made on account of Allowed RGCH PIK Notes Claims shall be made by the Disbursing Agent to the RGCH PIK Notes Agent, who shall act as the transfer agent with respect to the Class 5(a) Distribution for further distribution in accordance with the terms of the RGCH PIK Notes Credit Agreement or in accordance with the Plan where such RGCH PIK Notes Credit Agreement is silent. The RGCH PIK Notes Agent shall cooperate and assist the Disbursing Agent in connection with such distributions to the holders of Allowed RGCH PIK Notes Claims.

**13.2**    *Disbursing Agent.*

All distributions under the Second Amended Plan shall be made by the applicable Debtor or the Disbursing Agent on and after the Effective Date as provided therein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the applicable Debtor. Furthermore, any such Person required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

**13.3**    *Rights and Powers of Disbursing Agent.*

(a)    **Powers of Disbursing Agent.**

The Disbursing Agent shall be empowered to: (i) effect all actions and execute all

- 82 -

agreements, instruments, and other documents necessary to perform its duties under the Second Amended Plan, (ii) make all applicable distributions or payments contemplated thereby, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to the Second Amended Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions thereof.

### (b) Expenses Incurred on or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Debtors if the Disbursing Agent is a Person other than the Plan Administrator, the amount of any reasonable documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement Claims (including, without limitation, reasonable attorney and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Debtors.

### 13.4 *Delivery of Distribution.*

The Disbursing Agent, subject to Bankruptcy Rule 9010, will make all distributions or payments to any holder of an Allowed Claim or an Allowed Interest as and when required by the Second Amended Plan at: (i) the address of such holder on the books and records of the Debtors or their agents; or (ii) at the address in any written notice of address change delivered to the Debtors or the applicable Disbursing Agent, including any addresses included on any filed proofs of Claim or Interest or transfers of Claim filed pursuant to Bankruptcy Rule 3001 (provided that such transfer of Claim is docketed by the Bankruptcy Court on or before twenty (21) days prior to the Distribution Record Date). In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the applicable Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter such distribution shall be made to such holder without interest, provided, however, such distributions or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety days from the later of: (i) the Effective Date; and (ii) the date such holder's Claim or Interest is first Allowed; provided, further, however, that any holder of an Allowed Claim or Allowed Interest that does not provide a current address to the Debtors within 120 days after the date on which a distribution was deliverable to such holder of an Allowed Claim or Allowed Interest shall be treated as though such Claim or Interest has been disallowed. Any such undeliverable distribution shall be made available for distribution to the holders of the remaining Allowed Claims and Allowed Interests, as applicable, and no further payments shall be made to the holder of an Allowed Claim or an Allowed Interest on account of such undeliverable distribution.

### 13.5 *Unclaimed Property.*

Holders of Allowed Claims and Allowed Interests shall have 120 days from the date of any Plan Distribution check to negotiate such checks. To the extent such checks are not

negotiated within such time period, the payment on such applicable checks shall be stopped and the corresponding funds shall be made available for distribution to the remaining holders of Allowed Claims and Allowed Interests, as applicable, no further payments shall be made to the holder of an Allowed Claim or an Allowed Interest on account of such unclaimed property and such Claim or Interest shall be treated as though such Claim or Interest has been disallowed. The Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim or Allowed Interest other than by reviewing the Debtors' books and records, proofs of Claim or proofs of Interest filed against the Debtors or transfers of Claim filed pursuant to Bankruptcy Rule 3001 (provided that such transfer of Claim is docketed by the Bankruptcy Court on or before twenty (21) days prior to the Distribution Record Date).

**13.6** *Reserve Accounts*

On or as soon as practicable after the Effective Date, the Plan Administrator shall establish and maintain separate reserve accounts as set forth in the Second Amended Plan and for Disputed Claims and Interests against each Debtor if such Claims and Interests were to become Allowed Claims or Allowed Interests. Each such reserve account shall be funded from that portion of the Purchase Price allocated to each Debtor after: (i) first, payment in full of Allowed DIP Claims, Allowed Administrative Expense Claims, Allowed Fee Claims, U.S. Trustee Fees, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Other Secured Claims, and (ii) second, funding of the Wind Down Account, for the payment of Allowed Claims or Allowed Interests, as applicable, against each such Debtor pursuant to the terms of the Second Amended Plan and for the benefit of the holders of Disputed Claims or Disputed Interests in the applicable Class. Other than establishing and maintaining one separate account for each Debtor, reserves may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time, as appropriate.

**13.7** *Distribution of RG Tube Cash.*

The RG Tube Cash shall be distributed as follows:

(a)    first, to pay (or provide for the payment of): (i) the Allowed RGCH PIK Notes Agent Claims; and (ii) the Allowed Ad Hoc RGCH PIK Noteholders Committee Fee Claims;

(b)    second, to make the Class 6(a) Distribution;

(c)    third, to make the Class 6(b) Distribution;

(d)    fourth, to make the Class 5(a) Distribution; and

(e)    fifth, to make the Class 5(b) Distribution.

