# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x

In re                   :     **Chapter 11**

                       :

**RathGibson, Inc., et al.,**[1]     :     **Case No. 09-12452 (CSS)**

                       :     **Jointly Administered**

         **Debtors.**       :

                       :     Objection Deadline: March 18, 2010 at Noon.

                       :     Hearing Date: March 23, 2010 at 1:00 p.m.

------------------------------------------------------x

## DEBTORS' MOTION FOR AN ORDER (I) (A) APPROVING BID PROCEDURES WITH RESPECT TO SALE; (B) APPROVING BID PROTECTIONS WITH RESPECT TO STALKING HORSE BIDDER; (C) APPROVING ASSUMPTION, ASSIGNMENT AND/OR TRANSFER PROCEDURES; AND (D) SCHEDULING AN AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (the "Debtors" or the "Sellers") hereby submit this motion (the "Motion"), pursuant to sections 105, 363, 365, 503, 507 and 1146(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1(c) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for: entry of an order, substantially in the form attached hereto as Exhibit 1, (a) approving the Bid Procedures (as defined below) with respect to the sale of all or substantially all of the Debtors' assets (the "Sale"), (b) approving the Bid Protections (as defined below) with respect to the Stalking Horse Bidder (as defined below), (c) approving certain assumption, assignment and/or transfer procedures, and (d) scheduling the Auction (as defined below) and approving the form and

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) Greenville Tube Company (2689); (ii) RathGibson, Inc. (3283); (iii) RG Tube Holdings LLC (4080); and (iv) RGCH Holdings Corp. (9683). The Debtors' executive headquarters' address is 475 Half Day Road, Suite 210, Lincolnshire, Illinois 60069.

manner of notice thereof. In support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## INTRODUCTION[2]

1.     Since the inception of these cases, the Debtors have been endeavoring to formulate a strategy for exiting chapter 11 as expeditiously as possible while achieving the best possible results for their estates, creditors and other stakeholders. Following the solicitation of votes in respect of the Initial Plan, which was submitted by two of the Debtors (RathGibson, Inc. and Greenville Tube Company), the Debtors determined it was appropriate to amend the Initial Plan to, among other things, provide for the inclusion of the two other Debtors (RG Tube Holdings LLC and RGCH Holdings Corp.) and provide for the sale, assumption, assignment and/or transfer of all or substantially all of the Debtors' assets.

2.     To that end, the Debtors have worked with their key constituencies to resolve open issues with a view towards exiting chapter 11 during the second quarter of 2010. After extensive negotiations, the Debtors have filed with this Court concurrently herewith the *Second Amended Joint Chapter 11 Plan for RathGibson, Inc., et al.* (including all exhibits thereto and as amended, modified or supplemented from time to time, the "Plan") and the accompanying *Disclosure Statement for Second Amended Joint Chapter 11 Plan for RathGibson, Inc., et al.* (including all exhibits thereto and as amended, modified or supplemented from time to time, the "Disclosure Statement").

3.     The Plan reflects a global settlement (the "Global Settlement") of: (i) various intercompany claims; (ii) the Debtors' dispute with the Ad Hoc RGCH PIK Noteholders Committee; and (iii) issues raised by the Creditors' Committee regarding various matters. The

---

[2]     Capitalized terms not otherwise defined in this Introduction shall have the meanings ascribed to such terms herein.

068401.1001

Plan also provides for the Sale, free and clear of all liens, claims, interests, charges or other encumbrances (other than permitted encumbrances), to RathGibson Acquisition Co., LLC (the "Stalking Horse Bidder" or "Purchaser") or such other person or entity that submits the highest or otherwise best bid for the Purchased Assets (as more specifically defined in the Stalking Horse Agreement (defined below), the "Purchased Assets"), in exchange for $93 million in cash and the assumption of certain liabilities of the Debtors. The Sale of the Purchased Assets to the Stalking Horse Bidder (subject to the Debtors' marketing efforts and any higher or otherwise better offers for such assets) is an integral component to the Plan, and confirmation and consummation of the Plan is dependent upon consummation of the Sale. Accordingly, through this Motion, the Debtors are seeking approval of the Bid Procedures in connection with the Sale.

## JURISDICTION

4.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b) and venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 507 and 1146(a) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006 and Local Rule 6004-1(c).

## BACKGROUND

5.      On July 13, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

6. On July 23, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed a statutory committee of unsecured creditors (the "Creditors' Committee"). No trustee or examiner has been appointed in these cases.

7. The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the *Declaration of Jon M. Smith in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 3].

8. On the Petition Date, Debtors RathGibson, Inc. and Greenville Tube Company (the "Initial Plan Debtors") filed the *Joint Chapter 11 Plan for RathGibson, Inc. and Greenville Tube Company* [Docket No. 32] and the *Disclosure Statement for Joint Chapter 11 Plan for RathGibson, Inc. and Greenville Tube Company* [Docket No. 33] with the Court.

9. On July 31, 2009, the Initial Plan Debtors filed the *Debtors' Motion for Order (I) Approving Disclosure Statement; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan, Including (A) Approving Form and Manner of Solicitation Packages, (B) Approving Form and Manner of Notice of Confirmation Hearing, (C) Establishing Record Date and Approving Procedures for Distribution of Solicitation Packages, (D) Approving Forms of Ballots, (E) Establishing Deadline for Receipt of Ballots, and (F) Approving Procedures for Vote Tabulations; (III) Establishing Deadline and Procedures for Filing Objections to Confirmation of Plan; (IV) Approving Rights Offering Procedures, Entry Into and Performance Under Backstop Stock Purchase Agreement, and Authorizing Payment of Fees and Expenses in Connection Therewith; and (V) Granting Related Relief* [Docket No. 118].

10. On July 14, 2009, the Court entered an *Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof* [Docket No. 53], setting September 2, 2009 at

4:00 p.m. (prevailing Eastern Time) as the General Bar Date (as that term is defined therein) and January 11, 2010 at 4:00 p.m. as the Government Bar Date (as that term is defined therein). Additionally, the Debtors intend to file a motion seeking to establish a bar date for all administrative expense claims incurred from the Petition Date through the date that is approximately thirty-five (35) days after the date on which the order approving such motion (the "Administrative Expense Claim Bar Date Order") is entered by the Court. Further, the Plan provides that all holders of such administrative expense claims that are not subject to the Administrative Expense Claim Bar Date Order must file such administrative expense claims by no later than thirty (30) days following the Effective Date of the Plan. See Plan at § 3.2.

