IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
In re                                                            :     Chapter 11
                                                                 :
RathGibson, Inc., et al.,[1]                                     :     Case No. 09-12452 (CSS)
                                                                 :
            Debtors.                                             :     Jointly Administered
---------------------------------------------------------------- x

### DECLARATION OF LEON SZLEZINGER IN SUPPORT OF CONFIRMATION OF THE MODIFIED THIRD AMENDED JOINT PLAN FOR RATHGIBSON, INC., ET AL. AND SALE OF THE PURCHASED ASSETS

Leon Szlezinger, pursuant to 28 U.S.C. § 1746, declares as follows:

1.  I am a Managing Director at Jefferies & Company, Inc. ("Jefferies"), which is an investment banking firm with principal offices located at 520 Madison Avenue, New York, New York 10022. Prior to the commencement of these chapter 11 cases, in April 2009, the above-captioned debtors and debtors in possession (collectively, the "Debtors") retained Jefferies as their financial advisor and investment banker to explore and implement potential strategic alternatives to address their liquidity constraints. Jefferies' retention was approved pursuant to two orders of this Court, each dated August 31, 2009 [Docket Nos. 243, 244].

2.  I submit this declaration (the "Declaration") in support of confirmation of the *Modified Third Amended Joint Chapter 11 Plan for RathGibson, Inc., et al.* [Docket No. 756] (including all exhibits thereto and as amended, modified or supplemented from time to time, the "Plan"),[2] including the sale of the Purchased Assets (the "Sale") to RathGibson Acquisition Co.,

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) Greenville Tube Company (2689); (ii) RathGibson, Inc. (3283); (iii) RG Tube Holdings LLC (4080); and (iv) RGCH Holdings Corp. (9683). The Debtors' executive headquarters' address is 475 Half Day Road, Suite 210, Lincolnshire, Illinois 60069.

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Plan.

LLC (the "Purchaser") pursuant to the terms of the Asset Purchase Agreement by and among the Debtors and the Purchaser (the "APA"), a copy of which was attached to the *Disclosure Statement for Third Amended Joint Plan of RathGibson, Inc., et al.* [Docket No. 665] as Exhibit 4. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (a) my direct personal knowledge of the Debtors' operations and finances; (b) information learned from my review of relevant documents; and/or (c) information supplied to me by members of the Debtors' management, employees of Jefferies working directly with me or under my supervision, direction or control and/or from the Debtors' other professionals and advisors. I have reviewed and am familiar with the terms and provisions of the Plan and the APA. I am not being compensated specifically for this testimony (other than payments received by Jefferies in its capacity as financial advisor and investment banker to the Debtors). If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

3. I hold a Bachelor's Degree in Economics from the University of Manchester in England and have more than 20 years of financial advisory experience. I am a fellow of the Institute of Charted Accountants in England & Wales, a Certified Valuation Analyst and hold the Series 7 and 63 designations. Prior to working at Jefferies, I was the senior managing director leading the New York office of Mesirow Financial Consulting; prior that time, I was a partner in the Corporate Recovery group of KPMG LLP; and prior to my employment at KPMG LLP, I was a partner in the financial advisory services group of PricewaterhouseCoopers LLP.

I. **JEFFERIES QUALIFICATIONS AND ROLE IN THE CHAPTER 11 CASES**

4. Established in 1962, Jefferies is an independent full-service securities and investment banking firm serving companies and investors in North America, Europe and Asia.

Jefferies is a principal operating subsidiary of Jefferies Group, Inc., a public company which, together with its subsidiaries, has gross assets of approximately $28 billion and approximately 2,700 employees in more than 25 offices around the world.

5. Jefferies provides a broad range of corporate advisory services to its clients including, without limitation, services pertaining to: (i) general financial advice, (ii) mergers, acquisitions, and divestitures, (iii) special committee assignments (iv) capital raising, and (v) corporate restructuring. Jefferies and its senior professionals have extensive experience in the reorganization and restructuring of troubled companies, both out-of-court and in chapter 11 proceedings. Jefferies has advised debtors, creditors, equity constituencies, and purchasers in numerous reorganizations. Since 2001, Jefferies has been involved in over 160 restructurings representing over $175 billion in restructured liabilities.

6. Some of Jefferies' representative engagements in large and complex chapter 11 cases on behalf of debtors, creditors and creditors' committees throughout the United States, include: In re Pliant Corp.; In re Nortel Networks Inc.; In re Apex Silver Mines Limited; In re Circuit City Stores Inc.; In re Spheris Inc.; In re Quebecor World (USA) Inc.; In re Ames Department Stores, Inc.; In re Bally Total Fitness of Greater NY, Inc.; In re Tropicana Entertainment, LLC; In re ASARCO LLC; In re AmeriServe Food Distribution, Inc., In re Diamond Brands Operating Corp., In re Federal Mogul Corporation, In re Heartland Wireless Communications, In re Delphi Corporation, et. al., In re Foamex International Inc., In re International Wireless Communications. Inc., et. al., In re WXH Corp., and In re XO Communications Inc.

