# EXHIBIT A

**The APA**

ASSET PURCHASE AGREEMENT

BY AND AMONG

RATHGIBSON ACQUISITION CO., LLC,

as Purchaser,

and

RG TUBE HOLDINGS LLC,

RGCH HOLDINGS CORP.,

RATHGIBSON, INC., AND

GREENVILLE TUBE COMPANY,

as Sellers

Dated as of March 8, 2010

**TABLE OF CONTENTS**

ARTICLE 1.   PURCHASE AND SALE OF ASSETS; ASSUMPTION OF
             LIABILITIES..................................................................................1
    1.1      Purchase and Sale of Assets ...............................................1
    1.2      Excluded Assets....................................................................5
    1.3      Assumption of Liabilities ....................................................6
    1.4      Excluded Liabilities.............................................................8
    1.5      Designation of Assigned Contracts; Cure Costs....................9
    1.6      Post-Closing Assignment of Contracts................................12
    1.7      "As Is" Transaction ...........................................................12

ARTICLE 2.   CONSIDERATION; DEPOSIT; ADJUSTMENTS TO PURCHASE
             PRICE ................................................................................12
    2.1      Consideration.....................................................................12
    2.2      Deposit...............................................................................12
    2.3      Closing Date Adjustments to the Purchase Price. ...............13
    2.4      Post-Closing Date Adjustments to the Purchase Price.........14
    2.5      Withholding .......................................................................17

ARTICLE 3.   CLOSING AND TERMINATION........................................17
    3.1      Closing...............................................................................17
    3.2      Closing Deliveries by the Sellers.......................................17
    3.3      Closing Deliveries by the Purchaser...................................18
    3.4      Termination of Agreement .................................................19
    3.5      Procedure Upon Termination .............................................21
    3.6      Effect of Termination. .......................................................21

ARTICLE 4.   REPRESENTATIONS AND WARRANTIES OF THE SELLERS....................24
    4.1      Corporate Organization and Qualification .........................24
    4.2      Subsidiaries........................................................................25
    4.3      Authority Relative to This Agreement ...............................26
    4.4      Conflicts; Consents of Third Parties...................................26
    4.5      Absence of Certain Developments ......................................27
    4.6      Litigation ...........................................................................30
    4.7      Intellectual Property. ........................................................30
    4.8      Agreements, Contracts and Commitments; Certain Other Agreements..............31
    4.9      Permits................................................................................33
    4.10     Brokers and Finders............................................................34
    4.11     Title to Assets; Sufficiency and Condition of Assets...........34
    4.12     Tangible Personal Property; Equipment..............................34
    4.13     Real Property. ....................................................................35
    4.14     Compliance with Law..........................................................35
    4.15     Tax Returns; Taxes.............................................................36
    4.16     Employees. .........................................................................37

i

| | | |
|---|---|---|
| 4.17 | Company Benefit Plans | 38 |
| 4.18 | Parents | 40 |
| 4.19 | Affiliate Matters | 40 |
| 4.20 | Insurance Policies | 40 |
| 4.21 | Environmental Matters | 41 |
| 4.22 | Customers, Vendors and Suppliers | 41 |
| 4.23 | Accounts Receivable | 42 |
| 4.24 | Inventory | 42 |
| 4.25 | Financial Statements | 42 |
| 4.26 | Capital Expenditures | 42 |
| 4.27 | Absence of Undisclosed Liabilities | 43 |
| 4.28 | No Other Representations or Warranties | 43 |
| | | |
| ARTICLE 5. | REPRESENTATIONS AND WARRANTIES OF THE PURCHASER | 43 |
| 5.1 | Corporate Organization and Qualification | 44 |
| 5.2 | Authority Relative to This Agreement | 44 |
| 5.3 | Consents and Approvals; No Violation. | 44 |
| 5.4 | Brokers and Finders | 45 |
| 5.5 | Sufficiency of Financing | 45 |
| 5.6 | Investigation | 45 |
| 5.7 | HSR Matters | 45 |
| | | |
| ARTICLE 6. | EMPLOYEES | 45 |
| 6.1 | Employee Offers | 45 |
| 6.2 | Seller Plans | 46 |
| 6.3 | COBRA Coverage | 47 |
| 6.4 | WARN Act Liability | 47 |
| 6.5 | Eligibility; Service Credit | 48 |
| 6.6 | 401(k) Plans | 48 |
| 6.7 | No Third-Party Beneficiaries | 48 |
| | | |
| ARTICLE 7. | BANKRUPTCY COURT MATTERS | 49 |
| 7.1 | Certain Motions and Orders. | 49 |
| 7.2 | Competing Bids. | 50 |
| | | |
| ARTICLE 8. | COVENANTS AND AGREEMENTS | 51 |
| 8.1 | Conduct of Business of the Sellers. | 51 |
| 8.2 | Pre-Closing Access to Information | 54 |
| 8.3 | Assignability of Certain Contracts, Etc. | 55 |
| 8.4 | Rejected Contracts | 56 |
| 8.5 | Further Agreements | 56 |
| 8.6 | Consent and Approvals. | 56 |
| 8.7 | Preservation of Records; Post-Closing Access to Information. | 58 |
| 8.8 | Publicity | 59 |
| 8.9 | Notification of Certain Matters | 60 |
| 8.10 | Prohibition on Use of Purchased Names | 60 |
| 8.11 | Further Assurances. | 61 |

| 8.12 | Expenses | 62 |
| 8.13 | Confidentiality | 62 |
| 8.14 | Trademark Applications | 63 |
| 8.15 | Tax Clearance Certificates | 63 |

| ARTICLE 9. | CONDITIONS TO CLOSING | 64 |
| 9.1 | Conditions Precedent to the Obligations of Purchaser and Sellers | 64 |
| 9.2 | Conditions Precedent to the Obligations of the Sellers | 64 |
| 9.3 | Conditions Precedent to the Obligations of the Purchaser | 65 |

| ARTICLE 10. DEFINITIONS | | 67 |
| 10.1 | Certain Definitions | 67 |
| 10.2 | Additional Defined Terms | 79 |

| ARTICLE 11. TAXES | | 81 |
| 11.1 | Additional Tax Matters | 81 |

| ARTICLE 12. MISCELLANEOUS | | 82 |
| 12.1 | Payment of Expenses | 82 |
| 12.2 | Survival of Representations and Warranties; Survival of Post-Closing Covenants | 83 |
| 12.3 | Entire Agreement; Amendments and Waivers | 83 |
| 12.4 | Counterparts | 83 |
| 12.5 | Governing Law | 83 |
| 12.6 | Jurisdiction, Waiver of Jury Trial | 83 |
| 12.7 | Notices | 84 |
| 12.8 | Binding Effect; Assignment | 85 |
| 12.9 | Severability | 86 |
| 12.10 | Injunctive Relief | 86 |
| 12.11 | Non-Recourse | 86 |
| 12.12 | Time of the Essence | 86 |
| 12.13 | Third Party Beneficiaries | 87 |
| 12.14 | Certain Interpretations | 87 |

## EXHIBITS

| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of Assignment and Assumption Agreement |
| Exhibit C | Form of Bid Procedures Order |
| Exhibit D | Form of Disclosure Statement Order |

## SCHEDULES

| Schedule 1.1(r) | Assumed Plans |
| Schedule 1.2(j) | Excluded Assets |
| Schedule 1.3(n) | Additional Assumed Liabilities |
| Schedule 1.5(a) | Original Contract & Cure Schedule |
| Schedule 8.1(a) | Conduct of Business of the Sellers |
| Schedule 8.1(b) | Certain Transactions |
| Schedule 8.1(b)(xxix) | Restricted Payments |
| Schedule 8.14 | Trademark Applications |
| Schedule 8.15 | Tax Notice Jurisdictions |
| Schedule 9.1(b) | Necessary Approvals |
| Schedule 9.3(e) | Executed Consents |
| Schedule 10.1(q) | Closing Date Working Capital Line Items |
| Schedule 10.1(iii) | Non-Assumed Contracts |
| Schedule 10.1(pppp) | 2011 Capital Budget |

## SELLER DISCLOSURE SCHEDULE

| Section 4.2(a) | Subsidiaries Jurisdiction of Incorporation and Qualification; Ownership by Seller |
| Section 4.4(a) | Conflicts |
| Section 4.4(b) | Consents of Third Parties |
| Section 4.5 | Absence of Certain Developments |
| Section 4.6 | Litigation |
| Section 4.7(a) | Owned and Licensed Intellectual Property |
| Section 4.7(b) | Claims and Encumbrances on Intellectual Property |
| Section 4.7(c) | Intellectual Property Infringements |
| Section 4.8(a) | Material Contracts |
| Section 4.8(b) | Default under Material Contracts |
| Section 4.8(c) | Material Contracts Not Provided |
| Section 4.9(a) | Material Permits |
| Section 4.10 | Brokers and Finders |
| Section 4.12(a) | Tangible Personal Property; Equipment |
| Section 4.12(b) | Default under Personal Property Leases |
| Section 4.13(b)(i) | Leased Real Property |
| Section 4.13(b)(ii) | Assigned Real Property Leases |
| Section 4.14 | Compliance with Law |

NY 72446260v22

| Section 4.15 | Tax Returns; Taxes |
| Section 4.16(a) | Employees |
| Section 4.16(b) | Employment Loss |
| Section 4.16(c) | Employment Claims |
| Section 4.17 | Collective Bargaining Agreements and Company Benefit Plans |
| Section 4.18 | Parents |
| Section 4.19 | Affiliate Matters |
| Section 4.20 | Insurance Policies and Claims |
| Section 4.21 | Environmental Matters |
| Section 4.22(a) | Significant Customers and Significant Vendors/Suppliers |
| Section 4.22(b) | Contracts Not Provided to Purchaser |
| Section 4.22(c) | Proposed Material Changes to Contracts |
| Section 4.27(a) | RathGibson, Greenville and Foreign Subsidiaries Liabilities |
| Section 4.27(b) | RG Tube and RGCH Liabilities |

## PURCHASER DISCLOSURE SCHEDULE

| Section 5.3(a) | Conflicts |
| Section 5.3(b) | Consents of Third Parties |

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement"), dated as of March 8, 2010 (the "Execution Date"), by and among (a)(i) RG Tube Holdings LLC, a Delaware limited liability company ("RG Tube"), (ii) RGCH Holdings Corp., a Delaware corporation ("RGCH"), (iii) RathGibson, Inc., a Delaware corporation ("RathGibson"), and (iv) Greenville Tube Company, a Delaware corporation ("Greenville" and, together with RG Tube, RGCH and RathGibson, each a "Seller" and, collectively, the "Sellers"), and (b) RathGibson Acquisition Co., LLC, a Delaware limited liability company (together with its successors and permitted assigns, the "Purchaser"). Article 10 contains definitions of certain terms used herein and also provides cross-references to certain terms defined elsewhere in this Agreement.

## RECITALS

WHEREAS, Sellers currently conduct the Business and the Purchaser desires to purchase the Business;

WHEREAS, each of the Sellers is a debtor and debtor-in-possession in those certain bankruptcy cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), filed on July 13, 2009 (the "Filing Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (such bankruptcy cases, the "Chapter 11 Cases"); and

WHEREAS, the Purchaser desires to purchase and assume from the Sellers, and the Sellers desire to sell, transfer and assign to the Purchaser, the Purchased Assets and the Assumed Liabilities in accordance with this Agreement and in accordance with and subject to the Plan and the Confirmation Order, pursuant to sections 105(a), 363, 365, 1123, 1129 and 1146 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Purchaser and each of the Sellers hereby agree as follows:

## ARTICLE 1.

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1    Purchase and Sale of Assets.  Pursuant to sections 105(a), 363, 365, 1123, 1129 and 1146 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Confirmation Order, the Purchaser shall purchase, acquire and accept from each Seller, and each Seller shall sell, transfer, assign, convey and deliver to the Purchaser, on the Closing Date, all of such Seller's right, title and interest in, to and under, free and clear of all Encumbrances (other than Permitted Encumbrances), all of the assets, properties, rights and interests of any nature, tangible or intangible, real or personal, wherever located, of such Seller related to or used, or held for use, in connection with the operation of the Business, now existing

1

or hereafter acquired on or prior to the Closing Date, whether or not reflected on the books or financial statements of such Seller, as the same shall exist on the Closing Date, but in all cases excluding the Excluded Assets (as amended or modified by Section 1.5(a), collectively, the "Purchased Assets"), including, without limitation, the following assets, properties, rights and interests:

(a)     (i) all Contracts with customers of such Seller (the "Acquired Customers") to which such Seller is a party, and all rights pursuant thereto, including, without limitation, the Material Contracts set forth in part (i) to Section 4.8(a) of the Seller Disclosure Schedule and any other such Contract added as a Purchased Asset in accordance with Section 1.5(a), (ii) any other Contract with customers of such Seller entered into in the Ordinary Course of Business between the Execution Date and the Closing Date that, if entered into by such Seller on or prior to the Execution Date, would not be a Material Contract and (iii) any other Contract with customers of such Seller entered into between the Execution Date and the Closing Date that, if entered into by such Seller on or prior to the Execution Date, would be a Material Contract; provided, that if the execution of any Contract referred to in clause (a)(ii) or clause (a)(iii) above would require the prior written consent of the Purchaser pursuant to Section 8.1(a) or Section 8.1(b), the execution of such Contract has been approved in writing by the Purchaser (the Contracts referred to in this Section 1.1(a), collectively, the "Assumed Customer Contracts");

(b)     all Accounts Receivable (including all Inter-Company Receivables);

(c)     except as explicitly set forth in Section 1.2(l), all Cash and Cash Equivalents, whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts and including any cash collateral that is collateralizing any letters of credit, or any obligation with respect thereto;

(d)     all Documents used in or relating to the Business or in respect of the Purchased Assets or the Assumed Liabilities, including, without limitation, the Acquired Customers, products, services, marketing, advertising and promotional activities and trade shows and all files, supplier lists, vendor lists, records, literature and correspondence;

(e)     (i) all Contracts with suppliers and vendors to which such Seller is a party, and all rights pursuant thereto, including, without limitation, the Material Contracts set forth in part (iii) to Section 4.8(a) of the Seller Disclosure Schedule and any other such Contract added as a Purchased Asset in accordance with Section 1.5(a), (ii) any other Contract with suppliers or vendors of such Seller entered into in the Ordinary Course of Business between the Execution Date and the Closing Date that, if entered into by such Seller on or prior to the Execution Date, would not be a Material Contract and (iii) any other Contract with suppliers or vendors of such Seller entered into between the Execution Date and the Closing Date that, if entered into by such Seller on or prior to the Execution Date, would be a Material Contract; provided, that if the execution of any Contract referred to in clause (e)(ii) or clause (e)(iii) above would require the prior written consent of the Purchaser pursuant to Section 8.1(a) or Section 8.1(b), the execution of such Contract has been approved in writing by the Purchaser (the Contracts referred to in this Section 1.1(e), collectively, the "Assumed Vendor Contracts");

(f) all deposits and all prepaid charges, Taxes and expenses of such Seller, including, without limitation, (i) security deposits with third party suppliers, vendors, service providers or landlords, and lease and rental payments, (ii) rebates, (iii) tenant reimbursements, (iv) prepaid Taxes (including ad valorem Taxes, personal property Taxes and real estate Taxes), and (v) pre-payments, except to the extent that the foregoing relate solely to any Excluded Asset (including a Non-Assumed Contract) or Excluded Liability;

(g) all Equipment, including, without limitation, the Equipment leased pursuant to the leases and subleases for personal property set forth in <u>Section 4.12(a)</u> of the <u>Seller Disclosure Schedule</u>;

(h) all leases and subleases for personal property to which such Seller is a party and used or held for use in, or relating to, the operation of the Business and all of the rights of such Seller to such personal property, including, without limitation, those items leased pursuant to the leases or subleases set forth in <u>Section 4.12(a)</u> of the <u>Seller Disclosure Schedule</u> (the "<u>Assumed Personal Property Leases</u>");

(i) the names "RathGibson", "Greenville Tube" and "Mid-South", the names of the Sellers and, in all cases, any derivations thereof (the "<u>Purchased Names</u>");

(j) all fee or leasehold title to, and all other interests of such Seller in, all real property, together with all improvements, buildings and fixtures located thereon or therein and all rights and appurtenances appertaining thereto, including, without limitation, all leases and subleases for the Leased Real Property set forth in <u>Section 4.13(b)(i)</u> of the <u>Seller Disclosure Schedule</u> and all of such Seller's right, title and interest in and thereto and any other such leases and subleases added as a Purchased Asset in accordance with <u>Section 1.5(a)</u> (such leases and subleases, the "<u>Assumed Real Property Leases</u>" and the underlying Leased Real Property, the "<u>Assumed Leased Real Property</u>");

(k) all Contracts between such Seller and any independent contractors who are not employees of such Seller but who have been retained to render services (i) on behalf of such Seller or (ii) on behalf of third parties where such Seller acts as an intermediary, broker or agent, including, in each case, Contracts with (x) owner-operators, (y) independent sales agents and (z) qualified third-party carriers (collectively, the "<u>Assumed Independent Contractor Contracts</u>");

(l) all Permits and all pending applications therefor and all rights and incidents of interest therein, including, without limitation, the Material Permits (the "<u>Assumed Permits</u>");

(m) all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements to which any Seller is a party with current or former directors, officers, employees or agents, or with third parties, including, without limitation, the Acquired Customers and any Potential Bidder;

(n) all rights, claims, credits, causes of action or rights of set off against third parties relating to the Purchased Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to, the Assigned Contracts) or the Assumed Liabilities, including, without limitation, rights under vendors' and manufacturers' warranties, indemnities, guaranties

3

and avoidance claims and causes of action under the Bankruptcy Code or applicable state Law, including, without limitation, all rights and avoidance claims of such Seller arising under Chapter 5 of the Bankruptcy Code;

(o)     any claims, counterclaims, setoffs, rights of recoupment, equity rights or defenses that such Seller may have with respect to any Assumed Liabilities;

(p)     except as contemplated by Section 1.2(d), (i) all of such Seller's insurance policies and rights and benefits thereunder (including, without limitation, (A) all rights pursuant to and proceeds from such insurance policies and (B) all claims, demands, proceedings and causes of action asserted by such Seller under such insurance policies relating to any Purchased Asset or Assumed Liability) and (ii) any letters of credit related thereto;

(q)     any claim, right or interest of such Seller in or to any refund, rebate, abatement or other recovery for Taxes with respect to the Business, the Purchased Assets or the Assumed Liabilities, together with any interest due thereon or penalty rebate arising therefrom;

(r)     all of the Seller Plans and the Assumed Employment Contracts set forth on Schedule 1.1(r), and any associated funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained in connection with such Seller Plans (to the extent transferable in accordance with the existing terms and conditions of the applicable Seller Plan) and any applicable insurance policies (collectively, the "Assumed Plans");

(s)     (i) all Seller Intellectual Property (collectively, the "Assumed Intellectual Property") and (ii) all Contracts pursuant to which such Seller is granted a license to, or any rights under, any Intellectual Property of any other Person and all Contracts pursuant to which such Seller grants to any other Person a license to, or any rights under, the Seller Intellectual Property (the "Assumed Intellectual Property Contracts");

(t)     all other Contracts to which such Seller is a party other than Non-Assumed Contracts (such Contracts, together with the Assumed Customer Contracts, the Assumed Vendor Contracts, the Assumed Personal Property Leases, the Assumed Real Property Leases, the Assumed Independent Contractor Contracts, the Assumed Plans, the Assumed Intellectual Property Contracts and any other Contracts that are included in the definition of Purchased Assets pursuant to Section 1.5(a), but excluding any Non-Assumed Contracts (including any Contracts that are excluded from the definition of Purchased Assets pursuant to Section 1.5(a)), the "Assigned Contracts");

(u)     all goodwill and other intangible assets associated with, or relating to, the Business or the Purchased Assets;

(v)     all of the shares of capital stock or other equity interests of each of the Foreign Subsidiaries, or securities convertible into or exchangeable or exercisable for any such shares of capital stock or other equity interests (collectively, the "Foreign Subsidiary Stock");

(w)     except to the extent that any transfer or assignment is prohibited by applicable Law, all personnel files for Transferred Employees and, to the extent such files relate

4

to the Purchased Assets or the Assumed Liabilities, all personnel files for any former or current employee of such Seller that is not a Transferred Employee;

        (x)     all Inventory; and

        (y)     all loans and other Indebtedness payable or owed to such Seller.

