Purchased Names to clarify that they are the successors in interest to the Debtors and that they no longer use such Purchased Names. Prior to the Closing Date, each Seller shall, at its expense, undertake and promptly pursue all necessary action to change its business and corporate names to new names bearing no resemblance to any of its present names so as to permit the use of the Purchased Names by the Purchaser or any of its Subsidiaries following Closing. In furtherance of the foregoing, each Seller will (a) revoke any filing that it may have made heretofore with any Governmental Body relating to its use of the Purchased Names and of any like names or combinations of words or derivations thereof; and (b) prepare and file with the appropriate Governmental Bodies appropriate documents, including, without limitation, articles of amendment, changing its name so as to effectuate the same and promptly deliver evidence of such name change to the Purchaser.

### 8.11    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement and applicable Law, each Seller and the Purchaser shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to ensure that the conditions precedent to the other parties' obligations hereunder set forth in this Agreement are satisfied and to consummate and make effective the transactions contemplated by this Agreement as soon as practicable.

(b)    Subject to the terms and conditions of this Agreement, neither the Sellers nor the Purchaser shall take any action or refrain from taking any action the effect of which would be to delay or impede the ability of the Sellers or the Purchaser to consummate the transactions contemplated by this Agreement unless taking such action or refraining from taking such action is required by applicable Law.

(c)    Following the Execution Date and until the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 3.4, the Sellers, on the one hand, and the Purchaser, on the other hand, shall keep each other reasonably informed as to the status of matters relating to the completion of the transactions contemplated hereby, including promptly furnishing the other with copies of notices or other communications received by the Sellers or the Purchaser or by any of their respective Affiliates (as the case may be), from any third party and/or any Governmental Body with respect to the transactions contemplated by this Agreement.

(d)    Subject to the terms and conditions of this Agreement, at and following the Closing, each of the parties shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and cooperate and take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to the Purchaser and its successors and assigns, all of the Purchased Assets, and for the Purchaser and its successors and assigns to assume the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby. Nothing in this Section 8.11 shall obligate any party hereto to waive any right or condition under this Agreement.

(e)    The obligations of the Sellers pursuant to this Section 8.11 shall be subject to any orders, approvals or authorizations granted or required by the Bankruptcy Court or under

61

the Bankruptcy Code (including in connection with the Chapter 11 Cases), and each Seller's obligations as a debtor in possession to comply with any order of the Bankruptcy Court (including the Approval Order), and the Sellers' duty to seek and obtain the highest or otherwise best price for the Business in compliance with, and not in a manner inconsistent with, the Bid Procedures, as approved by the Bid Procedures Order.

8.12    Expenses. No later than 5:00 p.m. (New York City time) on the date that is two (2) Business Days following the date on which the Bankruptcy Court enters the Bid Procedures Order, the Sellers shall pay in cash to the Purchaser or its designee an amount up to $1,750,000 (the "Expense Amount") in respect of the reasonable documented fees and disbursements of the Purchaser's Counsel incurred by the Purchaser or any of its Affiliates through (and including) the date on which the Bankruptcy Court enters the Bid Procedures Order in connection with (a) the negotiation, preparation, documentation, execution, delivery, implementation and/or consummation of this Agreement and the transactions contemplated hereby and (b) the restructuring of the Sellers and the negotiation, preparation, documentation, execution, delivery, implementation, filing and/or consummation of the Chapter 11 Cases and the Plan, the Disclosure Statement and all related agreements, pleadings, motions filings and documents; provided, however, that if the Sellers are prevented from paying all or any portion of the Expense Amount on the date referred to above pursuant to the terms of the Bid Procedures Order, the Expense Amount (or portion thereof prevented from being paid on such date) shall be paid on the earlier to occur of (i) the termination of this Agreement pursuant to Section 3.4 (other than a termination pursuant to Section 3.4(m) or Section 3.4(n)) and (ii) the Closing Date. The Sellers shall use commercially reasonable efforts to ensure that the Bid Procedures Order permits the Sellers to pay the entire Expense Amount as set forth in the immediately preceding sentence on or prior to 5:00 p.m. (New York City time) on the date that is two (2) Business Days following the date on which the Bankruptcy Court enters the Bid Procedures Order. To the extent the Sellers are not permitted to pay the Expense Amount pursuant to the terms of the Bid Procedures Order, the Expense Amount shall constitute an allowed super-priority administrative claim against the Sellers' estates under sections 503(b) and 507(a)(1) of the Bankruptcy Code (except for the "Carve Out" under the DIP Credit Agreement, which shall be senior in priority to the Break-Up Fee, the Reimbursement Amount, the Collection Costs and the Expense Amount).

8.13    Confidentiality. Following the Closing, the Sellers shall, and the Sellers shall use reasonable efforts to cause their respective Affiliates and Representatives to, maintain as confidential and not use or disclose (except as may be necessary in the administration of their Chapter 11 estates, as otherwise required by Law or as authorized in writing by the Purchaser) (i) any information or materials relating to the Business, the Transferred Employees, the Purchased Assets, the Assumed Liabilities and/or the operations and affairs of the Sellers or the Foreign Subsidiaries (other than the Excluded Assets) and (ii) any materials developed by the Purchaser or any of its Representatives or provided by the Purchaser or any of its Representatives to any Seller. Except as otherwise permitted and provided above, in the event any Seller is required by Law to disclose any such information or materials, except to the extent prohibited by applicable Law, such Seller shall promptly notify the Purchaser in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall reasonably cooperate with the Purchaser, at the Purchaser's sole expense, to obtain a protective order and otherwise preserve the confidentiality of such information or materials consistent with applicable Law. Information and materials subject to the confidentiality obligations in this Section 8.13 do

62

not include any information or materials which (x) at the time of disclosure is generally available to or known by the public (other than as a result of the disclosure of such information or materials in breach of this Agreement) or (y) becomes available to the Sellers or their Representatives (including any plan administrator) on a non-confidential basis from a Person who is not bound by a confidentiality agreement with the Purchaser or its Affiliates.

8.14 <u>Trademark Applications</u>. The Sellers hereby covenant and agree (a) to file, or cause to be filed, with the United States Patent and Trademark Office, no later than five (5) Business Days after the Execution Date, trademark applications, in the name of the applicable Seller(s), for the marks in connection with goods and services, corresponding to the cancelled trademarks listed on <u>Schedule 8.14</u> based upon the applicable Seller(s) date of first use ("<u>Applications</u>"); and (b) to prosecute the Applications in a timely manner in order to secure corresponding trademark registrations ("<u>Trademark Registrations</u>"). Immediately following the Closing Date, the Sellers and the Purchaser shall cooperate (at the Purchaser's expense) to assign all rights, title and interest in and to the Trademark Registrations and the Applications (including all goodwill associated therewith) to the Purchaser so that it may, subject to the next sentence, hold such Trademark Registrations and continue to prosecute such Applications and, in connection therewith, the Sellers agree to execute any document reasonably requested by the Purchaser in connection therewith. If, following the Closing Date, the Trademark Registrations have not yet been issued, the Sellers agree to provide all reasonable assistance requested by the Purchaser, at the Purchaser's expense, to obtain such Trademark Registrations.

8.15 <u>Tax Clearance Certificates</u>. At the Purchaser's request, the Sellers shall promptly notify each applicable Governmental Body in the jurisdictions set forth on <u>Schedule 8.15</u> of the transactions contemplated by this Agreement in the form and manner required by such Governmental Bodies, if the failure to make such notifications or receive any available tax clearance certificate ("<u>Tax Clearance Certificate</u>") could subject the Purchaser to Liability for any Taxes of a Seller or for increased Taxes as a result of the transactions contemplated by this Agreement. The Purchaser may instead elect, in its sole discretion, to make such notifications itself, in which case such notifications shall be in form and substance reasonably acceptable to the Purchaser and the Sellers (it being understood and agreed that any notification prepared in the form and manner required by any such Governmental Body shall be deemed reasonably acceptable to the Purchaser and the Sellers), and the Sellers hereby (i) authorize the Purchaser to do so and (ii) agree to furnish to the Purchaser such necessary information and reasonable assistance as the Purchaser may reasonably request in connection with its preparation of such notifications. Any notifications to be provided by the Sellers as described above in this <u>Section 8.15</u> shall be in form and substance acceptable to the Purchaser. If, in respect to any application for Tax Clearance Certificates made pursuant to this <u>Section 8.15</u>, any Governmental Body asserts that a Seller is liable for any Tax (an "<u>Alleged Tax Liability</u>"), then, at the election of the Purchaser, (a) the Sellers shall promptly pay any and all such Alleged Tax Liabilities and shall provide evidence to the Purchaser that such Alleged Tax Liabilities have been paid in full or otherwise satisfied; <u>provided, however</u>, that the Sellers shall not be required to pay any such Alleged Tax Liabilities until the same are due and payable, and in no event prior to the Closing, or (b) the Purchaser may withhold an amount from the Closing Date Purchase Price equal to the amount of any Alleged Tax Liabilities (such amounts, in the aggregate, the "<u>Aggregate Alleged Tax Liability Amount</u>") and shall pay such amounts to the applicable Governmental Body that

has asserted the applicable Alleged Tax Liability when such amounts are due and payable, and in no event prior to the Closing.

## ARTICLE 9.

## CONDITIONS TO CLOSING

9.1    Conditions Precedent to the Obligations of Purchaser and Sellers. The respective obligations of each party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Sellers and the Purchaser, in whole or in part, to the extent permitted by applicable Law):

(a)    no temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall have been issued, nor shall any proceeding or other Action brought by a domestic or foreign administrative agency or commission or other domestic or foreign Governmental Body seeking any of the foregoing be pending or threatened in writing; nor shall there be any action taken, or any statute, rule, regulation, order or other Law promulgated, enacted, entered, enforced or deemed applicable to the parties hereto which makes the consummation of the transactions contemplated by this Agreement illegal, void or rescinded;

(b)    all authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Body, including those contemplated by the HSR Act, any foreign competition Law and those set forth on Schedule 9.1(b), that are legally required for the consummation of the transactions contemplated by this Agreement, shall have been filed, occurred or been obtained; and

(c)    the Bankruptcy Court shall have entered the Approval Order and the Confirmation Order, and each such order shall be a Final Order.

9.2    Conditions Precedent to the Obligations of the Sellers. The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Sellers, in whole or in part, to the extent permitted by applicable Law):

(a)    each of (i) the representations and warranties of the Purchaser in this Agreement that are not qualified as to "materiality" or "material adverse effect" shall be true and correct in all material respects and (ii) the representations and warranties of the Purchaser in this Agreement that are qualified as to "materiality" or "material adverse effect" shall be true and correct, in each case of clauses (i) and (ii), at and as of the Execution Date and at and as of the Closing Date as if made at and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and the Sellers shall have received a certificate signed by an authorized person of the Purchaser, dated the Closing Date, to the foregoing effect;

64

(b)      the Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Closing Date, and the Sellers shall have received a certificate signed by an authorized person of the Purchaser, dated the Closing Date, to the foregoing effect;

(c)      the Purchaser shall have delivered, or caused to be delivered, to the Sellers (or at the direction of the Sellers) all of the items set forth in Section 3.3; and

(d)      the Purchaser shall have delivered to the Sellers appropriate evidence of all necessary limited liability company action by the Purchaser in connection with the transactions contemplated hereby, including, without limitation: (i) certified copies of resolutions (or a written consent) duly adopted by the Purchaser's governing body approving the transactions contemplated by this Agreement and the Purchaser Ancillary Agreements, and authorizing the execution, delivery and performance by the Purchaser of this Agreement and the Purchaser Ancillary Agreements; and (ii) a certificate as to the incumbency of officers of the Purchaser executing this Agreement and the Purchaser Ancillary Agreements.