As part of the settlements and compromises contained in the Second Amended Plan, any remainder, after payment in accordance with (a) through (e) above shall be distributed to RathGibson to be distributed to its creditors in accordance with the Second Amended Plan.

- 84 -

068401.1001

**13.8** *Fractional Cents.*

Notwithstanding any other provision of the Second Amended Plan to the contrary, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

**13.9** *No Distribution in Excess of Amount of Allowed Claim.*

No holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Plan Distribution (of a value set forth therein) in excess of the Allowed amount of such Claim plus postpetition interest on such Claim (but only to the extent interest is provided in Section 8.2 of the Second Amended Plan).

**13.10** *Withholding and Reporting Requirements.*

In connection with the Second Amended Plan and all distributions thereunder, the Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Plan Distributions hereunder shall be subject to any such withholding and reporting requirements. The Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of any Plan Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Debtors or the Disbursing Agent believe are reasonable and appropriate, including requiring a holder of a Claim or Interest to submit appropriate tax and withholding certifications. Notwithstanding any other provision of the Second Amended Plan: (i) each holder of an Allowed Claim and/or an Allowed Interest that is to receive a distribution under the Second Amended Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution; and (ii) no Plan Distributions shall be required to be made to or on behalf of such holder pursuant to the Second Amended Plan if, after 120 days from the date of transmission of a written request to the holder of an Allowed Claim or Allowed Interest, the Debtor does not receive a valid, completed IRS form from such holder of an Allowed Claim or Allowed Interest, which is otherwise required for IRS reporting purposes, and such holder shall be treated as if their Claims or Interests had been disallowed.

<div align="center">

**ARTICLE XIV.**

**PROCEDURES FOR RESOLVING CLAIMS**

</div>

**14.1** *Objections to Claims.*

Other than with respect to Fee Claims, only the Debtors shall be entitled to object to Claims after the Effective Date. Any objections to those Claims (other than Administrative Expense Claims), shall be served and filed on or before the later of: (i) one-hundred twenty (120) days after the Effective Date; and (i) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (i) hereof. Any Claims filed

<div align="center">- 85 -</div>

after the Bar Date or Administrative Expense Claims Bar Date, as applicable, shall be deemed disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors, unless the Person wishing to file such untimely Claim has received Bankruptcy Court authority to do so. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the objecting party effects service in any of the following manners: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (ii) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (iii) if counsel has agreed to or is otherwise deemed to accept service, by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Chapter 11 Cases (so long as such appearance has not been subsequently withdrawn). From and after the Effective Date, the Debtors may settle or compromise any Disputed Claim without need for notice or approval of the Bankruptcy Court.

**14.2** *Amendment to Claims.*

From and after the Effective Date and in accordance with the Bar Date Order and the Administrative Expense Claims Bar Date Order (or such deadline as established pursuant to Section 3.2 of the Second Amended Plan and the Confirmation Order), unless a claimant has obtained prior Bankruptcy Court approval, no Claim may be filed to increase or assert additional claims not reflected in an already filed Claim (or Claim scheduled, unless superseded by a filed Claim, on the applicable Debtor's Schedules of Assets and Liabilities filed in the Chapter 11 Cases) asserted by such claimant and any such Claim shall be deemed disallowed and expunged in its entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors. Notwithstanding anything contained herein or the Second Amended Plan to the contrary, unless otherwise ordered by the Bankruptcy Court, no reserves shall be required to be established or maintained with respect to Claims or Administrative Expense Claims filed after the applicable Bar Date.

**14.3** *Disputed Claims and Disputed Interests.*

Except as provided in Section 9.3 of the Second Amended Plan, Disputed Claims and Disputed Interests shall not be entitled to any Plan Distributions unless and until such Claims or Interests become Allowed Claims or Allowed Interests, as applicable.

On each Distribution Date (or such earlier date as determined by the Debtors or the Disbursing Agent in their sole discretion but subject to Section 9.3 of the Second Amended Plan), the Disbursing Agent will make distributions or payments: (i) on account of any Disputed Claim or Disputed Interest that has become an Allowed Claim or Allowed Interest, as applicable, since the occurrence of the previous Distribution Date; and (ii) on account of previously Allowed Claims of property or Allowed Interests that would have been distributed or paid to the holders of such Claims or Interests on the dates distributions previously were made to holders of Allowed Claims or Allowed Interests, as applicable, in such Class had the Disputed Claims and Disputed Interests that have become Allowed Claims or Allowed Interests been Allowed on such dates. The Disbursing Agent shall distribute in respect of such newly Allowed Claims and

- 86 -

Allowed Interests the Plan Consideration as to which holders of such Claims would have been entitled under the Second Amended Plan if such newly Allowed Claims and Allowed Interests were fully or partially Allowed, as the case may be, on the Effective Date, less direct and actual expenses, fees, or other direct costs of maintaining Plan Consideration on account of such Disputed Claims and Disputed Interests, as applicable.