11.    On August 31, 2009, the Court conducted a hearing on, among other things, the Initial Disclosure Statement. After the conclusion of the hearing, the Court entered an order approving the Initial Disclosure Statement and establishing solicitation, voting and tabulation procedures in connection with the Initial Plan. See Docket No. 242. On September 2, 2009, the Court entered an amended order approving the Initial Disclosure Statement [Docket No. 254] (the "Amended Initial Disclosure Statement Order"), which established October 6, 2009 as the date by which objections to confirmation of the Initial Plan must be filed, and scheduled the confirmation hearing for the Initial Plan for October 16, 2009.[3]

12.    Subsequent to entry of the Amended Initial Disclosure Statement Order, among other things, the Debtors determined, in their business judgment, that it was in their estates' best interests to further revise the Initial Plan in order to implement a more efficient tax structure as well as to compromise various disputes and potential disputes with the Ad Hoc PIK Noteholders

---

[3]    On September 4, 2009, the Initial Plan Debtors filed the *First Amended Joint Chapter 11 Plan of RathGibson, Inc. and Greenville Tube Company, dated August 31, 2009* (the "Initial Plan") [Docket No. 260] and the related disclosure statement (the "Initial Disclosure Statement") [Docket No. 261], each of which reflected the Court-approved changes and revisions thereto.

DB02:9340147.4                                                                                                      068401.1001

Committee and the Creditors' Committee. Ultimately, the Debtors determined that it was in their estates' best interests to pursue the proposed Sale to the Stalking Horse Bidder or such other bidder that submits a higher or otherwise better offer pursuant to the Bid Procedures (as defined below). Under that certain Asset Purchase Agreement, dated March 8, 2010, by and among the Stalking Horse Bidder and the Debtors (as may be amended, modified, restated or supplemented from time to time and together with all schedules, exhibits, supplements and amendments thereto, the "Stalking Horse Agreement"), in exchange for substantially all of the Debtors' assets, the Stalking Horse Bidder has agreed to pay the Debtors $93 million in cash, plus assume certain liabilities.[4]

13.     The Plan, which has been filed with the Court concurrently with this Motion, reflects the revised restructuring plan, including the Sale and the Global Settlement. Pursuant to the Plan, the Debtors intend to, *inter alia*, sell substantially all of their assets, make distributions to holders of allowed claims (as defined in section 101(5) of the Bankruptcy Code, the "Claims") and certain equity interests, and effect the wind down of the Debtors' estates.

## RELIEF REQUESTED

14.     By this Motion, the Debtors respectfully request entry of an order substantially similar to the form attached hereto as Exhibit 1 (the "Bid Procedures Order").

15.     Through the proposed Bid Procedures Order, the Debtors are requesting entry, pursuant to sections 105, 363, 365, 503, 507 and 1146(a) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, the Court's approval of: (i) the institution of certain bidding, auction and notice procedures for the solicitation and consideration of competing offers for the Purchased Assets (collectively, the "Bid Procedures," attached in substantially final form

---

[4]     A copy of the Stalking Horse Agreement, excluding schedules and exhibits, is annexed hereto as Exhibit 3. Parties in interest may obtain a complete copy of the Stalking Horse Agreement upon written request directed to the Debtors' counsel and entry into an appropriate confidentiality arrangement.

as Exhibit A to the proposed Bid Procedures Order); (ii) the Bid Protections (defined below) provisions of the Stalking Horse Agreement; (iii) the Expense Amount payable to counsel to the Purchaser in its capacity as such as well as in its capacity as counsel to the ad hoc committee of RathGibson, Inc. 11.25% senior notes (the "Ad Hoc Senior Noteholders Committee"); (iv) certain procedures governing the assumption, assignment and/or transfer of certain executory contracts to the Stalking Horse Bidder or, alternatively, to such other qualified bidder who submits the highest or otherwise best bid (the "Successful Bidder") in accordance with the Plan; and (v) scheduling an auction (the "Auction"), if any, in connection with the Purchased Assets and approving the form and manner of notice thereof. Under the terms of the Stalking Horse Agreement, the Confirmation Order approving, among other things, the Sale, must be entered by the Court no later than June 1, 2010.

## BASIS FOR RELIEF REQUESTED

### I. RELEVANT BACKGROUND

#### A. THE EVENTS LEADING UP TO THE PROPOSED SALE

16.     In connection with the Initial Plan, an ad hoc committee of holders of 13.5% payment in kind notes issued by RGCH Holdings Corp., a debtor herein, (the "Ad Hoc RGCH PIK Noteholders Committee") served certain discovery requests upon the Debtors and one of the Lenders under the Debtors' debtor-in-possession financing facility (who was also a holder of Senior Notes). While the Debtors and such other party objected to service thereof as improper on several grounds, eventually the parties agreed to produce documents. During the time that discovery was being conducted, the parties engaged in settlement negotiations in an attempt to consensually resolve the Ad Hoc RGCH PIK Noteholders Committee's objection to the Initial Plan.

7

17. At the same time, the Debtors were in the process of reviewing and analyzing the various intercompany claims that each Debtor had against one or more of the other Debtors relating to several issues, including tax refunds and various administrative costs (e.g., professional fees, debtor in possession financing fees, tax-related filings and preparation, etc.), and the Creditors' Committee began to inquire about such matters. Further, prior to the confirmation hearing scheduled in connection with the Initial Plan, the Debtors determined it was in the estates' best interests to further revise the Initial Plan in order to implement a more efficient tax structure.

18. As a result of the foregoing, the Debtors engaged in extensive discussions with the Ad Hoc Senior Noteholders Committee and the Creditors' Committee regarding various alternative restructuring scenarios. Ultimately, the Debtors determined that it was in their estates' best interests to pursue the proposed Sale, which included extensive negotiations with the Stalking Horse Bidder, which bidder is comprised of a group of holders of approximately 70% of the RathGibson, Inc. 11.25% senior notes, to sell substantially all of their assets to the Stalking Horse Bidder or other Successful Bidder pursuant to the Plan. The Plan reflects both the proposed Sale and the Global Settlement.

## B. THE STALKING HORSE AGREEMENT WITH RATHGIBSON ACQUISITION CO., LLC

19. On March 8, 2010, the Debtors and the Stalking Horse Bidder entered into the Stalking Horse Agreement whereby the Stalking Horse Bidder has agreed to acquire the Debtors' right, title and interest in, to and under, free and clear of all encumbrances (other than Permitted Encumbrances (as defined in the Stalking Horse Agreement)), all or substantially all of the Debtors' assets for a purchase price consisting of $93 million in cash, subject to downward

adjustment, plus certain assumed liabilities. Annexed hereto as <u>Exhibit 2</u> is a summary of the material terms of the Stalking Horse Agreement (the "<u>Stalking Horse Agreement Summary</u>").[5]

20.    As described in the Stalking Horse Agreement Summary, the Stalking Horse Agreement provides that upon the occurrence of certain events of termination, the Stalking Horse Bidder shall become entitled to (i) a break-up fee equal to 3.0% of the pre-adjusted purchase price, or $2.79 million (the "<u>Break-Up Fee</u>"), plus (ii) reimbursement of expenses up to $1 million (the "<u>Reimbursement Amount</u>" and, together with the Break-Up Fee, the "<u>Bid Protections</u>").    In addition, the Stalking Horse Agreement provides for the payment of $1.75 million (the "<u>Expense Amount</u>") to the Stalking Horse Bidder's counsel, in its capacity as such and in its capacity as counsel to the Ad Hoc Senior Noteholders' Committee, for reasonable documented fees and expenses incurred through the date of the proposed Bid Procedures Order. Accordingly, by this Motion, the Debtors are seeking approval of and authority to pay (as and to the extent set forth in the Stalking Horse Agreement) the Break-Up Fee, the Reimbursement Amount and the Expense Amount.