7. I have been working closely with the Debtors' management and other professional advisors since April 27, 2009. As a result, I have developed relevant experience and

3

acquired considerable knowledge with respect to the Debtors' business operations, financial affairs, and debt structure. My primary responsibilities in connection with the engagement by the Debtors have included, without limitation: (i) analyzing the liquidity and projected cash flows of the Debtors; (ii) assisting in developing and evaluating alternative means to meet near-term liquidity requirements; (iii) exploring strategic restructuring and financing opportunities; (iv) assisting the Debtors in structuring and negotiating debtor in possession financing; (v) advising and assisting the Debtors in connection with the sale of their assets including negotiating the terms of the asset purchase agreement; (vi) running a process to market the Debtors and their businesses to potential purchasers, other than the Stalking Horse Bidder; (vii) providing information regarding the sale to potential purchasers; and (viii) assisting in the preparation of information and analysis necessary for the confirmation of the Plan, including certain of the information contained in the Disclosure Statement and the preparation of the Liquidation Analysis (as defined below).

## II. THE PLAN IS IN THE BEST INTERESTS OF HOLDERS OF IMPAIRED CLAIMS OR INTERESTS

a. The Liquidation Analysis

8. The Debtors, with the assistance of Jefferies and other of the Debtors' professionals, prepared a liquidation analysis providing a summary of the estimated liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates as compared to the expected recoveries of the Debtors' creditors and interest holders under the Plan (the "Liquidation Analysis"). A copy of the Liquidation Analysis is annexed to the Disclosure Statement as Exhibit 2. For the purposes of assisting the Debtors' management in the preparation of the Liquidation Analysis, Jefferies assumed and relied upon the material accuracy

and completeness of the Debtors' financial information that formed the basis of the assumptions contained in the Liquidation Analysis. Nothing has come to my attention to lead me to believe that such reliance is unreasonable. The Liquidation Analysis is subject to the assumptions, qualifications and limitations set forth therein and in the Disclosure Statement. I am not aware of any facts or circumstances that would lead me to conclude that such assumptions, qualifications and limitations no longer are valid.

9. The Liquidation Analysis examines the effects that a conversion of the Debtors' chapter 11 cases to cases under chapter 7 could have on the proceeds that could otherwise be available for distribution to holders of Claims against and Interests in the Debtors. Based upon the methodologies employed in the Liquidation Analysis, the estimated net proceeds available for distribution to creditors under a chapter 7 liquidation would range from $67.4 million to $70.8 million, after the deduction of the costs of liquidation.

10. It is my belief that the foregoing range reasonably estimates the potential proceeds that would be realized from a possible chapter 7 liquidation of the Debtors and that would be available to satisfy Claims under the assumptions set forth in the Liquidation Analysis. These assumptions include, among others, costs associated with a chapter 7 trustee and retained professionals as well as that recoveries on the Debtors' assets will yield less when sold through a liquidation rather than through a going concern sale.

11. Based on the assumptions described in the Liquidation Analysis, the holders of the Secured Claims, which for purposes of the Liquidation Analysis are estimated to be approximately $81.7 million and include estimated amounts owed under the DIP Credit Agreement and the Industrial Revenue Bond (including any accrued prepetition interest), would receive an estimated range of recovery on their Claims in a liquidation scenario between 82.5%

and 86.7%. As reflected in the Liquidation Analysis, holders of Administrative Expense Claims, U.S. Trustee Fees and Fee Claims,[3] Priority Non-Tax Claims, Priority Tax Claims, General Unsecured Claims and Interests would not be expected to receive any recovery.

12. As a result of the terms and conditions of the Plan and the proceeds from the Sale, holders of Allowed: (a) Administrative Expense Claims, including U.S. Trustee Fees and Fee Claims; (b) Priority Tax Claims; (c) Priority Non-Tax Claims; (d) Other Secured Claims; and (e) Prepetition Secured Credit Agreement Claims will receive 100% recovery on account of their respective Allowed Claims. Furthermore, holders of the following Claims, which otherwise would not be expected to receive any recovery in a chapter 7 liquidation, are estimated to receive the following: (i) Allowed Rath General Unsecured Claims (1.2%); (ii) Allowed Greenville General Unsecured Claims (0.2%); and (iii) Allowed RGCH PIK Note Claims (0.2%).[4]

b. <u>The Best Interests Test</u>

13. I also believe that the Plan meets the so-called "best interests test" under section 1129(a)(7) of the Bankruptcy Code. As the following table indicates, each holder of an impaired Class of Claims or Interests receiving distributions under the Plan either has accepted the Plan or the recoveries realized by such holders are estimated to be greater than the distributions they would receive in a hypothetical chapter 7 case.

---

[3] Subject to the rights to the carve out for certain professionals pursuant to the Final DIP Order.

[4] I understand from the Debtors that no General Unsecured Claims currently are pending against RG Tube and that one Claim in the amount of approximately $4,000 is pending against RGCH. Although I understand that the Debtors do not anticipate any General Unsecured Claims being asserted against RG Tube or any other General Unsecured Claims being asserted against RGCH, the Plan provides for holders of Allowed General Unsecured Claims against each of RG Tube and RGCH to receive distributions from the RG Tube Cash ($720,000) in accordance with the terms thereof.