      1.2     <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, in no event shall any Seller be deemed to sell, transfer, assign or convey, and each Seller shall retain all right, title and interest to, in and under the following assets, properties, rights and interests of such Seller (collectively, the "<u>Excluded Assets</u>"):

        (a)     all Non-Assumed Contracts;

        (b)     all Documents (whether copies or originals) (i) to the extent they relate solely to any of the Excluded Assets or the Excluded Liabilities, or (ii) that such Seller is required by Law to retain and is prohibited by Law from providing a copy thereof to the Purchaser;

        (c)     all shares of capital stock or other equity interests of a Seller, or securities convertible into or exchangeable or exercisable for any such shares of capital stock or other equity interests;

        (d)     any of such Seller's director and officer insurance policies, fiduciary policies or employment practices policies (in each case of the foregoing, including any tail policies or coverage thereon), and any of such Seller's rights, claims, demands, proceedings, causes of action or rights of set off thereunder, other than any of the foregoing maintained or held by such Seller that provides coverage for directors and/or officers of any Person with which such Seller engaged in an acquisition transaction (whether by merger, consolidation or acquisition of stock or assets);

        (e)     any avoidance claims or causes of action under the Bankruptcy Code or applicable state Law solely with respect to the Excluded Assets or the Excluded Liabilities, including, without limitation, all rights and avoidance claims of such Seller arising under Chapter 5 of the Bankruptcy Code with respect to the Excluded Assets;

        (f)     all claims that such Seller may have against any Person solely with respect to any other Excluded Assets;

        (g)     such Seller's rights under this Agreement and the Ancillary Agreements;

        (h)     each of the Seller Plans (other than the Assumed Plans), and any associated funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained in connection with such Seller Plans and any applicable insurance policies (collectively, the "<u>Excluded Plans</u>");

        (i)     all Documents (whether copies or originals) relating to formation, qualifications to conduct business as a foreign corporation or other legal entity, arrangements

5

with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock ledgers, stock certificates, by-laws and other documents relating to the organization and existence of such Seller as a corporation or other legal entity, as applicable (together with analogous documentation);

    (j)  the properties and assets set forth on Schedule 1.2(j);

    (k)  all deposits and all prepaid charges, Taxes and expenses of such Seller solely related to any Excluded Asset (including a Non-Assumed Contract) or Excluded Liability, including, without limitation, (i) security deposits with third party suppliers, vendors, service providers or landlords, and lease and rental payments, (ii) rebates, (iii) tenant reimbursements, (iv) prepaid Taxes (including ad valorem Taxes, personal property Taxes and real estate Taxes), and (v) pre-payments, in each case of clauses (i) through (v), solely related to any Excluded Asset (including a Non-Assumed Contract) or Excluded Liability;

    (l)  (i) $720,000.00 of cash held by RG Tube or RGCH (the "RG Tube/RGCH Cash Amount") and (ii) if the Sellers do not obtain the required consents to assume the IRB Loan Agreement and assign the IRB Loan Agreement to the Purchaser, an amount of cash held by Greenville equal to the aggregate amount required to repay or discharge all Indebtedness, amounts or other obligations outstanding under the IRB Loan Agreement (the "IRB Payoff Cash Amount"); provided, that Greenville uses the IRB Payoff Cash Amount to repay or discharge all such Indebtedness, amounts or other obligations on the Closing Date; and

    (m)  the Purchase Price (other than the Assumed Liabilities).

   1.3  Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement and the Confirmation Order, the Purchaser shall assume only the following Liabilities of each Seller (collectively, but in all cases excluding the Excluded Liabilities, the "Assumed Liabilities"):

    (a)  all Liabilities of such Seller under each Assigned Contract (excluding any Cure Costs), arising after the Closing Date and which relate solely to events occurring after the Closing Date (except for Liabilities arising out of any breach or default of the Assigned Contracts on or prior to the Closing Date or arising out of any event that occurs on or prior to the Closing Date which with the passage of time or after giving notice, or both, would constitute or give rise to such a breach or default);

    (b)  any Cure Costs with respect to any Assigned Contract;

    (c)  all Liabilities arising from the employment of the Transferred Employees from and after the Closing Date, but solely to the extent such Liabilities relate to events occurring after the Closing Date;

    (d)  solely to the extent set forth in Section 6.3, all Liabilities for COBRA Continuation Coverage for all current and former employees of the Sellers;

    (e)  all (i) Liabilities under the Assumed Plans arising after the Closing Date, solely to the extent such Liabilities relate to events occurring after the Closing Date, and

6

(ii) Liabilities for claims under the RathGibson, Inc. Medical, Dental and Vision Benefit Plan which are (x) incurred by Transferred Employees (and their eligible dependents) prior to the Closing Date, (y) unpaid as of the Closing Date and (z) covered by, and payable in accordance with, the terms of such RathGibson, Inc. Medical, Dental and Vision Benefit Plan;

(f)     all Liabilities with respect to (i) unused vacation earned and accrued with respect to the Transferred Employees as of the Closing Date and (ii) earned and accrued wages, salaries, commissions and bonuses accrued in the Ordinary Course of Business with respect to the Transferred Employees as of the Closing Date;

(g)     all Liabilities relating to contractual warranty claims of such Seller's customers with respect to the sale or provision of products or services after the Filing Date and on or prior to the Closing Date;

(h)     all Liabilities arising out of the conduct of the Business by the Purchaser or the ownership of the Purchased Assets by the Purchaser after the Closing Date to the extent such Liabilities arise out of any matter, occurrence, action, omission or circumstance that first occurred or existed after the Closing Date;

(i)     all trade accounts payable (including any obligations owed to customers of such Seller directly related to funds received by such Seller in advance from such customers for which such Seller has future production or service obligations) related to the Purchased Assets that are incurred in the Ordinary Course of Business after the Filing Date and on or prior to the Closing Date;

(j)     all Inter-Company Payables;

(k)     all Liabilities for the payment of money under the IRB Loan Agreement; provided, however, that if the Sellers do not obtain the required consents to assume the IRB Loan Agreement and assign the IRB Loan Agreement to the Purchaser, the Liabilities under the IRB Loan Agreement shall constitute Excluded Liabilities;

(l)     all Alleged Tax Liabilities solely to the extent that the amount thereof is withheld by the Purchaser from the Closing Date Purchase Price pursuant to Section 8.15;

(m)     (i) subject to the terms of the Kaplan Release Agreement and only if the Conditions Precedent (as defined in the Kaplan Release Agreement) are satisfied in accordance with the terms of the Kaplan Release Agreement, all Liabilities for the payment of base salary pursuant to Section 2(c) of the Kaplan Separation Agreement and (ii) subject to the terms of the Pudelsky Release Agreement and only if the Conditions Precedent (as defined in the Pudelsky Release Agreement) are satisfied in accordance with the terms of the Pudelsky Release Agreement, all Liabilities for the payment of base salary pursuant to Section 2(c) of the Pudelsky Separation Agreement (it is expressly understood and agreed by the Sellers and the Purchaser that the assumption by the Purchaser of Liabilities under the Kaplan Separation Agreement and the Pudelsky Separation Agreement is governed solely by this Section 1.3(m) and no other clause, term or provision of this Section 1.3 shall govern, describe, enlarge or otherwise affect the assumption by the Purchaser of Liabilities under the Kaplan Separation Agreement and the Pudelsky Separation Agreement); and

7

(n)     only such other Liabilities expressly set forth on Schedule 1.3(n).

The parties acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement or otherwise shall not create an Assumed Liability or other Liability of the Purchaser or any of its Affiliates, except where such disclosed Liability has been expressly assumed by the Purchaser as an Assumed Liability in accordance with the provisions of this Section 1.3.

1.4     Excluded Liabilities.  Except for the Assumed Liabilities set forth in Section 1.3 (which shall, in no event, be Excluded Liabilities), the Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of any Seller of any nature whatsoever, whether accrued or unaccrued (collectively, the "Excluded Liabilities"), including, without limitation, the following Liabilities, all of which shall remain Liabilities of each Seller:

(a)     all Liabilities of such Seller relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets (including, without limitation, the Non-Assumed Contracts);

(b)     all Liabilities arising out of or relating to (i) any breaches or defaults of such Seller under this Agreement or any of the Seller Ancillary Agreements or (ii) any amounts to be paid by such Seller under this Agreement or any of the Ancillary Agreements;

(c)     except to the extent that any such Liabilities are specifically assumed pursuant to Section 1.3(g), Section 1.3(i) or Section 1.3(n), all Liabilities of such Seller arising out of or relating to services or products of such Seller or its Subsidiaries to the extent such services or products are provided, designed, manufactured or sold on or prior to the Closing Date;

(d)     all Liabilities relating to any environmental, health or safety matters (including any Liability under any Environmental Law), arising out of or relating to such Seller's operation of its business or its leasing, ownership, use or operation of real property on or prior to the Closing Date, no matter when raised;

(e)     except to the extent that any such Liabilities are specifically assumed pursuant to Section 1.3(k) (but subject to the proviso set forth in Section 1.3(k)), all Liabilities of such Seller in respect of Indebtedness, whether or not relating to the Business, including, without limitation, Indebtedness arising under the DIP Credit Agreement;

(f)     all Liabilities arising out of any breach or default of the Assigned Contracts on or prior to the Closing Date or arising out of any event that occurs on or prior to the Closing Date which with the passage of time or after giving of notice, or both, would constitute or give rise to such a breach or default;

(g)     all Liabilities of such Seller to any current, former or prospective shareholder or other holder of equity securities or equity-linked securities of such Seller, including all Liabilities of such Seller related to the right to or issuance of any capital stock or other equity securities;

8

(h)     except to the extent that any such Liabilities are specifically assumed by the Purchaser pursuant to Section 1.3(e) (as limited under Section 6.2) or Section 1.3(f), any and all Liabilities arising under or relating to the Assumed Plans or any of the Seller Plans;

(i)     except to the extent that any such Liabilities are specifically assumed by the Purchaser pursuant to Section 1.3(l) or Section 1.3(n), any and all Liabilities of such Seller for Taxes;

(j)     all Liabilities of such Seller for pending or threatened Actions against such Seller, any of its assets or properties, the Business and/or such Seller's operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance that occurred or existed on or prior to the Closing Date;

(k)     all Liabilities (whether civil or criminal) occurring, arising out of or relating to acts or omissions of such Seller or its Affiliates, or any of their respective current or former directors, officers, employees, agents or independent contractors, in respect of any claimed violation of any Law at any time;

(l)     except to the extent that any such Liabilities are specifically assumed by the Purchaser pursuant to Section 1.3(e) (as limited by Section 6.2), Section 1.3(f) or Section 1.3(m), all Liabilities of such Seller for any and all claims by or on behalf of such Seller's current or former employees relating to periods ending on or prior to the Closing Date, including, without limitation, employment practices, terms and conditions of employment, labor relations, union organizing, employee safety and health, wages and hours, fair labor standards, child labor, employee leaves of absence, unemployment insurance, disability rights or benefits, immigration, plant closings and layoffs, equal employment opportunity, discrimination, harassment, affirmative action (to the extent applicable), breach of contract and wrongful discharge, employee grievances and liability for any pension, profit sharing, deferred compensation (and the funding of any such benefits relating to all income earned by such Seller's current or former employees relating to periods ending on or prior to the Closing Date), workers' compensation or any other employee health, welfare or other benefit plans;

(m)     all Liabilities of such Seller under any collective bargaining agreement or any agreement with any labor union; and

(n)     all Liabilities for any legal, accounting, investment banking, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by such Seller in connection with, resulting from or attributable to, the transactions contemplated by this Agreement, the Chapter 11 Cases or otherwise.

For the avoidance of doubt, none of the Excluded Liabilities shall be included as Assumed Liabilities, and the Excluded Liabilities shall remain the sole responsibility of and shall be retained, paid, performed and fully discharged by the Sellers.

1.5     Designation of Assigned Contracts; Cure Costs.

(a)     On the Execution Date, the Sellers have provided the Purchaser with Schedule 1.5(a) (the "Original Contract & Cure Schedule") which contains a list of each

9

Contract of the Sellers and the Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Contract, the amount of such Cure Cost has been designated for such Contract as "$0.00"). From the Execution Date through (and including) the Designation Deadline, promptly following any changes to the information set forth on the Original Contract & Cure Schedule (including, without limitation, any new Contracts to which any Seller becomes a party and any change in the Cure Cost of any Contract), the Sellers shall provide the Purchaser with a schedule (as such schedule may be amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement, the "Contract & Cure Update Schedule") that updates and corrects such information. Anything herein to the contrary notwithstanding, any and all increases to the amount of Cure Costs applicable to any Assigned Contract that are set forth on the Contract & Cure Update Schedule will not increase the amount of Cure Costs applicable to such Assigned Contract as set forth on the Original Contract & Cure Schedule. To the extent permitted by the Bid Procedures Order (it being understood, however, that if not so permitted by the Bid Procedures Order, then the Bid Procedures Order shall be subject to the approval of the Purchaser), the Purchaser may, at any time and from time to time through (and including) the Designation Deadline, include in the definition of Purchased Assets and exclude from the definition of Excluded Assets any Contract of any of the Sellers not otherwise included in the definition of Purchased Assets and require such Seller to give notice to the non-debtor parties to any such Contract of the Sellers' assumption and assignment thereof to the Purchaser and the amount of Cure Costs associated with such Contract; provided, that no such change of the definitions of Purchased Assets or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any increase in the assumption of the Assumed Liabilities as a result of Contracts being added to the Purchased Assets by the Purchaser pursuant to this Section 1.5(a). To the extent permitted by the Bid Procedures Order (it being understood, however, that if not so permitted by the Bid Procedures Order, then the Bid Procedures Order shall be subject to the approval of the Purchaser), the Purchaser may, at any time and from time to time through (and including) the Designation Deadline, exclude from the definition of Purchased Assets and include in the definition of Excluded Assets, any pre-petition Contract of any of the Sellers otherwise included in the definition of Purchased Assets and require such Seller to give notice to the non-debtor parties to any such pre-petition Contract of the rejection thereof; provided, that no such change of the definitions of Purchased Assets or Excluded Assets referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any reduction in the assumption of the Assumed Liabilities as a result of pre-petition Contracts being excluded from the Purchased Assets by the Purchaser pursuant to this Section 1.5(a). To exercise its rights under this Section 1.5(a) to include Contracts in, or exclude Contracts from, the Purchased Assets and the Excluded Assets, as applicable, the Purchaser shall deliver one or more written notices to the Sellers specifying the Contract(s) to be so included or excluded and specifying the requisite additions, deletions or other changes to any applicable Schedule to reflect such inclusion or exclusion. If any Contract is added to (or excluded from) the Purchased Assets and the Excluded Assets as permitted by this Section 1.5(a), then the Purchaser and the Sellers agree to make appropriate additions, deletions or other changes to any applicable Schedule to reflect such addition or exclusion; provided, that no addition, deletion or other change to any Schedule shall increase the amount of any Cure Cost with respect to any Assigned Contract set forth on the Original Contract & Cure Schedule. In addition, if any Contract is added to (or excluded from)

10

the Purchased Assets and the Excluded Assets as permitted by this Section 1.5(a), the Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, prompt delivery of notice to the non-debtor counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller, and assigned to the Purchaser, on the Closing Date (or excluded under the Confirmation Order and this Agreement). Any Contract that was executed or entered into prior to the Filing Date, but was amended, supplemented or otherwise modified at any time on or after the Filing Date, shall not cease to be a pre-petition Contract on account of such amendment, supplement or modification.

(b)    The Sellers shall be responsible for the verification of all Cure Costs for each Assigned Contract and shall use commercially reasonable efforts to establish the proper Cure Costs, if any, for each Assigned Contract prior to the Closing Date.

(c)    To the extent that any Assigned Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, at the Closing, the Cure Costs related to such Assigned Contract shall be paid by the Purchaser, subject to adjustments to the Purchase Price set forth in Sections 2.3 and 2.4; provided, however, that with respect to any Cure Costs that are Undetermined Cure Costs as of the Closing, such Cure Costs shall be paid by the Purchaser pursuant to the provisions of Section 1.5(d). The Purchaser shall not be required to make any payment for Cure Costs for, or otherwise have any Liabilities with respect to, any Contract that is not an Assigned Contract.

(d)    If any Assigned Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, and such Cure Costs will be Undetermined Cure Costs on the Closing Date because a non-debtor counterparty to such Assigned Contract proposed Cure Costs in an amount that is different than the amount of Cure Costs proposed by the Sellers and such difference will not be resolved prior to the Closing Date (each such Assigned Contract, a "Disputed Amount Contract"), then the Sellers shall provide the Purchaser, not less than three (3) Business Days prior to the Closing Date, with a schedule that lists each such Disputed Amount Contract and the amount of Cure Costs that has been proposed by each such non-debtor counterparty (each such amount, with respect to any particular Disputed Amount Contract, less the Cure Costs, if any, scheduled on the Original Contract & Cure Schedule with respect to such Disputed Amount Contract, a "Reserve Amount", and the aggregate amount of all such Reserve Amounts, the "Aggregate Reserve Amount"). The Sellers acknowledge and agree that, at and after the Closing, the Purchaser shall be entitled to reserve and retain the Aggregate Reserve Amount from the amount of the Closing Date Purchase Price, and to hold such Aggregate Reserve Amount in order to satisfy the Purchaser's obligation to pay the Cure Costs for each Disputed Amount Contract as such Cure Costs become Determined Cure Costs. Promptly following each Undetermined Cure Cost applicable to a Disputed Amount Contract becoming a Determined Cure Cost, the Purchaser shall pay such Determined Cure Cost and reduce the Aggregate Reserve Amount by the corresponding amount so paid. After all Undetermined Cure Costs associated with Disputed Amount Contracts have become Determined Cure Costs and have been paid by the Purchaser in accordance with this Section 1.5(d) (the aggregate amount so paid by the Purchaser, the "Post-Closing Cure Costs"), the Purchaser shall promptly pay to (or at the direction of) the Sellers, by wire transfer of immediately available funds, the amount (but only to the extent such amount is greater than zero) equal to (i) the Aggregate Reserve Amount minus (ii) the Post-Closing Cure Costs.

11

1.6     Post-Closing Assignment of Contracts.  With respect to any Contract which is not an Assigned Contract and which has not been rejected by the Sellers pursuant to section 365 of the Bankruptcy Code, upon written notice(s) from the Purchaser after Closing, and in any event, no later than thirty (30) days after Closing, the Sellers shall take such commercially reasonably actions as the Sellers deem reasonably necessary (at the Purchaser's sole cost and expense, including payment by the Purchaser of the Sellers' documented reasonable attorneys' fees and expenses related to such assumption and assignment) to assume and assign to the Purchaser the applicable Contract(s) set forth in the Purchaser's notice(s); provided, that any applicable Cure Cost shall be satisfied by the Purchaser.  Notwithstanding anything in this Agreement to the contrary, on the date any Contract is assumed and assigned to the Purchaser pursuant to this Section 1.6, such Contract also shall be deemed an Assigned Contract.

1.7     "As Is" Transaction.  THE PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE 4 OF THIS AGREEMENT, THE SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS OR THE BUSINESS. WITHOUT IN ANY WAY LIMITING THE FOREGOING, THE SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS.     ACCORDINGLY, THE PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE 2.

## CONSIDERATION; DEPOSIT; ADJUSTMENTS TO PURCHASE PRICE

2.1     Consideration.     The aggregate purchase price for the Purchased Assets is $93,000,000 (the "Pre-Adjusted Purchase Price") and the assumption of the Assumed Liabilities. The Pre-Adjusted Purchase Price shall be subject to downward adjustment on the Closing Date pursuant to Section 2.3(b), and the aggregate amount, as so adjusted (or not adjusted after application of the provisions of Section 2.3(b)), is referred to herein as the "Closing Date Purchase Price".  In addition, the Closing Date Purchase Price shall be subject to downward adjustment after the Closing Date pursuant to Section 2.4(f), and the aggregate amount, as so adjusted (or not adjusted after application of the provisions of Section 2.4(f)), and the assumption of the Assumed Liabilities is referred to herein as the "Purchase Price".  The Closing Date Purchase Price shall be paid on the Closing Date in accordance with Section 3.3(a).

2.2     Deposit.

(a)     On the Execution Date, the Purchaser and the Sellers have entered into an escrow agreement (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Escrow Agreement") with U.S. Bank National Association, a national banking association (the "Escrow Agent").  Concurrently with the execution and delivery of the Escrow Agreement by the Sellers, the Purchaser and the Escrow Agent, the Purchaser shall deposit $5,000,000 (including all interest and other earnings accrued thereon the "Initial Deposit") with the Escrow Agent by wire transfer of immediately available funds.  In addition,

12

no later than two (2) Business Days after the date on which the Approval Order is entered by the Bankruptcy Court (but only if the Approval Order is entered by the Bankruptcy Court), the Purchaser shall deposit an additional $2,500,000 (including all interest and other earnings accrued thereon, the "Additional Deposit" and, once funded, together with the Initial Deposit, the "Deposit") with the Escrow Agent by wire transfer of immediately available funds. The Escrow Agent shall hold the Deposit in a segregated, interest-bearing account (the "Escrow Account") pursuant to the Escrow Agreement. All interest or other earnings on amounts held in the Escrow Account pursuant to the Escrow Agreement shall automatically become a part of the Deposit as such interest or earnings accrue.