9.3      Conditions Precedent to the Obligations of the Purchaser. The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Purchaser, in whole or in part, to the extent permitted by applicable Law):

(a)      each of (i) the representations and warranties of each Seller in this Agreement that are not qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all material respects and (ii) the representations and warranties of each Seller in this Agreement that are qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects, in each case of clauses (i) and (ii), at and as of the Execution Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date); provided, however, that with respect to the representation and warranty made in Section 4.27, any undisclosed Excluded Liability shall not be considered for purposes of determining whether such representation and warranty was true and correct at and as of the Execution Date for purposes of this Section 9.3(a), and the Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect;

(b)      each of (i) the representations and warranties of each Seller set forth in Section 4.1, Section 4.3, Section 4.5(r), Section 4.10, and Section 4.11(a) shall be true and correct in all respects and (ii) the other representations and warranties of each Seller in this Agreement shall be true and correct in all respects (without regard for any "materiality" or "Material Adverse Effect" qualifiers set forth therein) except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect, in each case of clauses (i) and (ii), at and as of the Closing Date as if made at and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and the

65

Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect;

(c)     each Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by such Seller on or prior to the Closing Date, and the Purchaser shall have received a certificate signed by an authorized officer of such Seller, dated the Closing Date, to the forgoing effect;

(d)     the Sellers shall have delivered, or caused to be delivered, to the Purchaser all of the items set forth in Section 3.2;

(e)     the Purchaser shall have received from the Sellers duly executed copies of all the consents, approvals, orders and/or Permits (as applicable), or evidence of the making or filing of the registrations, declarations, notifications and/or filings (as applicable), set forth on Schedule 9.3(e) (and any other material consents, approvals, orders and/or Permits (as applicable), or evidence of the making or filing of the material registrations, declarations, notifications and/or filings (as applicable), that should have been included by the Sellers in Sections 4.4(a) and/or 4.4(b) of the Seller Disclosure Schedule as of the Execution Date, but which were omitted from such Sections of the Seller Disclosure Schedule); and all of such consents, approvals, orders, Permits, registrations, declarations, notifications and/or filings (as applicable) shall be in form and substance reasonably satisfactory to the Purchaser and shall be in full force and effect as of the Closing;

(f)     the Plan, as approved by the Bankruptcy Court, shall be in form and substance acceptable to the Purchaser as it relates to any of the Specified Matters (it being understood and agreed that the copy of the Plan provided to the Purchaser on the Execution Date is in form and substance satisfactory to the Purchaser);

(g)     the Disclosure Statement, as approved by the Bankruptcy Court, shall be in form and substance acceptable to the Purchaser as it relates to any of the Specified Matters (it being understood and agreed that the copy of the Disclosure Statement provided to the Purchaser on the Execution Date is in form and substance satisfactory to the Purchaser);

(h)     the conditions to confirmation and the conditions to the Effective Date set forth in the Plan shall have been satisfied or waived in accordance with the Plan, and the Effective Date shall have occurred

(i)     each Seller that holds a seller's permit under the Laws of the State of Wisconsin shall have delivered its seller's permit to the Wisconsin Department of Revenue for cancellation in accordance with the Laws of the State of Wisconsin;

(j)     on the Closing Date, the Sellers shall have an aggregate amount of cash on hand of not less than $19,000,000 (excluding the RG Tube/RGCH Cash Amount and including the IRB Payoff Cash Amount); and

(k)     since the Execution Date, there shall not have occurred a Material Adverse Effect.

66

## ARTICLE 10.

## DEFINITIONS

10.1    Certain Definitions. As used herein:

(a)    "Accounts Receivable" means (i) any and all accounts receivable, trade accounts and other amounts receivable (including any Inter-Company Receivables) owed to any Seller and any other rights of any Seller to payment from third parties, including, without limitation, those reflected (or required to be reflected under GAAP) in the books and records of such Seller, and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped, products sold or services rendered, in each case owing to such Seller; (ii) all other accounts or notes receivable of any Seller and the full benefit of all security for such accounts or notes receivable; and (iii) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon.

(b)    "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(c)    "Agreed Principles" means GAAP using accounting methods, practices, principles, policies and procedures and classifications, judgments and valuation, estimation and accrual methodologies, that were used in the preparation of the Audited Balance Sheet.

(d)    "Alternative Transaction" means (i) any financing, refinancing, acquisition, divestiture, sale, business combination, restructuring or reorganization of or involving the Business or all or substantially all of the consolidated assets of the Sellers or all or substantially all of the equity securities of the Sellers, whether proposed to be effected pursuant to a merger, consolidation, share exchange, amalgamation, foreclosure, compromise, sale, issuance, transfer or redemption of any assets or securities of any Seller or any successor thereto, other than the sale of the Purchased Assets to the Purchaser in accordance with the terms hereof, or (ii) the filing of a plan of reorganization that does not contemplate the sale of the Purchased Assets to the Purchaser in accordance with the terms hereof.

(e)    "Ancillary Agreements" means, collectively, the Purchaser Ancillary Agreements and the Seller Ancillary Agreements.

(f)    "Approval Motion" means, individually or collectively (as the context may require), the Bid Procedures Motion and the Disclosure Statement Motion.

(g)    "Approval Order" means, individually or collectively (as the context may require), the Bid Procedures Order and the Disclosure Statement Order.

67

(h)    "Assumption and Assignment Procedures" means the procedures for assumption, assignment and/or transfer of the Assigned Contracts as set forth in the Bid Procedures Order (including the procedures set forth in the Notice of Assumption and Assignment or any Supplemental Notice of Assumption and Assignment (each as defined in the Bid Procedures Order)) and the Plan.

(i)    "Auction" has the meaning ascribed to such term in the Bid Procedures Order.

(j)    "Base Net Working Capital Value" means $71,800,000.

(k)    "Bid Procedures" has the meaning ascribed to such term in the Bid Procedures Order.

(l)    "Bid Procedures Motion" means the motion to be filed by the Sellers in the Chapter 11 Cases seeking entry of the Bid Procedures Order.

(m)    "Bid Procedures Order" means an order of the Bankruptcy Court that, among other things, approves the Bid Procedures, including the Break-Up Fee, the Reimbursement Amount, the Collection Costs and the Expense Amount, in the form of Exhibit C attached hereto or such other form as the Purchaser may approve in its discretion as it relates to any of the Specified Matters.

(n)    "Business" means any and all business activities of any kind that are conducted by the Sellers as of the Execution Date or at any time through (and including) the Closing Date, including, among other things, designing, manufacturing, distributing and selling stainless steel and alloy tubular products.

(o)    "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

(p)    "Cash and Cash Equivalents" means all of the Sellers' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents (but specifically excluding any cash tendered as a component of the Purchase Price).

(q)    "Closing Date Net Working Capital" means, as of the Closing Time immediately prior to giving effect to the Closing, (a) the sum of (i) the total current assets of the Sellers that are Purchased Assets (other than Cash and Cash Equivalents) and the current assets of the Foreign Subsidiaries (as defined by and determined in accordance with GAAP applied on a basis consistent with the Agreed Principles), including any tax refunds but excluding any other deferred income tax assets or other income tax assets and excluding any receivables from any Seller's Affiliates, directors, managers, employees, officers or equity holders (other than any Inter-Company Receivables) and (ii) all Cash and Cash Equivalents of the Sellers and the Foreign Subsidiaries (other than (x) Cash held outside the United States that may not be repatriated therefrom, (y) any trust funds established under any deferred compensation program

68

or employee benefit program of any of the Sellers or any of the Foreign Subsidiaries and (z) the RG Tube/RGCH Cash Amount) (as defined by and determined in accordance with GAAP applied on a basis consistent with the Agreed Principles), minus (b) the total current liabilities of the Sellers that are Assumed Liabilities (including all Cure Costs set forth on the Original Contract & Cure Schedule) and the current liabilities of the Foreign Subsidiaries (as defined by and determined in accordance with GAAP applied on a basis consistent with the Agreed Principles). For purposes of calculating the Closing Date Net Working Capital (and solely for purposes of such calculation), any Alleged Tax Liabilities (other than (A) Alleged Tax Liabilities the amount of which is withheld by the Purchaser from the Closing Date Purchase Price pursuant to Section 8.15 and (B) Alleged Tax Liabilities that are paid by the Sellers) that the Purchaser pays, becomes liable or otherwise responsible to pay, or is alleged to be liable or otherwise responsible to pay, shall be deemed to be a current liability of the Sellers as of the Closing Time that is an Assumed Liability. Subject to the other provisions of this definition, Schedule 10.1(q) sets forth the current asset and current liability line items to be used in calculating the Closing Date Net Working Capital.

(r)     "Closing Time" means 5:00 p.m. (New York City time) on the Closing Date.

(s)     "Code" means the Internal Revenue Code of 1986, as amended.

(t)     "Confirmation Hearing" means a hearing seeking the confirmation of the Plan pursuant to the Confirmation Order and section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

(u)     "Confirmation Order" means the order of the Bankruptcy Court, in form and substance satisfactory to the Purchaser as it relates to any of the Specified Matters, confirming the Plan pursuant to section 1129 of the Bankruptcy Code and which shall, among other things, (i) authorize the sale of the Purchased Assets to the Purchaser pursuant to this Agreement free and clear of all Encumbrances (other than Permitted Encumbrances), (ii) establish and approve the amount of Cure Costs (if any) for each of the Assigned Contracts, (iii) authorize the assumption of the Assigned Contracts by the Sellers and the assignment of the Assigned Contracts to the Purchaser, and (iv) authorize the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements and all other transactions and agreements contemplated hereby or thereby.

(v)     "Contract" means any written or oral contract, indenture, note, bond, lease, license, commitment or instrument or other agreement or arrangement.

(w)     "Controlling Affiliates" means any Affiliate or Affiliates of the Purchaser who at the time of termination of this Agreement have committed equity financing in excess of 50% all committed equity financing to the Purchaser at such time, such Affiliate or Affiliates to be disclosed to the Sellers in writing by the Purchaser within ten (10) Business Days after such termination.

(x)     "Cure Cost/Assignment Objection Deadline" has the meaning ascribed to such term in the Bid Procedures Order.

69

(y)     "Cure Costs" means the amounts necessary to cure all defaults, if any, and that must be paid in connection with the assumption of each Assigned Contract pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code.