Except as otherwise provided in the Second Amended Plan, to the extent any Disputed Claim or Disputed Interest has become Disallowed in full or in part (in accordance with the procedures set forth in the Plan), any Plan Consideration held by the Debtors on account of, or to pay, such Disputed Claim or Disputed Interest, including amounts held in any reserve, shall become the sole and exclusive property of the applicable Debtor and shall be applied in accordance with the terms of the Second Amended Plan.

**14.4**   *Estimation of Claims; Certain Reserves.*

For purposes of calculating and making distributions under the Second Amended Plan, the Debtors shall be entitled to estimate, in good faith and with due regard to litigation risks associated with Disputed Claims, the maximum dollar amount of Allowed and Disputed Claims, inclusive of contingent and/or unliquidated Claims in a particular Class. The Debtors may request that the Bankruptcy Court estimate any Claim pursuant to section 502(c) of the Bankruptcy Code for purposes of determining the Allowed amount of such Claim regardless of whether any Person has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim for purposes of determining the allowed amount of such Claim at any time. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim for allowance purposes, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the objecting party may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Second Amended Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, resolved or withdrawn by any mechanism approved by the Bankruptcy Court.

**14.5**   *Directors' and Officers Claims.*

All contingent and unliquidated Claims relating from the obligation of a Debtor to exculpate, indemnify and advance any expenses to any Person serving at any time for one or more of the Debtors as one of its directors or officers (statutory or otherwise) by reason of such Person's service in such capacity, or as a director or officer (statutory or otherwise) of any other corporation or legal entity, for acts or omissions occurring at or prior to the Effective Date, whether asserted or claimed prior to, at or after the Effective Date, to the extent provided in such Debtor's constituent documents, a written agreement with the Debtor, in accordance with any applicable law, or any combination of the foregoing, shall be treated under the Second Amended Plan as a Claim for $0.00 and the Debtors shall have no obligation to reserve any amounts therefor; <u>provided</u>, nothing in the Second Amended Plan shall effect the right of any such

- 87 -

directors or officers (statutory or otherwise) to proceed against any Debtors' insurance policies, insurance proceeds or any insurer thereof nor effect the value of such Claims in respect of same.

## 14.6 *No Recourse.*

Notwithstanding that the Allowed amount of any particular Disputed Claim or Disputed Interest is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Second Amended Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims or Allowed Interests in the respective Class, no Claim or Interest holder shall have recourse against the Disbursing Agent, the Debtors, the Plan Administrator, the Purchaser or any of their respective professionals, consultants, officers, directors, employees or members or their successors or assigns, or any of their respective property. However, nothing in the Second Amended Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code, nor shall it modify or limit the ability of claimants (if any) to seek disgorgement to remedy any unequal distribution from parties other than those released under this section. THE ESTIMATION OF CLAIMS AND THE ESTABLISHMENT OF RESERVES UNDER THE SECOND AMENDED PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.

## 14.7 *No Successor Liability.*

Except as otherwise expressly provided in the Second Amended Plan or the APA, the Purchaser does not, pursuant to the Second Amended Plan or otherwise, assume, agree to perform, pay or indemnify or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other party relating to or arising out of the operations of or assets of the Debtors, whether arising prior to, on, or after the Effective Date. The Purchaser is not, and shall not be, a successor to any of the Debtors by reason of any theory of law or equity, and it shall not have any successor or transferee liability of any kind or character, except that the Purchaser shall assume the Assumed Liabilities under the terms and subject to the conditions set forth in the APA.

DB02:9340498.2                                                                                    068401.1001

## ARTICLE XV.

## CONCLUSION

The Debtors believe that confirmation and implementation of the Second Amended Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to holders of Claims and Interests. Other alternatives would involve significant delay, uncertainty and substantial administrative costs and are likely to reduce any return to creditors who hold Claims. The Debtors urge the holders of impaired Claims in Classes 3(b), 4(a), 5(a), 5(b) and 6(a) and Interests in Class 6(b) who are entitled to vote on the Second Amended Plan, to vote to accept the Second Amended Plan and to evidence such acceptance by returning their Ballots to the Voting Agent so that they will be received not later than 4:00 p.m. (prevailing Eastern Time) on May 11, 2010.

Dated: March _8_ , 2010
       Wilmington, Delaware

                    Respectfully submitted,

                    RATHGIBSON, INC.,

                    By: _____
                        Michael Schwartz
                        President and Chief Executive Officer

                    GREENVILLE TUBE COMPANY

                    By: _____
                        Michael Schwartz
                        President and Chief Executive Officer

                    RGCH HOLDINGS CORP.

                    By: _____
                        Michael Schwartz
                        President and Chief Executive Officer

RG TUBE HOLDINGS LLC

By: _____
Michael Schwartz
President and Chief Executive Officer

Counsel:

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000
Co-Counsel for the Debtors
and Debtors in Possession

- and -

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

Co-Counsel for Debtors
and Debtors In Possession