## C.  THE BID PROCEDURES

21.    By this Motion, the Debtors are also requesting approval of the proposed Bid Procedures[6] attached to the proposed Bid Procedures Order as Exhibit A:

    a.    **Assets to be Sold**: The Auction shall consist of the Purchased Assets.

    b.    **Confidentiality Agreements**:  Upon the execution of a confidentiality agreement (which confidentiality agreement, in the aggregate, is no less

---

[5]    The Stalking Horse Agreement Summary is intended as a summary only.  To the extent the description provided therein differs in any respects from the terms of the Stalking Horse Agreement, the terms of the Stalking Horse Agreement govern.

[6]    The description of the terms of the Bid Procedures provided herein is intended as a summary only.  To the extent the description provided herein differs in any respects from the terms of the Bid Procedures, the terms of the Bid Procedures shall govern.  Capitalized terms used in this summary that are not otherwise defined herein shall have the meanings ascribed to such terms in the Bid Procedures.

restrictive to the Potential Bidder than the ones executed by the Stalking Horse Bidder) and the provision to the Debtors of the most current audited and unaudited Financials of the Potential Bidder (for the purposes of demonstrating the financial wherewithal to close the Proposed Transaction within the timeframe set forth in the Stalking Horse Agreement, and provide adequate assurance of future performance to counterparties to any executory contracts an unexpired leases to be assumed and assigned to the Purchaser), a Potential Bidder may, at the discretion of the Debtors, be granted access to reasonable due diligence information.

c.   **Bid Deadline**: Any person or entity interested in participating in the Auction must submit an Qualified Bid on or before May 12, 2010 at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline") to the Notice Parties, as defined in paragraph 28, *infra*.

d.   **Qualified Bids**: In order to participate in the bidding process and be deemed a "Qualified Bidder," each Potential Bidder (other than the Stalking Horse Bidder), must submit a Qualified Bid by the Bid Deadline.

To constitute a Qualified Bid:

(i)   The Potential Bidder must submit its bid in the form of an offer letter, which states:

(1)   that such Qualified Bidder offers to purchase all or substantially all of the Purchased Assets upon terms and conditions substantially similar to the Stalking Horse Agreement pursuant to an asset purchase agreement (together with its exhibits and schedules, the "Proposed Agreement"), three copies of which (one hard copy executed by an individual authorized to bind such Qualified Bidder and two electronic versions in Word format (one clean and one blacklined against the Stalking Horse Agreement to show amendments and modifications to the Stalking Horse Agreement)), are to be provided to the Debtors contemporaneously therewith;

(2)   that such Qualified Bidder is prepared to consummate the transaction set forth in the Proposed Agreement on or before June 16, 2010, following entry of the Confirmation Order;

(3)   that the offer shall remain open and irrevocable as provided below; and

(4)   which of the Debtors' unexpired leases and executory contracts are to be assumed and assigned in connection with the consummation of the Qualified Bidder's bid.

In addition, all Qualified Bids:

(i)     must be accompanied by a deposit into escrow with the Debtors of an amount in cash equal to $10 million (the "Good Faith Deposit");

(ii)    must require cash to be the only form of consideration to be delivered (for the avoidance doubt, other than assumed liabilities) to the Debtors on the Closing Date;

(iii)   must be accompanied by satisfactory evidence, in the opinion of the Debtors, in consultation with the Creditors' Committee, of the Qualified Bidder's ability to: (a) fund the purchase price proposed by the Qualified Bidder with cash on hand or other sources of immediately available funds that are not conditioned on third party approvals or other commitments and (b) otherwise perform all transactions contemplated by the Proposed Agreement;

(iv)    must provide for funding of all payments required under the Plan;

(v)     must be on terms that are not materially more burdensome on the Debtors or conditional than the terms of the Stalking Horse Agreement;

(vi)    must fully disclose the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid (including any equity holder or other financial backer if the Qualified Bidder is an entity formed for the purpose of acquiring the Purchased Assets), and the complete terms of any such participation;

(vii)   cannot contain conditions or contingencies of any kind or any other conditions precedent to such party's obligation to acquire the Purchased Assets other than as may be included in the Stalking Horse Agreement, including, without limitation, conditions or contingencies relating to: (i) the obtaining or the sufficiency of financing or (ii) the outcome of due diligence;

(viii)  must provide for adequate working capital financing to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Qualified Bidder;

(ix)    must contain evidence that the Qualified Bidder has obtained authorization or approval from its Board of Directors (or comparable governing body) with respect to the submission of its bid and

execution of the Proposed Agreement and the consummation of the transactions contemplated thereby; and

(x)   must not entitle the Qualified Bidder to any termination or break-up fee, expense reimbursement or similar type of payment.

**ANY POTENTIAL BIDDER FAILING TO COMPLY WITH THESE REQUIREMENTS MAY NOT BE CONSIDERED A QUALIFIED BIDDER.**

The Debtors shall, in consultation with the Creditors' Committee, notify the Qualified Bidders by the fourth day prior to the commencement of the Auction of: (i) the Debtors' determination of, and the identity of, the Qualified Bidders; and (ii) which Qualified Bid represents the then highest or otherwise best bid (the "Starting Qualified Bid").

e.   **No Qualified Bids**:  In the event no Qualified Bids are received prior to the Bid Deadline, the Stalking Horse Bidder shall be deemed the Successful Bidder and no Auction shall be held in connection with the Purchased Assets.

f.   **Auction**:  In the event that the Debtors timely receive one or more Qualified Bids (other than the Stalking Horse Bidder's Bid) prior to the Bid Deadline, the Debtors shall conduct an Auction in connection with the Purchased Assets at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019 on May 19, 2010 beginning at 11:00 a.m. (prevailing Eastern Time), or such other place (located in New York City) and time as the Debtors shall notify all Qualified Bidders, the Creditors' Committee and other invitees. Only representatives of the Stalking Horse Bidder, the Debtors, the U.S., the Creditors' Committee, the Requisite Lenders and any Qualified Bidders who have timely submitted Qualified Bids shall be entitled to attend the Auction.[7]  The Debtors, in consultation with the Creditors' Committee, may announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.,* the amount of time allotted to make overbids) for conducting the Auction, so long as such rules are not inconsistent with these Bid Procedures. Based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction, and such other information as the Debtors determine, in consultation with the Creditors' Committee, is relevant, the Debtors may conduct the Auction in the manner they determine, in consultation with the Creditors' Committee, will achieve the maximum value for the Purchased Assets. Bidding at the Auction will be transcribed or videotaped.

---

[7]   By this Motion, because of the number of creditors in these cases, the Debtors are seeking a waiver of Local Rule 6004-1(c)(ii) that all creditors be permitted to attend the Auction.