6

| Class of Claims | Distribution Percentage Under Liquidation | Distribution Percentage Under The Plan |
|---|---|---|
| Class 1: Priority Non-Tax Claims | 0% | 100% |
| Class 2: Other Secured Claims | 82.5% - 86.7% | 100% |
| Class 3(a): Prepetition Secured Credit Agreement Claims | N/A[5] | 100% |
| Class 3(b): Rath General Unsecured Claims | 0% | 1.2% |
| Class 4(a): Greenville General Unsecured Claims | 0% | 0.2% |
| Class 5(a): RGCH PIK Note Claims | 0% | 0.2% |
| Class 5(b): RGCH General Unsecured Claims | 0% | N/A |
| Class 6(a): RG Tube General Unsecured Claims | 0% | N/A |
| Class 6(b): Existing RG Tube Interests | 0% | N/A |

14. Interests in Classes 3(c) (Existing Rath Interests), 4(c) (Existing Greenville Interests) and 5(c) (Existing RGCH Interests) are held by the Debtors and Plan proponents, and, under the Plan, such holders are deemed to have accepted the Plan.

---

[5] Pursuant to the Final DIP Order, the Prepetition Secured Credit Agreement Claims have been paid by the Debtors. However, I understand that the period of time in which the Committee has to challenge the validity and extent of the liens under the Prepetition Secured Credit Agreement was consensually extended between the parties until the Confirmation Hearing.

15. Accordingly, I believe that (a) the Plan is in the best interests of each of the Classes of Claims and Interests discussed above, (b) the Plan maximizes the recoveries for holders of Claims and Interests in each such Class, and (c) the Sale of substantially all of the Debtors' assets as a going concern, rather than a liquidation, will allow the realization of greater value for their respective impaired Classes.

### III. SALE OF THE PURCHASED ASSETS

16. The Plan provides for the Sale of the Purchased Assets to the Purchaser in accordance with the terms of the APA. In connection therewith, on March 26, 2010, the Court entered an order [Docket No. 627] (the "Bid Procedures Order") approving, among other things, bid procedures with respect to the Sale and procedures for the assumption, assignment and/or transfer of executory contracts and unexpired leases. I am familiar with and have reviewed the Bid Procedures Order and the Bid Procedures attached thereto.

17. In compliance with the Bid Procedures Order, Jefferies solicited interest in the Sale from 84 interested parties. Among those parties, 29 executed confidentiality agreements and were provided access to the electronic data room established by the Debtors and/or other forms of due diligence. During the marketing period, Jefferies, certain of the Debtors' other professionals, and the Debtors' management team responded to numerous due diligence and information requests from a number of interested parties.

18. Pursuant to the Bid Procedures Order, the Purchaser was identified as the Stalking Horse Bidder, and the Bid Deadline for other interested parties to submit bids was May 12, 2009 at 5:00 p.m. (EDT). The Debtors did not receive any competing bids on or prior to the Bid Deadline. As a result, the Debtors canceled the Auction resulting in the Purchaser having submitted the highest or otherwise best bid for the Purchased Assets.

19. To the best of my knowledge, the Purchaser is not affiliated with any of the Debtors. In addition, the Purchaser is represented by separate counsel. I am not aware of any collusion or any fraud or attempt by the Purchaser to assert any unfair advantage over any other potential bidder. As a result, I believe that the Purchaser is a good faith purchaser and the auction process was open and fair.

20. I was integrally involved in the negotiation of the business terms of the APA. In my view, the APA was negotiated by the Debtors and the Purchaser without collusion, in good faith and at arm's-length. Based upon: (i) the composition of ownership of the Stalking Horse Bidder, which includes sophisticated investors that specialize in high-yield and distressed investments, and (ii) based upon the *Declaration of John E. Foley in Support of: (A) Confirmation of Modified Third Amended Joint Chapter 11 Plan For RathGibson, Inc., et al., Providing for the (1) Sale of Substantially all of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests and (2) Assumption, Assignment and/or Transfer of Certain Executory Contracts and Unexpired Leases; and (B) Adequate Assurance of Future Performance to Counterparties to Assigned Contracts* [Docket No. 753] filed concurrently herewith, I believe the Purchaser has the financial ability to close the Sale and to meet the obligations under the agreements which the Debtors are assuming and assigning to it in connection with the Sale.

21. I believe that the consideration being provided by the Purchaser pursuant to the APA for the Purchased Assets is fair and reasonable and the highest or otherwise best offer for the Purchased Assets. Accordingly, I believe the Sale is in the best interests of the Debtors, their estates and creditors.

## IV. CONCLUSION

22. In conclusion, I believe that confirmation of the Plan, including approval of the Sale, will enable creditors to receive the best recoveries possible under the circumstances of these cases. As a result, I believe confirmation of the Plan, including the Sale, is in the best interests of the Debtors, their Estates and creditors.

[Remainder of Page Intentionally Left Blank]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 19, 2010

_____
Leon Szlezinger