(b)     At the Closing, the Deposit shall (i) be automatically converted into the Purchase Price Adjustment Escrow Amount and (ii) be held in the Escrow Account, on the terms set forth in the Escrow Agreement, as security (A) for amounts to which the Purchaser shall be entitled pursuant to Section 2.4(g), (B) to pay or reimburse costs and expenses pursuant to Section 8.3, (C) to satisfy the Sellers indemnification and other obligations under Section 11.1(a) and (D) for amounts to which the Purchaser shall be entitled pursuant to Section 3.6(b) and amounts to which the Sellers shall be entitled pursuant to Section 3.6(c). If this Agreement is validly terminated prior to the Closing, the Deposit in the Escrow Account shall be released and distributed to the Purchaser or the Sellers in accordance with Section 3.6(b), Section 3.6(c) and/or Section 3.6(d), as applicable.

2.3     Closing Date Adjustments to the Purchase Price.

(a)     Not less than three (3) Business Days prior to the scheduled Closing Date, the Sellers shall deliver to the Purchaser a certificate (a "Closing Certificate") signed by the chief financial officer of each Seller, which shall set forth a calculation by the Sellers of the estimated Closing Date Net Working Capital (and each component thereof) (the "Estimated Closing Date Net Working Capital"). At the request of the Purchaser, the Sellers shall consult with the Purchaser and the Purchaser's accountants, counsel, financial advisors and other Representatives in connection with the preparation of the Closing Certificate and shall permit the Purchaser and the Purchaser's accountants, counsel, financial advisors and other Representatives to review and, at the expense of the Purchaser, make copies of all documents, schedules or work papers used in the preparation of the Closing Certificate.

(b)     The Pre-Adjusted Purchase Price shall be adjusted downwards (if required) at the Closing as follows:

(i)     in the event that the Estimated Closing Date Net Working Capital is less than the Base Net Working Capital Value, the Pre-Adjusted Purchase Price shall be decreased on a dollar-for-dollar basis by the total amount by which the Estimated Closing Date Net Working Capital is less than the Base Net Working Capital Value; and

(ii)     in the event that the Purchaser pays or has a binding obligation to pay, pursuant to Section 1.5(c), (x) any Cure Cost with respect to any Assigned Contract that is not set forth on the Original Contract & Cure Schedule or (y) any Cure Cost with respect to any Assigned Contract (other than a Disputed Amount Contract) set forth on the Original Contract & Cure Schedule that is in excess of the Cure Cost set forth on the

13

Original Contract & Cure Schedule for such Assigned Contract (the aggregate amount of such Cure Costs referred to in clauses (x) and (y), the "Additional Closing Date Cure Amount"), the Pre-Adjusted Purchase Price shall be decreased on a dollar-for-dollar basis by the Additional Closing Date Cure Amount.

(c)     Anything in this Agreement to the contrary notwithstanding, no adjustment to the Purchase Price made pursuant to Section 2.3(b), Section 2.4(f) or any other provision of this Agreement shall result in an increase to the Purchase Price (it being understood and agreed that the adjustments to the Purchase Price contemplated by Section 2.3(b), Section 2.4(f) and any other provision of this Agreement shall only result in a decrease to the Purchase Price), except to the extent of any increase in the assumption of the Assumed Liabilities as a result of Contracts being added to the Purchased Assets by the Purchaser pursuant to Section 1.5(a).

2.4     Post-Closing Date Adjustments to the Purchase Price.

(a)     Within ninety (90) days of the Closing Date, the Purchaser shall deliver to the Sellers a certificate (an "Adjustment Certificate") signed by the chief financial officer of the Purchaser, which shall set forth a calculation by the Purchaser of the Closing Date Net Working Capital (and each component thereof) (the "Modified Closing Date Net Working Capital").

(b)     The Sellers shall have thirty (30) days following the date of delivery by the Purchaser to the Sellers of the Adjustment Certificate to provide the Purchaser with a written certificate confirming that the Modified Closing Date Net Working Capital as set forth in the Adjustment Certificate is correct (the "Confirmation Certificate") or notifying the Purchaser in writing of any good faith reasonable objections to the calculation of the Modified Closing Date Net Working Capital as set forth in the Adjustment Certificate (a "Dispute Notice"), setting forth a reasonably specific and detailed description of such objections. During the thirty (30)-day period immediately following the date of delivery by the Purchaser to the Sellers of the Adjustment Certificate, the Sellers shall be permitted to review, at reasonable times and upon reasonable prior written notice, the Purchaser's documents, schedules or working papers related to the preparation of the Adjustment Certificate and the determination of the Modified Closing Date Net Working Capital.

(c)     If the Sellers shall object to the Purchaser's calculation of the Modified Closing Date Net Working Capital as reflected in the Dispute Notice, the Purchaser and the Sellers shall attempt in good faith to resolve any such objections within fifteen (15) days of the date of receipt by the Purchaser of the Dispute Notice. If the Sellers deliver a timely Dispute Notice, then only those matters that are specified in such Dispute Notice shall be deemed in dispute and all other matters shall be final and binding upon the Purchaser and the Sellers. The Sellers shall be entitled to deliver only one Dispute Notice and no Dispute Notice delivered by the Sellers may be amended, supplemented or otherwise modified after delivery thereof without the prior written consent of the Purchaser.

(d)     If the Sellers and the Purchaser shall be unable to resolve any dispute specified in a Dispute Notice within the fifteen (15)-day period referred to in Section 2.4(c), the Sellers and the Purchaser shall submit the dispute to a mutually agreed upon independent

14

accounting firm (the "Independent Accountant") for review and resolution of all matters (but only such matters) specified in the Dispute Notice which remain in dispute, and the Independent Accountant shall make a final determination of the Modified Closing Date Net Working Capital to the extent such amounts are in dispute, in accordance with the guidelines and procedures set forth in this Agreement. Each of the Sellers, on the one hand, and the Purchaser, on the other hand, shall, and shall cause their respective officers, directors, employees and Representatives to, provide full cooperation to the Independent Accountant. The Independent Accountant shall (i) act in its capacity as an expert and not as an arbitrator, (ii) limit its review to such items and calculations as were specifically addressed in the Dispute Notice that have not been resolved by the parties and (iii) be instructed to reach its conclusions regarding any such dispute within thirty (30) days after its appointment and provide a written explanation of its decision. In resolving any matters in dispute, the Independent Accountant may not assign a value to any item in dispute greater than the greatest value for such item assigned by the Purchaser, on the one hand, or the Sellers, on the other hand, or less than the smallest value for such item assigned by the Purchaser, on the one hand, or the Sellers, on the other hand. The Independent Accountant's determination will be based solely on presentations by the Purchaser and the Sellers which are in accordance with the guidelines and procedures set forth in this Agreement (i.e., not on the basis of an independent review). The fees and expenses of the Independent Accountant shall be borne in equal proportions between the Sellers, on the one hand, and the Purchaser, on the other hand.

(e) The "Final Certificate" shall be deemed to be (i) the Adjustment Certificate if the Sellers provide the Purchaser with a Confirmation Certificate within the thirty (30)-day period referred to in Section 2.4(b) (and, in any such case, the Adjustment Certificate shall become the Final Certificate on the date the Sellers provide the Purchaser with a Confirmation Certificate), (ii) the Adjustment Certificate if no Confirmation Certificate or Dispute Notice is delivered by the Sellers within the thirty (30)-day period and otherwise in accordance with the terms specified in Section 2.4(b) (and the Adjustment Certificate shall become the Final Certificate at the expiration of such thirty (30)-day period), or (iii) if a Dispute Notice is delivered by the Sellers within the thirty (30)-day period and otherwise in accordance with the terms specified in Section 2.4(b), the Adjustment Certificate as adjusted by (A) the agreement of the Sellers and the Purchaser and/or (B) the final determination of the Independent Accountant (and the Adjustment Certificate shall become the Final Certificate on the later of the date the Sellers and the Purchaser reach such an agreement and/or the date the Independent Accountant delivers its final determination to the Purchaser and the Sellers). The Final Certificate, together with the calculation of the Modified Closing Date Net Working Capital set forth therein, shall be final and binding on the Sellers and the Purchaser.

(f) Within two (2) Business Days after the date that the Adjustment Certificate becomes the Final Certificate in accordance with Section 2.4(e), the Closing Date Purchase Price shall be adjusted downwards (if required) as follows:

(i) in the event that the Modified Closing Date Net Working Capital set forth in the Final Certificate is less than the lesser of the Base Net Working Capital Value and the Estimated Closing Date Net Working Capital, the Closing Date Purchase Price shall be decreased on a dollar-for-dollar basis by the total amount by which the Modified Closing Date Net Working Capital is less than the lesser of the Base Net Working Capital Value and the Estimated Closing Date Net Working Capital; and

15

(ii)     in the event that the Purchaser pays or has a binding obligation to pay, pursuant to Section 1.5(c), (x) any Cure Cost with respect to any Assigned Contract that is not set forth on the Original Contract & Cure Schedule or (y) any Cure Cost with respect to any Assigned Contract (other than a Disputed Amount Contract) set forth on the Original Contract & Cure Schedule that is in excess of the Cure Cost set forth on the Original Contract & Cure Schedule for such Assigned Contract that is, in the aggregate for all Cure Costs referred to in clauses (x) and (y), in excess of the Additional Closing Date Cure Amount (the aggregate amount of such excess Cure Costs referred to in clauses (x) and (y) over the Additional Closing Date Cure Amount, the "Additional Excess Cure Amount"), the Closing Date Purchase Price shall be decreased on a dollar-for-dollar basis by the Additional Excess Cure Amount.

The date the Closing Date Purchase Price is adjusted downwards as set forth above in this Section 2.4(f) is referred to herein as the "Final Determination Date".

(g)     If the Closing Date Purchase Price is adjusted downwards pursuant to Section 2.4(f), then the Purchaser shall be entitled to deliver to the Escrow Agent a letter instructing the Escrow Agent to pay to the Purchaser the amount of such downward adjustment from the Purchase Price Adjustment Escrow Amount by wire transfer of immediately available funds to an account designated by the Purchaser and the distribution of such amount shall be subject to the terms of the Escrow Agreement. If the Purchase Price Adjustment Escrow Amount available for distribution to the Purchaser is less than the full amount of such downward adjustment, then the Sellers shall be liable and responsible, on a joint and several basis, to pay to the Purchaser (and the Sellers shall pay to the Purchaser) the amount by which the Purchase Price Adjustment Escrow Amount available for distribution to the Purchaser is less than the full amount of such downward adjustment. All payments required to be made by the Sellers pursuant to this Section 2.4(g), shall be made within two (2) Business Days following the Final Determination Date (but subject to the resolution of any dispute with respect to any releases from the Escrow Account relating to any adjustment to the Closing Date Purchase Price contemplated by Section 2.4(f)).

(h)     If (i) there is no downward adjustment to the Closing Date Purchase Price pursuant to Section 2.4(f) or (ii) following a downward adjustment to the Closing Date Purchase Price pursuant to Section 2.4(f) and the related distribution to the Purchaser of any portion of the Purchase Price Adjustment Escrow Amount pursuant to Section 2.4(g) there remains any portion of the Purchase Price Adjustment Escrow Amount, then the Sellers shall be entitled to deliver a letter to the Escrow Agent instructing the Escrow Agent to release and distribute to the Sellers the remaining amount of the Purchase Price Adjustment Escrow Amount and the distribution of such amount shall be subject to the terms of the Escrow Agreement; provided, however, that the Sellers shall not instruct the Escrow Agent to release and distribute, and the Escrow Agent shall continue to hold in accordance with the terms of the Escrow Agreement, any portion of the Purchase Price Adjustment Escrow Amount that is subject to a Reserve for any Claim (as such terms are defined in the Escrow Agreement) that has not yet been resolved in accordance with the terms of the Escrow Agreement.

(i)     Anything in this Agreement to the contrary notwithstanding, no adjustment to the Purchase Price made pursuant to Section 2.3(b), Section 2.4(f) or any other

16

provision of this Agreement shall result in an increase to the Purchase Price (it being understood and agreed that the adjustments to the Purchase Price contemplated by Section 2.3(b), Section 2.4(f) or any other provision of this Agreement shall only result in a decrease to the Purchase Price), except to the extent of any increase in the assumption of the Assumed Liabilities as a result of Contracts being added to the Purchased Assets by the Purchaser pursuant to Section 1.5(a).

2.5    Withholding.    Notwithstanding anything herein to the contrary, the Purchaser shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement to each Seller such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code and the rules and regulations promulgated thereunder, or under any provision of state, local or foreign Tax Law. To the extent that amounts are so withheld by the Purchaser, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to each Seller in respect of which such deduction and withholding was made by the Purchaser.

## ARTICLE 3.

## CLOSING AND TERMINATION

3.1    Closing.    Subject to the satisfaction of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3, or the waiver thereof by the party or parties entitled to waive the applicable condition, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of the Purchaser's Counsel at 180 Maiden Lane, New York, New York 10038 (or at such other place as the parties may mutually designate in writing) on the date that is no later than the third (3rd) Business Day following the date on which all of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 are satisfied or waived by the party entitled to waive the applicable condition (other than (i) conditions that by their nature are to be satisfied at the Closing and (ii) the occurrence of the Effective Date, which occurrence shall happen simultaneously with the Closing). The date on which the Closing is held is referred to in this Agreement as the "Closing Date."

3.2    Closing Deliveries by the Sellers.    At the Closing, the Sellers shall deliver to the Purchaser:

(a)    a duly executed bill of sale with respect to the Purchased Assets, substantially in the form attached hereto as Exhibit A;

(b)    a duly executed assignment and assumption agreement with respect to the Assumed Liabilities, substantially in the form attached hereto as Exhibit B;

(c)    a true and correct copy of the Confirmation Order and case docket reflecting that the Confirmation Order is in effect;

(d)    a duly executed non-foreign person affidavit of each Seller dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that such Seller is not a "foreign person" as defined in Section 1445 of the Code;

17

(e)    the officer's certificates required to be delivered pursuant to Sections 9.3(a), 9.3(b) and 9.3(c);

(f)    physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery, provided that the physical presence of any such Purchased Assets at any leased real property that is also included in the Purchased Assets shall be deemed to be so delivered;

(g)    with respect to the Foreign Subsidiaries, (i) certificates or other instruments representing all of the Foreign Subsidiary Stock (but only to the extent certificated or that such certificates or instruments exist under applicable Law), duly endorsed in blank or with duly executed stock powers attached or otherwise in form satisfactory to the Purchaser for transfer, (ii) all minute books, stock books and other organizational documents of the Foreign Subsidiaries, including all such documentation required by Law and (iii) if requested by the Purchaser, written resignations, in form and substance reasonably satisfactory to the Purchaser of each director (or comparable person) of the Foreign Subsidiaries effective as of the Closing Date;

(h)    such documentation as may be necessary to change the authorized signatories on any bank accounts or powers of attorney relating (directly or indirectly) to the Purchased Assets;

(i)    evidence of the required name changes of the Sellers as more fully set forth in Section 8.10;

(j)    if the Sellers do not obtain the required consents to assume the IRB Loan Agreement and assign the IRB Loan Agreement to the Purchaser, pay-off letters and lien discharges (or agreements therefor) satisfactory to the Purchaser with respect to all Indebtedness, amounts or other obligations outstanding under the IRB Loan Agreement and the Encumbrances securing such Indebtedness, amounts or other obligations;

(k)    such other bills of sale, deeds, endorsements, assignments (including assignments with respect to the Assumed Real Property Leases and the Assumed Intellectual Property), acknowledgments and other good and sufficient instruments of conveyance and transfer, all in form and substance reasonably satisfactory to the Purchaser, that are necessary to vest in the Purchaser all of the right, title and interest of the Sellers in, to and under any or all of the Purchased Assets; and

(l)    all other previously undelivered Seller Ancillary Agreements required by this Agreement to be delivered by the Sellers at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.3    Closing Deliveries by the Purchaser. At the Closing, the Purchaser shall deliver to (or at the direction of) the Sellers:

(a)    an amount equal to (i) the Closing Date Purchase Price minus (ii) the Deposit minus (iii) the Aggregate Reserve Amount minus (iv) the Aggregate Alleged Tax Liability Amount, by wire transfer of immediately available funds to the accounts of the Sellers

18

in accordance with written instructions delivered by the Sellers to the Purchaser at least three (3) Business Days prior to the Closing Date;

(b)     a duly executed assignment and assumption agreement substantially in the form attached hereto as Exhibit B;

(c)     the officer's certificates required to be delivered pursuant to Sections 9.2(a) and 9.2(b); and

(d)     all other previously undelivered Purchaser Ancillary Agreements required by this Agreement to be delivered by the Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.4     Termination of Agreement. This Agreement may be terminated as follows:

(a)     by the mutual written consent of the Sellers and the Purchaser at any time prior to the Closing;

(b)     by the Purchaser or the Sellers, if the Closing shall not have been consummated on or prior to July 30, 2010 (the "Outside Date"); provided, however, that the right to terminate this Agreement under this Section 3.4(b) shall not be available to the Purchaser or the Sellers, as applicable, if the Purchaser or any Seller is, as applicable, in material breach or violation of any of their respective representations, warranties, covenants or agreements under this Agreement;

(c)     by the Purchaser or the Sellers, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence);

(d)     by the Purchaser, if any Chapter 11 Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Seller is appointed in any Chapter 11 Case;

(e)     by the Purchaser, if (i) the Approval Motion is not filed with the Bankruptcy Court within one (1) Business Day after the Execution Date, (ii) the Approval Order (including approval of the Break-Up Fee, the Reimbursement Amount, the Expense Amount and the Collection Costs) shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York City time) on April 9, 2010 or (iii) following entry of the Approval Order, the Approval Order shall (A) fail to be in full force and effect, (B) have been reversed, (C) have been stayed and such stay shall continue to be in effect for more than fifteen (15) days, or (D) have been modified or amended in any manner adverse to the Purchaser without the prior written consent of the Purchaser;

19

(f) by the Purchaser, if the Sellers fail to use commercially reasonable efforts to require that Qualified Bids are due no later than 5:00 p.m. (New York City time) on May 19, 2010;

(g) by the Purchaser, if the Sellers fail to have held and closed the Auction on or prior to 11:59 p.m. (New York City time) on May 28, 2010; provided, that the Purchaser shall not have the right to terminate this Agreement pursuant to this Section 3.4(g) if no Qualified Bids (other than the Stalking Horse Bid) are received pursuant to the Bid Procedures;

(h) by the Purchaser, if (i) the Confirmation Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York City time) on June 1, 2010 or (ii) following entry of the Confirmation Order, the Confirmation Order shall (A) fail to be in full force and effect, (B) have been reversed, (C) have been stayed and such stay shall continue to be in effect for more than fifteen (15) days, or (D) have been modified or amended in any manner adverse to the Purchaser without the prior written consent of the Purchaser;

(i) by the Purchaser or the Sellers, if any Seller has entered into, or shall have publicly announced its intention (including by means of any filings made with the Bankruptcy Court or any other Governmental Body) to enter into, an agreement in principle, letter of intent, memorandum of understanding, definitive agreement or other arrangement, whether binding or non-binding, or whether subject to terms and conditions, with any Person (other than the Purchaser or its Affiliates) with respect to any Alternative Transaction except, subject to the terms of the Bid Procedures, in the event that the entering into such agreement or document, or such announcement, relates to an Alternative Transaction with the Successful Bidder and the Purchaser is the Second-Highest Bidder; provided, however, that the Purchaser shall have the right to terminate this Agreement pursuant to this Section 3.4(i) on or at any time after the twentieth (20th) day following the date which is twenty (20) days after the date of the entry of the Confirmation Order unless the Purchaser becomes the Successful Bidder on or prior to such date;

(j) automatically upon consummation of an Alternative Transaction;

(k) by the Purchaser, if there shall have occurred a Material Adverse Effect;

(l) by the Purchaser, (i) if any Seller shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of any Seller in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of any condition set forth in Section 9.3(a), Section 9.3(b) or Section 9.3(c) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) twenty (20) days after written notice of such breach, failure or occurrence is given to the Sellers by the Purchaser; provided, that the right of the Purchaser to terminate this Agreement under this Section 3.4(l) shall not be available if the Purchaser is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement;

20

(m) by the Sellers, (i) if the Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, or if any representation or warranty of the Purchaser in this Agreement shall have become untrue, and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of a condition set forth in Section 9.2(a) or Section 9.2(b) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) twenty (20) days after written notice of such breach, failure or occurrence is given to the Purchaser by the Sellers; provided, that the right of the Sellers to terminate this Agreement under this Section 3.4(m) shall not be available if any Seller is then in material breach of its representations, warranties, covenants or other agreements contained in this Agreement;

(n) by the Sellers, if all of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 have been satisfied (other than (i) conditions that by their nature are to be satisfied at the Closing and (ii) the occurrence of the Effective Date, which occurrence shall happen simultaneously with the Closing) or waived in writing and the Purchaser fails to deliver any portion of the Closing Date Purchase Price (other than the Deposit, the Aggregate Reserve Amount and the Aggregate Alleged Tax Liability Amount) at the Closing;

(o) by the Purchaser, if all of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived in writing and the Sellers fail to consummate the transactions contemplated hereby at the Closing; and

(p) by the Purchaser, if the Sellers fail to pay the Expense Amount in accordance with Section 8.12, which failure continues for five (5) Business Days after the Expense Amount was initially due.