(z)     "Designation Deadline" means the later of (a) ten (10) calendar days prior to the Confirmation Hearing and (b) one (1) Business Day after the date the Auction closes and the Sellers announce the identity of the Successful Bidder; provided, however, that (i) with respect to any Contract that has an Undetermined Cure Cost at such later date, the Designation Deadline for such Contract shall be the date that such Undetermined Cure Cost becomes a Determined Cure Cost and (ii) with respect to any Contract that is first disclosed to the Purchaser after such later date, the Designation Deadline for such Contract shall be two (2) Business Days after the date a copy of such Contract is first provided to the Purchaser.

(aa)    "Determined Cure Cost" means, with respect to the Cure Cost of any particular Contract, that such Cure Cost is finally established in accordance with the Plan, by court order or by agreement by the parties to such Contract at the date or time in question.

(bb)    "DIP Credit Agreement" means that certain Secured Super-Priority Debtor in Possession Multiple Draw Term Loan Agreement, dated as of July 17, 2009, among RathGibson, as borrower, Greenville and RGCH, as guarantors, the financial institutions parties thereto as lenders thereunder, and Wilmington Trust FSB in its capacity as administrative agent thereunder, as amended, supplemented or otherwise modified from time to time.

(cc)    "Disclosure Statement" means the disclosure statement that relates to the Plan, as such disclosure statement may be amended, modified or supplemented from time to time (including all exhibits and schedules annexed thereto or referred to therein).

(dd)    "Disclosure Statement Motion" means the motion to be filed by the Sellers in the Chapter 11 Cases seeking entry of the Disclosure Statement Order.

(ee)    "Disclosure Statement Order" means the order of the Bankruptcy Court that, among other things, approves the Disclosure Statement as containing adequate information as required by section 1125 of the Bankruptcy Code, in the form of Exhibit D attached hereto or such other form as the Purchaser may approve in its discretion as it relates to any of the Specified Matters.

(ff)    "Documents" means all of the Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, correspondence, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, supplier lists, vendor lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials, in each case whether or not in electronic form.

(gg)   "Effective Date" means the first Business Day on which all conditions to the "Effective Date" set forth in Section 11.2 of the Plan have been satisfied or waived, and no stay of the Confirmation Order is in effect.

(hh)   "Employment Loss" means (i) an employment termination, other than a discharge for cause, voluntary departure or retirement, (ii) a layoff exceeding six (6) months, (iii) a reduction in hours of work of more than fifty percent (50%) in each month of any six (6) month period or (iv) or any similar employment action that (when aggregated with any other employment action) could trigger the notice requirements of the WARN Act, or under any similar provision of any federal, state, provincial, regional, foreign or local Law, rule or regulation.

(ii)   "Encumbrance" means any lien, encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

(jj)   "Environmental Laws" means all applicable Laws relating to pollution or protection of health, safety, natural resources or the environment, or the generation, use, treatment, storage, handling, transportation or Release of, or exposure to, Hazardous Materials, including, without limitation, the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), Safe Drinking Water Act (42 U.S.C. §3000(f) et seq.), Toxic Substances Control Act (15 U.S.C. §2601 et seq.), Clean Air Act (42 U.S.C. §7401 et seq.), Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601 et seq.) and other similar federal, state, provincial and local statutes.

(kk)   "Equipment" means all equipment, machinery, vehicles, storage tanks, furniture, fixtures and other tangible personal property of every kind and description and improvements and tooling owned or used, or held for use, in connection with the operation of the Business by the Sellers, wherever located, including, without limitation, communications equipment, the IT Assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto, to the extent such warranties are transferable.

(ll)   "ERISA Affiliate" means any entity which is, or at any relevant time was, a member of (i) a controlled group of corporations (as defined in Section 414(b) of the Code), (ii) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (iii) an affiliated service group (as defined under Section 414(m) of the Code) or (iv) any group specified in regulations under Section 414(o) of the Code, any of which includes or included a Seller.

(mm)   "Final Order" means an order, ruling or judgment of the Bankruptcy Court (or other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in any of the Chapter 11 Cases (or by the clerk of such other court of competent

jurisdiction on the docket of such court) that: (i) is in full force and effect; (ii) is not stayed; and (iii) is no longer subject to review, reversal, modification or amendment, by appeal or writ of certiorari; provided, however, that the possibility that a motion under Rule 50 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Civil Procedure or Bankruptcy Rules, may be filed relating to such order, ruling or judgment shall not cause such order, ruling or judgment not to be a Final Order.

(nn) "Foreign Subsidiaries" means, collectively, RathGibson Pte. Ltd., a Singapore limited company, and RathGibson Tubes Private Limited, an Indian limited company.

(oo) "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(pp) "Good Faith Deposit" has the meaning ascribed to such term in the Bid Procedures.

(qq) "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private).

(rr) "Hazardous Materials" means petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos and asbestos containing materials, and any and all materials now or hereafter defined, listed, designated or classified as, or otherwise determined to be, "hazardous wastes," "hazardous substances," "radioactive," "solid wastes," or "toxic" (or words of similar meaning) under or pursuant to or otherwise listed or regulated pursuant to any Environmental Law.

(ss) "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, together with the rules and regulations promulgated thereunder.

(tt) "Indebtedness" of any Person means, without duplication, (i) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person for money borrowed and (y) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property (other than for services and goods acquired in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any other Person for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Encumbrance (other than Permitted Encumbrances), on any property or asset of such Person (whether or not such obligation is assumed by such Person).

(uu) "Intellectual Property" means all intellectual property and proprietary rights of any kind, including the following: (i) trademarks, service marks, trade names, slogans,

72

logos, trade dress, internet domain names, uniform resource identifiers, rights in design, brand names, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) patents, utility models and industrial design registrations (and all continuations, divisionals, continuations in part, provisionals, renewals, reissues, re-examinations and applications for any of the foregoing); (iii) copyrights and copyrightable subject matter (including, without limitation, any registrations and applications for any of the foregoing); (iv) trade secrets and other confidential or proprietary business information (including manufacturing and production processes and techniques, research and development information, technology, drawings, specifications, designs, plans, proposals, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information), know how, proprietary processes, formulae, algorithms, models, and methodologies (the "Trade Secrets"); (v) computer software, computer programs, and databases (whether in source code, object code or other form); and (vi) all rights to sue for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing and all remedies at law or equity associated therewith.

(vv)     "Inter-Company Payable" means any accounts payable, trade accounts payable and other amounts payable owed to a Seller by or from a Seller.

(ww)     "Inter-Company Receivables" means any accounts receivable, trade accounts and other amounts receivable owed to a Seller by or from a Seller.

(xx)     "Inventory" means all of the Sellers' inventories (including, without limitation, raw materials, packaging materials, supplies, work in process, finished goods, spare parts and replacement and component parts and fuel) that are used, or held for use, in connection with the operation of the Business.

(yy)     "IRB Loan Agreement" means the Loan Agreement, dated as of December 1, 2007, by and among GE Capital Franchise Finance Corporation (as assignee of GE Government Finance, Inc.), as lender, City of Clarksville, Arkansas, as issuer, and Greenville, as borrower, as amended, supplemented or otherwise modified from time to time.

(zz)     "IT Assets" means all of the Sellers' computers, computer software and databases (including source code, object code and all related documentation), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements, and all associated documentation that are used, or held for use, in connection with the operation of the Business.

(aaa)     "Kaplan Release Agreement" means the Release Agreement, dated as of March 8, 2010, among the Purchaser, the Sellers and Harley B. Kaplan, as amended, supplemented or otherwise modified from time to time.

(bbb)     "Kaplan Separation Agreement" means the Separation Agreement and General Release between the Sellers (other than Greenville) and Harley B. Kaplan, as in effect on the Execution Date.

73

(ccc) "Knowledge of the Sellers" or "Sellers' Knowledge" means the actual knowledge, after reasonable investigation and inquiry, of Michael Schwartz, Jon M. Smith, Kirk Thorne, Richard Lore, Sr. and Andrew Yeghnazar.

(ddd) "Laws" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered by, any and all Governmental Bodies (including any court of competent jurisdiction), or other requirement or rule of law.

(eee) "Leased Real Property" means all of the real property leased, subleased, licensed, used or occupied by any of the Sellers, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the operation of the Business.

(fff) "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

(ggg) "Licensed Intellectual Property" means any Intellectual Property that is licensed to any Seller, and used, or held for use, in connection with the operation of the Business.

(hhh) "Material Adverse Effect" means any event, circumstance, change, development, occurrence or state of facts that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the (i) assets, Liabilities, business, operations, properties, condition (financial or otherwise) or results of operations of the Purchased Assets or the Business, taken as a whole, or (ii) the ability of any Seller to consummate the transactions contemplated by this Agreement or perform its obligations under this Agreement except, in each case, for any such effect resulting from any of the following: (A) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, except to the extent such changes disproportionately affect the Sellers relative to other Persons engaged in the industry in which the Sellers operate, (B) changes after the Execution Date in any applicable Law or in GAAP, except to the extent such changes disproportionately affect the Sellers relative to other Persons engaged in the industry in which the Sellers operate, (C) the announcement or pendency of this Agreement or the transactions contemplated hereby on relationships, contractual or otherwise, with customers, suppliers, vendors or employees, (D) changes caused by political conditions, such as acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreement, except to the extent such changes disproportionately affect the Sellers relative to other Persons engaged in the industry in which the Sellers operate, (E) earthquakes, hurricanes, floods, or other natural disasters, except to the extent such events disproportionately affect the Sellers relative to

74

other Persons engaged in the industry in which the Sellers operate, (F) any action by the Purchaser or any of its Affiliates or the omission of an action that was required to be taken by the Purchaser or any of its Affiliates; provided, however, that the exception in this clause (F) shall not apply to an action or an omission to act at the request or instruction of any Seller, (G) any action taken by the Sellers which is required by this Agreement or is taken at the request of the Purchaser, (H) changes, events or effects that are generally applicable to Persons engaged in the industry in which the Sellers operate, except to the extent such changes, events or effects disproportionately affect the Sellers relative to other Persons engaged in the industry in which the Sellers operate or (I) the commencement of the Chapter 11 Cases.

(iii) "Non-Assumed Contracts" means, collectively, (a) any Contracts to which any Seller is a party and are set forth on Schedule 10.1(iii), (b) any pre-petition Contracts excluded from the definition of Purchased Assets by the Purchaser pursuant to Section 1.5(a), (c) the Excluded Plans, and (d) any Contracts the execution of which required the prior written consent of the Purchaser pursuant to Section 8.1(a) or Section 8.1(b), but for which such prior written consent was not given by the Purchaser, unless any such Contract is specifically designated as a Purchased Asset by the Purchaser pursuant to Section 1.5(a).

(jjj) "Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice.

(kkk) "Owned Intellectual Property" means all Intellectual Property owned by any Seller, and used, or held for use, in connection with the operation of the Business.

(lll) "Permits" means all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and other similar documents and authorizations issued by any Governmental Body to any Seller and used, or held for use, in connection with the operation of the Business or applicable to ownership of the Purchased Assets or assumption of the Assumed Liabilities.