The Auction shall be governed by the following procedures, subject to modification by the Debtors, in consultation with the Creditors' Committee:

(i)     Only a Qualified Bidder and its authorized representatives who have submitted a Qualified Bid will be eligible to participate at the Auction. At the Auction, only the Stalking Horse Bidder and other Qualified Bidders who have submitted a Qualified Bid will be permitted to increase their bids. The bidding at the Auction shall start at the purchase price stated in the Starting Qualified Bid as disclosed to all Qualified Bidders prior to commencement of the Auction and then continue in increments of at least an amount equal to the sum of (i) the Bid Protections (assuming the Expense Reimbursement totaled $1,000,000), and (ii) $500,000. Subsequent overbids shall be made in minimum increments of $500,000, provided that the Debtors, after consultation with the Committee, may reduce such minimum increment amount (but in no event shall such minimum increment amount be reduced to lower than $250,000).

(ii)    During the course of the Auction, the Debtors shall, after the submission of each Qualified Bid, promptly inform each participant which Qualified Bid reflects, in the Debtors' view (after consultation with the Creditors' Committee), the highest or otherwise best offer. To the extent that such Qualified Bid has been determined to be the highest or otherwise best offer entirely or in part because of the addition, deletion or modification of a provision or provisions in the Stalking Horse Agreement (or related ancillary agreement) or the applicable Proposed Agreement (or related ancillary agreement), other than a provision or provisions related to an increase in the cash purchase price, the Debtors shall provide notice to each participant of the value ascribed by the Debtors to any such added, deleted or modified provision or provisions.

(iii)   Each Qualified Bidder participating at the Auction will be required to confirm that: (i) it has not engaged in any collusion with respect to the bidding or the Sale and (ii) its Qualified Bid is a good faith bona fide offer and it intends to consummate the transaction contemplated by the Proposed Agreement if selected as the Successful Bidder.

(iv)    The Auction may be adjourned as the Debtors, in consultation with the Creditors' Committee, deem appropriate. Reasonable notice of such adjournment and the time and place (which shall be in New York City) for the resumption of the Auction shall be given to the Stalking Horse Bidder, all other Qualified Bidders who have timely submitted Qualified Bids, the United States Trustee and counsel to the Creditors' Committee and the Requisite DIP Lenders.

DB02:9340147.4                                                                                          068401.1001

(v)    Any overbid made by the Stalking Horse Bidder shall be deemed to have been made in an amount equal to the overbid plus the Bid Protections (solely for purposes of determining the highest or otherwise best bid).

(vi)    The Debtors shall not close the Auction until all Qualified Bidders have been given a reasonable opportunity to submit an overbid at the Auction to the then-existing highest or otherwise best bid.

At the conclusion of the Auction, (i) the successful bid shall be the bid made pursuant to the Bid Procedures Order, that represents, in the Debtors' discretion (after consultation with the Creditors' Committee), the highest or otherwise best offer (the "Successful Bid"); and (ii) the Debtors shall announce the identity of the Successful Bidder.

If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid only when (a) such bid is declared the Successful Bid at the Auction, and (b) definitive documentation has been executed in respect thereof. Such acceptance by the Debtors is conditioned upon approval by the Bankruptcy Court of the Successful Bid and the entry of the Confirmation Order.

**g.**   **Back-Up Bidder and Return of Good Faith Deposits**:

(i)    The Successful Bid shall remain irrevocable in accordance with the terms of the purchase agreement executed by the Successful Bidder; provided, that (i) the last bid of the bidder (the "Second-Highest Bidder") that submits the next highest or otherwise best bid (the "Second-Highest Bid") at the Auction shall be subject to the terms of such Second-Highest Bidder's purchase agreement, irrevocable until the earlier of: (a) twenty (20) days after entry of the Confirmation Order approving the Successful Bid; and (b) the date of closing of the sale to the Successful Bidder or the Second-Highest Bidder (the "Outside Back-up Date"), and (ii) subject to the terms of such Second-Highest Bidder's purchase agreement, the Good Faith Deposit of the Second-Highest Bidder shall be returned within two (2) business days of the Outside Back-up Date.

(ii)    The identity of the Second-Highest Bidder and the amount and material terms of the Second-Highest Bid shall be announced by the Debtors at the same time the Debtors announce the identity of the Successful Bidder. Following the entry of the Confirmation Order, if the Successful Bidder fails to consummate the Sale because of a breach or failure to perform on the part of the Successful Bidder, the Second-Highest Bidder will be deemed to have the new Successful Bid (which will be the Second-Highest Bid), and the Debtors will be authorized to consummate the Sale with the Second-Highest Bidder

14

without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's Good Faith Deposit shall be forfeited to the Debtors and the Debtors shall have the right to seek any and all other remedies and damages from the defaulting Successful Bidder subject to the terms of, and the limitations and restrictions set forth in, the Proposed Agreement or the Stalking Horse Agreement (as the case may be) of the Successful Bidder.

(iii) Except as otherwise provided in the Bid Procedures, with respect to any Successful Bid and the Second-Highest Bid, if any, the Good Faith Deposits of all Qualified Bidders shall be returned upon or within two (2) business days after the Auction. The Good Faith Deposit of the Successful Bidder shall be held until the closing of the Sale and applied in accordance with the Successful Bid. The Good Faith Deposit of the Second-Highest Bidder shall be returned as set forth in the Bid Procedures.

(iv) If a Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies and/or causes of action that may be available to the Debtors subject to the terms of, and the limitations and restrictions set forth in, the Proposed Agreement or the Stalking Horse Agreement (as the case may be) of the Successful Bidder, and, the Debtors shall be free to consummate the Sale with the Second-Highest Bidder, without the need for an additional hearing or Order of the Bankruptcy Court.

h. **Hearing to Consider Sale**: The Successful Bid will be subject to approval by the Bankruptcy Court. The Sale will be considered in conjunction with the requested confirmation of the Plan at the hearing with respect to confirmation of the Plan (the "Confirmation Hearing"), at which time the Debtors will seek entry of the Confirmation Order, among other things: (x) confirming the Plan; (y) authorizing and approving the Sale to the Successful Bidder, as determined by the Debtors in accordance with these Bid Procedures, pursuant to the terms and conditions set forth in the Stalking Horse Agreement if the Stalking Horse is the Successful Bidder or the Proposed Agreement submitted by the Successful Bidder if the Stalking Horse is not the Successful Bidder (in each case, as any such agreement may be modified prior to, during or after the Auction with the agreement of the Debtors); and (z) exempting the sale and conveyance of the Purchased Assets from any transfer tax, stamp tax or similar tax pursuant to section 1146(a) of the Bankruptcy Code. The Debtors also will seek the inclusion of certain findings in the Confirmation Order regarding the Auction, including, among other things, that: (i) the Auction was conducted and the Successful Bidder

was selected in accordance with these Bid Procedures; (ii) the Auction was fair in substance and procedure; and (iii) consummation of the Sale contemplated by the Successful Bid will provide the highest or otherwise best value for the Purchased Assets and is in the best interests of the Debtors, the Debtors' estates and their creditors. The Confirmation Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date in open court.

i. **Reservation of Rights.** Except as otherwise provided in the Stalking Horse Agreement or the Bid Procedures Order, the Debtors reserve the right as they may reasonably determine to be in the best interests of their estates, to modify the Bid Procedures or impose, at or prior to the Auction, additional terms and conditions on the proposed Sale of the Purchased Assets if, in their reasonable business judgment, in consultation with the Creditors' Committee and the Stalking Horse Bidder, such modifications would be in the best interests of the Debtors' estates and promote an open and fair bidding process.