3.5 Procedure Upon Termination. In the event of a termination of this Agreement by the Purchaser or the Sellers, or both, pursuant to Section 3.4, (a) written notice of such termination shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made, and (b) except as set forth in Section 3.6, this Agreement shall thereupon terminate and become void and of no further force or effect, and the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto. Any termination of this Agreement by the Purchaser or the Sellers, or both, pursuant to Section 3.4 shall be effective on the date that written notice of such termination is given by the terminating party to the other parties hereto, and any automatic termination of this Agreement pursuant to Section 3.4(j) shall be effective on the date that an Alternative Transaction is consummated.

3.6 Effect of Termination.

(a) In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to the Purchaser or the Sellers or any of their respective Affiliates, except as expressly set forth in this Section 3.6. The provisions of Section 3.4, Section 3.5, this Section 3.6 and

21

Article 12 shall survive any termination of this Agreement and shall remain in full force and effect.

(b) If (i) the Purchaser or the Sellers, as applicable, terminate this Agreement pursuant to Section 3.4(i), (ii) the Purchaser terminates this Agreement pursuant to Section 3.4(o) or (iii) this Agreement terminates automatically pursuant to Section 3.4(j), then (A) the Purchaser shall be entitled to disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon) from the Escrow Account and (B) the Sellers shall pay to the Purchaser a fee in the amount of three percent (3.0%) of the Pre-Adjusted Purchase Price (the "Break-Up Fee") as liquidated damages. In the event this Agreement is terminated pursuant to Section 3.4(b), Section 3.4(c), Section 3.4(d), Section 3.4(e), Section 3.4(f), Section 3.4(g), Section 3.4(h), Section 3.4(i), Section 3.4(j), Section 3.4(k), Section 3.4(l), Section 3.4(o) or Section 3.4(p), then (x) the Sellers shall reimburse the Purchaser for all of the Purchaser's reasonable documented third party or out-of-pocket fees and expenses (including reasonable documented attorneys' fees and disbursements) incurred in connection with the negotiation, execution and consummation of this Agreement and the transactions contemplated hereby in a maximum amount of $1,000,000 (exclusive of the Expense Amount) (the "Reimbursement Amount"), and (y) to the extent the Purchaser is not already entitled to disbursement of the Deposit pursuant to the immediately preceding sentence, the Purchaser shall be entitled to disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon). In the event this Agreement is terminated pursuant to Section 3.4(b), Section 3.4(e), Section 3.4(f), Section 3.4(g), Section 3.4(h), Section 3.4(l), or Section 3.4(p), if within six (6) months after the effective date of any such termination any Seller enters into a binding written definitive agreement with any Person, other than the Purchaser or its Controlling Affiliates, with respect to any Alternative Transaction, the Sellers shall pay the Break-Up Fee to the Purchaser as liquidated damages. In the event this Agreement is terminated pursuant to Section 3.4(a), the Purchaser shall be entitled to disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon) from the Escrow Account. The parties expressly agree and acknowledge that it would be extremely difficult or impracticable to ascertain the actual damages that would be incurred by the Purchaser in the event of a termination of this Agreement pursuant to the Sections of this Agreement referenced above in this Section 3.6(b) and that the return of the Deposit and the payment of the Break-Up Fee and the Reimbursement Amount, as and if applicable pursuant to this Section 3.6(b), represent the parties' reasonable estimate of the damages that would be incurred by the Purchaser in the event of any such termination of this Agreement. Without limiting or prejudicing the Purchaser's rights under Section 12.10 (all of such rights being hereby reserved and unaffected by the terms of this Section 3.6(b) unless this Agreement is validly terminated in accordance with Section 3.4), the Purchaser's right to receive the Deposit, the Break-Up Fee and the Reimbursement Amount pursuant to this Section 3.6(b) and, to the extent provided in Section 3.6(d), any Collection Costs, shall be the sole and exclusive remedy available to the Purchaser and its Affiliates against the Sellers and the other Seller Parties for any loss or damage suffered as a result of the failure of the transactions contemplated by this Agreement and/or the Ancillary Agreements to be consummated or for a breach or failure to perform under this Agreement or otherwise and upon payment of such amounts, none of the Seller Parties shall have any further Liability relating to or arising out of this Agreement or the transactions contemplated by this Agreement (all such further Liabilities being hereby fully waived, released and forever discharged). The parties expressly agree and acknowledge that the

22

right of the Purchaser to receive a return of the Deposit and payment of the Break-Up Fee and the Reimbursement Amount as set forth in this Section 3.6(b) (and not the mere obligation of the Sellers to seek approval from the Bankruptcy Court of such right), (x) is actually necessary to preserve the value of the Sellers' estates and (y) is necessary to induce the Purchaser to execute and deliver this Agreement and to enter into the transactions contemplated hereby, and that the Purchaser would not have done so without receiving such right. The Sellers further expressly agree and acknowledge that there is no assurance that the Purchaser will not terminate this Agreement pursuant to Section 3.4 if the Bid Procedures Order does not approve the right of the Purchaser to receive a return of the Deposit and payment of the Break-Up Fee and the Reimbursement Amount as set forth in this Section 3.6(b).

(c)     If the Sellers terminate this Agreement pursuant to Section 3.4(m) or Section 3.4(n), then the Sellers shall be entitled to disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon) from the Escrow Account as liquidated damages. The parties expressly agree and acknowledge that it would be extremely difficult or impracticable to ascertain the actual damages that would be incurred by the Sellers in the event of a termination of this Agreement pursuant to Section 3.4(m) or Section 3.4(n) and that the Deposit represents the parties' reasonable estimate of the damages that would be incurred by the Sellers in the event of any such termination of this Agreement. Whether or not this Agreement is terminated, the Sellers' right to receive the Deposit from the Escrow Account pursuant to this Section 3.6(c) and, to the extent provided in Section 3.6(d), any Collection Costs from the Purchaser, shall be the sole and exclusive remedy available to the Sellers and their respective Affiliates against the Purchaser and the other Purchaser Parties for any loss or damage suffered as a result of the failure of the transactions contemplated by this Agreement and/or the Ancillary Agreements to be consummated or for a breach or failure to perform under this Agreement or otherwise and upon payment of the Deposit from the Escrow Account, none of the Purchaser Parties shall have any further Liability relating to or arising out of this Agreement or the transactions contemplated by this Agreement (all such further Liabilities being hereby fully waived, released and forever discharged). Without limiting the foregoing, and anything in this Agreement to the contrary notwithstanding, unless the Closing has occurred, the Sellers acknowledge that they may not seek specific performance for any reason to require the Purchaser or the Purchaser Parties to consummate the transactions (or any portion thereof) contemplated by this Agreement or any of the Ancillary Agreements under any circumstance whatsoever and the sole and exclusive remedy of the Sellers and the other Seller Parties for the failure by the Purchaser to consummate such transactions or for any other reason whatsoever shall be to receive the Deposit from the Escrow Account as set forth in (and under the limited circumstances set forth in) this Section 3.6(c) and, to the extent provided in Section 3.6(d), any Collection Costs from the Purchaser.

(d)     In the event that this Agreement is terminated pursuant to Section 3.4 and the Sellers or the Purchaser are entitled to receive the Deposit, then the Sellers or the Purchaser may deliver to the Escrow Agent, at any time following the effective date of any such termination, a letter instructing the Escrow Agent to pay to the Sellers or the Purchaser, as applicable, the Deposit from the Escrow Account and the distribution of the Deposit by the Escrow Agent shall be subject to the terms of the Escrow Agreement. In the event that this Agreement is terminated pursuant to Section 3.4 and the Sellers are required to pay to the Purchaser the Break-Up Fee and/or the Reimbursement Amount, then the Sellers shall pay such

23

amount(s) to the Purchaser in cash, by wire transfer of immediately available funds to an account designated by the Purchaser, within two (2) Business Days following the effective date of any such termination; provided, however, that in the event that the Sellers are required to pay the Break-Up Fee pursuant to the third sentence of Section 3.6(b), the Sellers shall pay the Break-Up Fee within two (2) Business Days following the date any Seller enters into the binding written definitive agreement described in such third sentence of Section 3.6(b). In the event that (i) the Break-Up Fee and/or the Reimbursement Amount is not paid by the Sellers to the Purchaser on or before the date set forth in the two immediately preceding sentences and/or (ii) the Sellers or the Purchaser dispute, in accordance with the terms of the Escrow Agreement, an instruction letter delivered to the Escrow Agent pursuant to the first sentence of this Section 3.6(d) and such dispute is resolved primarily in favor of the party that delivered the instruction letter to the Escrow Agent, then (x) in the case of clause (i), the Purchaser shall also be entitled to immediate reimbursement from the Sellers for all reasonable documented third party or out-of-pocket costs and expenses incurred by the Purchaser to collect such unpaid amounts and (y) in the case of clause (ii), the Purchaser or the Sellers, as applicable, shall also be entitled to immediate reimbursement from the Sellers or the Purchaser, as applicable, for all reasonable documented third party or out-of-pocket costs and expenses incurred by the Purchaser or the Sellers, as applicable, in resolving such dispute and/or collecting the Deposit (in either case, such costs and expenses, the "Collection Costs").

## ARTICLE 4.

### REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers hereby, jointly and severally, make the representations and warranties in this Article 4 to the Purchaser as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date). Except for the representations and warranties set forth in Sections 4.1, 4.2 and 4.3, each representation and warranty made in this Article IV as to a "Seller" or "Sellers" shall be deemed to include a representation and warranty as to the Foreign Subsidiaries by applying each such representation and warranty *mutatis mutandis* (such that all changes and modifications to the defined terms and other terminology shall be made so that each such representation and warranty can be applied in a logical manner to the Foreign Subsidiaries). Each Section of the Seller Disclosure Schedule is numbered by reference to representations and warranties in a specific Section of this Article 4. Any event, item or matter disclosed in any Section or numbered part of the Seller Disclosure Schedule shall be deemed to be disclosed with respect to every other representation and warranty in this Article 4 to the extent any description of facts regarding the event, item or matter disclosed is adequate so as to make reasonably apparent on its face that such event, item or matter is applicable to such other representations or warranties.

4.1    Corporate Organization and Qualification. Each Seller is a corporation or limited liability company (as applicable), duly incorporated or organized (as applicable), validly existing and in good standing under the Laws of the State of Delaware. Each Seller is qualified and in good standing as a foreign or limited liability company (as applicable) in each jurisdiction where the properties owned, leased or operated by such Seller or the conduct of its Business require such qualification, except where the failure to be so qualified would not, individually or in the

24

aggregate, reasonably be expected to be adverse in any material respect to such Seller's ability to conduct the Business in the Ordinary Course of Business. Each Seller has all requisite power and authority to own, lease and operate its properties and to carry on the Business as it is now being conducted, subject to the provisions of the Bankruptcy Code. Each Seller has previously made available to the Purchaser true, complete and correct copies of such Seller's certificate of incorporation or formation, bylaws, operating agreement, or any other similar organizational or governing documents of such Seller (all of the foregoing, collectively, the "Seller Organizational Documents").

4.2     Subsidiaries.

(a)     Section 4.2(a) of the Seller Disclosure Schedule sets forth the name and jurisdiction of incorporation or organization (as applicable) of each Subsidiary of the Sellers (other than a Subsidiary that is a Seller) (collectively, the "Specified Subsidiaries"). Except as set forth in Section 4.2(a) of the Seller Disclosure Schedule, one or more of the Sellers owns (beneficially and of record) all of the outstanding shares of capital stock or other equity securities (or any securities convertible into, or exercisable or exchangeable for, any such securities) of each of the Specified Subsidiaries. Except for the Specified Subsidiaries, the Sellers do not own or control any direct or indirect equity or other ownership or profits interests of any corporation, partnership, limited liability company or other Person or business. Except as described in Section 4.2(a) of the Seller Disclosure Schedule, no Seller nor any of its Subsidiaries has any Contract to directly or indirectly acquire any equity or other ownership or profits interests in any Person or business.

(b)     Each Specified Subsidiary is a corporation, partnership or limited liability company (as applicable), duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization (as applicable). Each Specified Subsidiary has full corporate, partnership or limited liability company (as applicable) power and authority to conduct its business as it is now or currently proposed to be conducted, and to own or use the properties and assets that it purports to own or use. Each Specified Subsidiary is duly qualified or registered to do business as a foreign corporation, partnership or limited liability company (as applicable) and is in good standing under the laws of each jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification or registration, except where the failure to be so qualified would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to such Specified Subsidiary.

(c)     All of the outstanding capital stock or other securities of each Specified Subsidiary directly or indirectly owned or controlled by a Seller have been duly authorized and validly issued and are fully paid and nonassessable and such Seller has good and marketable title to such capital stock or other equity securities, free and clear of all Encumbrances (except for Permitted Encumbrances). There are, and there will be on the Closing Date, no options, warrants, rights or other securities that are or may become exercisable or exchangeable for, convertible into, or that otherwise give any Person any right to acquire shares of capital stock or other securities of any Specified Subsidiary or to receive payments based in whole or in part upon the value of the capital stock of any Specified Subsidiary, whether pursuant to a phantom stock plan or otherwise. There are no Contracts relating to the issuance, grant, sale or transfer of

25

any equity securities, options, warrants, rights or other securities of any Specified Subsidiary. There are, and there will be on the Closing Date, no outstanding Contracts of any Specified Subsidiary to repurchase, redeem or otherwise acquire any equity securities, options, warrants, rights or other securities of any Specified Subsidiary and no Specified Subsidiary will have granted any registration rights with respect to any of its securities.

4.3     Authority Relative to This Agreement. Except for such authorization as is required from the Bankruptcy Court, each Seller has all requisite power, authority and legal capacity to (a) execute and deliver this Agreement, (b) execute and deliver each of the Seller Ancillary Agreements to be executed by such Seller, and (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements to be executed by such Seller, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each of the Seller Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of each Seller, including by any action or required approval of the equityholder or equityholders of such Seller. This Agreement has been, and at or prior to the Closing each of the Seller Ancillary Agreements will be, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Approval Order) this Agreement constitutes, and each of the Seller Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against such Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity) (the "Bankruptcy Exceptions").

4.4     Conflicts; Consents of Third Parties.

(a)     Except as set forth in Section 4.4(a) of the Seller Disclosure Schedule or as permitted by the Confirmation Order, none of the execution and delivery by any Seller of this Agreement or any of the Seller Ancillary Agreements, the consummation of the transactions contemplated hereby or thereby, or compliance by such Seller with any of the provisions hereof or thereof will (i) conflict with, result in a violation of, or default (with or without notice or lapse of time, or both) under, cause additional fees or other payments to be due under, increase, change or modify rights, benefits or obligations under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of (A) any of the Seller Organizational Documents; (B) subject to and assuming entry of the Confirmation Order, any Contract or Permit to which such Seller is a party or by which any of the properties, assets or business of such Seller is bound or subject to, including any Assigned Contract or Assumed Permit; (C) subject to and assuming entry of the Confirmation Order, any order of any Governmental Body applicable to such Seller or any of the properties, assets or business of such Seller, including the Purchased Assets or the Business; or (D) subject to and assuming entry of the Confirmation Order, any applicable Law, other than, in the case of clauses (B), (C) and (D), such conflicts, violations, defaults, fees, payments, increases, charges, modifications, terminations, cancellations, accelerations or losses that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to such Seller's or the

26

Purchaser's ability to conduct the Business in the Ordinary Course of Business, or (ii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) upon any of the Purchased Assets or the Business.

(b)     Except as set forth in Section 4.4(b) of the Seller Disclosure Schedule, assuming the accuracy of the Purchaser's representations in Section 5.7, no approval, order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body or other Person is required on the part of any Seller in connection with the execution and delivery of this Agreement or any of the Seller Ancillary Agreements, the compliance by such Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby (including, without limitation, the assumption by the Sellers of the Assigned Contracts and the assignment thereof to the Purchaser), or the taking by such Seller of any other action contemplated hereby or thereby, except for (i) the entry of the Confirmation Order and (ii) such other approvals, orders, Permits, consents, registrations, declarations, notifications or filings, the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to such Seller's or the Purchaser's ability to conduct of the Business in the Ordinary Course of Business.

4.5     Absence of Certain Developments.  Except (w) for actions taken in connection with the Chapter 11 Cases, (x) as expressly required or permitted by this Agreement, (y) as disclosed on the face of the Unaudited Financial Statements or (z) as set forth in Section 4.5 of the Seller Disclosure Schedule, since June 30, 2009, the Business has been conducted in the Ordinary Course of Business, and none of the Sellers has:

(a)     acquired any material assets, tangible or intangible, other than acquisitions of Equipment or Inventory in the Ordinary Course of Business;

(b)     sold, leased, transferred or assigned any material assets, tangible or intangible, other than (i) sales of Inventory in the Ordinary Course of Business, or (ii) the disposition of obsolete or immaterial assets not necessary for the conduct of the Business by the Sellers in the Ordinary Course of Business;

(c)     accelerated or terminated (other than at its stated expiry date), extended, modified or amended in any material respect, or cancelled any Material Contract, or waived, released or assigned any material rights or claims thereunder;

(d)     imposed, suffered or created any Encumbrance (other than Permitted Encumbrances) upon any of the assets or properties of such Seller, tangible or intangible;

(e)     incurred or made any capital expenditures in excess of $100,000 in the aggregate or in excess of $50,000 as to any individual capital expenditure, except as contemplated by such Seller's capital expenditure budget;

(f)     created, incurred, assumed or guaranteed any Indebtedness, other than Indebtedness under the DIP Credit Agreement;

27

(g) transferred, assigned, abandoned, disposed, permitted to lapse or granted any license or sublicense of, or any rights to use, any rights under or with respect to any Seller Intellectual Property, other than pursuant to license agreements entered into in the Ordinary Course of Business; took any action or knowingly failed to take any action that would reasonably be expected to result in the abandonment, cancellation or unenforceability of any Seller Intellectual Property; or entered into any settlement regarding breach or infringement of any Seller Intellectual Property, or disclosed to any Person (not an employee of the Sellers) any Seller Intellectual Property not theretofore a matter of public knowledge;

(h) experienced any damage, destruction or other casualty loss (whether or not covered by insurance) affecting the tangible assets or properties of such Seller and resulting in an aggregate loss in excess of $100,000;

(i) agreed to any change in the rate of compensation, commission, bonus or other direct or indirect remuneration payable, or paid any bonus, incentive, retention or other compensation, retirement, welfare, fringe or severance benefit or vacation pay, to or in respect of, any executive officers, directors or Significant Employees of such Seller or any employee of such Seller that would be a Significant Employee after any such change, in each case other than bonuses paid, and increases in base compensation made, in the Ordinary Course of Business;

(j) made any loans, advances or capital contributions to, or investments in, any other Person;

(k) delayed or postponed the payment of undisputed accounts payable or any other undisputed Liabilities of the Business in any material respect (except as required by the Bankruptcy Code);

(l) adopted, made or agreed to (i) any welfare, pension, retirement, profit sharing, incentive compensation or similar plan, program, payment or arrangement for any current or former director, employee or consultant, except pursuant to the existing Seller Plans or (ii) any new employment, severance or change of control agreement;

(m) made any material addition to or modification of any Seller Plan, other than (i) contributions to such plans made in the Ordinary Course of Business or (ii) the extension of coverage to employees of such Seller who became eligible after January 31, 2009;

(n) changed any finance or Tax accounting elections, methods, principles or practices, except insofar as may have been required by a change in GAAP or applicable Law;

(o) (i) made or rescinded any election relating to Taxes, (ii) filed any amended income Tax Return of, or claim for refund for, any Seller or any of its Subsidiaries, or (iii) settled or compromised any material Tax Liability;

(p) encountered any labor union organizing activity, threatened employee strikes, work stoppages, slowdowns or lockouts, or had any adverse change in any material respect in its relations with any Significant Employee, executive officer, Significant Vendor/Supplier or Significant Customer of such Seller;

28

(q)     terminated or received any notice of termination from any executive officer, director or Significant Employee of such Seller;

(r)     suffered or experienced a Material Adverse Effect;

(s)     made any distributions or dividends of the assets or properties of such Seller in respect of outstanding securities of the Sellers;

(t)     failed to manage working capital of the Business in the ordinary course of business since the Filing Date (including by failing to replenish Inventory in the normal and customary manner consistent with past practices and taking any action or failing to take any action that has the effect of accelerating sales to customers or other revenues, receivables or collections from customers or other Persons that would otherwise be expected to take place or be incurred at a later date, or postpone the payment of any accounts payable);

(u)     instituted, settled or agreed to settle any litigation, proceeding or other Action before any court or other Governmental Body;

(v)     made any material changes in policies or practices relating to selling practices, returns, discounts or other terms of sale of the products and/or services of the Business, or in respect of the payment of trade accounts payable or other similar Liabilities incurred in connection with the Business;

(w)     written off or written down as uncollectible any Accounts Receivable, other than in the Ordinary Course of Business, or written down a material amount of the value of any other assets;

(x)     agreed to any limitations on such Seller or any of its Subsidiaries from engaging or competing in any line of business or in any geographic area or location or otherwise with any Person or from soliciting or hiring any Person;

(y)     made any material change in the nature of the Business;

(z)     failed to pay when due any material (individually or in the aggregate with all other such unpaid Liabilities) Liabilities arising out of the operations of the Business, except with respect to any such Liabilities being contested in good faith and for which adequate reserves have been established in accordance with GAAP;

(aa)     amended or changed, as applicable, any of the Seller Organizational Documents;

(bb)     canceled or terminated any insurance policy naming such Seller as a beneficiary or a loss payable payee; or

(cc)     entered into any Contract or made (in writing, orally or otherwise) any promise or commitment with respect to any of the foregoing.