(mmm)"Permitted Encumbrances" means (i) Encumbrances for utilities and current Taxes not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Cases; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the operation of the Business and, in the case of the Assumed Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Assumed Leased Real Property as it relates to the operation of the Business or materially detract from the value of the Assumed Leased Real Property, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law), (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business for sums not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Cases and that do not result from a breach, default or violation by a Seller of any Contract or Law, (v) such other Encumbrance, title exceptions or imperfections of title as the Purchaser may approve in writing in its sole discretion or which do

75

not, individually or in the aggregate, adversely affect the operation of the Business or the value of the Purchased Assets and (vi) any Liabilities created by this Agreement or any of the Ancillary Agreements.

(nnn) "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(ooo) "Plan" means the Second Amended Joint Chapter 11 Plan For RathGibson, Inc., et al. filed with the Bankruptcy Court on March 8, 2010, as it may be amended, supplemented or otherwise modified from time to time.

(ppp) "Potential Bidder" has the meaning ascribed to such term in the Bid Procedures Order.

(qqq) "Pudelsky Release Agreement" means the Release Agreement, dated as of March 8, 2010, among the Purchaser, the Sellers and David Pudelsky, as amended, supplemented or otherwise modified from time to time.

(rrr) "Pudelsky Separation Agreement" means the Separation Agreement and General Release, dated as of February 6, 2009, between the Sellers (other than Greenville) and David Pudelsky, as in effect on the Execution Date.

(sss) "Purchase Price Adjustment Escrow Amount" means (i) as of the Closing, the Deposit and (ii) at all times after the Closing, the funds held and maintained in the Escrow Account from time to time, including any interest or other earnings on such funds. For the avoidance of doubt, the Deposit shall not be released to the Sellers at the Closing, but rather automatically converted into the Purchase Price Adjustment Escrow Amount at the Closing and held by the Escrow Agent pursuant to the terms of the Escrow Agreement.

(ttt) "Purchaser Ancillary Agreements" means, collectively, each certificate, agreement or document (other than this Agreement) that the Purchaser is required to execute and/or deliver in connection with this Agreement.

(uuu) "Purchaser Disclosure Schedule" means the disclosure schedules which are attached hereto and delivered by the Purchaser.

(vvv) "Purchaser 401(k) Plan" means a defined contribution plan of the Purchaser or an Affiliate of the Purchaser intended to qualify under Sections 401(a) and 401(k) of the Code.

(www) "Purchaser Parties" means, collectively, the Purchaser and its Subsidiaries, and any of their respective former, current or future directors, officers, employees, agents, general or limited partners, managers, members, stockholders, investors, lenders, creditors, representatives, Affiliates or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, investor, lender, creditor, representative, Affiliate or assignee of any of the foregoing.

76

(xxx)  "Purchaser's Counsel" means Stroock & Stroock & Lavan LLP.

(yyy)  "Qualified Bids" has the meaning ascribed to such term in the Bid Procedures Order.

(zzz)  "Release" means, with respect to any Hazardous Material, any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migrating into or through any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or the ambient air.

(aaaa)  "Release Agreement" or "Release Agreements" means, individually or collectively, as applicable, the Kaplan Release Agreement and/or the Pudelsky Release Agreement.

(bbbb)  "Second-Highest Bidder" has the meaning ascribed to such term in the Bid Procedures.

(cccc)  "Seller Ancillary Agreements" means, collectively, each certificate, agreement or document (other than this Agreement) that any Seller is required to execute and/or deliver in connection with this Agreement.

(dddd)  "Seller Disclosure Schedule" means the disclosure schedules which are attached hereto and delivered by the Sellers.

(eeee)  "Seller 401(k) Plans" means, collectively, (i) the RathGibson, Inc. (Wisconsin) 401(k) Retirement Plan, (ii) the RathGibson Employees' Profit Sharing Plan and Trust, (iii) the Mid-South Control Lines Inc. 401(k) Plan and (iv) the Greenville Tube Company 401(k) Plan.

(ffff)  "Seller Intellectual Property" means any Intellectual Property that is owned by, licensed to, or used or held for use by, any Seller in connection with the operation of the Business.

(gggg)  "Seller Parties" means, collectively, the Sellers and their respective Subsidiaries, and any of their respective former, current or future directors, officers, employees, agents, general or limited partners, managers, members, stockholders, investors, lenders, creditors, representatives, Affiliates or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholder, investor, lender, creditor, representative, Affiliate or assignee of any of the foregoing.

(hhhh)  "Seller Plans" means (i) all "employee benefit plans" (as defined in Section 3(3) of ERISA), including all employee benefit plans which are "pension plans" (as defined in Section 3(2) of ERISA) and any other written employee benefit arrangements or payroll practices (including, without limitation, severance pay, vacation pay, company awards, salary continuation for disability, sick leave, death benefit, hospitalization, welfare benefit, group or individual health, dental, medical, life, insurance, survivor benefit, deferred compensation, profit sharing, retirement, retiree medical, supplemental retirement, bonus or other incentive compensation, stock purchase, stock option, stock appreciation rights, restricted stock and

77

phantom stock arrangements or policies) and (ii) all written employment, termination, bonus, severance, change in control or other similar contracts or agreements, in each case to which any Seller is a party, with respect to which any Seller has any Liability or obligation or which are maintained by any Seller and to which any Seller contributes or is obligated to contribute with respect to current or former directors, officers, consultants and employees of any Seller.

(iiii) "Significant Employee" means any employee of any Seller that (i) is involved in the management of the Business of such Seller, (ii) has supervisory authority over the Business (or any material aspect thereof) or a significant number of employees of such Seller or (iii) earns aggregate annual compensation (including salary, bonus or other direct or indirect remuneration) in excess of $80,000.

(jjjj) "Specified Matters" means, collectively, this Agreement and all the transactions contemplated herein, the Ancillary Agreements and all the transactions contemplated therein, the Auction, the Bid Procedures, the Assumption and Assignment Procedures, the Break-Up Fee, the Reimbursement Amount, the Collection Costs and the Expense Amount; provided, however, for the avoidance of doubt, the foregoing shall not include any matters relating to (i) the solicitation of votes or the voting on the Plan, (ii) the wind down of the Sellers' bankruptcy estates, or (iii) the Plan, in each case to the extent not related to this Agreement or the transactions contemplated herein, the Ancillary Agreements or the transactions contemplated therein, the Auction, the Bid Procedures, the Assumption and Assignment Procedures, the Break-Up Fee, the Reimbursement Amount, the Collection Costs or the Expense Amount.

(kkkk) "Stalking Horse Bid" has the meaning ascribed to such term in the Bid Procedures Order.

(llll) "Subsidiary" means, with respect to any Person (the "Owner"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person, are held by the Owner or one or more of its Subsidiaries.

(mmmm) "Successful Bidder" has the meaning ascribed to such term in the Bid Procedures.

(nnnn) "Tax" and "Taxes" means (i) any and all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever; (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Governmental Body in connection with any item described in clause (i); and (iii) any Liability in respect of any items described in clauses (i) and/or (ii) payable by reason of Contract, assumption, transferee liability, operation of Law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law) or otherwise.

78

(oooo) "Tax Return" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

(pppp) "2011 Capital Budget" means the capital budget of the Sellers for the 2011 fiscal year as set forth on Schedule 10.1(pppp).

(qqqq) "Undetermined Cure Cost" means, with respect to the Cure Cost of any particular Contract, that such Cure Cost is not finally determined in accordance with the Plan, by court order or by agreement by the parties to such Contract as of the time or date in question.

(rrrr)   "WARN Act" means the United States Worker Adjustment and Retraining Notification Act, and the rules and regulations promulgated thereunder.

10.2    Additional Defined Terms.  The following terms have the meanings set forth in the Sections set forth below:

| Defined Term | Location |
|---|---|
| Acquired Customers | 1.1(a) |
| Actions | 4.6 |
| Additional Closing Date Cure Amount | 2.3(b)(ii) |
| Additional Deposit | 2.2(a) |
| Additional Excess Cure Amount | 2.4(f)(ii) |
| Adjustment Certificate | 2.4(a) |
| Aggregate Reserve Amount | 1.5(d) |
| Aggregate Alleged Tax Liability Amount | 8.15 |
| Agreement | Preamble |
| Alleged Tax Liability | 8.15 |
| Allocation | 11.1(b) |
| Applications | 8.14 |
| Assigned Contracts | 1.1(t) |
| Assumed Customer Contracts | 1.1(a) |
| Assumed Employment Contracts | 6.1 |
| Assumed Independent Contractor Contracts | 1.1(k) |
| Assumed Intellectual Property | 1.1(s) |
| Assumed Intellectual Property Contracts | 1.1(s) |
| Assumed Leased Real Property | 1.1(j) |
| Assumed Liabilities | 1.3 |
| Assumed Permits | 1.1(l) |
| Assumed Personal Property Leases | 1.1(h) |
| Assumed Plans | 1.1(r) |
| Assumed Real Property Leases | 1.1(j) |
| Assumed Vendor Contracts | 1.1(e) |
| Audited Balance Sheet | 4.25 |
| Audited Financial Statements | 4.25 |
| Bankruptcy Code | Recitals |

| **Defined Term** | **Location** |
| --- | --- |
| Bankruptcy Court | Recitals |
| Bankruptcy Court Orders | 7.1(d) |
| Bankruptcy Exceptions | 4.3 |
| Break-Up Fee | 3.6(b) |
| Chapter 11 Cases | Recitals |
| Closing | 3.1 |
| Closing Certificate | 2.3(a) |
| Closing Date | 3.1 |
| Closing Date Purchase Price | 2.1 |
| COBRA Continuation Coverage | 6.3 |
| Collateral | 3.6(e) |
| Collection Costs | 3.6(d) |
| Confirmation Certificate | 2.4(b) |
| Contract & Cure Update Schedule | 1.5(a) |
| Deposit | 2.2(a) |
| Dispute Notice | 2.4(b) |
| Disputed Amount Contract | 1.5(d) |
| Employee Plans | 4.17(b) |
| Employment Contracts | 6.1 |
| Equity Financing Letters | 5.5 |
| Escrow Account | 2.2(a) |
| Escrow Agent | 2.2(a) |
| Escrow Agreement | 2.2(a) |
| Estimated Closing Date Net Working Capital | 2.3(a) |
| Excluded Assets | 1.2 |
| Excluded Liabilities | 1.4 |
| Excluded Plans | 1.2(h) |
| Execution Date | Preamble |
| Exempt Trust | 4.17(d) |
| Expense Amount | 8.12 |
| Filing Date | Recitals |
| Final Certificate | 2.4(e) |
| Final Determination Date | 2.4(f) |
| Financial Statements | 4.25 |
| Foreign Subsidiary Stock | 1.1(v) |
| Greenville | Preamble |
| Independent Accountant | 2.4(d) |
| Initial Deposit | 2.2(a) |
| Insurance Policies | 4.20 |
| Interim Arrangement | 8.3(b) |
| IRB Payoff Cash Amount | 1.2(l) |
| Material Contracts | 4.8(a) |
| Material Permits | 4.9(a) |
| Modified Closing Date Net Working Capital | 2.4(a) |
| Most Recent Balance Sheet | 4.25 |