j. **Expenses.** Any bidders presenting bids shall bear their own expenses in connection with the proposed sale. Notwithstanding the foregoing, the Stalking Horse Bidder may recover the Bid Protections under the Stalking Horse Agreement.

k. **Highest Or Otherwise Best Bid.** In determining the highest or otherwise best offer, as compared to the Stalking Horse Bidder's Bid, the Debtors may, in their discretion, consider the following factors in addition to any other factors that the Debtors deem appropriate: (a) the number, type and nature of any changes to the Stalking Horse Agreement requested by the Qualified Bidder, and whether such bid is for different assets than those proposed to be purchased by the Stalking Horse or on different terms from those contained in the Stalking Horse Agreement; (b) the extent to which such requested modifications to the Stalking Horse Agreement are likely to delay the closing of the transaction contemplated by Proposed Agreement and the cost to the Debtors of any such delay; (c) the total consideration to be received by the Debtors; (d) the likelihood of the Qualified Bidder's ability to timely close the Plan Sale; and (e) the net benefit to the Debtors' estates, taking into account the Stalking Horse's rights to the Bid Protections.

## D. LOCAL RULE 6004-1(C)(1) REQUIREMENTS

22. In accordance with Local Rule 6004-1(c)(i), in addition to the terms of the Stalking Horse Agreement highlighted in the Stalking Horse Agreement Summary, the Debtors highlight the following provisions of the Bid Procedures:

a. **Provisions Governing Qualifications of Bidders**: See Bid Procedures at ¶¶ (c) and (d).

b. **Provisions Governing Qualified Bids**: See Bid Procedures at ¶¶ (d) & (p); Stalking Horse Agreement at § 7.2.

c. **Provisions Providing Bid Protections to "Stalking Horse Bidder" or Initial Bidder**: See Bid Procedures at ¶ (g); Stalking Horse Agreement at §§ 3.6(b), 7.2 & 8.12.

d. **No-Shop or No-Solicitation Procedures**: See Stalking Horse Agreement at § 7.2.

e. **Break-Up/Topping Fees and Expense Reimbursement**: Bid Procedures at ¶ (g); Stalking Horse Agreement at §§ 3.6(b), 3.6(c), 7.1 & 8.12.

f. **Bidding Increments**: Bid Procedures at ¶¶ (g) and (h) .

g. **Treatment of Break-Up Fee or Topping Fee and Expense Reimbursement at Auction**: Bid Procedures at ¶¶ (g) and (h).

h. **Closing with Alternative Backup Bidder**: Bid Procedures at ¶ (j).

i. **Modification of Bidding and Auction Procedures**: Bid Procedures at ¶ (m).

## II. APPROVAL OF THE BID PROCEDURES AND AUCTION IS WARRANTED UNDER THE CIRCUMSTANCES

23. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re

Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

24.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. The Debtors believe a sale of the Purchased Assets pursuant to a public auction governed by the proposed Bid Procedures will maximize the sale proceeds received by the estates, which is the paramount goal in any proposed sale of property of the estate. See Dura Auto. Sys., Inc., Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, * 253 (Bankr. D. Del. Aug. 15, 2007) (noting that "[t]he paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.") (internal citations omitted).[8]

25.     The Debtors believe that the proposed Bid Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the best possible consideration for the Purchased Assets. Bid procedures should be approved when they provide a benefit to the estate by maximizing the value of the assets and enhance competitive bidding. Id. (citing Calpine Corp. v. O'Brien Envt'l Energy, Inc., 181 F.3d 527, 535-37 (3d Cir. 1999)) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate).

---

[8]     Courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. See, e.g., In re Integrated Resources, Inc., 147 B.R. 650, 659 (S.D.N.Y. 1992) (such procedures "encourage bidding and maximize the value of the debtor's assets"); In re Financial News Network, Inc., 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of a bankruptcy estate").

DB02:9340147.4                                                                 068401.1001

26.     The Bid Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances because they are designed to maximize the value received for the Purchased Assets and enable the Debtors to satisfy all claims required to be satisfied in order to confirm the Plan. The process proposed by the Debtors allows for a timely auction while providing bidders with sufficient time and information to submit a timely bid. Along with the Debtors' marketing process, the Bid Procedures are designed to increase the opportunity for the Debtors to receive competitive bids for the purchase of the Purchased Assets at the Auction and ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price. The Debtors are subjecting the value of the Purchased Assets to market testing and permitting prospective strategic and financial purchasers to bid on the Purchased Assets, thereby exposing the proposed Sale to a market check through the solicitation of competing bids in a court-supervised auction process. In addition, the notice described herein and in the Bid Procedures Order is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Purchased Assets in the past six (6) months. The Debtors and all parties in interest, therefore, can be assured that the consideration received for the Purchased Assets will be fair and reasonable. Further, the Debtors believe that the Bid Procedures are consistent with other procedures previously approved in this District and other bankruptcy courts. See, e.g., deCODE genetics, Inc., Case No. 09-14063 (PJW) (Bankr. D. Del. Dec. 11, 2009); In re Velocity Express Corp., Case No. 09-13294 (MFW) (Bankr. D. Del. Oct. 16, 2009); In re Philadelphia Newspapers, LLC, Case No. 09-11204 (SR) (Bankr. E.D. Pa. Oct. 15, 2009); In re Tronox Inc., Case No. 09-10156 (ALG) (Bankr S.D.N.Y. Sep. 23, 2009); In re Refco Inc., Case No. 05-60006 (RRD) (Bankr. S.D.N.Y. Oct. 26, 2005).

27.     Accordingly, the Debtors hereby request the Court's approval of the process and procedures set forth in the Bid Procedures for the submission and consideration of competing bids from other interested parties for the Purchased Assets.

## A. **BID PROCEDURES HEARING**

28.     The Debtors request that any responses or objections to the relief requested related to the Bid Procedures as set forth herein:  (a) be in writing; (b) state the name and address of the objecting or responding party and the nature of the claim or interest of such party; (c) state with particularity the basis and nature of any objection or response; and (d) be filed, together with proof of service, with the Court and served on the following parties such that the Court and the following parties actually receive the responses or objections (and the Court receives the proof of service) on or before **Noon (prevailing Eastern Time) on March 18, 2010**: (i) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019-6099 (Attn: Paul V. Shalhoub, Esq. and Robin Spigel, Esq.), co-counsel to the Debtors; (ii) Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801 (Attn: Robert S. Brady, Esq. and Matthew B. Lunn, Esq.), co-counsel to the Debtors; (iii) the Office of the United States Trustee, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Jane Leamy, Esq.); (iv) Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169 (Attn: Jenette A. Barrow-Bosshart, Esq. and Jessica M. Ward, Esq.), co-counsel to the Creditors' Committee; (v) Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 Market Street, Wilmington, Delaware 19899 (Attn: Henry J. Jaffe, Esq. and John H. Schanne II, Esq.), co-counsel to the Creditors' Committee; (vi) Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 (Attn: Kristopher M. Hansen, Esq. and Jayme T. Goldstein, Esq.), co-counsel to the Stalking Horse Bidder, the Ad Hoc Senior

DB02:9340147.4                                                                    068401.1001

Noteholders Committee and the DIP Lenders; and (vii) Richards Layton & Finger, One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Daniel J. DeFranceschi, Esq.), co-counsel to the Stalking Horse Bidder, the Ad Hoc Senior Noteholders Committee and the DIP Lenders (collectively, the "Notice Parties").