29

4.6    Litigation. Except as set forth in Section 4.6 of the Seller Disclosure Schedule, there is no material litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, inquiry, subpoena or audit, whether in law or equity, or whether civil, criminal, regulatory, arbitral or administrative (collectively, "Actions"), pending or, to the Knowledge of the Sellers, threatened against any Seller or any property or asset of any Seller or which could give rise to or increase an Assumed Liability or which seeks to or is reasonably likely to have the effect of preventing the Sellers from consummating the transactions contemplated by this Agreement. Except as set forth in Section 4.6 of the Seller Disclosure Schedule, no Seller is subject to any judgment, decree, injunction, subpoena, order, ruling, writ, assessment or award of any court, arbitration panel or other Governmental Body that relates to the Business, the Purchased Assets or the Assumed Liabilities and for which such Seller has continuing obligations or Liabilities.

4.7    Intellectual Property.

(a)    Section 4.7(a) of the Seller Disclosure Schedule sets forth a true, complete and correct list of (i) all of the patents, registered trademarks, registered copyrights, Internet domain names, and applications for any of the foregoing, in each case that constitute the Owned Intellectual Property ("Registered IP") and (ii) a list of all other material Owned Intellectual Property and a list of all Licensed Intellectual Property (except for Intellectual Property licensed pursuant to off-the-shelf software and licenses implied in the sale of such software).

(b)    Except as set forth in Section 4.7(b) of the Seller Disclosure Schedule, (i) the Sellers owns all right, title and interest in and to the Owned Intellectual Property, free from any Encumbrances (other than Permitted Encumbrances) and free from any requirement of any present or future royalty payments, license fees, charges or other payments, or conditions or restrictions whatsoever; and (ii) no Action is pending, or to the Knowledge of the Sellers threatened, challenging the validity, enforceability, registration, ownership or use of any Seller Intellectual Property.

(c)    To the Knowledge of the Sellers, none of the Sellers nor any of its respective products or services is infringing upon, misappropriating, diluting or otherwise violating, the Intellectual Property of any third party and no Person is infringing upon, misappropriating, diluting or otherwise violating, any Seller Intellectual Property. Except as set forth in Section 4.7(c) of the Seller Disclosure Schedule, there is no pending Action alleging that any Seller or any of its products or services is infringing, misappropriating, diluting or otherwise violating the Intellectual Property rights of any Person, and to the Knowledge of the Sellers, no such Actions are threatened.

(d)    The Sellers own or have the right to use the Seller Intellectual Property as used in the conduct of the Business as currently conducted, free and clear from any Encumbrances (other than Permitted Encumbrances and subject to the terms and conditions of any agreement pursuant to which such Seller Intellectual Property was obtained).

(e)    To the Knowledge of the Sellers, all Seller Intellectual Property is valid and enforceable and has not been adjudged invalid or unenforceable, in whole or in part, and the

30

Sellers have paid all renewal, maintenance, and other fees and taxes when due as required to maintain each and every registration and application of Registered IP in full force and effect.

(f)     The Sellers have been using appropriate statutory notice or marking in connection with their use of Intellectual Property in the Business and the Sellers use commercially reasonable standards of quality in the provision of all services rendered under or in connection with all trademarks and have taken commercially reasonable measures to insure that all licensees, if any, of the trademarks that are part of Seller Intellectual Property use such adequate standards of quality.

(g)     Commercially reasonable steps have been taken to protect the Sellers' rights in the Trade Secrets used in the Business, and any Trade Secrets or confidential information of third parties provided to the Sellers and, without limiting the foregoing, except as set forth in Section 4.7(g) of the Seller Disclosure Schedule, the Sellers have obtained from all employees and consultants who provide or provided services to the Sellers related to the creation, development, modification or ownership of the Trade Secrets used in the Business, executed agreements under which such employees or consultants are or were required to maintain the confidentiality of all Trade Secrets and convey to the Sellers ownership of all inventions and developments conceived or created by them in the course of their work with the Business.

(h)     To the Knowledge of the Sellers, the Assumed Intellectual Property together with the other Purchased Assets comprises all the Intellectual Property necessary for the Sellers to conduct and operate the Business in the Ordinary Course of Business.

(i)     The IT Assets are adequate in all material respects for their intended use and for the operation of the Business in the Ordinary Course of Business. There has not been any material malfunction with respect to any of the IT Assets since January 1, 2008 that has not been remedied or replaced in all material respects.

4.8     Agreements, Contracts and Commitments; Certain Other Agreements.

(a)     Section 4.8(a) of the Seller Disclosure Schedule sets forth the following types of material executory Contracts that are unexpired as of the Execution Date relating to the Business to which a Seller is a party or by which a Seller is bound or any of the Purchased Assets are bound (such Contracts set forth below are collectively referred to as the "Material Contracts"):

(i)     Contracts to which any Acquired Customer is a party requiring payments by or to a Seller in excess of $150,000 during (A) any twelve (12)-month period or (B) during the term of the Contract if such term is less than twelve (12) months;

(ii)     Contracts to which any Significant Customer is a party;

(iii)     Contracts to which any Significant Vendor/Supplier is a party;

31

(iv)     all Contracts requiring payments by or to a Seller in excess of $150,000 during (A) any twelve (12)-month period or (B) during the term of the Contract, if such term is less than twelve (12) months;

(v)     master agreements, blanket purchase orders or other Contracts which relate to the transportation of Hazardous Materials (other than receipts, bills of lading and trip tickets issued pursuant to such master agreements, purchase orders or other Contracts) and each Contract (including any indemnification arrangement) for the cleanup, abatement or remediation of any environmental condition involving Hazardous Materials;

(vi)     employment agreements, consulting agreements, severance agreements, change of control agreements, retention agreements and collective bargaining agreements (and any other Contract with any labor organization, union or association);

(vii)     Contracts to which any officer, director, equity holder or Significant Employee of a Seller, or any Affiliate of any such Person, is a party;

(viii)     each Contract for the lease, sublease, license or use of any real property or any material Equipment used or held for use in the Business;

(ix)     Contracts that (A) limit or restrict a Seller or any of its Affiliates from engaging in any business or other activity in any jurisdiction or (B) create or purport to create any exclusive relationship or arrangement;

(x)     Contracts granting to any Person an option or a right of first refusal, first-offer or similar preferential right to purchase or acquire any of the Purchased Assets;

(xi)     Contracts for the granting or receiving of a license, sublicense or franchise or under which any Person is obligated to pay or has the right to receive a royalty, license fee, franchise fee or similar payment;

(xii)     Contracts with respect to Seller Intellectual Property except for off-the-shelf software;

(xiii)     joint venture or partnership Contracts or Contracts entitling any Person to any profits, revenues or cash flows of a Seller or requiring payments or other distributions based on such profits, revenues or cash flows;

(xiv)     each Contract for capital expenditures or the acquisition or construction of fixed assets relating to the Business, the performance of which involves consideration in excess of $150,000;

(xv)     each Contract that provides for an increased payment or benefit, or accelerated vesting of any benefit, to any current or former employee of a Seller upon the

32

execution of this Agreement or the consummation of the transactions contemplated hereby;

(xvi)  each Contract relating to the acquisition (by merger, consolidation or acquisition of stock or assets) of any Person or division thereof or collection of assets constituting all or substantially all of a business or business unit;

(xvii)  each Contract that is a requirements contract or other arrangement pursuant to which a Seller is obligated or otherwise required to obtain all or any portion of products or services exclusively from any Person;

(xviii)  each Contract that contains minimum purchase obligations (e.g., take-or-pay) or that contains penalties or repricing provisions if certain minimum quantities of products or services are not purchased; and

(xix)  Contracts with any Governmental Body.

(b)  Except as set forth in Section 4.8(b) of the Seller Disclosure Schedule, (i) each Material Contract is in full force and effect and is the legal, valid, binding and enforceable obligation of the Seller(s) party(ies) thereto and, to the Knowledge of the Sellers, of the other party or parties thereto, (ii) there is not under any Material Contract any existing breach by any Seller (and, to the Sellers' Knowledge, no breach has been alleged to exist) and there exists no event or condition that, after notice or lapse of time or both, would constitute a breach of or default under the terms of any Material Contract on the part of any Seller, other than a breach or default resulting from the filing of the Chapter 11 Cases, (iii) to the Knowledge of the Sellers, there is not under any Material Contract any existing breach by any party thereto that is not a Seller (and no breach has been alleged to exist) and there exists no event or condition that, after notice or lapse of time or both, would constitute a breach of or default under the terms of any Material Contract on the part of any such other party, and (iv) assuming entry of the Confirmation Order, upon consummation of the transactions contemplated by this Agreement, each Material Contract shall continue in full force and effect without penalty or any adverse consequence to the Purchaser, except for any Material Contracts that expired in accordance with the terms thereof prior to the Closing Date.

(c)  Except as set forth in Section 4.8(c) of the Seller Disclosure Schedule, the Sellers have heretofore delivered or made available to the Purchaser true, correct and complete copies of all Material Contracts that are in writing, including all amendments, modifications, schedules and supplements thereto and all waivers (including descriptions of oral waivers) with respect thereto.

4.9  Permits.

(a)  All of the Permits that are necessary for the operation of the Business as currently conducted and the ownership or use of the Purchased Assets (collectively, the "Material Permits") are held by the Sellers in full force and effect. Section 4.9(a) of the Seller Disclosure Schedule sets forth a true, complete and correct list of all Material Permits held by the Sellers as of the Execution Date.

33

(b)        Each Seller is in compliance with its obligations under each of the Material Permits and the rules and regulations of the Governmental Body issuing such Material Permits, and no condition exists that with notice or lapse of time or both would constitute a default under, or a violation of, any Material Permit except for such failures to be in compliance or defaults that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to such Seller's or the Purchaser's ability to conduct the Business in the Ordinary Course of Business.

(c)        Each Material Permit is valid and in full force and effect and there is no Action, notice of violation, order of forfeiture or written complaint or, to the Knowledge of the Sellers, investigation against any Seller relating to any of the Material Permits pending or, to the Knowledge of the Sellers, threatened, before any Governmental Body.  None of the Material Permits will be terminated or otherwise adversely impacted by the transactions contemplated by this Agreement.

4.10    Brokers and Finders.  Except as set forth in Section 4.10 of the Seller Disclosure Schedule, no Seller has employed, and to the Knowledge of the Sellers, no other Person has made any arrangement by or on behalf of any Seller with, any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

4.11    Title to Assets; Sufficiency and Condition of Assets.

(a)        At the Closing, the Sellers will have (and, subject to Section 8.3 and after giving effect thereto, shall convey to the Purchaser at the Closing) good and marketable title or a valid leasehold interest in and to each of the Purchased Assets, free and clear of all Encumbrances (except Permitted Encumbrances).  At the Closing, the Sellers will have (and, subject to Section 8.3 and after giving effect thereto, shall convey to the Purchaser at the Closing) valid leasehold interests in the Assumed Personal Property Leases and the Assumed Real Property Leases, free and clear of all Encumbrances (except Permitted Encumbrances).

(b)        The Purchased Assets constitute all of the properties, assets and rights used by the Sellers and necessary for the Purchaser to conduct and operate the Business in the Ordinary Course of Business.  All of the Purchased Assets are in good order and repair for assets of comparable age and past use and are capable of being used in the Ordinary Course of Business in the manner necessary to operate the Business, except where the failure to be in such condition would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Sellers' or the Purchaser's ability to conduct the Business in the Ordinary Course of Business.

4.12    Tangible Personal Property; Equipment.  Section 4.12(a) of the Seller Disclosure Schedule sets forth all leases and subleases involving annual payments under such lease or sublease in excess of $150,000 relating to personal property, including Equipment, used by any Seller in the Business or to which any Seller is a party or by which the personal property, including Equipment, of any Seller is bound.  Except as set forth in Section 4.12(b) of the Seller Disclosure Schedule, no Seller has received any written notice, or to the Knowledge of the

34

Sellers, oral notice, of any default or event that with notice or lapse of time or both would constitute such a default by such Seller under any such leases or subleases.

4.13    Real Property.

(a)     None of the Sellers owns any real property.

(b)     Section 4.13(b)(i) of the Seller Disclosure Schedule sets forth a complete and correct list of all Leased Real Property specifying the address or other information sufficient to identify all such Leased Real Property and a description of all documents comprising the Assumed Real Property Leases. Each Assumed Real Property Lease grants the Seller party thereto the sole and exclusive right to use and occupy the applicable Assumed Leased Real Property, in accordance with the terms thereof, subject to Permitted Encumbrances. Except as set forth in Section 4.13(b)(ii) of the Seller Disclosure Schedule, no Seller has assigned, mortgaged, pledged or otherwise encumbered its interest under any Assumed Real Property Lease and no Seller has leased, subleased or granted to any Person the right to access, enter upon, use, occupy, lease, manage, operate, maintain, broker or purchase any portion of such Seller's interest in the Leased Real Property that is not otherwise a Permitted Encumbrance or that will not otherwise be terminated on or prior to the Closing Date.

(c)     No Seller has received any written notice of, or to the Knowledge of the Sellers, oral notice of, condemnation or eminent domain proceedings pending or threatened that affect any of the Assumed Leased Real Property. No Seller has received any written notice of, or to the Knowledge of the Sellers, any oral notice of, any zoning, ordinance, building, fire or health code or other legal violation affecting any of the Assumed Leased Real Property, except where any such violations would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to such Seller's or the Purchaser's ability to conduct the Business in the Ordinary Course of Business.

(d)     To the Knowledge of the Sellers, there are no encroachments or other facts or conditions affecting any of the Assumed Leased Real Property other than encroachments, facts or conditions that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to any Seller's or the Purchaser's ability to conduct the Business in the Ordinary Course of Business. To the Knowledge of the Sellers, none of the buildings and structures on any of the Assumed Leased Real Property encroaches, in any material respect, upon real property of another Person or upon the area of any easement affecting the Assumed Leased Real Property.

4.14    Compliance with Law. Each Seller is in compliance in all material respects with all applicable Laws. As of the Execution Date, no Seller has received any written notice or, to the Knowledge of the Sellers, oral notice of any alleged violation of any Law applicable to it. No Seller is subject to, or in default in any respect with, any order of any Governmental Body applicable to the Business, the Purchased Assets or the transactions contemplated under this Agreement. Except as set forth in Section 4.14 of the Seller Disclosure Schedule, no investigations, inquiries or reviews by any Governmental Body with respect to the Business have been commenced nor, to the Knowledge of the Sellers, are any contemplated that would impose

35

any Liability on any Seller or, from and after the Closing Date, the Purchaser, the Purchased Assets or the Business.

        4.15    Tax Returns; Taxes. Except as set forth in Section 4.15 of the Seller Disclosure Schedule:

        (a)    All material Tax Returns required to have been filed by the Sellers have been duly filed and are true, correct and complete in all material respects, and no material fact has been omitted therefrom. No extension of time in which to file any such Tax Returns is in effect.

        (b)    All material Taxes due and payable by the Sellers (whether or not shown on any Tax Return) have been paid in full or are accrued as Liabilities for Taxes on the books and records of the Sellers (true and correct copies of which have been provided to the Purchaser). The accruals and reserves with respect to Taxes (other than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the Most Recent Balance Sheet are adequate to cover all material Taxes of the Sellers accruing or payable with respect to Tax periods (or portions thereof) ending on or before the date of the Most Recent Balance Sheet. All material Taxes of the Sellers attributable to Tax periods (or portions thereof) commencing after the date of the Most Recent Balance Sheet have arisen in the Ordinary Course of Business.

        (c)    No claims have been asserted, no Taxes have been assessed and no proposals or deficiencies for any material amount of Taxes of the Sellers are being asserted, proposed or, to the Knowledge of the Sellers, threatened, and no audit or investigation of any material Tax Return of any Seller has occurred in the last five (5) years or is currently underway, pending or, to the Knowledge of the Sellers, threatened.

        (d)    No claim has ever been made against any Seller by any Governmental Body in a jurisdiction where such Seller does not file Tax Returns that such Seller is or may be subject to taxation in such jurisdiction.

        (e)    The Sellers have withheld and paid all material Taxes required to have been withheld and paid by them to the appropriate Governmental Body in connection with amounts paid or owing to any current or former employee, independent contractor, creditor or shareholder thereof or other third party.

        (f)    There are no Encumbrances for Taxes with respect to the Sellers or their respective assets or the Business, nor is there any such Encumbrance that is pending or, to the Knowledge of the Sellers, threatened, other than Permitted Encumbrances.

        (g)    No Seller has executed or filed with any Governmental Body any agreement or waiver extending the period for assessment, reassessment or collection of any material Taxes. No Seller has made an election, nor is any Seller required, to treat any of its assets or properties as owned by another Person or as tax-exempt bond financed property or tax-exempt use property within the meaning of Section 168 of the Code or under any comparable provision of state or local Tax law.

(h) No Seller is a party to or bound by any written tax sharing, tax indemnity or tax allocation agreement or other similar written arrangement with any other party.

(i) No Seller has any Liability for Taxes of any other Person as a transferee or successor, by Law or by Contract.

4.16 Employees.

(a) Section 4.16(a) of the Seller Disclosure Schedule contains a true and correct list of all of the employees of each Seller as of the Execution Date, specifying their position, annual compensation for calendar years 2008 and 2009, expected annual compensation for calendar years 2010 and 2011, and date of hire. Each Seller has delivered or made available to the Purchaser true and complete copies of all of the employee policies, handbooks and procedure manuals of the Sellers and written descriptions of all material employment or personnel policies of the Sellers, if any, not set forth therein. Each Seller is in compliance in all material respects with all Laws relating to the employment and termination of employment of current and former employees, including, without limitation, employment practices, terms and conditions of employment, labor relations, union organizing, employee safety and health, wages and hours, fair labor standards, child labor, workers' compensation, employee leaves of absence, unemployment insurance, disability rights or benefits, immigration, plant closings and layoffs, equal employment opportunity, discrimination, harassment, affirmative action (to the extent applicable), breach of contract and wrongful discharge. No Seller has any direct or indirect material Liability with respect to any misclassification of any Person as an independent contractor rather than as an employee, or with respect to any employee leased from another employer. No employee of a Seller that is a party to a written employment Contract has notified a Seller, and no Seller has notified any such employee, that such employee or such Seller elects not to extend the term of such employment Contract or such employee's employment with such Seller.