NY 72446260v22

| **Defined Term** | **Location** |
|---|---|
| New Employment Contracts | 6.1 |
| Nonassignable Assets | 8.3 |
| Original Contract & Cure Schedule | 1.5(a) |
| Outside Date | 3.4(b) |
| Pre-Adjusted Purchase Price | 2.1 |
| Purchase Price | 2.1 |
| Purchased Assets | 1.1 |
| Purchased Names | 1.1(i) |
| Purchaser | Preamble |
| Qualified Plan | 4.17(d) |
| RathGibson | Preamble |
| Registered IP | 4.7(a) |
| Reimbursement Amount | 3.6(b) |
| Representatives | 8.2 |
| Reserve Amount | 1.5(d) |
| RG Tube | Preamble |
| RG Tube/RGCH Cash Amount | 1.2(l) |
| RGCH | Preamble |
| Seller | Preamble |
| Seller Organizational Documents | 4.1 |
| Seller Reserves | 4.23 |
| Significant Customers | 4.22 |
| Significant Vendors/Suppliers | 4.22 |
| Specified Subsidiaries | 4.2(a) |
| Tax Clearance Certificate | 8.15 |
| Trade Secrets | 10.1(ss) |
| Trademark Registrations | 8.14 |
| Transfer Taxes | 11.1(a) |
| Transferred Employee | 6.1 |
| Unaudited Financial Statements | 4.25 |
| UPE | 8.6(b) |

## ARTICLE 11.

### TAXES

11.1    Additional Tax Matters.

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein (all of the foregoing, "Transfer Taxes") shall be borne and timely paid by the Sellers, and the Sellers shall indemnify, defend (with counsel reasonably satisfactory to the Purchaser), protect, and save and hold the Purchaser harmless from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Transfer Taxes. If the Sellers shall fail to indemnify or otherwise satisfy

81

their obligations described in the immediately preceding sentence within two (2) Business Days after receiving notice from the Purchaser, the Purchaser shall be entitled to deliver to the Escrow Agent a letter instructing the Escrow Agent to pay to the Purchaser from the Purchase Price Adjustment Escrow Amount the amount necessary to satisfy such indemnification or other obligation and the distribution of such amount by the Escrow Agent shall be subject to the terms of the Escrow Agreement.

(b) The Purchaser shall, not later than one hundred twenty (120) days after the Closing Date, prepare and deliver to the Sellers for their consent (which consent shall not be unreasonably withheld, delayed or conditioned) a schedule allocating the Purchase Price (and any other items that are required for federal income tax to be treated as Purchase Price) among the Sellers and the Purchased Assets (such schedule, the "Allocation"). If the Sellers raise any objection to the Allocation within twenty (20) days of the receipt thereof, the Purchaser and the Sellers will negotiate in good faith to resolve such objection(s). If the Sellers do not raise any objection to the Allocation within twenty (20) days of the receipt thereof, the Sellers shall be deemed to have conclusively accepted the Allocation. The Purchaser and the Sellers shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation as finally agreed upon, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Body or any other proceeding) without first giving the other party prior written notice; provided, however, that nothing contained herein shall prevent the Purchaser or the Sellers from settling any proposed deficiency or adjustment by any Governmental Body based upon or arising out of the Allocation, and neither the Purchaser or the Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Body challenging such Allocation. The Purchaser and the Sellers shall cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to the Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price. If and to the extent the parties are unable to agree on the Allocation, the parties shall retain a mutually agreed upon accounting firm of national repute to resolve such dispute. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 11.1(b) shall survive the Closing without limitation.

## ARTICLE 12.

## MISCELLANEOUS

12.1 Payment of Expenses. Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each party hereto will bear its own costs and expenses (including investment advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby; provided, however, that (a) all Transfer Taxes (as well as the costs and expenses incurred in connection with the preparation and filing of all Tax Returns with respect thereto) shall be borne solely by the Sellers, (b) the Break-Up Fee, the Reimbursement Amount, the Expense Amount and the Collection Costs payable to the Purchaser, if any of the foregoing are payable under this Agreement, shall be borne solely by the Sellers, and (c) all filing fees (but not the costs and expenses of preparing any applicable filings) in connection with any required filings or submissions under the HSR Act or any other competition Law shall be borne by the Purchaser.

82

12.2    Survival of Representations and Warranties; Survival of Post-Closing Covenants. The parties hereto agree that the representations and warranties contained in this Agreement shall expire automatically and immediately upon the Closing Date. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

12.3    Entire Agreement; Amendments and Waivers.    This Agreement (including the schedules and exhibits hereto) and the Ancillary Agreements represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each party hereto, or in the case of a waiver, by the party against whom the waiver is to be effective. No action taken pursuant to this Agreement, including, without limitation, any investigation by or on behalf of any party shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

12.4    Counterparts.    For the convenience of the parties hereto, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

12.5    Governing Law.    THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

12.6    Jurisdiction, Waiver of Jury Trial.

(a)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE SOUTHERN DISTRICT OF THE STATE OF NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY,

83

ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b) EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.7 Notices. Unless otherwise set forth herein, any notice, request, instruction or other document to be given, provided or furnished hereunder by any party to the other parties shall be in writing and shall be deemed duly given, provided or furnished (i) upon delivery, when delivered personally, (ii) one (1) Business Day after being sent by overnight courier or when sent by facsimile transmission, and (iii) three (3) Business Days after being sent by registered or certified mail, postage prepaid, as follows:

If to the Sellers:

> c/o RathGibson, Inc.
> 475 Half Day Road, Suite 210
> Lincolnshire, IL 60069
> Attn: Michael G. Schwartz
> Facsimile No.: 847-276-2100

> with a copy (which shall not constitute effective notice) to:

> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, New York 10019
> Attn: Paul V. Shalhoub, Esq.
> Attn: Robin Spigel, Esq.
> Attn: Matthew J. Rizzo, Esq.
> Facsimile No.: 212-728-8111

If to the Purchaser prior to the Closing:

> c/o Wayzata Investment Partners LLC
> 701 East Lake Street, Suite 300
> Wayzata, MN 55391
> Attn: Ray Wallander, Esq.
> Facsimile No.: 952-345-8901

> with a copy (which shall not constitute effective notice) to:

> Stroock & Stroock & Lavan LLP
> 180 Maiden Lane
> New York, New York 10038
> Attn: Kristopher M. Hansen, Esq.

Attn: Matthew A. Schwartz, Esq.
Attn: Jayme T. Goldstein, Esq.
Facsimile No.: 212-806-6006

If to the Purchaser after the Closing:

RathGibson Acquisition Co., LLC
475 Half Day Road, Suite 210
Lincolnshire, IL 60069
Attn: Michael G. Schwartz
Facsimile No.: 847-276-2100

with copies (which shall not constitute effective notice) to:

c/o Wayzata Investment Partners LLC
701 East Lake Street, Suite 300
Wayzata, MN 55391
Attn: Ray Wallander, Esq.
Facsimile No.: 952-345-8901

and

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Attn: Kristopher M. Hansen, Esq.
Attn: Matthew A. Schwartz, Esq.
Attn: Jayme T. Goldstein, Esq.
Facsimile No.: 212-806-6006

or to such other Persons, addresses or facsimile numbers as may be designated in writing by the party to receive such notice.

12.8    Binding Effect; Assignment. This Agreement shall be binding upon the Purchaser and, subject to entry of the Approval Order (with respect to the matters covered thereby) and the Confirmation Order, the Sellers, and inure to the benefit of the parties and their respective successors and permitted assigns, including, without limitation, any trustee or estate representative appointed in the Chapter 11 Cases or any successor Chapter 7 case.   No assignment of this Agreement or of any rights or obligations hereunder may be made by the Sellers or the Purchaser (by operation of Law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void; provided, however, that the Purchaser (and, in the case of clause (b), any of its Affiliates) may assign, delegate or transfer, in whole or in part, this Agreement and any of its rights, obligations and/or interests hereunder, without the consent of the Sellers, (a) to any Affiliate of the Purchaser and/or (b) to any Person as security for any obligations arising in connection with the Purchaser's or its Affiliate's financing in connection with the transactions contemplated by this Agreement.  No assignment of any obligations hereunder shall relieve the parties hereto of

85

any such obligations. Upon any such permitted assignment, the references in this Agreement to the Purchaser shall also apply to any such assignee unless the context otherwise requires.

12.9     Severability. If any term, condition or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party. Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

12.10   Injunctive Relief.

(a)     The parties agree that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by the Sellers, and, accordingly, the Purchaser shall be entitled to injunctive relief with respect to any such breach, including, without limitation, specific performance of such covenants, promises or agreements or an order enjoining the Sellers from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement by the Sellers, all without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond. The rights set forth in this Section 12.10 shall be in addition to any other rights which the Purchaser may have at Law or in equity pursuant to this Agreement.

(b)     The Sellers acknowledge and agree that they shall not be entitled to an injunction or injunctions to prevent any breaches of this Agreement by the Purchaser or to enforce specifically the terms and provisions of this Agreement or otherwise to obtain any equitable relief or remedy against the Purchaser or the Purchaser Parties and that the Sellers' sole and exclusive remedy against the Purchaser and the other Purchaser Parties shall be the remedies explicitly set forth in Section 3.6(c). Without limiting the generality of the foregoing, and anything in this Agreement to the contrary notwithstanding, unless the Closing has occurred, the Sellers acknowledge that they may not seek specific performance for any reason to require the Purchaser or the Purchaser Parties to consummate the transactions (or any portion thereof) contemplated by this Agreement or any of the Ancillary Agreements under any circumstance whatsoever and the sole and exclusive remedy of the Sellers for the failure by the Purchaser to consummate such transactions or for any other reason whatsoever shall be as expressly set forth in Section 3.6(c).

12.11   Non-Recourse. Except as expressly contemplated by this Agreement, no Purchaser Party (other than the Purchaser) and no Seller Party (other than the Sellers) shall have any Liability under this Agreement or the Ancillary Agreements of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

12.12   Time of the Essence. Time is of the essence in the performance of each of the obligations of the parties and with respect to all covenants and conditions to be satisfied by the

86

parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

12.13 Third Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person (including, without limitation, any of the Seller Parties (other than the Sellers) and any of the Purchaser Parties (other than the Purchaser)), other than the parties hereto and such permitted assigns (including, for the avoidance of doubt, any plan administrator administering the Chapter 11 Cases), any legal or equitable rights hereunder.

12.14 Certain Interpretations. Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i) All references in this Agreement to Articles, Sections, clauses, parts, Schedules and Exhibits shall be deemed to refer to Articles, Sections, clauses, parts, Schedules and Exhibits to this Agreement unless otherwise specified.

(ii) All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii) The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv) The words "include," includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless or whether such words or similar words actually appear).