29.     The Debtors also request that the Court consider the Sale in conjunction with the confirmation of the Plan at the Confirmation Hearing, which the Debtors are requesting through the motion to approve the Disclosure Statement filed concurrently herewith, be scheduled for May 21, 2010 at 1:00 p.m. (prevailing Eastern Time), or as soon thereafter as counsel may be heard, to consider entry of the Confirmation Order authorizing the Sale and approving the Stalking Horse Agreement, or a Proposed Agreement (as defined in the Bid Procedures), as the case may be, with the Successful Bidder (as defined in the Bid Procedures), in accordance with the Bid Procedures.

## B.  THE NOTICE OF AUCTION AND SALE HEARING

30.     Bankruptcy Rule 6004 provides that notice of a proposed sale of property outside the ordinary course pursuant to section 363(b) of the Bankruptcy Code must satisfy the requirements of Bankruptcy Rule 2002.  Pursuant to Bankruptcy Rule 2002, the Debtors are required to notify their creditors of the Sale, including a disclosure of the date, time and location of the Auction, the terms and conditions of the Sale, and the deadline for filing any objections. In accordance with such rules, the Debtors propose to serve copies of the order approving this Motion and the Notice of Auction and Sale, which is attached to the proposed Bid Procedures Order as Exhibit B, no later than five (5) business days after entry of the Bid Procedures Order, by first class mail, postage prepaid, or other method reasonably calculated to provide notice of the Sale and the Auction, upon:  (a) the U.S. Trustee; (b) counsel for the Creditors' Committee;

(c) counsel to the agent for the Debtors' prepetition secured lenders; (d) counsel for the Ad Hoc Senior Noteholders Committee and the DIP Lenders; (e) those parties that have requested notice pursuant to Bankruptcy Rule 2002; (f) all entities known by the Debtors to have asserted any lien, claim, interest or encumbrance in or on the Purchased Assets; (g) the non-Debtor counterparties to the Executory Contracts and Unexpired Leases (as defined below); (h) the Attorneys General in the State where the Purchased Assets are located; (i) the United States Environmental Protection Agency; (j) any applicable state environmental agency; and (k) all persons who have expressed an interest in acquiring some or all of the Purchased Assets within the last six (6) months. All parties identified by the Debtors as potential bidders will be contacted directly by the Debtors via telephone, facsimile or courier. The Debtors also intend to publish, subject to applicable submission deadlines, the Notice of Auction and Sale once in one or more publications that the Debtors deem appropriate, including but not limited to The New York Times (national edition).

31.     The Debtors submit that the Notice of Auction and Sale shall constitute good and sufficient notice of the Auction and the Sale, and that no other or further notice need be given. Accordingly, the Debtors request that the Court approve the form and manner of the Notice of Auction and Sale.

32.     In addition, to facilitate and effectuate the sale of the Purchased Assets, the Debtors seek authority to assume, assign and/or transfer various executory contracts and unexpired leases (collectively, the "Executory Contracts and Unexpired Leases") to the Stalking Horse Bidder (or other Successful Bidder) to the extent required by such purchaser. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such

contracts and leases are cured and adequate assurance of future performance is provided. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co., 318 U.S. 523 (1943) (applying Bankr. Act section 77 subsection (b), predecessor to Bankruptcy Code Section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1046-47 (4th Cir. 1985).

33.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989).     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See In re Bygaph, Inc., 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

34.     The Debtors propose to assume assign to the Stalking Horse Bidder (or other Successful Bidder) all Executory Contracts and Unexpired Leases, except for those Executory Contracts and Unexpired Leases that:  (a) have previously has been assumed and assigned or rejected pursuant to a final order of the Court; (b) are identified on the a schedule of rejected

DB02:9340147.4     068401.1001

contracts and leases (the "Schedule of Rejected Contracts and Leases") to be filed with the Bankruptcy Court as part of the Plan Supplement; or (c) are the subject of a separate motion to assume and assign to a person other than the Stalking Horse Bidder (or other Successful Bidder) or to reject under section 365 of the Bankruptcy Code pending on the Effective Date.[9] The Debtors believe that they can demonstrate that all requirements for the assumption, assignment and/or transfer of the Executory Contracts and Unexpired Leases to the Stalking Horse Bidder (or other Successful Bidder) will be satisfied at the Confirmation Hearing. The Debtors, as required by the Bid Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Purchased Assets. Further, the Debtors will provide all counterparties to the Executory Contracts and Unexpired Leases an opportunity to be heard by the Court in the event of a dispute regarding the assumption, assignment and/or transfer of such contracts and leases.

35. In connection therewith, the Debtors will serve a notice (the "Notice of Assumption and Assignment"), substantially in the form annexed to the proposed Bid Procedures Order as Exhibit C, of potential assumption and assignment of the Executory Contracts and

---

[9] Under the Stalking Horse Agreement, the following categories of contracts and leases will not be assumed by the Stalking Horse Bidder, will be listed on the Schedule of Rejected Contracts and Leases and rejected unless the counterparty to a specific contract receives a Notice of Assumption and Assignment, in which case the applicable contract or lease shall be assumed and assigned to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement and in accordance with sections 365 and 1123 of the Bankruptcy Code: (i) all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their respective employees, retirees and non-employee directors including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans are treated as executory contracts under the Plan; (ii) any contract pursuant to which any Debtor has a commitment, undertaking, arrangement or commitment to make loans or otherwise extend credit to any Person (other than any of any such contract consisting of extensions of credit in the nature of accounts receivable arising from the grant of trade credit in the ordinary course of business); and (iii) any contract relating to the offer, subscription, issuance, sale or distribution of, or rights (including voting rights), restrictions or obligations relating to, shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership, equity or profits interests or units in) a Debtor, and all warrants, options, rights or other securities for the purchase, acquisition or exchange from a seller of any shares of capital stock of (or other ownership, equity or profits interests or units in) a Debtor (including through any convertible securities).

Unexpired Leases that are anticipated to be assumed and assigned to the Stalking Horse Bidder (the "Assigned Contracts") on the applicable non-Debtor counterparties, on or within five (5) business days after the entry of the Bid Procedures Order by first class mail or hand delivery. The Notice of Assumption and Assignment shall set forth the amount, if any, that the Debtors contend is the amount needed to cure any defaults and pecuniary losses with respect to such Assigned Contracts (the "Cure Costs"). To the extent a counterparty to an Executory Contract and Unexpired Lease does not receive an Assumption Notice, the Cure Cost for such executory contract or unexpired lease shall be $0.00. If the Debtors identify additional Executory Contracts and Unexpired Leases that might be assumed by the Debtors and assigned to the Stalking Horse Bidder, the Debtors promptly will send a supplemental notice of assumption and assignment (the "Supplemental Notice of Assumption and Assignment") to the applicable counterparties to such contract or lease.