(b) Section 4.16(b) of the Seller Disclosure Schedule lists the name, job title, job site and unit, date of Employment Loss, and type of Employment Loss (e.g., termination, layoff or reduction in work hours) of each employee of a Seller who has experienced an Employment Loss in the 90 days immediately preceding the Execution Date (excluding employees of a Seller who are employed for an average of fewer than 20 hours per week). Except as set forth in Section 4.16(b) of the Seller Disclosure Schedule, no Seller presently intends to take any action that would result in a "mass layoff" or "plant closing" as defined in the WARN Act, or under any similar provision of any federal, state, provincial, regional, foreign or local Law, rule or regulation, between the Execution Date and the Closing Date. At the Closing, the Sellers shall provide an update of Section 4.16(b) of the Seller Disclosure Schedule that discloses all employees of the Sellers who have experienced an Employment Loss in the ninety (90) days immediately preceding the Closing Date (excluding employees of a Seller who are employed for an average of fewer than twenty (20) hours per week or who have been employed for fewer than six (6) of the twelve (12) months preceding the Closing Date). With respect to any Employment Loss that occurred within the one (1) year preceding the Execution Date, the Sellers have complied with all of the requirements of the WARN Act, or under any similar provision of any federal, state, provincial, regional, foreign or local Law, rule or regulation.

37

(c)     Except as provided in Section 4.16(c) of the Seller Disclosure Schedule, there are no material claims or proceedings pending or, to the Knowledge of the Sellers, threatened, by or on behalf of any current or former employee or group of employees of any Seller against any Seller, including, without limitation, any claims or proceedings involving employment practices, terms and conditions of employment, labor relations, union organizing, employee safety and health, wages and hours, fair labor standards, child labor, workers' compensation, employee leaves of absence, unemployment insurance, disability rights or benefits, immigration, plant closings and layoffs, equal employment opportunity, discrimination, harassment, affirmative action (to the extent applicable), breach of contract or wrongful discharge.

4.17    Company Benefit Plans.    Except as provided in Section 4.17 of the Seller Disclosure Schedule:

(a)     No Seller is a party to or bound by, either directly or by operation of Law, any collective bargaining agreement, labor contract, letter of understanding, letter of intent, voluntary recognition agreement or legally binding commitment or written communication to any labor union, trade union or employee organization or group which may qualify as a trade union in respect of or affecting current or former employees of any Seller, nor is any Seller subject to any union organization effort, nor is any Seller engaged in any labor negotiation. There are no, and within the prior three (3) years there have not been, any (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of the Sellers, threatened against or involving any Seller, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of the Sellers, threatened by or on behalf of any current or former employee or group of employees of any Seller.  No Seller has any obligation to make any severance or termination payment to any current of former employees in excess of any amount required to be paid under applicable Law.

(b)     Each Seller Plan is listed in Section 4.17 of the Seller Disclosure Schedule (collectively, the "Employee Plans").  The Sellers have delivered or made available to the Purchaser true, correct and complete copies of (i) all Assumed Plans and related trust agreements, annuity contracts or other funding instruments, (ii) the latest Internal Revenue Service determination or opinion letter obtained with respect to any such Assumed Plan qualified or exempt under Section 401 or 501 of the Code, as applicable, and the results of discrimination testing for the most recently completed three (3) fiscal years for each such Assumed Plan, (iii) Forms 5500 and certified financial statements for the most recently completed three (3) fiscal years for each Assumed Plan required to file such form, together with the most recent actuarial report, if any, prepared by the Assumed Plan's enrolled actuary, (iv) the current summary plan descriptions for each Employee Plan required to prepare, file and distribute summary plan descriptions, (v) all summaries furnished to employees, officers or directors of any Seller of all incentive compensation, other plans and fringe benefits for which a summary plan description is not required and (vi) the form notifications to employees of their rights under Section 4980B of the Code.

(c)     None of the Employee Plans is a "multiemployer plan" (as defined in Section 3(37) of ERISA), is or has been subject to Sections 4063 or 4064 of ERISA, or is or has been subject to Title IV of ERISA or Section 412 or 430 of the Code. Neither any Seller nor any

38

of its ERISA Affiliates has any Liability under Title IV of ERISA or Section 412 or 430 of the Code. None of the Employee Plans is subject to any Laws outside of the United States.

(d)     Each Employee Plan has been established, administered and invested in accordance with its terms and in material compliance with all applicable Laws. Each Seller has performed and complied with all material respects with all of its obligations under or with respect to the Employee Plans. Each Assumed Plan that is intended to be a "qualified plan" within the meaning of Section 401(a) of the Code ("Qualified Plan") and each trust that is intended to be exempt under Section 501 of the Code ("Exempt Trust") has received a determination or opinion letter from the Internal Revenue Service to the effect that such Qualified Plan is so qualified and such Exempt Trust is so exempt, and, to the Knowledge of the Sellers, nothing has occurred since the date of the most recent Internal Revenue Service determination or opinion letter, as applicable, that would adversely affect the tax-qualified status of any Qualified Plan or Exempt Trust.

(e)     There is no Action relating to, or seeking benefits under, any Assumed Plan that is pending or, to the Knowledge of the Sellers, threatened against any Seller (other than any claims for benefits under the Assumed Plans in the Ordinary Course of Business). No Seller or, to the Knowledge of the Sellers, any fiduciary of any Assumed Plan, has any Liability with respect to any transaction in violation of Sections 404 or 406 of ERISA or any "prohibited transaction," as defined in Section 4975(c)(l) of the Code, for which no exemption exists under Section 408 of ERISA or Section 4975(c)(2) or (d) of the Code.

(f)     No Assumed Plan provides post-retirement or post-termination employee benefits (including death, medical or health benefits) to or in respect of any current or former employees of any Seller or their beneficiaries, and no Seller has any obligation to provide such benefits other than COBRA Continuation Coverage. No Assumed Plan provides health benefits that are not fully insured through an insurance Contract. All contributions or premiums required to be made by any Seller to or under each Assumed Plan have been made in a timely fashion in accordance with applicable Law, and the terms of the applicable Assumed Plan, and no Seller has, and as of the Closing Date will not have, any actual or potential unfunded Liabilities with respect to any Assumed Plans.

(g)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result, separately or in the aggregate, in the payment to any Transferred Employee of any "excess parachute payment" within the meaning of Section 280G of the Code (or any corresponding provision of state, local, or foreign Tax Law) or in the imposition of an excise tax under Section 4999 of the Code (or any corresponding provisions of state, local or foreign Tax Law).

(h)     Each Assumed Plan that is a "nonqualified deferred compensation plan" (as defined under Section 409A(d)(1) of the Code) has (i) since January 1, 2005, been operated and administered in good faith compliance with Section 409A of the Code and IRS Notice 2005-1 and other authoritative and binding guidance thereunder and (ii) since January 1, 2009, been in documentary and operational compliance with Section 409A of the Code and all applicable authoritative and binding guidance thereunder. To the Knowledge of the Sellers, none of the

39

Sellers has any indemnity obligation which could result in Liability to the Purchaser for any Taxes or penalties imposed or accelerated under Section 409A of the Code.

(i) Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby (whether alone or in conjunction with any other event) will result in forgiveness of Indebtedness or the acceleration or creation of any rights of any Person to benefits under any Assumed Plan (including the acceleration of the accrual or vesting of any benefits under any such Assumed Plan or the acceleration or creation of any rights under any employment, severance, retention, parachute or change in control agreement or the right to receive any transaction bonus or other similar payment) or the obligation to take action to secure any benefits payable under any Assumed Plan.

4.18 Parents. Except as set forth in Section 4.18 of the Seller Disclosure Schedule, neither RG Tube nor RGCH holds, owns, uses, is a party to, or is liable, responsible or an obligor under, any of the Purchased Assets or the Assumed Liabilities, or otherwise conducts any business or operations, except for (a) with respect to RG Tube, owning and holding all of the equity interests of RGCH, and (b) with respect to RGCH, owning and holding all of the equity interests of RathGibson.

4.19 Affiliate Matters. Except as set forth in Section 4.19 of the Seller Disclosure Schedule, no (a) shareholder, member, officer or director of any Seller, (b) entity in which any shareholder, member, officer or director of any Seller owns any beneficial interest (other than a publicly held corporation whose stock is traded on a national securities exchange or in the over-the-counter market and less than two percent (2%) of the stock of which is beneficially owned by such shareholders, members, officers or directors in the aggregate), or (c) Affiliate of any of the Persons described in clause (a) or (b) of this Section 4.19 (i) is a party to any Contract with, or relating to, any Seller, any Seller's Business, the Purchased Assets or the Assumed Liabilities; or (ii) has any interest in any property (real, personal or mixed, tangible or intangible) used by any Seller in the operation of the Business. Section 4.19 of the Seller Disclosure Schedule also sets forth a true, correct and complete list of all Accounts Receivable, and accounts payable owed to or due from any such Person described in clause (a), (b) or (c) of this Section 4.19 from or to any Seller, except for any compensation payable to any such officers or directors in their capacity as such in the Ordinary Course of Business.

4.20 Insurance Policies. Section 4.20 of the Seller Disclosure Schedule lists all insurance policies owned or held by any Seller or otherwise applicable to the Business, the Purchased Assets or the Assumed Liabilities (the "Insurance Policies"). All Insurance Policies (or substitute policies with substantially similar terms and underwritten by insurance carriers with substantially similar or higher ratings than the insurance carriers that underwrote the policy(ies) substituted for) are in full force and effect, all premiums with respect thereto covering all periods up to and including the Execution Date have been paid, and no written notice of cancellation or termination (or any other threatened termination) has been received with respect to any such policy. Except as set forth in Section 4.20 of the Seller Disclosure Schedule, there are no pending or, to the Knowledge of the Sellers, threatened claims under any Insurance Policy. Each Seller maintains sufficient insurance with reputable insurers for the Business, properties and assets of such Seller against all risks normally insured against, and in amounts normally carried, by such Seller in the Ordinary Course of Business.

40

4.21    Environmental Matters.    Except as set forth in Section 4.21 of the Seller Disclosure Schedule, (a) each Seller is in material compliance with all Environmental Laws, (b) there is no investigation, suit, claim, judicial or administrative proceeding or other Action relating to or arising under Environmental Laws that is pending or, to the Knowledge of the Sellers, threatened against any Seller or any real property owned, operated or leased by any Seller, or the Business or any of the Purchased Assets, (c) none of the Leased Real Property has been listed on the federal Comprehensive Environmental Response, Compensation Liability Information System (CERCLIS) database or any other similar federal, provincial or state list of known or suspected contaminated sites, (d) no Hazardous Materials have been treated, stored or Released by any Seller at the Leased Real Property in any manner or concentration that requires investigation, removal or remediation under Environmental Laws that would, individually or in the aggregate, reasonably be expected to be adverse in any material respect to such Seller or would otherwise cause any Seller or any future owner or operator of any Leased Real Property to incur material Liability under Environmental Laws, and (e) no Seller has received any notice of or entered into any order, settlement, judgment, injunction or decree involving uncompleted, outstanding or unresolved material obligations, Liabilities or requirements relating to or arising under Environmental Laws.

4.22    Customers, Vendors and Suppliers.    Section 4.22(a) of the Seller Disclosure Schedule sets forth a complete and accurate list of all Significant Customers and Significant Vendors/Suppliers. "Significant Customers" are (a) the ten (10) customers of each Seller that have purchased the most, in terms of dollar value, products or services sold by the Business of such Seller during the fiscal year ended January 31, 2009; and (b) the ten (10) customers of each Seller that have purchased the most, in terms of dollar value, products or services sold by the Business of such Seller during the fiscal year ended January 31, 2010.    "Significant Vendors/Suppliers" are: (y) the ten (10) vendors and/or suppliers of each Seller that have sold the most, in terms of dollar value, products or services to the Business during the fiscal year ended January 31, 2009; and (z) the ten (10) vendors and/or suppliers of each Seller that have sold the most, in terms of dollar value, products or services to the Business of such Seller during the fiscal year ended January 31, 2010. Except as set forth in Section 4.22(b) of the Seller Disclosure Schedule, true, correct and complete copies of all written Contracts (other than purchase orders issued under a master agreement) with Significant Customers and Significant Vendors/Suppliers have been provided or made available to the Purchaser. No Significant Customer or Significant Vendor/Supplier has given any Seller written notice or, to the Knowledge of the Sellers, oral notice terminating, canceling or materially reducing, or threatening to terminate, cancel or materially reduce, any Contract or relationship with such Seller. As of the Execution Date, no Significant Customer (i) has given any Seller written notice or, to the Knowledge of the Sellers, oral notice that such Seller no longer meets such Significant Customer's quality specifications or any certification requirements imposed upon companies in the same industry as that of the Business or (ii) to the Knowledge of the Sellers, has threatened to terminate such Significant Customer's Contract or relationship with any Seller. During the six-month period immediately preceding the Execution Date, there has been no material increase in the dollar amount of customer claims relating to the quality of any Seller's products or services as compared with the comparable period of the preceding calendar year. Except as set forth in Section 4.22(c) of the Seller Disclosure Schedule, no Acquired Customer, Significant Customer or Significant Vendor/Supplier has proposed in writing, or given any Seller written notice or, to the Knowledge of the Sellers, oral notice of its intention to propose, any material price structure

41

changes or any other material changes to any Contract with such Seller, nor to the Knowledge of the Sellers, does any Acquired Customer, Significant Customer or Significant Vendor/Supplier intend to propose a material change to the price structure of any such Contract or any other material change to any such Contract.

4.23    Accounts Receivable. Each Seller has made available to the Purchaser a complete and accurate list, as of December 31, 2009, of the Accounts Receivable of such Seller, including an aging of all Accounts Receivable showing amounts due in thirty (30)-day aging categories. Each Seller has provided reserves for Accounts Receivable (the "Seller Reserves") in accordance with GAAP, consistently applied in the Ordinary Course of Business by such Seller. All Accounts Receivable represent valid obligations arising from bona fide business transactions in the Ordinary Course of Business. Subject to the Seller Reserves, there is no pending or, to the Knowledge of the Sellers, threatened contest, claim, counterclaim, defense or right of set-off under any Contract or otherwise with any obligor of any Account Receivable relating to the amount or validity of such Account Receivable.

4.24    Inventory. All Inventory is in good and merchantable quality and is useable and saleable in the Ordinary Course of Business and none of it is slow-moving, obsolete, materially damaged or materially defective, except for those items the value of which has been reduced in accordance with GAAP and the Sellers' inventory policies consistently applied by the Sellers. The quantities of all Inventory items are sufficient in light of the present and anticipated volume of business of the Business.

4.25    Financial Statements.    The Sellers have delivered or made available to the Purchaser the following financial statements: (a) the audited consolidated balance sheet of RathGibson as of January 31, 2009 (the "Audited Balance Sheet"), and the related consolidated statements of operations, stockholders' equity (deficiency) and cash flows for the twelve (12)-month period then ended, included in the Annual Report on Form 10-K of RathGibson for the year ended January 31, 2009 (the "Audited Financial Statements"), and (b) the condensed consolidated unaudited balance sheet of RathGibson as of December 31, 2009 (the "Most Recent Balance Sheet"), and the related condensed consolidated unaudited statements of operations and cash flows for the eleven (11)-month period then ended (the "Unaudited Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements"). Each of the Financial Statements (i) has been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby (subject, in the case of the Unaudited Financial Statements to normal recurring year-end adjustments and the absence of all required footnotes thereto (that, if presented, would not, individually or in the aggregate, differ materially from those included in the Audited Financial Statements)); and (ii) fairly present in all material respects the consolidated financial condition, stockholders' equity and results of operations and cash flows (as applicable) of RathGibson and its Subsidiaries as of the respective dates thereof and for the periods referred to therein.

4.26    Capital Expenditures. As of the Execution Date, the Sellers have made available to the Purchaser a true and complete copy of the 2011 Capital Budget. The 2011 Capital Budget was prepared in good faith and based on reasonable assumptions and the best available information to the Sellers.

42

4.27    Absence of Undisclosed Liabilities.

        (a)     Except as set forth in Section 4.27(a) of the Seller Disclosure Schedule, none of RathGibson, Greenville nor any of the Foreign Subsidiaries has any Liabilities, except (i) Liabilities reflected on the liabilities side of the Most Recent Balance Sheet, (ii) Liabilities that have arisen after the date of the Most Recent Balance Sheet in the Ordinary Course of Business or otherwise in accordance with the terms and conditions of this Agreement (none of which is a material Liability) and (iii) Liabilities of the type that are not required to be reflected on a balance sheet prepared in accordance with GAAP (none of which is a material Liability).

        (b)     Except as set forth in Section 4.27(b) of the Seller Disclosure Schedule, neither RG Tube nor RGCH has any Liabilities.

        (c)     None of the Sellers has any Liabilities relating to contingent payments, purchase price adjustments or earnout payments under (i) that certain Asset Purchase Agreement, dated July 1, 2003, between GT Acquisition Company and Greenville Tube, LLC or the Earnout Agreement referred to therein; (ii) that certain Stock Purchase Agreement, dated as of December 6, 2005, by and among RGCH Holdings LLC, RathGibson and the sellers named therein; (iii) that certain Stock Purchase Agreement, dated as of April 28, 2007, by and among RG Tube, RGCH and RGCH Holdings LLC; or (iv) that certain Asset Purchase Agreement, dated as of February 27, 2008, by and among RathGibson, Mid-South Control Line, Inc. and the stockholders of Mid-South Control Line, Inc., or any ancillary agreements entered into in connection with any of the agreements referred to in clauses (i)-(iv) above.

4.28    No Other Representations or Warranties. Except for the representations and warranties contained in this Article 4, none of the Sellers or any other Person on behalf of the Sellers makes any express or implied representation or warranty with respect to any of the Sellers or with respect to any other information provided to the Purchaser in connection with the transactions contemplated hereby, including, without limitation, as to the probable success or profitability of the ownership, use or operation of the Business, and the Purchased Assets following the Closing. None of the Sellers will have or be subject to any liability or indemnification obligation to the Purchaser resulting from the distribution to the Purchaser, or the Purchaser's use of, any such information, including any information, documents, projections, forecasts or other materials made available to the Purchaser in expectation of the transactions contemplated by this Agreement, unless any such information is expressly included in a representation or warranty contained in this Section 4.28.

## ARTICLE 5.

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

        The Purchaser hereby makes the representations and warranties in this Article 5 to the Sellers as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

43

5.1     Corporate Organization and Qualification.  The Purchaser is a limited liability company, duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation.  The Purchaser is qualified and in good standing as a foreign entity in each jurisdiction where the properties owned, leased or operated, or the business conducted by it require such qualification, except where the failure to be so qualified would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.  The Purchaser has all requisite power and authority (limited liability company or otherwise) to own its properties and to carry on its business as it is now being conducted.

5.2     Authority Relative to This Agreement.  The Purchaser has the requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Purchaser Ancillary Agreements, and (c) perform its obligations hereunder and under each of the Purchaser Ancillary Agreements, and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by the Purchaser of this Agreement and each of the Purchaser Ancillary Agreements have been duly authorized by all necessary limited liability company action on behalf of the Purchaser.  This Agreement has been, and at or prior to the Closing each of the Purchaser Ancillary Agreements will be, duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and entry of the Confirmation Order) this Agreement constitutes, and each of the Purchaser Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to the Bankruptcy Exceptions.

5.3     Consents and Approvals; No Violation.

(a)     Except as set forth in Section 5.3(a) of the Purchaser Disclosure Schedule, none of the execution and delivery by the Purchaser of this Agreement or the Purchaser Ancillary Agreements, the consummation of the transactions contemplated hereby or thereby, or the compliance by the Purchaser with any of the provisions hereof or thereof will conflict with, result in a violation of, or default (with or without notice or lapse of time, or both) under, cause additional fees or other payments to be due under, increase, change or modify rights, benefits or obligations under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of (i) the certificate of formation or the limited liability company agreement (or similar organizational documents) of the Purchaser, (ii) any Contract (including, without limitation, any Contracts related to financing) or Permit to which the Purchaser is a party or by which the Purchaser or its properties, assets or business are bound or subject, (iii) any order of any Governmental Body applicable to the Purchaser or by which any of the properties, assets or business of the Purchaser are bound, or (iv) any applicable Law, other than, in the case of clauses (ii), (iii), and (iv), such conflicts, violations, defaults, fees, payments, increases, changes, modifications, terminations, cancellations, accelerations or losses that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.

44

(b)　　Except as set forth in <u>Section 5.3(b)</u> of the <u>Purchaser Disclosure Schedule</u>, no approval, order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body or other Person is required on the part of the Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Ancillary Agreements, the compliance by the Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the taking by the Purchaser of any other action contemplated hereby or thereby, or for the Purchaser to operate the Purchased Assets, except for such approvals, orders, Permits, consents, registrations, declarations, notifications or filings the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.

5.4　　<u>Brokers and Finders</u>.　The Purchaser has not employed, and to the knowledge of the Purchaser, no other Person has made any arrangement by or on behalf of the Purchaser with, any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

5.5　　<u>Sufficiency of Financing</u>.　The Purchaser has obtained equity financing letters from certain investors for the financing of the transactions contemplated by the Purchaser in connection with this Agreement (the "<u>Equity Financing Letters</u>"), which shall provide the Purchaser with funds that are sufficient to pay the Purchase Price and all related fees, expenses and obligations for which the Purchaser will be responsible hereunder.　The execution and delivery of each Equity Financing Letter has been duly authorized by all requisite action on the part of the Purchaser.