(v) When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(vi) Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

(vii) Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii) The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b)     The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

*[Remainder of Page Intentionally Left Blank]*

NY 72446260v22

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLERS:**

**RATHGIBSON, INC.**

By:
Name: Michael Schwartz
Title: President, CEO and COO

**GREENVILLE TUBE COMPANY**

By:
Name: Michael Schwartz
Title: President

**RG TUBE HOLDINGS LLC**

By:
Name: Michael Schwartz
Title: President and CEO

**RGCH HOLDINGS CORP.**

By:
Name: Michael Schwartz
Title: President and CEO

**PURCHASER:**

**RATHGIBSON ACQUISITION CO., LLC**

By:

Name:

Title:

**WAIVER, CONSENT AND AMENDMENT NO. 1
TO ASSET PURCHASE AGREEMENT**

WAIVER, CONSENT AND AMENDMENT NO. 1 TO ASSET PURCHASE AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Amendment"), dated as of March 26, 2010 (the "Effective Date"), by and among (a)(i) RG Tube Holdings LLC, a Delaware limited liability company ("RG Tube"), (ii) RGCH Holdings Corp., a Delaware corporation ("RGCH"), (iii) RathGibson, Inc., a Delaware corporation ("RathGibson"), and (iv) Greenville Tube Company, a Delaware corporation ("Greenville" and, together with RG Tube, RGCH and RathGibson, each a "Seller" and, collectively, the "Sellers"), and (b) RathGibson Acquisition Co., LLC, a Delaware limited liability company (together with its successors and permitted assigns, the "Purchaser"). The Sellers and the Purchaser are sometimes referred to herein, each a "Party" and, collectively, the "Parties".

## W I T N E S S E T H:

WHEREAS, the Parties entered into an Asset Purchase Agreement, dated as of March 8, 2010 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Purchase Agreement");

WHEREAS, the Sellers have requested that the Purchaser grant certain waivers, consents and approvals, and agree to amend the Purchase Agreement in certain respects; and

WHEREAS, the Purchaser is willing to grant such consents, waivers and approvals, and amend the Purchase Agreement as requested by the Sellers on the terms set forth herein.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein, the Parties hereby agree as follows:

1.    Defined Terms. Unless otherwise defined herein, terms used herein and defined in the Purchase Agreement are used herein as defined in the Purchase Agreement.

2.    Waivers and Consents.

(a)    Effective as of the Effective Date, the Purchaser hereby grants all waivers and consents that may be necessary or required under Section 8.1 of the Purchase Agreement to permit RathGibson to pledge up to $250,000 of cash and/or cash equivalents (the "Wells LC Cash Collateral") to Wells Fargo Bank, National Association ("Wells Fargo") as collateral for reimbursement obligations related to one or more irrevocable standby letters of credit (collectively, the "Wells Letters of Credit") issued by Wells Fargo for the account of RathGibson and for the benefit of certain beneficiaries from time to time that are necessary or required for the operation of the Business in the ordinary course, including, without limitation, that certain Wells Letter of Credit issued by Wells Fargo for the account of RathGibson and for the benefit of Avalon Risk Management Insurance Agency, LLC in the original face amount of $50,000. The Sellers hereby acknowledge and agree that its rights, title and interest with respect to the Wells LC Cash Collateral (to the extent not used to satisfy reimbursement obligations under the Wells

Letters of Credit) shall constitute a Purchased Asset and shall be subject to the terms of the Purchase Agreement.

(b)    Effective as of the Effective Date, the Purchaser hereby waives any and all right to terminate the Purchase Agreement under Section 3.4(e)(ii) of the Purchase Agreement; provided, that the Bid Procedures Order in the form attached hereto as Annex A (with such changes thereto that are approved by the Purchaser in its discretion, the "Entered BPO") is entered by the Bankruptcy Court by 11:59 p.m. (New York City time) on April 9, 2010. The Sellers hereby understand, acknowledge and agree that (i) the Entered BPO is not acceptable to the Purchaser, (ii) absent the waiver by the Purchaser set forth in this Section 2(b), the Purchaser would have the right to terminate the Purchase Agreement pursuant to Section 3.4(e)(ii) of the Purchase Agreement, and (iii) the willingness of the Purchaser to (w) execute and deliver this Amendment, (x) grant the waiver set forth in this Section 2(b), (y) not terminate the Purchase Agreement on account of the Bid Procedures Order being entered in the form of the Entered BPO, which is unacceptable to the Purchaser and (z) proceed with the transactions contemplated by the Purchase Agreement on the terms set forth therein, is expressly conditioned upon, and being done in reliance upon, the right of the Purchaser to receive a return of the Deposit and payment of the Break-Up Fee and the Reimbursement Amount as set forth in, and subject to, Section 3.6(b) of the Purchase Agreement. Without limiting the generality of Section 6(a) of this Amendment, the Sellers further acknowledge and agree that the waiver by the Purchaser set forth in this Section 2(b) of the Purchaser's right to terminate the Purchase Agreement shall not operate or be construed as a further or continuing waiver of its right to terminate the Purchase Agreement pursuant to any provision of the Purchase Agreement (other than Section 3.4(e)(ii) of the Purchase Agreement as described, and subject to the limitations set forth, in this Amendment), all of which rights are hereby reserved in full.

3.    Amendments. Each of the Parties hereby agrees that, effective upon the Effective Date, the Purchase Agreement shall be amended as follows:

(a)    Section 3.3 of the Purchase Agreement shall be amended by (i) deleting the "and" at the end of Section 3.3(c), (ii) deleting the period at the end of Section 3.3(d) and inserting "; and" in lieu thereof, and (iii) adding a new Section 3.3(e) to read as follows:

"(e)    immediately after giving effect to the transfer and delivery of the Purchased Assets pursuant to Section 1.1, $500,000 to Purchaser's Counsel, solely in its capacity as counsel to certain holders of the Senior Notes, in respect of fees and disbursements of Purchaser's Counsel incurred in connection with the representation of such holders in the Chapter 11 Cases, which shall be paid to Purchaser's Counsel pursuant to Section 8.12."

(b)    Section 3.4(e) of the Purchase Agreement shall be amended and restated in its entirety to read as follows:

"(e)    by the Purchaser, if (i) the Approval Motion is not filed with the Bankruptcy Court within one (1) Business Day after the Execution Date, (ii) the Approval Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York City time) on April 9, 2010 or (iii) following entry of the

2

Approval Order, the Approval Order shall (A) fail to be in full force and effect, (B) have been reversed, (C) have been stayed and such stay shall continue to be in effect for more than fifteen (15) days, or (D) have been modified or amended in any manner adverse to the Purchaser without the prior written consent of the Purchaser;"

(c)     Section 3.4(i) of the Purchase Agreement shall be amended and restated in its entirety to read as follows:

"(i)    by the Purchaser or the Sellers, if any Seller has entered into, or shall have publicly announced its intention (including by means of any filings made with the Bankruptcy Court or any other Governmental Body) to enter into, an agreement in principle, letter of intent, memorandum of understanding, definitive agreement or other arrangement, whether binding or non-binding, or whether subject to terms and conditions, with any Person (other than the Purchaser or its Affiliates) with respect to any Alternative Transaction except, subject to the terms of the Bid Procedures, in the event that entering into such agreement or document, or such announcement, relates to an Alternative Transaction with the Successful Bidder and the Purchaser is the Second-Highest Bidder; provided, however, that the Purchaser shall have the right to terminate this Agreement pursuant to this Section 3.4(i) (x) on or at any time after the twentieth (20th) day following the date which is twenty (20) days after the date of the entry of the Confirmation Order unless the Purchaser becomes the Successful Bidder on or prior to such date and/or (y) immediately following the conclusion of the Confirmation Hearing if the Purchaser is not the Successful Bidder and the Bankruptcy Court has not approved or does not approve, as applicable, payment by the Sellers to the Purchaser of the Break-Up Fee and the Reimbursement Amount as an administrative expense under section 503 of the Bankruptcy Code (or other applicable Law) prior to or in connection with the Confirmation Hearing;"

(d)     Section 3.4(p) of the Purchase Agreement shall be amended and restated in its entirety to read as follows:

"(p)    by the Purchaser, if the Sellers fail to pay the Expense Amount within five (5) Business Days after the payment of the Expense Amount is approved by the Bankruptcy Court."

(e)     Section 3.6(b) of the Purchase Agreement shall be amended and restated in its entirety to read as follows:

"(b)    If (i) the Purchaser or the Sellers, as applicable, terminate this Agreement pursuant to Section 3.4(i), (ii) the Purchaser terminates this Agreement pursuant to Section 3.4(o) or (iii) this Agreement terminates automatically pursuant to Section 3.4(j), then (A) the Purchaser shall be entitled to disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon) from the Escrow Account and (B)

3

the Sellers shall pay to the Purchaser a fee in the amount of three percent (3.0%) of the Pre-Adjusted Purchase Price (the "Break-Up Fee") as liquidated damages. In the event this Agreement is terminated pursuant to Section 3.4(b), Section 3.4(c), Section 3.4(d), Section 3.4(e), Section 3.4(f), Section 3.4(g), Section 3.4(h), Section 3.4(i), Section 3.4(j), Section 3.4(k), Section 3.4(l), Section 3.4(o) or Section 3.4(p), then (x) the Sellers shall reimburse the Purchaser for all of the Purchaser's reasonable documented third party or out-of-pocket fees and expenses (including reasonable documented attorneys' fees and disbursements) incurred in connection with the negotiation, execution and consummation of this Agreement and the transactions contemplated hereby in a maximum amount of $1,000,000 (exclusive of the Expense Amount) (the "Reimbursement Amount"), and (y) to the extent the Purchaser is not already entitled to disbursement of the Deposit pursuant to the immediately preceding sentence, the Purchaser shall be entitled to disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon). In the event this Agreement is terminated pursuant to Section 3.4(b), Section 3.4(e), Section 3.4(f), Section 3.4(g), Section 3.4(h), Section 3.4(l), or Section 3.4(p), if within six (6) months after the effective date of any such termination any Seller enters into a binding written definitive agreement with any Person, other than the Purchaser or its Controlling Affiliates, with respect to any Alternative Transaction, the Sellers shall pay the Break-Up Fee to the Purchaser as liquidated damages. In the event this Agreement is terminated pursuant to Section 3.4(a), the Purchaser shall be entitled to disbursement of the Deposit (including, for the avoidance of doubt, all interest and other earnings accrued and earned thereon) from the Escrow Account. The parties expressly agree and acknowledge that it would be extremely difficult or impracticable to ascertain the actual damages that would be incurred by the Purchaser in the event of a termination of this Agreement pursuant to the Sections of this Agreement referenced above in this Section 3.6(b) and that the return of the Deposit and the payment of the Break-Up Fee and the Reimbursement Amount, as and if applicable pursuant to this Section 3.6(b), represent the parties' reasonable estimate of the damages that would be incurred by the Purchaser in the event of any such termination of this Agreement. The parties further expressly agree and acknowledge that the right of the Purchaser to receive the Break-Up Fee and the Reimbursement Amount, and the obligation of the Sellers to pay the Break-Up Fee and the Reimbursement Amount, pursuant to this Section 3.6(b) shall be subject to the approval by the Bankruptcy Court, and the Purchaser shall be entitled to seek approval by the Bankruptcy Court of the payment by the Sellers of the Break-Up Fee and the Reimbursement Amount as an administrative expense under section 503 of the Bankruptcy Code (or other applicable Law) and the Sellers shall use their commercially reasonable efforts to support the Purchaser's request for such approval (including, without limitation, filing supporting affidavits, motions and pleadings on behalf of the Sellers, and providing testimony of the Sellers if reasonably requested by the Purchaser, and using commercially reasonable efforts to cause its advisors to file supporting affidavits, motions and pleadings and to provide testimony if reasonably requested by the