36. The Debtors request that unless the non-Debtor party to an Executory Contract or Unexpired Lease files an objection (the "Cure Cost/Assignment Objection") to: (a) adequate assurance of future performance by the Purchaser, (b) its scheduled Cure Cost, and/or (c) to the proposed assumption, assignment and/or transfer of such Executory Contract or Unexpired Lease to the Purchaser by the later of 5:00 p.m. on: (i) April 15, 2010, or (ii) eight (8) days after service of the Supplemental Notice of Assumption and Assignment (such later date, "Cure Cost/Assignment Objection Deadline") and serves a copy of the Cure Cost/Assignment Objection so as to be received no later than the Cure Cost/Assignment Objection Deadline on the same day by the Notice Parties (see paragraph 28, supra); then such non-Debtor counterparty shall: (a) be forever barred, estopped and enjoined from (i) disputing the Cure Cost relating to any Executory Contract or Unexpired Lease set forth on the Notice of Assumption or

Assignment or, if no Notice of Assumption or Assignment is received and such Executory Contract or Unexpired Lease is not listed on the Schedule of Rejected Contracts and Leases, as $0.00; and (b) be deemed to have consented to the assumption and assignment of such Executory Contract or Unexpired Lease and shall be forever barred and estopped from asserting or claiming against the Debtors, the Purchaser or any other assignee of the relevant Executory Contract or Unexpired Lease that any additional amounts are due or defaults exist, or conditions to assumption and assignment of such Executory Contract or Unexpired Lease must be satisfied (pursuant to Section 365(b)(1) of the Bankruptcy Code or otherwise).

37.     If a non-Debtor counterparty to an Executory Contract or Unexpired Lease challenges a Cure Cost (a "Cure Dispute") pursuant to a Cure Cost/Assignment Objection, such objection shall be required to specify the Cure Cost proposed by the counterparty to the applicable Executory Contract or Unexpired Lease. To the extent a Cure Dispute relates solely to a Cure Cost, the Debtors shall be entitled to assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of the Cure Dispute provided that the Purchaser establishes a reserve containing cash in an amount sufficient to pay the full amount asserted as cure payment by the non-Debtor party to such Executory Contract or Unexpired Lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court). To the extent the Cure Dispute is resolved or determined unfavorably to the applicable Debtor, the Debtors may reject the applicable Executory Contract or Unexpired Lease after such determination.

38.     The Debtors, the Stalking Horse Bidder or the other Successful Bidder, as the case may be, may amend the Schedule of Rejected Contracts and Leases to add any executory contract or unexpired lease listed therein (thereby providing for the rejection of such executory

DB02:9340147.4
068401.1001

contract or lease) or to delete any executory contract or unexpired lease listed therein (thereby providing for its assumption and assignment) no later than the tenth (10th) calendar day prior to the Confirmation Hearing.[10] The non-Debtor party or parties to any such added or deleted Executory Contract or Unexpired Lease will be notified of such addition or deletion by written notice mailed within two (2) business days of such determination.

39.     In the event that the Stalking Horse Bidder is not the Successful Bidder for the Purchased Assets, within one (1) business day after the conclusion of the Auction for the Purchased Assets, the Debtors will serve a notice identifying the Successful Bidder to the non-Debtor counterparties to the Executory Contracts and Unexpired Leases that have been identified in such successful bid. In such event, the non-Debtor counterparties to the Executory Contracts and Unexpired Leases shall have until 10:00 a.m. (prevailing Eastern Time) on the date of the Confirmation Hearing (unless the Confirmation Hearing is adjourned to a date that is at least six (6) days after the originally scheduled date of the Confirmation Hearing, in which case such non-Debtor counterparties shall have until 4:00 p.m. (prevailing Eastern Time) on the date that is three (3) business days prior to the Confirmation Hearing) (the "Adequate Assurance Objection Deadline"), to file and serve on the Notice Parties any objection to the assumption, assignment and/or transfer of such Executory Contract and Unexpired Lease solely based on the issue of whether the Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code.

---

[10]     The Debtors propose that such deadline to amend the Schedule of Rejected Contracts and Leases will be extended: (i) with respect to any additional Executory Contracts and Unexpired Leases that were not previously identified as Assigned Contracts that are identified as such in connection with the Successful Bid, until one (1) business day after the close of the Auction; (ii) with respect to any Executory Contract or Unexpired Lease for which the Cure Cost is disputed, until the date such Cure Cost has been determined; and (iii) with respect to any Executory Contract or Unexpired Lease not previously disclosed to the Debtors prior to such deadline, until two (2) business days after a copy of such Executory Contract or Unexpired Lease is provided to the Successful Bidder.

## C. **THE BID PROTECTIONS ARE REASONABLE AND APPROPRIATE**

40.     As part of the Bid Procedures Order, the Debtors are requesting approval of the provisions of the Stalking Horse Agreement concerning the Bid Protections, on the terms and conditions set forth in the Stalking Horse Agreement. See Local Rule 6004-1(c)(i)(C). The Bid Protections are the Break-Up Fee and the Reimbursement Amount.[11]

41.     Approval of the Bid Protections as administrative expenses of the Debtors is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999). In O'Brien, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, [the inquiry] . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." Id. at 535. Here, the Bid Protections should be approved because they will provide a benefit to the Debtors' Estates.

42.     In O'Brien, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award bidding protections such as the Break-Up Fee and Reimbursement Amount:  (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the

---

[11]     The Reimbursement Amount is exclusive of the $1.75 million to be paid to the Stalking Horse Bidder's counsel, in its capacity as such and in its capacity as counsel to the Ad Hoc Senior Noteholders' Committee for fees incurred through the date of the proposed Bid Procedures Order.

fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors' committees of the break-up fee and expense reimbursement; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee and expense reimbursement] on unsecured creditors, where such creditors are in opposition to the break-up fee." See id. at 536.

43.     Whether evaluated under the "business judgment rule" applied by certain courts[12] or the Third Circuit's "administrative expense" standard, the Bid Protections should be approved. First, the negotiations between the Debtors and the Stalking Horse Bidder have been conducted in good faith, on an arm's-length basis, and are necessary to preserve the value of the Debtors' estates. Second, the Break-Up Fee and Reimbursement Amount are necessary to attract and retain a stalking horse bidder that will thoroughly evaluate a debtor's value.[13] As is customary, the Stalking Horse Bidder required the Debtors to seek approval of the Bid Protections as a condition to it spending the significant time and expense to negotiate, perform the requisite due diligence attendant to the acquisition of the Purchased Assets and ultimately enter into the Stalking Horse Agreement. The Debtors' ability to continue to seek a higher or otherwise better

---

[12]     See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed 3 F.3d 49 (2d Cir. 1993). In Integrated, the court held that "break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets.... In fact, because the...corporation ha(s) a duty to encourage bidding, break-up fees can be *necessary* to discharge [such] duties to maximize values." Id. at 147 B.R. at 659-60.