5.6　　<u>Investigation</u>.　In entering into this Agreement, the Purchaser has relied upon its own investigation and analysis as well as the representations and warranties made by the Sellers in <u>Article 4</u>, and the Purchaser acknowledges that neither the Sellers nor any of their respective Affiliates makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to the Purchaser or any of its Affiliates, except as and only to the extent expressly set forth in <u>Article 4</u>.

5.7　　<u>HSR Matters</u>.　As of the Execution Date and as of the Closing, the Purchaser (a) is its own UPE and (b)(i) had annual net sales of less than $13,000,000 and (ii) has less than $13,000,000 in total assets, each as determined in accordance with Section 801.11 of the Rules to the HSR Act.

## ARTICLE 6.

## EMPLOYEES

6.1　　<u>Employee Offers</u>.　On or prior to the Closing Date, the Purchaser shall offer employment (on an "at will" basis) with the Purchaser or one of its Affiliates to each of the employees of the Sellers (other than any employee the hiring of whom required the prior written consent of the Purchaser pursuant to <u>Section 8.1(a)</u> or <u>Section 8.1(b)</u>, but for which such prior

NY 72446260v22

written consent was not given by the Purchaser, unless the Purchaser otherwise elects to make an offer of employment) who is, as of immediately prior to the Closing, (a) actively at work in connection with the Business, (b) on short-term disability or workers' compensation in connection with the Business, or (c) on a leave of absence approved by the Sellers in connection with the Business, including under the Family and Medical Leave Act, as amended, and the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended. Each such offer of employment shall be at the substantially same hourly wage rate or salary level (excluding performance-based or incentive compensation, bonuses and equity-based compensation, as applicable) and position in effect immediately prior to the Closing Date (except to the extent that any of the foregoing was provided, set or given in violation of this Agreement); provided, however, that with respect to (i) Transferred Employees whose written employment Contracts with a Seller have been assumed by such Seller and assigned to the Purchaser in accordance with the terms of this Agreement (the "Assumed Employment Contracts") and (ii) Transferred Employees who enter into written employment Contracts with the Purchaser at the Closing (the "New Employment Contracts" and, together with the Assumed Employment Contracts, the "Employment Contracts"), the terms of such Employment Contracts shall govern such Transferred Employee's employment. In addition, any offer of employment to any such employee of the Sellers who is a party to a written employment Contract with a Seller that entitles such employee to severance upon a termination of employment by such Seller without cause and whose employment Contract will not be an Assumed Plan will require, as a condition to the acceptance of such offer of employment, that such employee waive in writing his or her right to receive such severance from the Sellers; provided, however, that the Purchaser shall be entitled to waive such condition if such employee does not agree to provide such waiver. Notwithstanding the foregoing, nothing in this Agreement will, after the Closing Date, impose on the Purchaser any obligation to retain any Transferred Employee in its employment or the employment of any of its Affiliates. Except as described in the remaining sentences of this Section 6.1, the employment of each Transferred Employee with the Purchaser or any of its Affiliates will commence immediately upon the Closing (but only if the Closing occurs). In the case of any individual who is absent from active employment and receiving short-term disability or workers' compensation benefits, or is otherwise out of work on an approved leave of absence as set forth above, the employment of such individual with the Purchaser or its designated Affiliate will commence upon his or her return to active work, and such individual will become a Transferred Employee as of such date (but only if the Closing occurs). Each employee of a Seller to whom the Purchaser has made an offer of employment pursuant to this Section 6.1 and that has accepted such offer and commences employment with the Purchaser or any of its Affiliates on or following the Closing Date is hereinafter referred to as a "Transferred Employee". Except as provided in Section 1.3(d), Section 1.3(e) and Section 1.3(f), the Purchaser shall have no Liability with respect to any employee of a Seller referred to in the first sentence of this Section 6.1 prior to the date he or she becomes (or declines to become) a Transferred Employee.

6.2    Seller Plans. Except as otherwise set forth in this Section 6.2, the Purchaser shall adopt and assume, as of the Closing Date, each of the Assumed Plans with respect to all benefits to be provided under the provisions of such Assumed Plans. With respect to each Assumed Plan, the Purchaser or any Person designated by the Purchaser, will be substituted for the applicable Seller as the plan sponsor under each such Assumed Plan and the Purchaser shall have all rights of such Seller thereunder, including, without limitation, full authority to maintain, amend or

46

terminate any such Assumed Plan at any time, in the Purchaser's sole discretion. The Sellers agree to cooperate with the Purchaser in adopting and effectuating any plan amendments to the Assumed Plans reasonably desired by the Purchaser, so long as such amendments are effective as of, or after, the Closing Date and are consistent with applicable Law. The parties agree to cooperate in all respects and take any actions necessary to implement the assumption by the Purchaser of the Assumed Plans. Without limiting the obligations of the Sellers under Section 1.1, before, or as soon as administratively practicable after, the Closing, the Sellers will supply the Purchaser with (a) all records concerning participation, vesting, accrual of benefits, payment of benefits, and election forms of benefits under each Assumed Plan, and (b) any other information reasonably requested by the Purchaser as necessary or appropriate for the administration of each Assumed Plan. Notwithstanding the foregoing, the Purchaser shall not assume any Liabilities arising out of any acts or omissions of any of the Sellers or any fiduciaries or trustees of any Assumed Plan occurring on or prior to the Closing Date in connection with the operation or administration of such Assumed Plan. Sellers shall retain all Liabilities for (i) the payment or provision of severance or similar benefits in connection with (A) the termination of employment of any Transferred Employee as of the Closing Date, and (B) except to the extent explicitly set forth in Section 1.3(m) (and subject to the conditions set forth therein), the termination of employment of any current or former employee of a Seller who is not a Transferred Employee (whether before, as of, or after the Closing Date), (ii) the payment or provision of any change in control payment, transaction bonus or similar benefits arising as a result of the transactions described herein, and (iii) to the extent not set forth on the Final Certificate, the payment of accrued vacation as of the Closing Date with respect to all current and former employees of the Sellers (including Transferred Employees), and no such Liabilities shall be assumed by the Purchaser under this Section 6.2.

6.3     COBRA Coverage.  The Purchaser shall be responsible for providing, and shall assume all Liabilities in respect of, the provision of continued medical coverage pursuant to its group health plans for employees under Part 6, Title I of ERISA and Section 4980B of the Code ("COBRA Continuation Coverage"), for all current and former employees of the Sellers with respect to any "qualifying event" (within the meaning of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended) incurred on or prior to the Closing Date or otherwise arising as a result to the transactions described herein. Immediately prior to the Closing, the Sellers will provide to the Purchaser a list of all current and former employees of the Sellers (i) terminated by the Sellers within the ninety (90) days immediately preceding the Closing and (ii) receiving COBRA Continuation Coverage on the Closing Date.

6.4     WARN Act Liability.  The Sellers shall be solely responsible, on a joint and several basis, for any obligations or other Liabilities under the WARN Act, or under any similar provision of any federal, state, provincial, regional, foreign or local Law, that might arise on or prior to the Closing Date, or as a consequence of the transactions contemplated by this Agreement, including, without limitation, providing any notice of layoff or plant closing, or maintaining the employees of any Seller on such Seller's payroll for any period of notice required by the WARN Act, or under any similar provision of any federal, state, provincial, regional, foreign or local Law. The Sellers shall retain all Liabilities, if any, for any severance or termination costs relating to employees of any Seller who, on or at the Closing Date, experience a termination of employment by any Seller as a result of the transactions contemplated by this Agreement.

47

6.5     Eligibility; Service Credit. From and after the Closing Date, each Transferred Employee shall (to the extent permitted by applicable Laws) be credited under each of the Purchaser's employee benefit plans or programs in which such Transferred Employee participates (including, without limitation, the Purchaser 401(k) Plan), with his or her years of service with the Sellers before the Closing Date for purposes of vesting, eligibility, and level of benefits (except for purposes of benefit accrual under a defined benefit pension plan or where such credit would result in a duplication of benefits) to the same extent as such Transferred Employee was entitled, before the Closing Date, to credit for such service with the Sellers under any similar Seller Plan in which such Transferred Employee participated immediately prior to the Closing Date. In addition, and without limiting the generality of the foregoing, the Purchaser shall (to the extent that such limitation would not apply with respect to substantially similar plans maintained by the Sellers prior to the Closing Date) use its commercially reasonable efforts to (i) cause to be waived any eligibility requirements (to the extent such requirements were satisfied by the applicable Transferred Employee prior to the Closing Date with respect to the similar Seller Plan) or pre-existing condition limitations applicable to any Transferred Employee, and (ii) give effect, in determining any deductible maximum out of pocket limitations, to amounts paid by any Transferred Employee during the plan year in which the Closing Date occurs.

6.6     401(k) Plans. The Sellers shall cause the account balances of each Transferred Employee under each of the Seller 401(k) Plans to become fully vested as of the Closing Date. The Purchaser shall, or shall cause an Affiliate of the Purchaser to, adopt the Purchaser 401(k) Plan effective as of the Closing Date for the benefit of eligible Transferred Employees. The Purchaser shall cause the Purchaser 401(k) Plan to accept a direct rollover of each Transferred Employee's "eligible rollover distribution" (within the meaning of Section 402 of the Code) from the applicable Seller 401(k) Plans, at the election of the Transferred Employee. The Purchaser agrees that the property so rolled over may include promissory notes evidencing loans from the Seller 401(k) Plans to such Transferred Employees that are outstanding as of the Closing Date.

6.7     No Third-Party Beneficiaries.

(a)     Notwithstanding anything set forth in this Article 6, nothing contained herein, whether express or implied, (i) shall be treated as an amendment or other modification of any Seller Plan or (ii) shall limit the right of the Purchaser or any of its Affiliates to amend, terminate or otherwise modify any Seller Plan or any of the Purchaser's or any of its Affiliate's employee benefit plans or programs following the Closing Date; provided, that the Purchaser complies with its obligations under Section 6.2.

(b)     Without limiting the generality of Section 12.13, the Sellers and the Purchaser acknowledge and agree that all provisions contained in this Article 6 with respect to current and former employees of the Sellers are included for the sole benefit of the Sellers and the Purchaser, and that nothing herein, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including, without limitation, any current or former employees, directors, officers or consultants of any Seller, any participant in any Seller Plan, or any dependent or beneficiary thereof, or (ii) to continued employment with the Purchaser or any of its Affiliates.

48

## ARTICLE 7.

## BANKRUPTCY COURT MATTERS

### 7.1  Certain Motions and Orders.

(a)     No later than the close of business on the date that is one (1) Business Day following the Execution Date, the Sellers shall file with the Bankruptcy Court the Approval Motion. The Approval Motion shall seek approval of, and the Approval Order shall approve, the payment by the Sellers of the Break-Up Fee, the Reimbursement Amount, the Collection Costs and the Expense Amount to the extent such amounts are required to be paid by the Sellers under this Agreement. The Break-Up Fee, the Reimbursement Amount and the Collection Costs shall constitute allowed super-priority administrative claims against the Sellers' estates under sections 503(b) and 507(a)(1) of the Bankruptcy Code (except for the "Carve Out" under the DIP Credit Agreement, which shall be senior in priority to the Break-Up Fee, the Reimbursement Amount, the Collection Costs and the Expense Amount). The Approval Order shall provide for such super-priority administrative expense rights in form and substance satisfactory to the Purchaser. The Sellers shall comply in all material respects with, and take no actions inconsistent with, all of the terms and conditions contained in the Approval Order (including, without limitation, the Bid Procedures and the Assumption and Assignment Procedures) including the occurrence of the events by the dates and the times set forth therein, all of which are expressly incorporated herein by reference.

(b)     The Sellers shall use their commercially reasonable efforts to: (i) obtain entry by the Bankruptcy Court of the Approval Order no later than April 9, 2010, (ii) ensure that the deadline by which votes on the Plan are due is no later than May 18, 2010, (iii) ensure that Qualified Bids are due no later than May 19, 2010, (iv) ensure that the Auction, which will be conducted in accordance with the Bid Procedures and the Bid Procedures Order, shall be held and closed no later than May 28, 2010, (v) ensure that the Cure Cost/Assignment Objection Deadline shall be scheduled no later than May 15, 2010, (vi) ensure that the Confirmation Hearing is held no later than June 1, 2010, (vii) obtain entry by the Bankruptcy Court of the Confirmation Order no later than June 1, 2010, and (viii) subject to the satisfaction of the conditions precedent contained in this Agreement, consummate the Closing as soon as reasonably practicable after the entry by the Bankruptcy Court of the Confirmation Order (but in no event later than June 16, 2010).

(c)     The Approval Motion and the motion seeking entry by the Bankruptcy Court of the Confirmation Order, including any exhibits thereto and any notices or other materials in connection therewith, in each case as they relate to any of the Specified Matters, must be in form and substance satisfactory to the Purchaser.

(d)     If the Approval Order, the Confirmation Order or any other orders of the Bankruptcy Court relating to this Agreement (all such orders, the "Bankruptcy Court Orders") shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any Bankruptcy Court Order), the Sellers shall diligently defend against any such appeal, petition or motion and shall use their commercially reasonable efforts to obtain an

49

expedited resolution of any such appeal, petition or motion. The Sellers shall keep the Purchaser reasonably informed and updated regarding the status of any such appeal, petition or motion.

(e)     The Sellers shall, except where not practicable, exercise commercially reasonable efforts to provide draft copies of all motions, notices, statements, schedules, applications, reports and other papers the Sellers intend to file with the Bankruptcy Court in connection with the Approval Order, the Confirmation Order or any other Bankruptcy Court Order to the Purchaser within a reasonable period of time prior to the date the Sellers intend to file any of the foregoing and consult in advance in good faith with the Purchaser regarding the form and substance of any such proposed filing with the Bankruptcy Court.

### 7.2     Competing Bids.

(a)     From the Execution Date until the date of entry by the Bankruptcy Court of the Bid Procedures Order, none of the Sellers shall, and the Sellers shall cause their respective Affiliates and Representatives not to, directly or indirectly, (i) solicit, initiate, encourage or discuss any proposal or offer from any Person (other than the Purchaser and its Affiliates and Representatives) relating to any Alternative Transaction, (ii) furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek the foregoing or (iii) seek or support the Bankruptcy Court approval of a motion or order inconsistent in any way with the transactions contemplated herein.

(b)     This Agreement and the transactions contemplated hereby are subject to the Sellers' right and ability to consider higher or better competing bids with respect to the Business and the Purchased Assets pursuant to the Bid Procedures, as approved by the Bid Procedures Order. In accordance with the Bid Procedures, from the date of entry by the Bankruptcy Court of the Bid Procedures Order until the conclusion of the Auction, the Sellers shall have the right to, and may cause their Representatives and Affiliates to, (i) initiate contact with, solicit or encourage submission of any inquiries, proposals, offers or bids by, and negotiate with, any Person (in addition to the Purchaser and its Affiliates and Representatives) in connection with any sale or other disposition of the Purchased Assets; (ii) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such Person; and (iii) furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing; provided, that the exercise of all such rights described in this Section 7.2(b) shall be exercised solely in compliance with (to the extent the applicable matter is addressed in the Bid Procedures), and not in a manner inconsistent with, the Bid Procedures, as approved by the Bid Procedures Order.

(c)     From the date of entry by the Bankruptcy Court of the Bid Procedures Order until the conclusion of the Auction, the Sellers shall have the responsibility and obligation, as required under the Bankruptcy Code or other applicable Law, to respond to any inquiries or offers to purchase all or any part of the Purchased Assets, and perform any and all other acts related thereto, including, without limitation, supplying information relating to the Business and the assets of the Sellers to prospective purchasers, subject only to the provisions of the Bid Procedures Order. Following the conclusion of the Auction, provided that the Purchaser is the Successful Bidder or the Second-Highest Bidder, none of the Sellers shall, and the Sellers shall

50

cause their respective Affiliates and Representatives not to, directly or indirectly, take any of the actions or do any of the things described in clauses (i)-(iii) of Section 7.2(a) other than as any such action or thing relates to the Successful Bidder or the Second-Highest Bidder.

## ARTICLE 8.

## COVENANTS AND AGREEMENTS

8.1    Conduct of Business of the Sellers.

(a)    During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date, except (1) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (2) as required by applicable Law, the Bankruptcy Court or the Bankruptcy Code, (3) as otherwise expressly contemplated by this Agreement or as set forth in Schedule 8.1(a) or (4) with the prior written consent of the Purchaser (such consent not to be unreasonably withheld, conditioned or delayed), each Seller shall:

(i)    conduct the Business and operate and maintain its assets and properties in the Ordinary Course of Business (including performing its obligations under the Material Contracts);

(ii)    maintain and keep its properties and Equipment in good repair, working order and condition (normal wear and tear excepted);

(iii)    maintain in full force and effect the Insurance Policies;

(iv)    use its commercially reasonable best efforts to (x) preserve the goodwill of and relationships with Governmental Bodies, customers, suppliers, vendors, lessors, licensors, licensees, contractors, distributors, insurers, agents, employees and others having business dealings with such Seller in connection with the Business; and (y) comply with all applicable Laws (including Environmental Laws) and Permits and, to the extent consistent therewith, preserve its assets (tangible and intangible), including the IT Assets; and

(v)    with respect to compliance with Environmental Laws or as required by any Governmental Body, continue with any required remedial activities to address any Release or threatened Release of Hazardous Materials and operate and maintain its assets and properties in material compliance with Environmental Laws.

(b)    During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date, except (1) for any limitations on operations imposed by, or actions required by, the Bankruptcy Court or the Bankruptcy Code, (2) as required by applicable Law, the Bankruptcy Court or the Bankruptcy Code, (3) as otherwise expressly contemplated by this Agreement or as set forth in Schedule 8.1(b), or (4) with the prior written consent of the Purchaser (such consent not to be unreasonably withheld, conditioned or delayed), no Seller shall:

(i)     acquire any material assets, tangible or intangible, other than in the Ordinary Course of Business;

(ii)    sell, lease, transfer or assign any material assets or properties, tangible or intangible, other than (x) sales of Inventory in the Ordinary Course of Business, or (y) the disposition of obsolete or immaterial assets not necessary for the conduct of the Business by the Sellers in the Ordinary Course of Business;

(iii)   accelerate, terminate (other than at its stated expiry date), extend, modify or amend in any material respect or cancel any Material Contract or any Contract that would be a Material Contract if in effect on the Execution Date; waive, release or assign any material rights or claims under any Material Contract or any Contract that would be a Material Contract if in effect on the Execution Date; or enter into any Contract that would have been a Material Contract had it been entered into prior to the Execution Date;

(iv)    impose, suffer or create any Encumbrance (other than Permitted Encumbrances) upon any of the assets or properties of such Seller, tangible or intangible;

(v)     incur or make any capital expenditures, except to the extent permitted by the DIP Credit Agreement;

(vi)    create, incur, assume or guarantee any Indebtedness, except Indebtedness (other than Indebtedness for borrowed money) created, incurred, assumed or guaranteed in the Ordinary Course of Business;

(vii)   transfer, assign, abandon, dispose, permit to lapse or grant any license or sublicense of, or any rights to use, any rights under or with respect to any Seller Intellectual Property, other than pursuant to license agreements entered into in the Ordinary Course of Business; take any action or knowingly fail to take any action that would reasonably be expected to result in the abandonment, cancellation or unenforceability of any Seller Intellectual Property; enter into any settlement regarding breach or infringement of any Seller Intellectual Property, or disclose to any Person (not an employee of the Sellers) any Seller Intellectual Property not heretofore a matter of public knowledge;

(viii)  make any principal payments on the Indebtedness under the DIP Credit Agreement, except as required by the DIP Credit Agreement;

(ix)    agree to any change in the rate of compensation, commission, bonus or other direct or indirect remuneration payable, or pay any bonus, incentive, retention or other compensation, retirement, welfare, fringe or severance benefit or vacation pay, to or in respect of, any executive officers, directors or Significant Employees of such Seller or any employee of such Seller that would be a Significant Employee after any such change, in each case, other than the payment of bonuses and increases in base compensation made in the Ordinary Course of Business;

52

(x)     fail to make any planned capital expenditures or capital additions when and as contemplated by the 2011 Capital Budget;

(xi)     make any loans, advances or capital contributions to, or investments in, any other Person;

(xii)     delay or postpone the payment of undisputed accounts payable or any other undisputed Liabilities of the Business in any material respect (except as required by the Bankruptcy Code);

(xiii)     adopt, make or agree to (x) any welfare, pension, retirement, profit sharing, incentive compensation or similar plan, program, payment or arrangement for any current or former director, employee or consultant, except pursuant to the existing Seller Plans or (y) any new employment, severance or change of control agreement;

(xiv)     make any material addition to or modification of any Seller Plan, other than (x) contributions to any Seller Plan made in the Ordinary Course of Business or (y) the extension of coverage to employees of such Seller who became eligible after the Execution Date;

(xv)     materially change any finance or Tax accounting elections, methods, principles or practices, except insofar as may be required by a change in GAAP or applicable Law;

(xvi)     (x) make or rescind any material election relating to Taxes, (y) file any amended income Tax Return of, or claim for refund for, any Seller or any of its Subsidiaries, or (z) settle or compromise any material Tax Liability, except for claims for refunds that would not reasonably be expected to result in Liability to the Purchaser or the Business;

(xvii)     terminate any executive officer, director or Significant Employee of such Seller, unless such termination is for cause;

(xviii)     make any distributions or dividends of the assets or properties of the Sellers (other than Excluded Assets) in respect of outstanding securities of the Sellers;

(xix)     fail to manage working capital of the Business in the ordinary course of business since the Filing Date (including by failing to replenish Inventory in the normal and customary manner consistent with past practices and taking any action or failing to take any action that has the effect of accelerating sales to customers or other revenues, receivables or collections from customers or other Persons that would otherwise be expected to take place or be incurred at a later date, or postpone the payment of any accounts payable);

(xx)     institute, settle or agree to settle any litigation, proceeding or other Action before any court or other Governmental Body;

53

(xxi)  make any material changes in policies or practices relating to selling practices, returns, discounts or other terms of sale of the products and/or services of the Business, or in respect of the payment of trade accounts payable or other similar Liabilities incurred in connection with the Business;

(xxii)  write off or write down as uncollectible any Accounts Receivable, other than in the Ordinary Course of Business, or write down a material amount of the value of any other assets;

(xxiii)  agree to any limitations on such Seller or any of its Subsidiaries from engaging or competing in any line of business or in any geographic area or location or otherwise with any Person or from soliciting or hiring any Person;

(xxiv)  make any material change in the nature of the Business;

(xxv)  fail to pay when due any material (individually or in the aggregate with all other such unpaid Liabilities) Liabilities arising out of the operations of the Business, except with respect to any such Liabilities being contested in good faith and for which adequate reserves have been established in accordance with GAAP;

(xxvi)  cancel or terminate any insurance policy naming any Seller as a beneficiary or a loss payable payee;

(xxvii) assume or enter into any labor or collective bargaining agreement;

(xxviii) amend or change, as applicable, any of the Seller Organizational Documents;

(xxix)  make any distributions that are intended to be made under the Plan or make any payments or other distributions in respect of the claims, expenses or other items that fall within the categories set forth on Schedule 8.1(b)(xxix); or

(xxx)  enter into any Contract or make (in writing, orally or otherwise) any promise or commitment with respect to any of the foregoing.