4

Purchaser), shall take such commercially reasonable actions reasonably requested by the Purchaser to facilitate the obtaining of such approval. If the payment by the Sellers of the Break-Up Fee and/or the Reimbursement Amount to the Purchaser is approved by the Bankruptcy Court, then, without limiting or prejudicing the Purchaser's rights under Section 12.10 (all of such rights being hereby reserved and unaffected by the terms of this Section 3.6(b) unless this Agreement is validly terminated in accordance with Section 3.4), the Purchaser's right to receive the Deposit and, if the Break-Up Fee and/or the Reimbursement Amount is approved by the Bankruptcy Court, the Break-Up Fee and/or the Reimbursement Amount (whichever is approved) pursuant to this Section 3.6(b) and, to the extent provided in Section 3.6(d), any Collection Costs, shall be the sole and exclusive remedy available to the Purchaser and its Affiliates against the Sellers and the other Seller Parties for any loss or damage suffered as a result of the failure of the transactions contemplated by this Agreement and/or the Ancillary Agreements to be consummated or for a breach or failure to perform under this Agreement or otherwise and upon payment of such amounts, none of the Seller Parties shall have any further Liability relating to or arising out of this Agreement or the transactions contemplated by this Agreement (all such further Liabilities being hereby fully waived, released and forever discharged). The parties expressly agree and acknowledge that the right of the Purchaser to receive a return of the Deposit and payment of the Break-Up Fee and the Reimbursement Amount as set forth in this Section 3.6(b) (and not the right of the Purchaser to seek approval from the Bankruptcy Court of such right), is actually necessary to preserve the value of the Sellers' estates."

(f)     The second sentence of Section 3.6(d) of the Purchase Agreement shall be amended and restated in its entirety to read as follows:

"In the event that this Agreement is terminated pursuant to Section 3.4 and the Sellers are required, pursuant to a final non-appealable order of the Bankruptcy Court, to pay to the Purchaser the Break-Up Fee and/or the Reimbursement Amount, then the Sellers shall pay such approved amount(s) to the Purchaser in cash, by wire transfer of immediately available funds to an account designated by the Purchaser, within two (2) Business Days following the effective date of any such termination; provided, however, that in the event that the Sellers are required to pay the Break-Up Fee pursuant to the third sentence of Section 3.6(b), the Sellers shall pay the Break-Up Fee within two (2) Business Days following the date any Seller enters into the binding written definitive agreement described in such third sentence of Section 3.6(b)."

(g)     Section 7.1(a) of the Purchase Agreement shall be amended and restated in its entirety to read as follows:

"(a)     No later than the close of business on the date that is one (1) Business Day following the Execution Date, the Sellers shall file with the Bankruptcy Court the Approval Motion.     To the extent approved by the Bankruptcy Court, the Break-Up Fee, the Reimbursement Amount, the Collection

5

Costs and the Expense Amount shall constitute allowed administrative claims against the Sellers' estates under section 503 of the Bankruptcy Code. The Sellers shall comply in all material respects with, and take no actions inconsistent with, all of the terms and conditions contained in the Approval Order (including, without limitation, the Bid Procedures and the Assumption and Assignment Procedures) including the occurrence of the events by the dates and the times set forth therein, all of which are expressly incorporated herein by reference."

(h)     Section 8.12 of the Purchase Agreement shall be amended and restated in its entirety to read as follows:

"8.12   Expenses.   If (x) this Agreement is terminated pursuant to Section 3.4 (other than a termination pursuant to Section 3.4(a), Section 3.4(b), Section 3.4(c), Section 3.4(m) or Section 3.4(n)) or (y) the Purchaser is the Second-Highest Bidder, the Purchaser shall be entitled to seek approval by the Bankruptcy Court of the payment by the Sellers, as an administrative expense under section 503 of the Bankruptcy Code (or other applicable Law), of an amount up to $1,750,000 (exclusive of the Reimbursement Amount) (the "Expense Amount") in respect of the reasonable documented fees and disbursements of the Purchaser's Counsel, in its capacity as counsel to the Purchaser and in its capacity as counsel to certain holders of the Senior Notes, incurred by the Purchaser or any of its Affiliates or any such holders of Senior Notes through (and including) the date on which the Bankruptcy Court enters the Bid Procedures Order in connection with (a) the negotiation, preparation, documentation, execution, delivery, implementation and/or consummation of this Agreement and the transactions contemplated hereby and (b) the restructuring of the Sellers and the negotiation, preparation, documentation, execution, delivery, implementation, filing and/or consummation of the Chapter 11 Cases and the Plan, the Disclosure Statement and all related agreements, pleadings, motions filings and documents. The Sellers shall use commercially reasonable efforts to support the Purchaser's request for such approval and shall take such commercially reasonable actions reasonably requested by the Purchaser to facilitate the obtaining of such approval (including, without limitation, filing supporting affidavits, motions and pleadings on behalf of the Sellers, and providing testimony of the Sellers if reasonably requested by the Purchaser, and using commercially reasonable efforts to cause its advisors to file supporting affidavits, motions and pleadings and to provide testimony if reasonably requested by the Purchaser). The Purchaser agrees that if the Closing occurs, the Purchaser shall, on the Closing Date, use cash that is a Purchased Asset to pay $500,000 of fees and disbursements of the Purchaser's Counsel, solely in its capacity as counsel to certain holders of the Senior Notes, that are incurred prior to the date the Bid Procedures Order is entered by the Bankruptcy Court in connection with such Purchaser's Counsel's representation of such holders in the Chapter 11 Cases."

(i)     Section 9.3(j) of the Purchase Agreement shall be amended and restated in its entirety to read as follows:

6

"(j)   on the Closing Date, the Sellers shall have an aggregate amount of cash on hand in an amount not less than $20,750,000 (excluding the RG Tube/RGCH Cash Amount and including the IRB Payoff Cash Amount), less the Expense Amount to the extent paid by the Sellers to the Purchaser on or prior to the Closing Date (other than a payment made by delivering the Purchased Assets to the Purchaser at the Closing); and"

(j)   The definition of "Base Net Working Capital Value" set forth in Section 10.1 of the Purchase Agreement shall be amended and restated in its entirety to read as follows:

""Base Net Working Capital Value" means $73,550,000, less the Expense Amount to the extent paid by the Sellers to the Purchaser on or prior to the Closing Date (other than a payment made by delivering the Purchased Assets to the Purchaser at the Closing)."

(k)   The definition of "Bid Procedures Order" set forth in Section 10.1 of the Purchase Agreement shall be amended and restated in its entirety to read as follows:

""Bid Procedures Order" means an order of the Bankruptcy Court in the form of Annex A attached to Amendment No. 1 to APA or such other form as the Purchaser may approve in its discretion as it relates to any of the Specified Matters."

(l)   Section 10.1 of the Purchase Agreement is amended by adding the following new defined term in appropriate alphabetical order:

""Amendment No. 1 to APA" means Waiver, Consent and Amendment No. 1 to Asset Purchase Agreement, dated as of March 26, 2010, by and among the Sellers and the Purchaser, as amended, supplemented, amended and restated or otherwise modified from time to time."

""Senior Notes" means RathGibson's 11.25% senior notes due 2014, as amended, supplemented, amended and restated, modified, increased, replaced, reissued or extended from time to time."

4.    Acknowledgment.   The Sellers understand, acknowledge and agree that the willingness of the Purchaser to (w) execute and deliver this Amendment, (x) grant the waiver set forth in Section 2(b) of this Amendment, (y) not terminate the Purchase Agreement on account of the Bid Procedures Order being unacceptable to the Purchaser as set forth in (and subject to the conditions set forth in) Section 2(b) of this Amendment and (z) proceed with the transactions contemplated by the Purchase Agreement on the terms set forth therein, is expressly conditioned upon, and being done in reliance upon, the right of the Purchaser to receive, a return of the Deposit and payment of the Break-Up Fee and the Reimbursement Amount as set forth in, and subject to the terms of, Section 3.6(b) of the Purchase Agreement, as amended by this Amendment.

5.    Effectiveness.   The waivers, consents, amendments and acknowledgments set forth in this Amendment shall become effective as of the Effective Date.

7

6.    Miscellaneous.

(a)    Except as expressly provided herein, this Amendment shall not, by implication or otherwise, alter, modify, amend or in any way affect any of the obligations, covenants or rights (including, without limitation, rights to terminate the Purchase Agreement) contained in the Purchase Agreement, all of which are ratified and confirmed in all respects by the Parties and shall continue in full force and effect.

(b)    Each reference to the Purchase Agreement hereafter made in any document, agreement, instrument, notice or communication shall mean and be a reference to the Purchase Agreement amended and modified hereby.

(c)    THIS AMENDMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

(d)    The Section captions herein are for convenience of reference only, do not constitute part of this Amendment and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(e)    This Amendment, together with the Purchase Agreement and the Ancillary Agreements, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings among the Parties with respect to such subject matter.

(f)    For the convenience of the Parties, this Amendment may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

(g)    If any term, condition or other provision of this Amendment is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Amendment shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any Party. Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Amendment so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

(h)    The words "include," includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless or whether such words or similar words actually appear). Any reference in this Amendment to gender shall include all genders, and words imparting the singular number only shall include the plural and

8

vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Amendment as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(i) The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Amendment and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

[Remainder of Page Intentionally Left Blank.]

9

IN WITNESS WHEREOF, each Party has caused this Amendment to be duly executed and delivered as of the date first above written.

**SELLERS:**

**RATHGIBSON, INC.**

By:
Name: Michael Schwartz
Title: President, CEO and COO

**GREENVILLE TUBE COMPANY**

By:
Name: Michael Schwartz
Title: President

**RG TUBE HOLDINGS LLC**

By:
Name: Michael Schwartz
Title: President and CEO

**RGCH HOLDINGS CORP.**

By:
Name: Michael Schwartz
Title: President and CEO

**PURCHASER:**

**RATHGIBSON ACQUISITION CO., LLC**

By: _____
Name:
Title:

## AMENDMENT NO. 2
## TO ASSET PURCHASE AGREEMENT

**AMENDMENT NO. 2 TO ASSET PURCHASE AGREEMENT** (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Amendment"), dated as of May 11, 2010 (the "Effective Date"), by and among (a)(i) RG Tube Holdings LLC, a Delaware limited liability company ("RG Tube"), (ii) RGCH Holdings Corp., a Delaware corporation ("RGCH"), (iii) RathGibson, Inc., a Delaware corporation ("RathGibson"), and (iv) Greenville Tube Company, a Delaware corporation ("Greenville" and, together with RG Tube, RGCH and RathGibson, each a "Seller" and, collectively, the "Sellers"), and (b) RathGibson Acquisition Co., LLC, a Delaware limited liability company (together with its successors and permitted assigns, the "Purchaser"). The Sellers and the Purchaser are sometimes referred to herein, each a "Party" and, collectively, the "Parties".