[13]     "[A]greements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." In re S.N.A. Nut Co., 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); see also In re 995 Fifth Ave. Assoc. L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); In re Integrated Resources, 147 B.R. at 660 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); In re Hupp Indus., Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992 ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder would capital on the initial bidder's...due diligence").

offer without risk of losing a "bird-in-the-hand" would be eliminated if the Debtors could not secure a stalking horse bidder.

44.     The Debtors submit that authorization to pay the Bid Protections in accordance with the terms of the Stalking Horse Agreement will not chill the bidding for the Purchased Assets. The Bid Protections were negotiated items, and the Debtors believe that such incentives are appropriate under the circumstances because: (a) the Stalking Horse Bidder is providing a substantial benefit to the estates by acting as a "stalking horse" bidder for the Purchased Assets; (b) the Stalking Horse Agreement will secure an adequate floor at the Auction by which other bids may be judged; and (c) the Bid Protections afforded to the Stalking Horse Bidder were conditions to the Purchaser's entry into the Stalking Horse Agreement.

45.     Further, payment of the Bid Protections is not likely to diminish the Debtors' estates. The Debtors will incur the obligation to pay the Bid Protections only if they receive from a third party a higher or otherwise better offer on the Purchased Assets, and that offer is subsequently approved by the Court and closes. Such subsequent bidder, however, would effectively pay those costs because, pursuant to the proposed Bid Procedures, competing bids must include the Bid Protections (plus an additional amount) to be sufficient for the Debtors to determine that they are higher or better bids. In contrast, without the Bid Protections, the Debtors risk losing the Stalking Horse Bidder's offer to the detriment of the Debtors' estates.

46.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." In re Integrated Resources, 147 B.R. at 660. The Debtors submit that the Break-Up Fee of 3.0% is within the

range of fees typically paid in other significant sales transactions that have been consummated in the past and approved by bankruptcy courts, including those in this District. See, e.g., In re Monaco Coach Corp., Case No. 09-10750 (KJC) (Bankr. D. Del. May 1, 2009) (approving break-up fee of $1.75 million and expense reimbursement of $1.25 million, equal to approximately 3.3% and 2.4% of pre-adjustment purchase price, respectively); In re Global Motorsport Group, Inc., Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (approving break-up fee equal to approximately 3.13% of purchase price, or $500,000, in connection with sale); In re Global Home Products, Case No. 06-10340 (KG) (Bankr. D. Del. Jul. 14, 2006) (approving break-up fee of approximately 3.1%, or $650,000, in connection with $21 million sale); In re Genuity Inc., Case No. 02-43558 (PCB) (Bankr. S.D.N.Y. Dec. 16, 2002) (approving a break-up fee equal to 4.14% of pre-adjustment purchase price); In re Ameriserve Food Distrib., Inc., Case No. 00-00358 (PJW) (Bankr. D. Del. June 15, 2000) (approving break-up fee of 3.6%, or $4 million, in connection with $110 million sale); In re Great Kansas City Paper, Inc., Case No. 03-10048 (Bankr. D. Me. February 18, 2003) (approving expense reimbursement up to $750,000 in addition to a break-up fee of 5.4%, the aggregate value of which was $5 million); In re FSC Corp., Case No. 00-04659 (Bankr. N.D. Ill. February 28, 2000) (approving expense reimbursement up to $500,000 in addition to a break-up fee of 3.4%, valued at $1,500,000).

47.      In addition, courts have approved a range of expense reimbursements as being appropriate under the facts and circumstances of the case. See e.g., In re Radnor Holdings, Case No. 06-10894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); In re Riverstone Networks, Case No. 06-10110 (Bankr. D. Del. February 24, 2006) (approving expense reimbursement up to $1 million where the stalking horse purchase price was $170 million); In re Great Kansas City Paper, Inc., Case No. 03-10048 (Bankr. D. Me.

February 18, 2003) (approving expense reimbursement up to $750,000); In re FSC Corp., Case No. 00-04659 (Bankr. N.D. Ill. February 28, 2000) (approving expense reimbursement up to $500,000 in addition to a break-up fee of 3.4%, valued at $1,500,000).

48.     The Debtors are also seeking approval of the Expense Amount described above in paragraph 20 as well as in section 8.12 of the Stalking Horse Agreement.  The Expense Amount is being provided to reimburse the expenses of counsel to the Purchaser, in counsel's capacity as counsel to the Stalking Horse Bidder as well as in its capacity as counsel to the Ad Hoc Senior Noteholders Committee, incurred in connection with the Stalking Horse Agreement and these chapter 11 cases since the Petition Date.   The Expense Amount is exclusive of the Bid Protections, and solely with respect to counsel for the Purchaser in its capacity as such, is capped at $1.75 million.  Like the Bid Protections, the Expense Amount was a negotiated item upon which the Purchaser's entry into the Stalking Horse Agreement was expressly conditioned.

49.     For these reasons, and in light of the benefits to the Debtors' estates conferred by the Purchaser and the Stalking Horse Agreement, the Debtors respectfully request that the Court to approve: (a) the Bid Protections, including the Break-Up Fee; and (b) the Expense Amount.[14]

### III.  RELIEF UNDER BANKRUPTCY RULE 6004(h) IS APPROPRIATE

50.     The Debtors request that the Bid Procedures Order be effective immediately by providing that any stays under Bankruptcy Rule 6004(h) or otherwise are waived.

51.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rule 6004(h) and the Advisory Committee

---

[14]     Pursuant to section 8.12 of the Stalking Horse Agreement, in the event the Debtors are not authorized to pay the Expense Amount pursuant to the Bid Procedures Order, the Expense Amount will constitute an allowed super-priority administrative claim against the Debtors' estates under sections 503(b) and 507(a)(1) of the Bankruptcy Code, subject only to payment first of the "Carve Out" under the DIP Credit Agreement.

Notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, Collier suggests that the stay period should be eliminated to permit a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 <u>Collier on Bankruptcy</u> 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id</u>.

52.     The Debtors hereby request that the Court waive any stay period under Bankruptcy Rule 6004(h) or otherwise or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## NOTICE

53.     Notice of this Motion will be provided to: (a) the U.S. Trustee; (b) counsel for the Creditors' Committee; (c) counsel to the agent for the prepetition secured lenders; (d) counsel to the Ad Hoc Senior Noteholders Committee and DIP Lenders; (e) those parties that have requested notice pursuant to Bankruptcy Rule 2002; (f) all entities known by the Debtors to have asserted any lien, claim, interest or encumbrance in or on the Purchased Assets; and (g) all persons who have expressed an interest in acquiring some or all of the Purchased Assets within the last six (6) months. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the proposed Bid Procedures Order, substantially in the form attached hereto as Exhibit 1, and grant such other and further relief as this Court deems just and proper.

Dated: March 8, 2010
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
Matthew B. Lunn (No. 4119)
Maris J. Finnegan (No. 5294)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

-and-

WILLKIE FARR & GALLAGHER LLP
Paul V. Shalhoub
Robin Spigel
787 Seventh Avenue
New York, New York 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Counsel to the Debtors
and Debtors in Possession*

DB02:9340147.4

068401.1001