(c)  During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 3.4 and the Closing Date, the Sellers shall cause the Foreign Subsidiaries to comply with the terms and provisions of Sections 8.1(a) and 8.1(b) as if such terms and provisions were applicable to the Foreign Subsidiaries by applying such terms and provisions *mutatis mutandis* (such that all changes and modifications to the defined terms and other terminology used in such terms and provisions shall be made so that such terms and provisions can be applied in a logical manner to the Foreign Subsidiaries).

8.2  Pre-Closing Access to Information.  Each Seller agrees that, between the Execution Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.4, the Purchaser and the directors, officers, employees, counsel, professionals, advisors, accountants, agents, contractors and other representatives (the "Representatives") of the Purchaser (including Representatives of entities providing or arranging

54

financing for the Purchaser), shall be entitled to have, and each Seller shall afford, such reasonable access to, and make such reasonable, non-invasive investigation and examination of, the books, records and other Documents, properties, businesses, assets, employees, accountants, auditors, counsel and operations of the Sellers as the Purchaser or any of the Purchaser's Representatives may reasonably request, and to make extracts and copies of any such books, records and other Documents. Any such investigations and examinations shall be conducted during regular business hours and upon reasonable advance notice to the applicable Seller. Pursuant to this Section 8.2, each Seller shall furnish to the Purchaser and its Representatives such financial, operating and property related data and other information as such Persons reasonably request. Each Seller shall use commercially reasonable efforts to cause its Representatives to reasonably cooperate with the Purchaser and the Purchaser's Representatives in connection with such investigations and examinations.

      8.3    Assignability of Certain Contracts, Etc.

      (a)    To the extent that the assignment to the Purchaser of any Purchased Asset pursuant to this Agreement is not permitted without the consent, waiver, confirmation or other approval of a third party or is prohibited by applicable Law and such consent, waiver, confirmation or other approval or waiver of such prohibition in compliance with Law cannot be obtained prior to the Closing or overridden or canceled by the Confirmation Order or other related order of the Bankruptcy Court (such Purchased Assets, the "Nonassignable Assets"), then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Nonassignable Asset or any right or interest therein unless and until such consent, waiver, confirmation or other approval is obtained or such prohibition is waived in compliance with Law.

      (b)    If any such consent, waiver, confirmation or other approval or such waiver is not obtained prior to the Closing Date in respect of a Nonassignable Asset, then, solely to the extent not prohibited under applicable Law (including, without limitation, the Bankruptcy Code) or the terms of such Nonassignable Asset, the Purchaser and the Sellers shall reasonably cooperate with each other, as of and after the Closing Date, in any lawful and feasible arrangement designed to provide the Purchaser with the benefits and obligations of such Nonassignable Asset (an "Interim Arrangement"). The Purchaser shall be responsible for performing all obligations under each such Nonassignable Asset required to be performed by the Sellers after the Closing Date to the extent that if such Nonassignable Asset were purchased by the Purchaser as of the Closing Date, the obligations thereunder would have constituted Assumed Liabilities.

      (c)    All Interim Arrangements shall be at the Purchaser's sole cost and expense; provided, however, that any such costs or expenses incurred by the Purchaser or the Sellers in connection with an Interim Arrangement shall be paid for or reimbursed from the Purchase Price Adjustment Escrow Amount until the earlier of (i) such time as the Purchase Price Adjustment Escrow Amount has been released to the Sellers pursuant to Section 2.4(h) (except that claims by the Purchaser under this Section 8.3 made prior to the delivery of an instruction letter from the Sellers instructing such release shall remain subject to the terms of the Escrow Agreement) and (ii) such time when no Purchase Price Adjustment Escrow Amount otherwise remains in the Escrow Account, after which time such costs and expenses shall be

55

borne solely and directly by the Purchaser. In order for a payment or reimbursement to be made from the Escrow Account on account of any such costs or expenses, the Sellers or the Purchaser shall be entitled to deliver to the Escrow Agent a letter instructing the Escrow Agent to pay to the Sellers or the Purchaser, as applicable, from the Purchase Price Adjustment Escrow Amount the amount specified in such instruction letter and the distribution of such amount by the Escrow Agent shall be subject to the terms of the Escrow Agreement.

(d)     Unless the Purchaser elects that it does not desire assignment of a Nonassignable Asset, following the Closing, the Sellers and the Purchaser shall cooperate using their respective commercially reasonable efforts (at the Purchaser's sole cost and expense) to obtain as expeditiously as possible the applicable consent, waiver, confirmation or other approval with respect to each Nonassignable Asset and/or a waiver of any prohibition under applicable Law necessary for the assignment thereof to the Purchaser.

(e)     Nothing in this Section 8.3 shall obligate the Purchaser to waive any right or condition under this Agreement.

8.4     Rejected Contracts.     No Seller shall reject any Assigned Contract in the Chapter 11 Cases or any other bankruptcy proceeding following the Execution Date without the prior written consent of the Purchaser.

8.5     Further Agreements.     After the Closing, each Seller shall (i) promptly deliver to the Purchaser any mail or other communication received by such Seller and relating to the Business, the Purchased Assets or the Assumed Liabilities, (ii) promptly transfer in immediately available funds to the Purchaser any cash, electronic credits or deposits received by such Seller but solely to the extent that such cash, electronic credits or deposits are Purchased Assets and (iii) promptly forward to the Purchaser any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Purchased Assets. After the Closing, each of the Sellers shall permit, and each of the Sellers hereby authorizes, the Purchaser to collect, in the name of such Seller, all Accounts Receivable constituting part of the Purchased Assets and to endorse with the name of such Seller for deposit in the Purchaser's account any checks or drafts received in payment thereof. After the Closing, the Purchaser shall (x) promptly deliver to the Sellers any mail or other communication received by the Purchaser and relating to the Excluded Assets or the Excluded Liabilities, (y) promptly wire transfer in immediately available funds to the Sellers, any cash, electronic credits or deposits received by the Purchaser but solely to the extent that such cash, electronic credits or deposits are Excluded Assets and (z) promptly forward to the Sellers any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Excluded Assets. From and after the Closing Date, the Sellers shall refer all inquiries with respect to the Business, the Purchased Assets and the Assumed Liabilities to the Purchaser, and the Purchaser shall refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to the Sellers.

8.6     Consent and Approvals.

(a)     Prior to Closing, the Sellers shall, at their sole cost and expense: (i) use their commercially reasonable efforts, as promptly as practicable, to obtain all approvals, authorizations, clearances, consents and waivers of, and to file all notices and other filings with,

56

regulatory and other Governmental Bodies and all other Persons (including, without limitation, those set forth in Sections 4.4(a) and 4.4(b) of the Seller Disclosure Schedule) that are necessary or required of the Sellers to consummate the transactions set forth herein; (ii) provide such other information and communications to regulatory and other Governmental Bodies and other Persons as the Purchaser or such Governmental Bodies or other Persons may reasonably request; and (iii) provide reasonable cooperation to the Purchaser in obtaining or making, as soon as practicable, all approvals, authorizations, clearances, consents, waivers, notices and filings of or with regulatory and other Governmental Bodies and all other Persons required of the Purchaser to consummate the transactions set forth herein.

(b)     To the extent any filing is required under the HSR Act or any foreign competition Law, the Purchaser and each of the Sellers shall, or shall cause its "ultimate parent entity" (as such term is defined by the rules to the HSR Act, "UPE"), if any, to promptly prepare and file all necessary documentation and effect all applications that are required thereunder with respect to the transactions contemplated under this Agreement. Each of the Purchaser and the Sellers shall furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with its preparation of any filing or submission which is necessary under the HSR Act or any foreign competition Law. The Sellers and the Purchaser shall keep each other apprised of the status of any communications with, and any inquiries or requests for additional information from, the United States Federal Trade Commission, the United States Department of Justice or any other Governmental Body. If such a filing is made, the Purchaser and each of the Sellers shall or shall cause its UPE, if any, to seek early termination of the waiting period under the HSR Act or any foreign competition Law and use its reasonable best efforts to obtain as promptly as possible any clearance required for the consummation of the transactions contemplated under this Agreement. Anything herein to the contrary notwithstanding, (i) neither the Purchaser nor any of its UPE or Affiliates shall be required to (x) disclose to any other party hereto any information contained in its HSR Notification and Report Form or any other form or filing under any foreign competition Law which such party, in its sole discretion, deems confidential, except as may be required by applicable Law as a condition to the expiration or termination of the applicable waiting period under the HSR Act or any applicable foreign competition Law with respect to the transactions contemplated under this Agreement, (y) hold separate (including by trust or otherwise) or divest any of its businesses or assets or agree to any condition, restraint or limitation relating to its ability to freely own or operate all or a portion of its businesses or assets or (z) hold separate (including by trust or otherwise) or divest any assets of any of the Sellers; and (ii) in connection with seeking clearance or approval from any Governmental Body, neither any of the Sellers nor any of their respective UPEs shall, without the Purchaser's prior written consent, commit to any divestiture transaction, or commit to alter any Seller's businesses or commercial practices in any way, or otherwise take or commit to take any action that limits the Purchaser's freedom of action with respect to, or the Purchaser's ability to retain or otherwise receive the full benefits of, this Agreement. Notwithstanding Section 8.6(a), the payment of any applicable filing fees (but not the costs or expenses of preparing any applicable filings) under the HSR Act or any foreign competition Law shall be borne by the Purchaser.

57

### 8.7    Preservation of Records; Post-Closing Access to Information.

(a)    The Sellers and the Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Business, the Purchased Assets and the Assumed Liabilities until the later of the closing of the Chapter 11 Cases and the liquidation and winding up of the Sellers' estates (but in no event later than three (3) years after the Closing Date except, in the case of Tax matters, until thirty (30) days following the expiration of the period of any applicable statute of limitations) and shall make such records available to the other party as may be reasonably required by such other party in connection with, among other things, any insurance claims by, actions or tax audits against or governmental investigations of the Sellers or the Purchaser or any of their respective Affiliates or in order to enable the Sellers or the Purchaser to comply with their respective obligations under this Agreement or any of the Ancillary Agreements and each other agreement, document or instrument contemplated hereby or thereby. In the event the Sellers or the Purchaser wishes to destroy such records at the end of such preservation period, such party shall first give sixty (60) days' prior written notice to the other party and such other party shall have the right at its option and expense, upon prior written notice given to such party within such sixty (60) day period, to take possession of the records within one hundred and twenty (120) days after the date of such notice, or such shorter period as the liquidation and winding up of the Sellers' estates shall permit.

(b)    Until the closing of the Chapter 11 Cases, the Purchaser shall give the Sellers and the Sellers' Representatives reasonable access, during normal business hours, upon reasonable advance written notice (which notice shall specify the intended use or purpose of such access) and in a manner as would not be unreasonably disruptive to the business or operations of the Purchaser or any of its Subsidiaries, to the Purchaser's offices, facilities, plants, properties, assets, employees and Documents that were included in the Purchased Assets pertaining to (A) the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date or (B) the Excluded Assets and the Excluded Liabilities, to the extent necessary for, and solely in order for, the Sellers to effect the wind down of their Chapter 11 estates, including, without limitation, reconciling and objecting to claims in the Chapter 11 Cases and compiling and filing tax returns. Subject to the terms of a mutually acceptable services agreement providing for the reimbursement to the Purchaser for its reasonable costs and expenses and the payment to the Purchaser of reasonable fees and expenses for services provided by the Purchaser thereunder, the Purchaser will use commercially reasonable efforts to cause its Representatives to furnish to the Sellers such financial, technical, operating and other information pertaining to (i) the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date or (ii) the Excluded Assets and the Excluded Liabilities, in each case, as the Sellers' Representatives shall from time to time reasonably request in a written notice (which notice shall specify the intended use or purpose of any such information) and to discuss such information with such Representatives to the extent necessary for, and solely in order for, the Sellers to effect the wind down of their Chapter 11 estates. Notwithstanding the foregoing, the Purchaser shall not be required to provide any such access, or cause its Representatives to furnish any such information, to the extent that doing so, in the reasonable judgment of the Purchaser, would (I) constitute a waiver of the attorney-client privilege or (II) be detrimental to the Purchaser or its assets, properties, condition or operations. The Sellers acknowledge and agree that any and all information received from or on behalf of, or made available by or on behalf of, the Purchaser pursuant to this <u>Section</u>

58

8.7(b) shall be used solely as specified in any applicable written notice requesting such information and shall be subject to the terms of the confidentiality provision in Section 8.13. In addition, the Sellers agree that only those Representatives who require the receipt of information for the purposes allowed hereunder and who have been informed by Sellers of the confidential nature of such information and the confidentiality obligations of the Sellers as set forth in Section 8.13 shall be provided access to such information.

(c) Until the closing of the Chapter 11 Cases, the Sellers shall give the Purchaser and the Purchaser's Representatives reasonable access, during normal business hours, upon reasonable advance written notice (which notice shall specify the intended use or purpose of such access) and in a manner as would not be unreasonably disruptive to the Sellers and the wind down of their estates, to the properties, assets and Documents included in the Excluded Assets pertaining to the conduct of the Business. Notwithstanding the foregoing, the Sellers shall not be required to provide any such access, or cause their Representatives to furnish any such information, to the extent that doing so, in the reasonable judgment of the Sellers, would (I) constitute a waiver of the attorney-client privilege or (II) be detrimental to the Sellers or their assets, properties, condition or operations. The Purchaser acknowledges and agrees that any and all information received from or on behalf of, or made available by or on behalf of, the Sellers pursuant to this Section 8.7(c) shall be used solely as specified in any applicable written notice requesting such information and shall be subject to the terms of a mutually agreeable confidentiality agreement to be entered into by the Purchaser and the Sellers. In addition, the Purchaser agrees that only those Representatives who require the receipt of information for the purposes allowed hereunder and who have been informed by the Purchaser of the confidential nature of such information and the confidentiality obligations of the Purchaser as set forth in the applicable confidentiality agreement shall be provided access to such information. In connection with the foregoing, Sellers shall, at the Purchaser's sole cost and expense, use commercially reasonable efforts to cause their Representatives to furnish to the Purchaser such financial, technical, operating and other information pertaining to the Business (to the extent known) as the Purchaser or the Purchaser's Representatives shall from time to time reasonably request and to discuss such information with such Representatives.

8.8    Publicity. The Sellers and the Purchaser agree to communicate with each other and cooperate with each other prior to any public disclosure of this Agreement or the transactions contemplated hereby. Each of the Sellers and the Purchaser agree that it shall not issue, and it shall cause its respective Affiliates and Representatives not to issue, any public release or public announcement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other party, except as such release or announcement may be required by applicable Law or by the Bankruptcy Court (which shall include the filings to be made with the Bankruptcy Court in connection with this Agreement), in which case the party required to make the release or announcement shall allow the other party reasonable time to comment on such release or announcement in advance of such issuance. Unless otherwise required by the Bankruptcy Court, this Agreement shall be filed with the Bankruptcy Court without Disclosure Schedules or Exhibits designated by the Purchaser. For purposes of this Section 8.8, the Sellers may freely communicate with their employees regarding this Agreement and the sale of the Purchased Assets; provided, however, that prior to making any written communications to their employees pertaining to compensation or benefit matters that are affected by the transactions contemplated by this Agreement, the Sellers shall provide

59

the Purchaser with a copy of the intended communication, the Purchaser shall have a reasonable period of time to review and comment on the communication, and the Purchaser and the Sellers shall cooperate in providing any such mutually agreeable communication.

8.9 Notification of Certain Matters.

(a) The Sellers shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to the Sellers, of (i) any notice or other communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated by this Agreement is not likely to be obtained prior to Closing and (ii) any written objection or Action that challenges the transactions contemplated hereby or the entry of any Bankruptcy Court Order.

(b) To the extent permitted by applicable Law, the Sellers shall give prompt notice to the Purchaser of (i) any notice of any alleged violation of Law applicable to any Seller, (ii) the commencement of any investigation, inquiry or review by any Governmental Body with respect to the Business or that any such investigation, inquiry or review is, to the Knowledge of any Seller, contemplated, (iii) the Sellers' Knowledge of any infringement or unauthorized use by any Person of any material Intellectual Property and (iv) any event or circumstance that would result in any representation or warranty of any Seller being untrue or any covenant or agreement of any Seller not being performed or complied with such that the conditions set forth in Section 9.3(a), Section 9.3(b), Section 9.3(c) or Section 9.3(d) would not be satisfied if such event or circumstance existed on the Closing Date.

(c) No information received by the Purchaser pursuant to this Section 8.9 nor any information received or learned by the Purchaser or any of its Representatives pursuant to an investigation made under Section 8.2 shall be deemed to (i) qualify, modify, amend or otherwise affect any representations, warranties, conditions, covenants or other agreements of any Seller set forth in this Agreement or any of the Seller Ancillary Agreements, (ii) amend or otherwise supplement the information set forth in the Seller Disclosure Schedule, (iii) limit or restrict the remedies available to the Purchaser under this Agreement, applicable Law or otherwise arising out of a breach of this Agreement, or (iv) limit or restrict the ability of the Purchaser to invoke or rely on, or effect the satisfaction of, the conditions to the obligations of the Purchaser to consummate the transactions contemplated by this Agreement set forth in Article 9.

8.10 Prohibition on Use of Purchased Names. Each Seller hereby agrees that, on and at all times following the Closing Date, it shall not use and shall cease using, and shall cause its respective Affiliates not to use and to cease using, directly or indirectly, the Purchased Names and any like names or combinations of words or derivations thereof or any names or marks confusingly similar thereto; provided, however, that each Seller may use the Purchased Names solely for purposes of closing the Chapter 11 Cases; and provided, further, that notwithstanding any other provision of this Agreement, to the extent the Sellers use the Purchased Names in connection with closing the Chapter 11 Cases in any publicly filed document or in communication with former customers, suppliers or vendors of the Sellers, the Sellers (and their successors in interest, including any trustee or estate representative appointed in the Chapter 11 Cases or any successor Chapter 7 case) shall not use such Purchased Names in the caption, title or header of such documentation or communication and shall only be permitted to use the

60