## W I T N E S S E T H:

WHEREAS, the Parties entered into an Asset Purchase Agreement, dated as of March 8, 2010 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Purchase Agreement");

WHEREAS, pursuant to Section 1.5(a) of the Purchase Agreement, the Purchaser has delivered to the Sellers a notice specifying certain Contracts to be included in, and certain Contracts to be excluded from, the Purchased Assets and the Excluded Assets (as applicable);

WHEREAS, pursuant to Section 1.5(a) of the Purchase Agreement, the Parties have agreed to make appropriate additions, deletions or other changes to any applicable Schedule to the Purchase Agreement to reflect additions or exclusions of Contracts from the Purchased Assets and the Excluded Assets (as applicable) made in accordance with Section 1.5(a) of the Purchase Agreement; and

WHEREAS, the Parties desire to amend the Purchase Agreement in accordance with Section 1.5(a) of the Purchase Agreement and in certain other respects as set forth herein.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein, the Parties hereby agree as follows:

1.      Defined Terms. Unless otherwise defined herein, terms used herein and defined in the Purchase Agreement are used herein as defined in the Purchase Agreement.

2.      Amendments. Each of the Parties hereby agrees that, effective upon the Effective Date, the Purchase Agreement shall be amended as follows:

(a)      Schedule 1.1(r) ("Assumed Plans") of the Purchase Agreement shall be amended and restated in its entirety to read as Schedule 1.1(r) attached hereto.

(b)      Schedule 1.5(a) ("Original Contract & Cure Schedule") of the Purchase Agreement shall be amended and restated in its entirety to read as Schedule 1.5(a) attached hereto.

(c)     Schedule 10.1(iii) ("Non-Assumed Contracts") of the Purchase Agreement shall be amended and restated in its entirety to read as <u>Schedule 10.1(iii)</u> attached hereto.

(d)     Section 1.3(m) of the Purchase Agreement shall be amended and restated in its entirety to read as follows:

"(i) subject to the terms of the Kaplan Release Agreement and only if the Conditions Precedent (as defined in the Kaplan Release Agreement) are satisfied in accordance with the terms of the Kaplan Release Agreement, all Liabilities for the payment of base salary pursuant to Section 2(c) of the Kaplan Separation Agreement, (ii) subject to the terms of the Pudelsky Release Agreement and only if the Conditions Precedent (as defined in the Pudelsky Release Agreement) are satisfied in accordance with the terms of the Pudelsky Release Agreement, all Liabilities for the payment of base salary pursuant to Section 2(c) of the Pudelsky Separation Agreement, (iii) subject to the terms of the Nuss Release Agreement and only if the Conditions Precedent (as defined in the Nuss Release Agreement) are satisfied in accordance with the terms of the Nuss Release Agreement, all Liabilities for the payment of base salary pursuant to Section 2(c) of the Nuss Separation Agreement, and (iv) subject to the terms of the Bernstein Release Agreement and only if the Conditions Precedent (as defined in the Bernstein Release Agreement) are satisfied in accordance with the terms of the Bernstein Release Agreement, all Liabilities for the payment of base salary pursuant to Section 2(b) of the Bernstein Separation Agreement (it is expressly understood and agreed by the Sellers and the Purchaser that the assumption by the Purchaser of Liabilities under the Kaplan Separation Agreement, the Pudelsky Separation Agreement, the Nuss Separation Agreement and the Bernstein Separation Agreement is governed solely by this <u>Section 1.3(m)</u> and no other clause, term or provision of this <u>Section 1.3</u> shall govern, describe, enlarge or otherwise affect the assumption by the Purchaser of Liabilities under the Kaplan Separation Agreement, the Pudelsky Separation Agreement, the Nuss Separation Agreement or the Bernstein Separation Agreement); and"

(e)     The definition of ""Release Agreement" or "Release Agreements"" set forth in Section 10.1 of the Purchase Agreement shall be amended and restated in its entirety to read as follows:

""<u>Release Agreement</u>" or "<u>Release Agreements</u>" means, individually or collectively, as applicable, the Kaplan Release Agreement, the Pudelsky Release Agreement, the Nuss Release Agreement and/or the Bernstein Release Agreement."

(f)     Section 10.1 of the Purchase Agreement is amended by adding the following new defined terms in the appropriate alphabetical order:

""<u>Bernstein Release Agreement</u>" means the Release Agreement, dated as of May 3, 2010, among the Purchaser, the Sellers and Matthew A. Bernstein, as amended, supplemented or otherwise modified from time to time."

2

""Bernstein Separation Agreement" means the Separation Agreement and General Release, dated as of April 6, 2009, between RathGibson and Matthew A. Bernstein, as amended, supplemented or otherwise modified from time to time."

""Nuss Release Agreement" means the Release Agreement, dated as of May 3, 2010, among the Purchaser, the Sellers and Barry Nuss, as amended, supplemented or otherwise modified from time to time."

""Nuss Separation Agreement" means the Separation Agreement and General Release, effective as of January 31, 2009, between the Sellers (other than Greenville) and Barry Nuss, as amended, supplemented or otherwise modified from time to time."

3. Effectiveness. The amendments set forth in this Amendment shall become effective as of the Effective Date.

4. Miscellaneous.

(a) Except as expressly provided herein, this Amendment shall not, by implication or otherwise, alter, modify, amend or in any way affect any of the obligations, covenants or rights (including, without limitation, rights to terminate the Purchase Agreement) contained in the Purchase Agreement, all of which are ratified and confirmed in all respects by the Parties and shall continue in full force and effect.

(b) Each reference to the Purchase Agreement hereafter made in any document, agreement, instrument, notice or communication shall mean and be a reference to the Purchase Agreement as amended and modified hereby.

(c) THIS AMENDMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

(d) The Section captions herein are for convenience of reference only, do not constitute part of this Amendment and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(e) This Amendment, together with the Purchase Agreement and the Ancillary Agreements, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings among the Parties with respect to such subject matter.

(f) For the convenience of the Parties, this Amendment may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart

3

being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

(g)     If any term, condition or other provision of this Amendment is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Amendment shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any Party. Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Amendment so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

(h)     The words "include," includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless or whether such words or similar words actually appear). Any reference in this Amendment to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Amendment as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(i)     The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Amendment and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

[Remainder of Page Intentionally Left Blank.]

4

IN WITNESS WHEREOF, each Party has caused this Amendment No. 2 to Asset Purchase Agreement to be duly executed and delivered as of the date first above written.

**SELLERS:**

**RATHGIBSON, INC.**

By:
Name:
Title:

**GREENVILLE TUBE COMPANY**

By:
Name:
Title:

**RG TUBE HOLDINGS LLC**

By:
Name:
Title:

**RGCH HOLDINGS CORP.**

By:
Name:
Title:

**PURCHASER:**

**RATHGIBSON ACQUISITION CO., LLC**

By: _____
Name:  John Foley
Title:  Authorized Person

## WAIVER AND CONSENT AGREEMENT

**WAIVER AND CONSENT AGREEMENT** (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement"), dated as of May 14, 2010 (the "Effective Date"), by and among (a)(i) RG Tube Holdings LLC, a Delaware limited liability company ("RG Tube"), (ii) RGCH Holdings Corp., a Delaware corporation ("RGCH"), (iii) RathGibson, Inc., a Delaware corporation ("RathGibson"), and (iv) Greenville Tube Company, a Delaware corporation ("Greenville" and, together with RG Tube, RGCH and RathGibson, each a "Seller" and, collectively, the "Sellers"), and (b) RathGibson Acquisition Co., LLC, a Delaware limited liability company (together with its successors and permitted assigns, the "Purchaser"). The Sellers and the Purchaser are sometimes referred to herein, each a "Party" and, collectively, the "Parties".

## W I T N E S S E T H:

WHEREAS, the Parties entered into an Asset Purchase Agreement, dated as of March 8, 2010 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Purchase Agreement");

WHEREAS, the Sellers have requested that the Purchaser grant certain waivers, consents and approvals under the Purchase Agreement; and

WHEREAS, the Purchaser is willing to grant such consents and waivers, as requested by the Sellers on the terms set forth herein.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein, the Parties hereby agree as follows:

1.      Defined Terms. Unless otherwise defined herein, terms used herein and defined in the Purchase Agreement are used herein as defined in the Purchase Agreement.

(a)      Waivers and Consents. Effective as of the Effective Date, the Purchaser hereby grants all waivers and consents that may be necessary or required under Section 8.1 of the Purchase Agreement: (a) to permit RathGibson to enter into a lease extension agreement with Gibson Industrial Park, L.L.C., extending for an additional five (5) years the term of that certain Lease Agreement, dated as of November 1, 1999, between Gibson Industrial Park, L.L.C. and RathGibson (f/k/a Gibson Tube, Inc.), as amended October 31, 2001 (as further amended, supplemented, amended and restated or otherwise modified from time to time, the "Lease"), pertaining to certain premises at 100 Aspen Hill Road, North Branch, New Jersey 08876 (as more particularly described in the Lease) and (b) to permit the Sellers to enter into (i) a settlement agreement (the "Settlement") with respect to the cancellation of Shell International Exploration & Production's Gumusut project and (ii) any agreements (including master supply agreements) and other documents contemplated by the Settlement, relating to purchases of subsea umbilical tubing (and related products) from the Sellers.

2.      Effectiveness. The waivers and consents set forth in this Agreement shall become effective as of the Effective Date.

3.    Miscellaneous.

(a)    Except as expressly provided herein, this Agreement shall not, by implication or otherwise, alter, modify, amend or in any way affect any of the obligations, covenants or rights (including, without limitation, rights to terminate the Purchase Agreement) contained in the Purchase Agreement, all of which are ratified and confirmed in all respects by the Parties and shall continue in full force and effect.

(b)    THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

(c)    The Section captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(d)    This Agreement, together with the Purchase Agreement and the Ancillary Agreements, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings among the Parties with respect to such subject matter.

(e)    For the convenience of the Parties, this Agreement may be executed and delivered (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

(f)    If any term, condition or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any Party. Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

(g)    The words "include," includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless or whether such words or similar words actually appear). Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(h)     The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

[Remainder of Page Intentionally Left Blank.]

IN WITNESS WHEREOF, each Party has caused this Agreement to be duly executed and delivered as of the date first above written.

**SELLERS:**

**RATHGIBSON, INC.**

By:

Name: Michael Schwartz
Title: President CEO and COO

**GREENVILLE TUBE COMPANY**

By:

Name: Michael Schwartz
Title: President

**RG TUBE HOLDINGS LLC**

By:

Name: Michael Schwartz
Title: President and CEO

**RGCH HOLDINGS CORP.**

By:

Name: Michael Schwartz
Title: President and CEO

**PURCHASER:**

**RATHGIBSON ACQUISITION CO., LLC**

By:
Name:
Title:   John E. Foley
         Authorized Signatory